**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| **SHAUNI KERKHOFF**, | ) ) ) |
| *Plaintiff*, | ) ) |
| v. | ) Civil Action No. _____ ) ) |
| **BLAZE MEDIA LLC**, a Delaware limited liability company; **STEPHEN M. BAKER**, an individual; **JOSEPH M. HANNEMAN**, an individual; and **VERITAS REGNAT LLC**, a Wisconsin limited liability company. | ) **JURY TRIAL DEMANDED** ) ) ) ) ) ) ) |
| *Defendants*. | ) |

**COMPLAINT & DEMAND FOR JURY TRIAL**

Plaintiff Shauni Kerkhoff, by and through undersigned counsel, brings the following

Complaint against Defendants Blaze Media LLC, Stephen M. Baker, Joseph M. Hanneman, and

Veritas Regnat LLC, and in support thereof states as follows:

**NATURE OF THE ACTION**

1.      Defendant Blaze Media, a multimedia firm and aspiring rival to Fox News, staked

its brand on a baseless conspiracy theory that the January 6, 2021 attack on the United States

Capitol was an "inside job" by Washington elites and federal law enforcement.  It hired two

reporters, Defendants Stephen Baker and Joseph Hanneman, to promote this theory full time.

Baker had stormed the Capitol on January 6.  He was prosecuted for his crimes, and he sought

vindication.  Hanneman was a veteran of conspiracist media, and he sought professional relevance.

Lacking any evidence to advance their claims, they seized on a genuine mystery.  The night before

the riot, surveillance cameras had captured a masked, hooded figure planting pipe bombs outside

of the Democratic and Republican National Committee headquarters in Washington, D.C.  The

FBI investigated the incident for years but failed to identify a suspect.  So, Defendants manufactured one.  They falsely accused Shauni Kerkhoff—a former Capitol Police Officer who defended the Capitol on January 6—of planting the bombs.

2.      In a November 8, 2025 article headlined "Former Capitol Police officer a forensic match for Jan. 6 pipe bomber, sources say," Defendants baselessly alleged that a "forensic gait analysis"—which they "arranged"—determined that Ms. Kerkhoff was an "up to 98% match" with the bombing suspect.  They implied Ms. Kerkhoff planted the bombs as a diversion to draw resources away from the Capitol so it would be quickly overwhelmed.  To Defendants, it did not matter that the claim was nonsensical.  (Ms. Kerkhoff did not attack or even neglect the Capitol; she defended it at great personal cost.)  And it did not matter that they lacked a shred of evidence. They simply made it up.



3.      In the Article, Defendants detailed the elaborate process by which they framed an innocent woman.  First, they engaged an anonymous "analyst" who used an undisclosed "software algorithm" to compare videos of Ms. Kerkhoff with grainy surveillance video of the pipe bomber

and, by some undisclosed digital alchemy, determined that Ms. Kerkhoff's gait and the pipe bomber's gait were a "94% match." Next, they "confirmed" this finding with another anonymous source who watched the videos and "personally pegged the match at closer to 98%." Third, they reported their "match" to sympathetic (and then-anonymous) "intelligence sources," inducing the FBI to place Ms. Kerkhoff under investigation. Finally, they published their Article—and, in an extraordinary feat of circular reasoning, presented the FBI's investigation as confirmation that their baseless claim was true.

4.      To Defendants, Ms. Kerkhoff was the perfect "suspect." They despised her for firing (less-than-lethal) projectiles at rioters on January 6 as a last-ditch effort to protect the Capitol, and they reviled her for bravely testifying against two January 6 defendants at trial. So, they set out to inflict maximum harm on her. Not only did they falsely accuse Ms. Kerkhoff of placing pipe bombs in the Nation's Capital, but they published her current job (campus security at the CIA), her age (31), the names of her parents (Brandt and Patricia), her mother's cause of death (pancreatic cancer), details about her alma mater (Temple University), her hobbies (Rubik's Cube), and her past accomplishments as a collegiate soccer player.

5.      Defendants succeeded in their mission to irreparably harm Ms. Kerkhoff. Because of Defendants' false allegations, the CIA placed Ms. Kerkhoff on administrative leave. FBI agents with bomb dogs ransacked her Alexandria, Virginia home, and reporters and January 6 obsessives descended in droves. A top Blaze Media editor even traveled to her house just to "observe" it. Commenters on X posted memes accusing Ms. Kerkhoff of planting the pipe bombs, and keyboard warriors threatened Ms. Kerkhoff for her role in supporting the "deep state"—including in posts on her mother's obituary webpage. For two weeks, Ms. Kerkhoff was forced to hide. She kept a loaded gun within arm's reach, terrified that a conspiracist would break in and harm her.

3

6.    Meanwhile, Defendants embarked on a victory tour.  They touted their Article as a "bombshell revelation."  Baker posted on X that it "might just be the biggest scandal and conspiracy in American history."  Hanneman posted: "SOLVED."  They amassed thousands of reposts, millions of views, and plaudits from X users whom Defendants encouraged, calling them "patriots."  The false allegations even reached the X pages of key Washington decision makers, including Trump administration officials and members of Congress.

7.    But Defendants' spurious claims eventually fell apart.  For one, Ms. Kerkhoff had an alibi.  She gave prosecutors and law enforcement evidence that on the evening of January 5, 2021, she was not planting pipe bombs around Washington, D.C. but rather was at home with her boyfriend, who was video-recording Bella, their greyhound, as they watched Bella twitch in her sleep.  Ms. Kerkhoff's voice was clear in the video: "I told you," Ms. Kerkhoff said, laughing, "You can see her neck vein sticking out, do you see it?":



8.    The CIA brought Ms. Kerkhoff back from administrative leave, and she returned to work.  Then, on December 4, 2025, the FBI announced that it had apprehended and charged a real suspect in the pipe bomber case: Brian J. Cole, Jr., who quickly confessed to the crimes.  The FBI and DOJ ruled Ms. Kerkhoff out as a suspect.  Even then-FBI Deputy Director Dan Bongino—

who had previously called the pipe bombing an "inside job"—called Defendants' reporting "grossly inaccurate," adding that it "serves only to mislead the public."[1]

9.    Still, Defendants refuse to retract their Article and have instead doubled-down on their defamation of Ms. Kerkhoff.  They did not retract the Article when they learned of Ms. Kerkhoff's alibi, or when the FBI cleared her as a suspect, or when CBS News reported that their false accusations and flawed investigation had "raised concerns" among top Trump administration officials.  Even after the FBI arrested Cole—nearly a month after Defendants published the Article—Blaze Media refused to apologize or admit that it was wrong.  Instead, it doubled-down on the Article by replacing it with a statement that further defamed Ms. Kerkhoff by asserting that its sources "continue[d] to stand by the information they provided" and that its "reporting adhered to professional journalistic standards."  Blaze Media thus encouraged conspiracy theories about Ms. Kerkhoff to continue to percolate.  Even now, conspiracists denigrate Ms. Kerkhoff in vitriolic podcasts and post her name and photographs on social media, alleging that the real suspect—not Ms. Kerkhoff—was falsely accused.  The fear that they will continue to leave harassing posts on her mother's online obituary has forced Ms. Kerkhoff to monitor it regularly.  And more.

10.    Worse still, Defendants Baker and Hanneman have repeatedly stated that they did not retract the false allegations at all.  They claimed "censorship" by Blaze Media—even though Blaze Media stood by, rather than retracted, their reporting—and founded a new media "platform," Defendant Veritas Regnat LLC, purely to continue to defame Ms. Kerkhoff.  They have even used

---

[1]    Dan    Bongino    (@FBIDDBongino),    X    (Nov,    12,    2025,    8:07    a.m.), https://x.com/FBIDDBongino/status/1988956947190616397.

their defamation to solicit donations from readers, earning thousands of dollars from their baseless accusations against Ms. Kerkhoff.

11.     Defendants knew that their allegations against Ms. Kerkhoff were false when they published them. But they did not care. They used their contrived, sensational narrative to elevate their brand because they knew it would attract the attention of their target audiences. And they manufactured or distorted facts to fit that narrative.

12.     Defendants made no secret of their animus toward Ms. Kerkhoff—in fact, they baselessly accused her of using "lethal force on protesters" days before they published their Article—and they knowingly abused a forensic science to falsely accuse her of being the pipe bomber. Defendants relied on undisclosed and/or facially unreliable sources, including a disgraced former FBI agent and a pseudonymous "video analyst" whose primary occupation appeared to be posting on X. Defendants never contacted any source that would challenge their preconceived narrative, including Ms. Kerkhoff herself, before they published heinous allegations against her. And long after their story was debunked, Defendants all dug in their heels. Blaze Media defended its sources and the reliability of Baker and Hanneman's flawed reporting, allowing the false accusation to spread unchecked; Baker and Hanneman capitalized on their false claims about Ms. Kerkhoff to crowd-source an entire new "platform," Veritas Regnat, after Blaze Media terminated them.

13.     Although Ms. Kerkhoff was ultimately exonerated, Defendants' false and defamatory accusations have irreparably changed her life. Before Defendants published their false accusations, Ms. Kerkhoff aspired to a lifetime career in public service. But Defendants' false accusations and the foreseeable (indeed, intended) fallout therefrom have made that virtually impossible. Records of the FBI's investigation will surface during future security clearance

reviews and her "Google footprint" will forever link her to the eve-of-January-6 pipe bombings. And Defendants have destroyed Ms. Kerkhoff's personal life and reputation. Ms. Kerkhoff has lost friends because of Defendants' false accusations, and she has become distrustful of strangers. She once proudly wore Temple University and Capitol Police t-shirts and hats around her neighborhood, but now she mostly hides those affiliations, rightly afraid that hostile actors who still believe Defendants' defamatory attacks will recognize and hurt her.

14.    Ms. Kerkhoff brings this lawsuit to correct the record, hold Defendants accountable, and reclaim her life.

**PARTIES**

15.    Plaintiff Shauni Kerkhoff ("Ms. Kerkhoff") is a citizen of the United States and the Commonwealth of Virginia who resides and is domiciled in Alexandria, Virginia. On January 6, 2021, Ms. Kerkhoff defended the U.S. Capitol as a Capitol Police Officer. Ms. Kerkhoff currently works for the Central Intelligence Agency ("CIA") at its headquarters in McLean (Langley), Virginia.

16.    Defendant Blaze Media LLC ("Blaze Media") is a limited liability company formed under the laws of Delaware that operates as a national news platform and multimedia brand; it maintains the website www.theblaze.com, as well as the media "products" Blaze News, BlazeTV, Blaze Live, Blaze Radio, and Blaze Podcasts. Blaze Media touts itself as "one of the nation's largest independent media companies" featuring "some of the biggest names in conservative media," and as "a media powerhouse, engaging over 64 million people each month through video, podcasts, radio, digital print, email newsletters, distributed publishing, and our highly engaged

social media channels."[2]  It produces the podcast The Glenn Beck Program, which is ranked as one of the top national radio talk programs in the United States and reaches millions of listeners nationwide.  Blaze Media is headquartered in Irving, Texas.  None of Blaze Media's members are domiciled in or are otherwise citizens of Virginia.

17.    Defendant Stephen M. Baker ("Baker") is a citizen of the United States and a citizen and domiciliary of the State of North Carolina who resides in Durham, North Carolina.  He is an "investigative journalist," who was an employee of Blaze Media until April 1, 2026 when he was terminated.  Until the time of his termination, Baker was an employee of Blaze Media acting within the scope of his employment.

18.    Defendant Joseph M. Hanneman ("Hanneman") is a citizen of the United States and a citizen and domiciliary of the State of Wisconsin who resides in Sun Prairie, Wisconsin.  He is an "investigative reporter" who was an employee of Blaze Media until, on information and belief, he resigned on or about April 3, 2026.  Until the time of his resignation, Hanneman was an employee of Blaze Media acting within the scope of his employment.

19.    Defendant Veritas Regnat LLC is a limited liability company formed under the laws of Wisconsin by Defendants Baker and Hanneman to operate their WordPress blog titled "Veritas Regnat" at www.veritasregnat.com.  In addition to operating the Veritas Regnat blog, Veritas Regnat LLC also received money via an online fundraising campaign that Baker and Hanneman organized to fund the blog.  Veritas Regnat is headquartered in Sun Prairie, Wisconsin.  None of Veritas Regnat LLC's members are domiciled in or are otherwise citizens of Virginia.

---

[2] *About Blaze Media*, Blaze Media, https://www.theblaze.com/about (last visited Apr. 8, 2026).

## JURISDICTION AND VENUE

20.    This Court has subject-matter jurisdiction over this action under 28 U.S.C. § 1332 because there exists complete diversity between Ms. Kerkhoff and Defendants and the amount in controversy exceeds $75,000, exclusive of interest and costs.

21.    This Court has personal jurisdiction over Defendants under Virginia's long-arm statute, Va. Code § 80.1-328.1(A)(1) and (A)(4), and the Due Process Clause of the U.S. Constitution because Ms. Kerkhoff's claims arise from Defendants transacting business in Virginia and from Defendants' causing tortious injury to Ms. Kerkhoff in Virginia by act or omission outside of Virginia (and inside Virginia) while Defendants regularly did or solicited business, engaged in other persistent course of conduct, or derived substantial revenue from goods used or consumed or services rendered in Virginia, and exercising jurisdiction over Defendants would not offend traditional notions of fair play and substantial justice:

(a)    Defendants deliberately targeted Ms. Kerkhoff—who they knew was (and is) a Virginia citizen, domiciliary, and resident—by publishing false and defamatory statements about her.  Defendants directed those false and defamatory statements at a Virginia audience:  Defendants' defamatory publications identified Ms. Kerkhoff, that she resides in Alexandria, Virginia and works in McLean, Virginia, and reported on events that took place in Virginia, including law enforcement surveillance of her residence in Virginia and prior FBI surveillance of other suspects residing in Virginia;

(b)    Defendants admitted that they purposefully availed themselves of the privileges of conducting activities in Virginia by traveling to Virginia to investigate Ms. Kerkhoff and others in Virginia:  Defendants reported, for example, that Blaze Media's "editor in chief Christopher Bedford was pulled over by local police after stopping to observe [Ms. Kerkhoff's] home,"[3] and they reported that Defendant Baker traveled to Falls Church,

---

[3] Steve Baker & Joseph M. Hanneman, *UPDATE: Former Capitol Police Officer a Forensic Match for Jan. 6 Pipe Bomber, Sources Say*, Blaze Media (Nov. 8, 2025), https://web.archive.org/web/20251113153216/https://www.theblaze.com/news/former-capitol-police-officer-a-forensic-match-for-jan-6-pipe-bomber-sources-say (archived Nov. 13, 2025).

Virginia to knock on the door of someone he suspected to be a "person of interest in the pipe-bomb case";[4]

(c)     Defendants injured Ms. Kerkhoff in Virginia—where she lives and works— through their conduct outside of Virginia:  Defendants' false and defamatory statements were directed at, received, and read by individuals in Virginia, and as a result, Ms. Kerkhoff has suffered irreparable harm in Virginia, including reputational harm, emotional distress, and loss of business and professional development opportunities in Virginia, and she has suffered threats and harassment directed at her in Virginia;

(d)     Defendants regularly do and/or solicit significant business in Virginia, engage in other persistent courses of conduct, and/or derive substantial revenue from goods sold, used, or consumed, or services rendered in Virginia, such that they have made minimum contacts with the state and have purposefully availed themselves of its laws:  For example, Defendants report on local Virginia political issues and attract Virginia audiences,[5] Defendants' publications are directed at and consumed by people in Virginia, and Blaze Media is registered to do business in Virginia with the Virginia State Corporation Commission;

(e)     Upon information and belief, a significant portion of Defendants' readers and followers are Virginia residents such that Defendants generate substantial revenue as a result of business transactions involving individuals residing in Virginia, including from posting Virginia-related content online and soliciting financial contributions.

22.     Venue is proper in this Court under 28 U.S.C. § 1391 because Defendants published their defamatory publications in this District, Ms. Kerkhoff suffered damage from Defendants' defamation in this District, and because Defendants are subject to personal jurisdiction in this District.

---

[4] *Id.*

[5] *See, e.g.*, Ben Cline, *The Truth Behind Democrats' Virginia Gerrymander*, The Blaze (Feb. 28, 2026), https://www.theblaze.com/columns/opinion/the-truth-behind-democrats-virginia-gerrymander; Cooper Williamson, *Virginia Lawmakers Send Sweeping Gun Control Bill to Democrat Governor Spanberger*, The Blaze (Mar. 10, 2026), https://www.theblaze.com/news/virginia-lawmakers-send-sweeping-gun-control-bill-to-democrat-governor-spanberger; Joseph MacKinnon, *Virginia Democrats Just Hit Their First Setback — and It Could Make a Difference in the Midterm Elections*, The Blaze (Jan. 28, 2026), https://www.theblaze.com/news/virginia-democrats-just-hit-their-first-setback-and-it-could-make-a-difference-in-the-midterm-elections.

## FACTUAL ALLEGATIONS

### Shauni Kerkhoff Lands Her Dream Job with the Capitol Police

23.     Long before Defendants' false accusations derailed Shauni Kerkhoff's life, she was an ordinary kid from Westerville, Ohio with impressive athletic talents.  She played club soccer as a child, and she was accepted to Temple University on a full scholarship.  There, she played for the Temple Owls' soccer team as a goalkeeper.

24.     In Ms. Kerkhoff's first year at Temple, she took a course on criminal justice and was inspired by her professor, who had been a career Homeland Security Investigations agent. Ms. Kerkhoff also believed her main purpose in life was to help people, and she thought a law enforcement career would be a good way to do that.  It would also enable her to remain physically active, and it would reward the soft skills that she had honed as a soccer player, such as discipline, teamwork, and quick decision-making under pressure.

25.     Ms. Kerkhoff majored in criminal justice and pursued an accelerated master's degree in it.  She decided early that she wanted a federal job, because it seemed stable, lucrative, and prestigious—and because her professor, with his impressive background and passion for the subject, encouraged her to do so.

26.     At Temple, Ms. Kerkhoff won scores of athletic and academic awards, including the Irving J. Leder and Beatrice Deglin Leder Award by the Temple University College of Liberal Arts, which recognized Ms. Kerkhoff for being in the top five percent of the class and for "demonstrating an affinity for community service and a love for humankind."  In 2015, the American Athletic Conference honored her as the Preseason Goalkeeper of the Year.

11

27.     In a 2015 game against the University of Pennsylvania, Ms. Kerkhoff collided with a midfielder and broke her tibia in half.[6]  Surgeons inserted a steel rod into Ms. Kerkhoff's leg to support the broken bone, and Ms. Kerkhoff was able to walk the following night.  About five months after the surgery, she was back on the field.  That spring, she ran the New Jersey Marathon. Her time was 3:49, placing her in the top 10 to 20% of female marathoners worldwide.

28.     For years, Ms. Kerkhoff's online presence was essentially limited to two publications:  a brief biography of her Temple soccer career on the school's athletics website in 2015[7] that described her height (5'7"), her injury, and her accolades; and an article in Temple's student newspaper that described the circumstances of her injury and her mother's caring support through her recovery.[8]

---

[6] Tom Reifsnyder, *Kerkhoff Injured in Owls First Loss*, Temple News (Sep. 15, 2015), https://temple-news.com/kerkhoff-injured-in-owls-first-loss.

[7] *Shauni Kerkhoff*, Temple University Athletics — Women's Soccer Roster (2015), https://owlsports.com/sports/womens-soccer/roster/shauni-kerkhoff/8078 (last visited Mar. 27, 2026).

[8] Tom Reifsnyder, *With New Outlook, Kerkhoff 'Grateful' for Broken Leg*, The Temple News (Nov. 17, 2015), https://temple-news.com/with-new-outlook-kerkhoff-grateful-for-broken-leg/.



**With new outlook, Kerkhoff 'grateful' for broken leg**

*Shauni Kerkhoff's season-ending injury led to her pursuing a post-graduation program for next year.*

🕐 17 November 2015   Tom Reifsnyder 📁 Soccer, Sports, Women's soccer

Senior goalkeeer Shauni Kerkhoff and her mother, Patti, share a hug on the sideline at Ambler Soccer Field during Temple's Senior Day win over the University of Houston Sunday, Oct. 25, 2015 | Tom Reifsnyder TTN

29.    The student newspaper article also described how Ms. Kerkhoff's injury affected her outlook and professional trajectory.  While she recovered, she decided to pursue Temple's ProRanger program, where she trained to become a law enforcement park ranger.  But the reality of low pay and isolation as a National Park Ranger did not appeal to her, so she switched gears. After she graduated from Temple (with a 4.0 GPA), she spent time working as a security guard, playing soccer for the semi-professional Columbus Eagles, running the Philadelphia Marathon (in 3 hours and 19 minutes), and seeking long-term employment.  Ms. Kerkhoff applied for positions with the Secret Service Uniform Division and the Capitol Police—the highest paid federal law enforcement agency at the time.  The Capitol Police accepted her first, so she took the job.

30.    On June 19, 2017, Ms. Kerkhoff began training as a Capitol Police Officer.  She completed the 12-week Uniformed Police Training Program at the Federal Law Enforcement Training Center and 12 weeks of Capitol Police-specific training at the United States Capitol Police Academy in Cheltenham, Maryland, followed by eight weeks of field training. Ms. Kerkhoff excelled.  She ranked second overall in her class of 19 officers, and she set a new

13

female record on a physical fitness test.  Between April 2018 and April 2019, she also ran three additional marathons, finishing the Boston Marathon with an elite time of 3 hours and 34 minutes.

31.    In March 2018, Ms. Kerkhoff began working as a Capitol Police Officer.  She was assigned to the Senate Division, the unit responsible for providing security for the Senate side of the Capitol complex.

32.    Around March 2019, Ms. Kerkhoff was assigned as Civil Disturbance Unit Instructor.  In this role, Ms. Kerkhoff was assigned to do crowd control and to teach officers to respond to "civil disturbances," which encompassed all demonstrations at the Capitol ranging from peaceful protests to full-on riots.  This began as a "collateral assignment"; in addition to her ordinary daily duties on the force, she also took weeklong trips to Cheltenham to train recruits in Civil Disturbance Unit tactics.  She specialized in "less-than-lethal" equipment, which encompasses batons as well as chemical and impact munitions and is designed to safely mitigate danger during protests.  She learned to use the "PepperBall launcher," a device resembling a paintball gun that fires plastic frangible projectiles containing a chemical agent powder called "PAVA," a capsaicinoid found in pepper plants similar to oleoresin capsicum ("OC"), the active ingredient in pepper spray.  Ms. Kerkhoff was trained according to PepperBall's specifications, which offers users of the launcher the ability to start with a low level of force application of PAVA chemical agent only (also known as area saturation); if suspect compliance is not gained with PAVA alone, then kinetic impact (also known as direct impact) pain compliance can be used.[9]

33.    From approximately 2019 to 2021, the Capitol Police detailed Ms. Kerkhoff out as a less-lethal grenadier to stand guard at weekend protests, including several Black Lives Matter

---

[9] When a PepperBall strikes a surface, it bursts, releasing a cloud of PAVA powder that causes intense burning in the eyes, nose, and throat, temporarily incapacitating the target.

protests against police brutality.  But those protests rarely, if ever, got out of hand.  Until January 6, 2021, Ms. Kerkhoff never used the PepperBall launcher outside of a training environment.

### An Unknown Suspect Plants Pipe Bombs
### Around Washington, D.C.

34.    On January 5, 2021, between 7:30 and 8:30 p.m., a then-unknown suspect planted two pipe bombs in central Washington, D.C.  He was dressed in a gray hooded sweatshirt, face mask, glasses, black gloves, and distinctive Nike Air Max Speed Turf sneakers.  Surveillance cameras recorded his movements through Capitol Hill.  At 7:54 p.m., he placed a pipe bomb near a park bench outside the Democratic National Committee headquarters.  At 8:16 p.m., he planted the second pipe bomb in an alley behind the Republican National Committee headquarters.  At 8:18 p.m., cameras recorded the suspect walking away—and then he vanished.

35.    Neither of the bombs exploded.  They were discovered in the early afternoon of January 6, as that day's riot at the Capitol gathered force.  The FBI spent five years investigating who planted them.  It initially offered a $50,000 reward for the suspect, then raised the reward to $100,000, then $500,000.  Still, the case remained unresolved.

36.    The evening of the attempted bombing, Ms. Kerkhoff was at home with her boyfriend, Daniel Dickert.[10]  Mr. Dickert took a cell phone video of their greyhound, Bella, twitching in her sleep, as if she was running.  "I told you," Ms. Kerkhoff says in the video, laughing.  "You can see her neck vein sticking out, do you see it?"  She had no way of knowing that this video would one day exonerate her of planting the bombs.

---

[10] Mr. Dickert is a member of the Capitol Police force, and he and Ms. Kerkhoff met while on duty.  Ms. Kerkhoff first met Mr. Dickert while on break.  At the time, Mr. Dickert was stationed at an out-of-the-way post.  Ms. Kerkhoff felt bad that no one would check-in on him, so she began to swing by regularly, standing guard so he could take short breaks.  They grew closer, and eventually, he asked her out to dinner.  That was their first date.  They quickly fell in love.

**Kerkhoff Defends the U.S. Capitol Building on January 6**

37.     After Joe Biden won the 2020 presidential election, supporters of then-President Donald Trump gathered in Washington, D.C. to protest what they considered a widespread conspiracy of electoral fraud.  The movement—which called itself "Stop the Steal"—drew together a coalition of right-wing groups.  On November 14, 2020, these groups converged in D.C. for the "Million MAGA March."  For Capitol Police, this was an "all-hands-on-deck" protest.  Civil Disturbance Unit officers formed police lines to separate the crowds.  But the protest was relatively peaceful.  About a month later, on December 12, 2020, a second Stop the Steal protest grew violent; clashes between the Proud Boys (a rightwing militia) and counterprotesters resulted in four people getting stabbed, and dozens arrested.  But that protest unfolded away from the Capitol, and D.C.'s Metropolitan Police, not the Capitol Police, were the primary responders.

38.     Capitol Police knew that protesters would return to Washington, D.C. on January 6: the day Congress was scheduled to certify the 2020 election results.  But they used the December 12 event as a baseline for their January 6 planning.  They knew that the protest might turn violent, but they vastly underestimated the threat.

39.     January 6, 2021 was another "all-hands-on-deck" event.  Ms. Kerkhoff reported to work at approximately 8:00 AM.  She was stationed on the building's "East Front," facing the Library of Congress, with her partner on the less-than-lethal team.

40.     Ms. Kerkhoff and her colleagues began the day on high alert.  They heard on the radio that Metropolitan Police had stopped some protesters around D.C. with guns, so they knew that some would be armed.  From about 11:00 a.m. to about 1:00 p.m., they watched the crowd at the Eastern Front grow increasingly rowdy.  But radio chatter from the West Front—on the other

16

side of the building, facing the Washington Monument—suggested the crowd there was far worse, pushing against the security line and assaulting officers.

41.    Meanwhile, President Trump was giving a speech on the Ellipse outside of the White House.  He finished the speech at around 1:00 p.m. by saying "We're going to the Capitol." Around that time, Ms. Kerkhoff received a radio call from officers on the West Front that, as new waves of rioters approached, the crowd had become extremely violent.  This was a "priority call," meaning Ms. Kerkhoff had to immediately rush over.

42.    Shortly after 1:00 p.m., Ms. Kerkhoff arrived at the West Front's "center stage" area, the semicircular landing in front of the Inaugural Stage, overlooking the crowd.  She reeled at the riot's size.  She heard a cacophony of flash bangs, people yelling, and heavy objects hitting officers' shields.  The crowd screamed at the officers, calling them "traitors" and demanding they step out of the way.  Below her was a huge, freshly constructed gallows and noose, where protesters and rioters chanted, "Hang Mike Pence."[11]  Most alarmingly, Ms. Kerkhoff saw that the crowd had breached a perimeter around the Inaugural Stage, a temporary stage that was under construction and intended for the president-elect to use in his upcoming inaugural speech.  The mob had ransacked the Inaugural Stage's construction site and armed itself with rebar spikes and wooden pallets.

43.    A small crowd broke through police lines and was assaulting officers. Ms. Kerkhoff was instructed to deploy less-than-lethal rounds.  Her unit was under-equipped for the size of the crowd; the force had only two PepperBall launchers, two FN-303 launchers (compressed-air launchers that can cause intense pain), and cannisters of pepper spray.

---

[11] Mr. Pence, as sitting Vice President, would preside over the Joint Session of Congress to certify the Electoral College count.  President Trump had pressured him to refuse to certify the election.

Ms. Kerkhoff was carrying one of the PepperBall launchers. After being given the command to launch less-than-lethal force by on-scene commanders, she began, as she was trained, to give verbal commands and warnings, and to launch PepperBalls for area saturation and direct impact in an effort to protect her fellow officers who were being assaulted by rioters and to prevent rioters from advancing on the Capitol.

44. At around 1:47 p.m., Ms. Kerkhoff noticed a man advancing up the Capitol stairs wearing a blue jacket and a military-style helmet. She later learned he was Guy Reffitt, a member of the Texas Three Percenters, a far-right anti-government militia. Reffitt arrived at the Capitol wearing a camera-equipped helmet and body armor and carrying zip-tie cuffs. He was also armed with a Smith & Wesson .40 caliber-handgun on his waist. He recorded himself stating: "We're all gonna drag them motherfuckers out kicking and screaming. I don't give a shit. I just want to see Pelosi's head hit every fucking stair on the way out. Fuck yeah. And Mitch McConnell, too. Fuck 'em all."

45. Reffitt advanced towards the Capitol carrying a megaphone, which he directed toward Ms. Kerkhoff. He shouted something furious that she could not comprehend. Ms. Kerkhoff commanded Reffitt to stop, and—per policy—warned him that she would have to use the PepperBall launcher. He did not comply. So, she began to escalate her response, as she had been trained to do. She aimed first at the ground to get the PAVA powder chemical airborne without striking him. He did not stop. She then shot slightly upwards, towards his chest. This had no effect—he appeared to be wearing either heavy clothing or body armor. She estimated she fired approximately 40 to 50 PepperBalls at him. Again, he just kept moving. Whenever he moved forward, the crowd advanced behind him. Other rioters seemed emboldened by his defiance and his ability to endure Ms. Kerkhoff's rounds.

18

46.    When PepperBalls proved ineffective, Ms. Kerkhoff's partner arrived with the FN-303. But even FN-303 rounds had no effect on Reffitt's advance. Finally, an officer retrieved a pepper spray cannister and deployed it directly at Reffitt's face. Reffitt finally buckled, though he continued to wave the crowd past him.

47.    By this time, Ms. Kerkhoff was positioned on the middle of a narrow staircase approximately four feet wide, with about two people abreast per stair. She was with a handful of fellow officers. Roughly 50 to 60 protesters were positioned on the staircase and rail, backed by thousands more. The sound was deafening—the officers couldn't hear their radios or hear each other speak. Rioters held up scaffolding tarp to protect themselves from less-than-lethal irritants. Ms. Kerkhoff shouted "PepperBall!" "Get back!" and "Stop!" repeatedly, as loud as she could. She fired more PepperBalls, attempting futilely to stop the mob's advance. The crowd pressed on, and Ms. Kerkhoff's unit was overwhelmed. Rioters pushed Ms. Kerkhoff's partner into a doorway. They pushed the gas mask off his face, sprayed him with mace, then put the mask back on his face and removed the filter, debilitating and temporarily blinding him.

48.    Ms. Kerkhoff noticed a man assaulting officers with a wooden construction pallet near the police line at the top of the stairs. She would later learn that this was Christopher Alberts, who had arrived at the Capitol wearing a body armor vest with metal plates and carrying a loaded 9mm pistol in a holster. He advanced up the stairs, shouting that the officers were "treasonous" and "communists." After breaching the police line, Alberts was among one of the first rioters in the area to reach the Upper West Terrace of the Capitol.

49.    Although Ms. Kerkhoff was armed with her service weapon, she did not seriously consider using it. She knew that the crowd was armed and violent, and that firing even one round could result in a shootout with untold casualties on both sides.

19

50.    Ms. Kerkhoff retreated.  She entered the Capitol Building's iconic Rotunda and found herself isolated and surrounded by the mob.  She attempted to pacify the rioters, asking them to leave, but none listened.

51.    Ms. Kerkhoff ran from office to office, responding to reports of an active shooter. She saw officers tending to an unconscious woman who had been passed through the door by rioters; she had been trampled, and she later died.  The hall was filled with CS gas (a chemical riot control agent often referred to as "tear gas"), and Ms. Kerkhoff was one of only a few officers with a gas mask.  She attempted to help fellow officers and rioters alike.  Officers placed a rioter at her feet who had been debilitated by OC spray, and Ms. Kerkhoff attempted to wash it from his eyes. She saw officers bleeding.  She was called to respond to protect a door against the mob trying to break through.  She felt completely powerless.  In her testimony, Ms. Kerkhoff likened the scene to a domestic war zone.

52.    Eventually, backup forces from multiple federal, state, and local law enforcement agencies arrived, and, by late afternoon, they managed to push the mob out of the Capitol.  At 8:00 p.m., Congress assembled to certify the vote.  Ms. Kerkhoff received a boxed lunch for dinner in the basement of the visitor center.  There, as she awaited dinner with her colleagues, one of them— Officer Brian Sicknick, who had been pepper sprayed by rioters—suffered two strokes and collapsed.  Fellow officers administered CPR and he was transported to the hospital, where he died the following day.

### Defendant Baker Storms the Capitol on January 6

53.    As Ms. Kerkhoff defended the Capitol, one of the men who would spearhead the defamatory campaign against her was storming it.

54.     Stephen Baker was a Raleigh, North Carolina musician who sang in a David Bowie tribute band.  During the COVID-era lockdowns, he could no longer support himself with music, so he started a libertarian-populist blog and podcast.  His motives for joining the January 6 protest were rooted in a nebulous rage against Washington elites.  Days before January 6, he wrote that he planned on joining "because the 'powers that be' on all sides of the political equation need to see WE THE PEOPLE in force, letting them know that WE ARE WATCHING. . . . WE are not going to lay down to any level of tyranny — whether it come from the right or the left, the Democrats or the GOP.[12]"  Baker also noted that he was "hoping to document on video anything 'special' that might happen," hinting that he expected the protest to spin out of control.

55.     Baker approached the Capitol with a group of rioters at around 1:10 p.m., near the freshly constructed gallows and noose, just as Ms. Kerkhoff's unit was being overwhelmed.  He recorded himself taunting members of Congress: "Look out your windows bitches, look what's coming."  At 1:19 p.m., Baker breached the restricted perimeter at the West Plaza—mere steps from where Ms. Kerkhoff was attempting to repel the crowd.  He pushed against police bicycle racks intended to serve as a police line, and he ignored repeated officer instructions to leave.  Baker breached the security perimeter and entered the Capitol through the broken Senate Wing Door.  He moved through the various chambers of the building—from the Crypt (a vaulted space beneath the Rotunda), up through the Rotunda, into Statuary Hall, and joined the mob pressing against the barricaded House Chamber doors, where members of Congress were sheltering inside.  Baker would later boast of reaching Speaker of the House Nancy Pelosi's office.

---

[12]     Steve     Baker,     *TPC     Newsletter*,     The     Pragmatic     Constitutionalist, https://mailchi.mp/a86c1bad67a8/tpc-newsletter.

56.     When Capitol Police officers deployed tear gas to disperse the crowd, Baker pushed through it toward a new police line.  He repeatedly taunted officers: "Are you going to use that [gun] on us?!"

57.     After approximately 37 minutes inside the building, Baker was escorted out through the Hall of Columns.  Standing on the East Front steps, Baker narrated on video: "I think that we may have just seen the true first shot in this war."

58.     Once the riot had dispersed, Baker gave an interview on the Washington, D.C. news station WUSA 9.  He expressed pride in breaching the Capitol.  "The only thing I regret is that I didn't like steal their computers because God knows what I could've found," he said.  He continued: "They got Pelosi's office and you know, it couldn't happen to a better deserving bitch." The newscaster asked Baker whether he approved of the day's events.  Baker replied: "I approve 100%."[13]  As the reporter played Baker's footage, he offered a caveat about Baker's journalistic objectivity.  He said: "Let me be crystal clear: Steve Baker, who shot this video inside the Rotunda, was part of the mob that penetrated the Capitol Building—an angry mob, hellbent on destruction and deviation from democracy[.]"[14]

### Ms. Kerkhoff Testifies Against January 6 Defendants— Making Her a Target

59.     Ms. Kerkhoff had virtually no time to process the events of January 6 before she was back in action.  In the months following the riot, Ms. Kerkhoff worked 16 hour days, trained National Guard troops in less-than-lethal equipment, and wrote updated policies for the use of less-than-lethal force—all while dealing with protests nearly every weekend.  Seeking better work-life

---

[13] *Eye-Witness Account from Inside the Capitol Riots*, WUSA9, YouTube (Jan. 7, 2021), https://www.youtube.com/watch?v=Gu4MEs2ANck.
[14] *Id.*

22

balance, she applied for a job at the Central Intelligence Agency. She was quickly hired, and she left the Capitol Police in good standing. In December 2022, Ms. Kerkhoff, as a previous member of the United States Capitol Police, was awarded the Congressional Gold Medal for defending the Capitol on January 6.

60.    Meanwhile, federal prosecutors developed cases against the rioters and charged more than 1,500 of them with crimes—including Baker.

61.    The first January 6 defendant to be tried was Guy Reffitt, and the first witness to testify in his trial was Ms. Kerkhoff. Ms. Kerkhoff described watching Reffitt encourage other rioters and her escalating attempts to subdue him using less-than-lethal methods. Prosecutors played a video for the Court of Reffitt describing Ms. Kerkhoff to other members of the Texas Three Percenters after the riot. Reffitt said he wished he had "shot the bitch" (*i.e.*, Ms. Kerkhoff) who had impacted him with less-than-lethal rounds.

62.    The jury convicted Reffitt, and Ms. Kerkhoff read a victim impact statement at his sentencing hearing. Following her statement, the judge thanked Ms. Kerkhoff for her service and called her a patriot; Reffitt's defense attorney agreed.

63.    Reffitt was sentenced to more than seven years in federal prison.

64.    In April 2023, Ms. Kerkhoff testified at the trial of Christopher Alberts, leading to his conviction on nine charges, including civil disorder and assaulting or impeding officers. Like Reffitt, he was sentenced to a lengthy prison term.

65.    Ms. Kerkhoff knew that testifying in Reffitt's trial carried some risk, and Ms. Kerkhoff addressed it in her victim impact statement:

> By testifying as a witness in this trial, I have become a target for the defendant's followers. My name is plastered all over the internet and will forever be associated with this case, the defendant ... and that terrible day. I worry about his followers coming to my house, targeting myself and my loved ones. My life and the lives of every officer on duty that day will forever be changed because of the defendant's actions and the actions of those he encouraged.

66. Fortunately, the harassment Ms. Kerkhoff feared did not immediately manifest. But, when she realized President-elect Trump was likely to pardon the January 6 defendants, that fear rose again. Out of an abundance of caution, to protect her identity and prevent rioters or their supporters from harassing her, Ms. Kerkhoff retained a personal data removal service provider to scan and remove private information from data brokers and "people search" websites, so that Reffitt and other like-minded defendants would not be able to locate her. Ms. Kerkhoff did not receive any threats or messages from rioters or their supporters—that is, not until Defendants published their false accusations.

**Blaze Media Hires Defendants Baker and Hanneman and,
Together, Defendants Promote a Conspiracy Theory That
the Pipe Bombing Was an "Inside Job"**

67. The riot and its aftermath exacerbated Baker's rage at what he perceived to be the "deep state" Washington "elite." The following week, Baker wrote on his now-deleted blog that he "could feel and relate to the heat, anger, and passion being directed at the occupants of that Capitol building." He continued: "They are liars. They are power mongers. They do not care about us, and put their own interests and prosperity above those of the American people."[15]

68. In the following months, Baker discovered that this rage—coupled with his firsthand experience of the riot—could bring him attention and even income. He sold his videos

---

[15] Steve Baker, *What I Saw on January 6th, 2021*, The Pragmatic Constitutionalist (Jan. 13, 2021), https://web.archive.org/web/20230218180307/https://thepragmaticconstitutionalist.com/web/the-pragmatic-constitutionalist/what-i-saw-on-january-6th-2021 (archived Feb. 18, 2023).

of the riot to The New York Times and HBO.[16]  And he began keeping a blog about his experience.

From the beginning, Baker maintained absolute confidence in a narrative about January 6 that

cleanly conformed to his notions of institutional corruption and repression.  That narrative also

conveniently absolved him of any blame.

69.     For example, in a February 24, 2021 post, Baker wrote that he had "come to some

conclusions—or at least a working theory—about the who, the how, and the why of what took

place on Capitol Hill that day."  He wrote that the riot was an attempt by "the occupying elites of

that federal building" to "capture[] an unprecedented amount of political territory in their

escalating war against the 1st and 2nd Amendments."  To do so, he wrote, they deluded "a couple

hundred radical suckers" into being "useful idiots" to stage the riot in their campaign to amass

more power.[17]

70.     In November 2021, federal prosecutors charged Baker for his participation in the

riot.  But he remained unrepentant.  He self-published a "press release" defending his "non-violent,

non-participatory coverage of the events in DC January 6th."[18]  The narrative Baker presented in

his "press release" regarding his actions on January 6 stood in stark contrast to the statements he

made on the videos he recorded that day.

---

[16] Michael Kunzelman, *Writer for Conservative Media Outlet Surrenders to Face Capitol Riot Charges*, Associated Press (Mar. 1, 2024), https://apnews.com/article/steve-baker-blaze-news-capitol-riot-88004e2ce919d39cc84e1b2922840fc2.

[17] Steve Baker, *February 2021 Blogs*, The Pragmatic Constitutionalist (Feb. 2021), https://web.archive.org/web/20230218180307/https://thepragmaticconstitutionalist.com/web/the-pragmatic-constitutionalist/february-2021-blogs (archived Feb. 18, 2023).

[18] Steve Baker, *Press Release Regarding TPC's Upcoming Prosecution*, The Pragmatic Constitutionalist, Locals.com (Nov. 22, 2021), https://thepragmaticconstitutionalist.locals.com/post/1331483/press-release-regarding-tpcs-upcoming-prosecution.

71. All the while, Baker continued advancing his conspiracy theory that the riot was an inside job. Baker's narrative about January 6 caught the attention of Defendant Blaze Media. Blaze Media was attracted to Baker's ideas and his growing audience, and it hired him as a contributor in 2023.

72. On March 1, 2024, Baker surrendered to police to face charges for his crimes on January 6. Blaze Media broadcast it, publishing updates throughout the day.[19]

73. That summer, Blaze Media hired Wisconsin-based journalist Joseph Hanneman as an "investigative reporter." Hanneman, unlike Baker, had a decades-long career in traditional journalism at the Wisconsin State Journal, the Journal Times of Racine, Wisconsin, and most recently, the right-leaning newspaper Epoch Times, where he wrote almost exclusively about January 6.

74. Hanneman's most substantial work at the Epoch Times was a documentary titled "The Real Story of Jan. 6," which laid an early foundation for his later attacks on Ms. Kerkhoff. The documentary presented several interlocking narratives: that the riot was a justified expression of grievance for the theft of the 2020 election; that it was an "inside job" that the "deep state" orchestrated to reap political benefits; and that Capitol Police officers bore responsibility for the riot by brutalizing rioters with less-than-lethal rounds.

75. The documentary featured an interview with Kash Patel, a high-ranking official in Trump's first term who, during Biden's presidency, hosted an Epoch Times podcast. In the interview, Patel blamed the Capitol Police for refusing National Guard assistance in the days

---

[19] Dave Urbanski, *Blaze News Investigative Writer Steve Baker — Who's Been Reporting on January 6 — Handcuffed, Charged*, Blaze News (Mar. 1, 2024), https://www.theblaze.com/news/blaze-news-investigative-writer-steve-baker-whos-been-reporting-on-january-6-handcuffed-charged.

preceding the riot, suggesting that it intentionally left the Capitol vulnerable to attack. The interviewer concluded that "a comprehensive review of evidence suggests that Capitol Police officers flagrantly violated the law in their handling of January 6. Many of them should face criminal charges."

76.    In another segment, Hanneman himself castigated what he deemed Capitol Police "provocation" of the rioters, including the use of "explosive munitions" against a crowd that was "pretty much just milling there." As he spoke, the documentary showed footage of Capitol Police officers at the West Front launching less than lethal rounds into the mob. Several of the officers wore face coverings, but one did not, and her face was fully visible. It was Ms. Kerkhoff:



77.    Baker contributed video footage to the documentary, and he interviewed Hanneman on his own podcast after the documentary's release.[20]

78.    Baker and Hanneman's "inside job" theory was entirely baseless. Yearslong investigations by the House Select Committee and federal prosecutors have not produced evidence that *any* Capitol Police officer perpetrated or in any way abetted the riot. Conversely, federal

---

[20] Steve Baker, *Steve Interviews Epoch Times' J6 Lead Reporter, Joe Hanneman*, The Pragmatic Constitutionalist (July 31, 2022), https://thepragmaticconstitutionalist.locals.com/post/2505231/steve-interviews-epoch-times-j6-lead-reporter-joe-hanneman.

investigations have documented that approximately 140 Capitol and Metropolitan police officers were assaulted by rioters.

79.    Baker and Hanneman quickly became reporting partners.  In coming years, they published over 105 articles—and hundreds, perhaps thousands of social media posts—predicated on the theory that January 6 was an inside job.  And as their theory developed, they began to focus on the attempted pipe bombing, purporting that the bomber's identity would prove their theories right.

80.    Baker and Hanneman's claims were egregiously false and obviously contrived.  For example, they claimed certain publicly released surveillance videos excluded material that existed on other publicly released surveillance videos.  To Baker and Hanneman, this was evidence of intentional concealment.  The pipe bombs were not particularly well hidden but went undetected for 17 hours.  To Baker and Hanneman, this was evidence that the discovery was pre-planned.  The bombs were haphazardly constructed.  To Baker and Hanneman, this was evidence that they were not intended to explode.

81.    Baker and Hanneman treated the ***absence*** of evidence—missing surveillance footage, minor inconsistencies in timelines, details they believed to be missing from official reports—as ***affirmative*** evidence of a conspiracy.  They treated normal, if suboptimal institutional behavior—for example, under-preparedness in an unprecedented crisis—as evidence of premeditation. Their theories contained glaring contradictions that they did not address, much less reconcile.  For example, Baker criticized frontline Capitol Police officers for failing to draw their service weapons on January 6, suggesting that the officers intentionally allowed the riot to grow

28

in force.[21]    But he also accused them of unjustly victimizing—or in Hanneman's view, intentionally agitating—rioters by deploying less-than-lethal force.[22]



82.    Baker and Hanneman relied exclusively and enthusiastically on sources that confirmed their narrative (no matter how facially biased or unqualified), and they ignored or attacked sources that contradicted them.

83.    For example, they extensively quoted Kyle Seraphin, a disgraced former FBI special agent whose security clearance was suspended in 2023 for his violation of "numerous FBI rules and regulations," his "routine use of derogatory, racist, sexist, and/or homophobic language," and his unauthorized release of "sensitive government information."[23]    Seraphin became a conservative podcaster who devoted his entire online presence to denigrating the FBI.  He broadcast wild conspiracy theories as an on-air guest of Alex Jones, a media personality best-known for the $1.4 billion defamation judgment against him for defaming victims of the Sandy Hook shooting.  He baselessly accused current FBI director Kash Patel's girlfriend of being a "honeypot" and a "former Mossad agent," and in August 2025, she sued him for defamation.

---

[21]    Steve    Baker    (@SteveBakerUSA),    X    (May    20,    2021,    at    12:56    PM), https://x.com/SteveBakerUSA/status/139542319952181657.
[22]    Steve    Baker    (@SteveBakerUSA),    X    (Sep.    26,    2025,    at    2:45    PM), https://x.com/SteveBakerUSA/status/1971647446163116143.
[23] Ryan J. Reilly, *The Conservative Ex-FBI Agents Who Have Kash Patel's Ear*, NBC News (Jan. 30,    2025),    https://www.nbcnews.com/politics/justice-department/conservative-ex-fbi-agents-kash-patels-ear-rcna189611.

84.     Baker and Hanneman also leaned heavily on a pseudonymous self-proclaimed "video sleuth" who prolifically posted January 6 "inside job" claims on X under the name "Armitas," and whose profile picture was taken from a 1998 Japanese role-playing video game.[24]

85.     This reliance contributed to extreme journalistic errors.  For example, on August 26, 2024, Baker published a report alleging that the "suspected bomber" interacted with a Capitol Police vehicle right before planting the bomb outside of the RNC—implying that the Capitol Police at minimum turned a blind eye to the attempted bombing.[25]  He claimed that the "footage was discovered by social media user 'Armitas' (@accabbat on X), who provided it exclusively to Blaze News."

86.     But the claim quickly fell apart.  After publication, Blaze Media published an "Editor's Note" admitting that the "suspected bomber" was not the bomber at all, but a person "unrelated to the bombing case."  Blaze Media did not retract the story, and the overall sweep of Baker and Hanneman's reporting did not change.

### Defendants Lay the Foundation for Their Forthcoming Defamatory Attack on Ms. Kerkhoff

87.     Defendants' spurious reporting on the pipe bomber did not end there.  In early autumn 2025, Defendants decided to falsely accuse Ms. Kerkhoff of planting the pipe bombs.

88.     On November 4, 2025, Blaze Media published an article by Baker and Hanneman headlined, "Capitol Police repeatedly used lethal force on protesters early on Jan. 6, video

---

[24] Will Sommer, *The Blaze's Pipe-Bomb Bombshell Appears to Bomb*, The Bulwark (Nov. 10, 2025), https://www.thebulwark.com/p/the-blaze-right-wing-media-pipe-bomb-january-6th.

[25] Steve Baker & Joseph M. Hanneman, *Suspect Was Across the Street from Capitol Police Squad Car While Walking to Jan. 5 Bomb Drop, Video Shows*, The Blaze (Aug. 26, 2024), *as corrected*, https://www.theblaze.com/news/capitol-police-interacted-with-suspect-during-jan-5-pipe-bomb-drop-video-shows.

shows."[26] (the "November 4 Article"). Consistent with Baker and Hanneman's prior theories that federal law enforcement was responsible for the January 6 riots, the November 4 Article relied on the false premise that Capitol Police Officers' reaction to violent protestors charging the U.S. Capitol on January 6, 2021 "le[d] to a large escalation of violence toward police"—and not the other way around.

89. Blaming Capitol Police for the violent actions of the January 6 rioters was yet another way for Defendants to falsely insist the January 6 attack on the Capitol was an inside job by the "deep state" to discredit the far right. Throughout the November 4 Article, Defendants invoked the same false narrative introduced in Hanneman's documentary: that Capitol Police officers "repeatedly used lethal force on the crowd" and were "criminally negligent."

90. But the November 4 Article served a second—then-secret—purpose, central to their plan to falsely accuse Ms. Kerkhoff of being the pipe bomber. Baker and Hanneman made Ms. Kerkhoff, and her actions in defending the Capitol on January 6, a central component of their false narrative. Thus, the November 4 Article was a "breadcrumb" (as Baker would later refer to it) for Defendants' impending accusations of Ms. Kerkhoff.

91. The November 4 Article revealed the primary reason for Defendants' vendetta against Ms. Kerkhoff: her testimony in the Guy Reffitt trial. Throughout the Article, Defendants selectively quoted from Ms. Kerkhoff's trial testimony to give the false impression that she admitted to using improper force on January 6, misleadingly reporting that Ms. Kerkhoff "told a jury that she fired pepper balls at Reffitt as he scaled the Northwest Steps. When that didn't stop

---

[26] Steve Baker & Joseph M. Hanneman, *Capitol Police Repeatedly Used Lethal Force on Protesters Early on Jan. 6, Video Shows*, The Blaze (Nov. 4, 2025), https://www.theblaze.com/news/capitol-police-repeatedly-used-lethal-force-on-protesters-early-on-jan-6-video-shows.

Reffitt, she said, another officer fired at Reffitt with the FN 303 launcher." (This was not an improper use of force, and Ms. Kerkhoff admitted no such thing; she and other officers escalated their response to Reffitt's advance exactly as they were trained.)

92. The November 4 Article further falsely implied that Ms. Kerkhoff trained other Capitol Police officers to use improper force, stating: "One of the Capitol Police officers whom video showed firing on the crowd with a Tippmann 98 pepper-ball rifle was Shauni Kerkhoff, a certified trainer on the proper use of crowd-control weapons. Pepper balls struck protesters in the early crowd in the head and face." Defendants underscored this false narrative by including a photo of Ms. Kerkhoff training National Guard members:



U.S. Capitol Police Officer Shauni Kerkhoff shows a rubber bullet to soldiers of the Maryland Army National Guard's 115th Military Police Battalion, Salisbury, Md., during a joint training event in Washington, D.C., on Jan. 27, 2021.

93. At the time, Defendants' November 4 reporting on Capitol Police less-than-lethal force, and particularly their focus on Ms. Kerkhoff (and not any one of the other approximately dozen members of the Civil Disturbance Unit or hundreds of other Capitol Police officers who defended the Capitol on January 6), seemed inexplicable and out of the blue. No newsworthy event preceded the November 4 Article, and no significant anniversary occurred or was impending near it.

94.     But Defendants foreshadowed their real intent in publishing the November 4 Article when they cited an anonymous source to suggest Ms. Kerkhoff left Capitol Police under suspicious circumstances: "The former Civil Disturbance Unit officer told Blaze News that Kerkhoff left the U.S. Capitol Police about six months after Jan. 6 and that he had since been unable to reach her. Her colleagues heard she went to work for a three-letter federal intelligence agency, he said. 'She immediately wiped her social media, phone numbers, and email accounts,' he said. 'Nobody was able to reach her after that.'"  Because Baker and Hanneman had previously (and repeatedly) framed their "inside job" narrative as a vast inter-agency conspiracy, a post-January 6 career move from the Capitol Police to the CIA was sure to raise their readers' red flags.

95.     Neither Baker, Hanneman, nor anyone else at Blaze Media ever contacted Ms. Kerkhoff for comment before publishing the November 4 Article.

96.     That the November 4 Article served as the first link of the narrative chain for their false accusations against Ms. Kerkhoff was confirmed by how Baker promoted it.  For instance, in an X post linking the November 4 Article, Baker highlighted the same foreshadowing language that concluded the Article: "'*Less lethal' instructor Kerkhoff left @CapitolPolice about 6 months after J6.* Her colleagues heard she went to work for a 3-letter federal intel agency. 'She immediately wiped her social media, phone numbers, and email accounts.'"  He then teased, "*more to follow* …"[27]  The next day, Baker shared the November 4 Article to X again, cautioning his followers: "*This is a story you might want to bookmark*. Part two is going to change everything."[28]

---

[27]    Steve    Baker    (@SteveBakerUSA),    X    (Nov.    4,    2025,    at    12:19    PM), https://x.com/SteveBakerUSA/status/1985758892966793366.

[28]    Steve    Baker    (@SteveBakerUSA),    X    (Nov.    4,    2025,    at    7:14    PM), https://x.com/SteveBakerUSA/status/1985863211808104785.

97.     Defendants' social media promotion of the November 4 Article was strategic and intentional.  By cryptically teasing future posts ("*more to follow…*") and using dramatic language ("part two" of their reporting would "*change everything*"), Defendants hooked their followers' attention and built momentum for the virality of their false claims.

**Defendants Publish and Broadcast Their
First Reports Falsely Accusing Ms. Kerkhoff
of Planting Pipe Bombs**

98.     Defendants broadcast and published "part two" the next day.  On November 5, 2025, Baker appeared on an episode of Blaze Media's Glenn Beck Program (the "November 5 Podcast"). [29]   The same day, Blaze Media published an article by Joseph MacKinnon headlined, "'She's one of us!' Steve Baker stuns Glen Beck with bombshell revelation about J6 pipe-bomb suspect" (the "November 5 Article").[30]  The November 5 Article summarized Baker's November 5 Podcast appearance and republished Baker's comments. [31]

99.     In the November 5 Article, Blaze Media claimed that, after "spend[ing] years working to identify the masked individual who placed pipe bombs" on January 5, 2021, Baker and Hanneman "finally locked in on a suspect."

---

[29] *Why Mamdani's Victory Was Bad, but Virginia's Was WORSE*, The Glenn Beck Program (iHeart, Nov. 5, 2025), https://www.iheart.com/content/2025-11-05-175-the-glenn-beck-program-why-mamdanis-victory-was-bad-but-virginias-was-w/; *The Glenn Beck Program*, Blaze Media Podcasts, https://www.theblaze.com/podcasts/the-glenn-beck-program.

[30] Steve Baker & Joseph M. Hanneman, *'She's One of Us!' Steve Baker Stuns Glenn Beck with Bombshell Revelation About J6 Pipe-Bomb Suspect*, Blaze Media (Nov. 5, 2025), https://web.archive.org/web/20251105225145/https://www.theblaze.com/news/shes-one-of-us-steve-baker-stuns-glenn-beck-with-bombshell-revelation-about-j6-pipe-bomb-suspect   (archived Nov. 5, 2025).

[31] The Glenn Beck Program publishes its episodes to Blaze Media's website, YouTube, Spotify, Apple Podcasts, and other listening platforms.  It is also syndicated to hundreds of radio stations across the United States, including both AM and FM stations.  The Glenn Beck Program's YouTube channel has over 1.7 million subscribers, and radio industry data ranks it among the topmost listened "news" programs in the country.

100.    Consistent with Defendants' theory that the January 6 attack on the Capitol was an inside job by deep-state law enforcement—and that the pipe bombs served to distract or divert resources from the Capitol to further incite violence there—the November 5 Article claimed that "the suspect's imminent identification will implicate and shame at least one federal agency."

101.    In both the November 5 Article and Podcast, Defendants called back to their prior reporting to indicate that the target of their "investigation" was a Capitol Police employee.  The November 5 Article cited Blaze Media's prior reporting that FBI-released footage of the pipe bomber suspect "contained footage edited to exclude showing a U.S. Capitol Police SUV pull up directly across the street from where the suspect stood[.]"  Likewise, on the November 5 Podcast, Glenn Beck claimed that Defendants' November 4 Article "about the Capitol Police on January 6" "led Steve Baker to see some things and go, wait a minute [a]nd … start[] connecting some dots[.]"  He then stated, "Steve's … lead suspect is at the highest levels of government."  Baker explained the "genesis" of his claims went "back … into examining the various players at Capitol Police[.]"  Baker told Beck that "Joe Hanneman and myself, what we did is we started drilling down into identifying who these officers were," referring to Ms. Kerkhoff's unit.  He then confirmed that this identification led him to "pull[] a thread."  And, according to Baker, when he took his "investigation" to a "federal" source, they remarked, "She's one of us!"  This statement—which also served as the headline for the November 5 Article—indicated two things to Blaze Media's audience: first, that the target of their reporting was a woman, and second, that she was a member of federal law enforcement.

102.    To lend a facade of legitimacy to their accusations, Defendants previewed for the first time their gross abuse of a forensic science—"gait analysis"—to identify the target of their reporting.

35

103.    Baker specifically represented that "gait analysis" allowed him to identify a suspect with "much higher" than "94% accuracy"—previewing his forthcoming allegation that Ms. Kerkhoff and the pipe bomber were an "up to 98% match."  But gait analysis is simply incapable of reaching such a result, and Defendants knew it from their own research.

104.    In the November 5 Article, Blaze Media linked to two research articles regarding gait analysis: one published by PeerJ Computer Science,[32] and one published by the American Bar Association.[33]  Blaze Media intentionally misrepresented these research articles' findings to grossly exaggerate the reliability of gait analysis as a method of suspect identification.

105.    According to the November 5 Article, the PeerJ Computer Science article supported the notion that gait analysis "is regarded as one of the most sophisticated approaches to identifying an individual from CCTV footage or video recordings and as especially valuable in the absence of other biometric identifiers."  But, actually, the PeerJ Computer Science article's introduction described gait analysis as "one of the ***most complicated*** and sophisticated approaches."  Defendants purposefully omitted this full description from their Article—as well as the research article's description of what, exactly, makes gait analysis so "complicated"—to misleadingly enhance both the reliability and capability of gait analysis.

106.    The PeerJ Computer Science article also summarized the gait analysis's limitations.  It expressly addressed "***the potential for misidentification***" posed by gait analysis.  It warned that "it's ***essential*** to use gait analysis ***in conjunction with other evidence*** and investigative techniques

---

[32] Sai Tun Yein Aung & Worapan Kusakunniran, *A Comprehensive Review of Gait Analysis Using Deep Learning Approaches in Criminal Investigation*, 10 PeerJ Computer Science e2456 (2024), https://doi.org/10.7717/peerj-cs.2456.
[33] Michael Nirenberg, *Gait: How Video of a Criminal Can Acquit or Convict*, Crim. Just., https://www.americanbar.org/groups/criminal_justice/resources/magazine/archive/gait-how-video-criminal-can-acquit-or-convict/ (Apr. 19, 2023).

to ensure accurate identification[,]" and "[i]t is ***crucial*** that gait analysis from surveillance footage ***is only one component*** of the whole investigation." Finally, the research article noted that there is an "absence of a consensus standard or protocol" surrounding the "methodology behind likelihood calculations" like those stated by Baker.

107. If Defendants had disclosed any of these caveats in their November 5 Article, their readers would have understood that gait analysis cannot reach the type of conclusions that Baker insisted his own analysis had yielded. So, Defendants did not disclose them.

108. Blaze Media also misrepresented and selectively quoted from the American Bar Association article. Blaze Media insisted that the article supported Defendants' claim that gait analysis "has been used to help secure criminal convictions throughout the Anglosphere for decades." But Blaze Media selectively omitted the American Bar Association's disclosure that expert forensic gait analysis has "not been used at trial in America."

109. Furthermore, by the November 5 Article's own admission, gait analysis has only been used as ***corroborating*** evidence. The American Bar Association article makes clear that gait analysis, standing alone, is scientifically and legally insufficient to identify a suspect. But Defendants purposefully omitted language from the article that confirms this is the case: "***[P]recise individualization of a person's gait has yet to be scientifically proved***"; "Gait analysis has limitations, beginning with the fact that this analysis is considered as corroborative evidence because ***it does not confirm the identity of the suspect***"; and ***"[G]ait analysis is not a positive identification, which the scientific community readily admits***."

110. Yet, "precise individualization," "confirm[ation of] the identity of the suspect," and a "positive identification"—with near-absolute (94-98%) certainty—is exactly the conclusion Defendants represented their "analysis" yielded.

111.    Defendants linked to these research articles to lend credence to their investigation and conclusions—counting on the fact that their readers would not actually read them to discover the facts for themselves.

112.    Both the November 5 Article and Podcast gratuitously promoted the significance of Defendants' reporting and quality of Defendants' investigation.  Glenn Beck boasted, "This is one of the biggest stories – I think it is the biggest scandals of my lifetime, maybe in the last 100 years.  It is monstruous."  He stated Baker's investigation was "Pulitzer Prize winning stuff."

113.    Defendants further bolstered the credibility of their investigation by stating their conclusions triggered "national security-related briefings."   In the November 5 Article and Podcast, Defendants claimed that they would release the "suspect's name … after the relevant agencies have battened down the hatches."   This would prove to be a key (manufactured) component of their attempt to (only) facially bolster their false claims.

114.    The November 5 Podcast also drew direct connections between the November 4 Article, the November 5 Article, and forthcoming reporting by Baker.  Glenn Beck stated the November 4 Article was "connected to the next one"; Steve Baker stated that "for our next story," he "put some breadcrumbs in [the November 4 Article] on purpose."

115.    It did not take long for Blaze Media's readers to put together which "breadcrumbs" Baker was referring to.  Within hours, X users began to identify Ms. Kerkhoff, some directly referencing Defendants' November 4 Article and quoting the November 5 Podcast and Article:[34]

---

[34]    Annette    Kelly    (@nettles_18),    X    (Nov.    5,    2025,    at    6:05    PM), https://x.com/nettles_18/status/1986208312162197831.



> **Annette Kelly**
> @nettles_18
>
> After reading the bread crumbs in @SteveBakerUSA piece on the targeted shooting of the J6 protestors, I suspect the pipe bomber is Shauni Kerkhoff, on of the non-lethal shooters, aiming to start a riot.
>
> She joined intelligence 6 months after Jan. 6th.
>
> 6:05 PM · Nov 5, 2025 · **2,902** Views

116. The next day, November 6, 2025, Baker took to his X page to promote the impending reporting the November 5 Podcast and Article had previewed.[35]

117. Baker explained to his followers that he was "hit[ting] the pause button" on naming the target of his reporting "[a]fter an abundance of counsel from trusted parties within and outside the government." He assured his followers that members of the government "need … time to do what they need to do." He concluded, "The government's investigation into the J6 pipe bombs was going nowhere just two weeks ago. Today I can tell you that has all changed. A bunch of people got pretty spun up yesterday."

118. Once again, Defendants' cryptic build-up, references to ongoing investigations, and bold assertions about their "game-chang[ing]" reporting were specifically designed to engage followers and amplify the reach of Defendants' false claims. Defendants' strategy worked. In response to this post, Baker's followers continued to engage with and publicly piece together the "breadcrumbs" Baker previously reported.

119. Some readers parroted the language Baker had used in his November 4 article to cast suspicion over Ms. Kerkhoff's departure from Capitol Police:[36]

---

[35] Steve Baker (@SteveBakerUSA), X (Nov. 6, 2025, at 4:58 PM), https://x.com/SteveBakerUSA/status/1986553903555748088.
[36] Merica's Memes (@Snark_Shark_), X (Nov. 6, 2025, at 5:19 PM), https://x.com/Snark_Shark_/status/1986559137736524261.



120.    Others directly screen-captured Defendants' November 4 Article and compared it

to Ms. Kerkhoff's college soccer profile:[37]



121.    Thus, even before Defendants named Ms. Kerkhoff, their clear implicit accusations

were starting to go viral on X, with many users crediting Defendants' reporting as providing the

(false) facts that allowed them to draw their own (false) conclusions:

---

[37]    swell22   (@theswell22),   X   (Nov.   7,   2025,   at   3:57   AM), https://x.com/theswell22/status/198671955580099015.



122.    Baker, Hanneman, and Blaze Media had carefully orchestrated a media campaign that would, *first,* catch their readers' attention by promising "bombshell" and "game changing" reporting; *then,* maintain their readers' attention by providing teasers on X, podcasts, and in their own reporting—ensuring readers stayed tuned to "more to come," and looked back on "breadcrumbs" they had already posted; and, *last,* increase their readers' interactions with their reporting and posts by giving their readers enough information to come to false conclusions on their own.  The goal of this strategic sequence was to create maximum virality before publishing the end-result of Defendants' years-long January 6 "reporting" project.

123.    Defendants' strategy worked.  Readers and followers were tuned-in to see if they had solved Defendants' "bread crumb" puzzle when their "bombshell" actually dropped.  Within 24 hours of Defendants' November 5 Podcast and Article, Shauni Kerkhoff's name had spread like wildfire across X and other forums.

**Defendants Manufacture News and Attempt to Reinforce Their Own False Claims
By Sharing Their False Findings with Federal Officials**

124. Baker did not only preview his baseless accusations to Blaze Media's readers. He also, in his words, "took it to a source in one of the most important, highest-level investigative federal agencies in the country."

125. That agency was the Office of the Director of National Intelligence, the federal body that coordinates U.S. intelligence agencies. Baker did not take his "investigation" or his "findings" to the Federal Bureau of Investigation, which would have had appropriate jurisdiction to investigate his claims and was leading the pipe bomb investigation, even offering a cash award for valid tips to identify the January 6 pipe bomber. According to Baker, he did not report his findings to the FBI because it was "actively engaged in the cover-up."

126. Baker shared his "tip" with the ODNI only weeks before his planned reporting on Ms. Kerkhoff. On information and belief, this "tip" was a key component of Defendants' orchestrated plan to falsely name Ms. Kerkhoff as the pipe bomber. Standing alone, gait analysis was not enough to name Ms. Kerkhoff. But, if Defendants could reference an existing investigation in line with their own conclusions, they could create an illusion of credibility for their claims. So, Baker set out to manufacture the exact corroborative evidence he needed by taking his "tip" to an agency he handpicked—because he believed it would be most likely to entertain his flawed investigation and false conclusions.

127. What happened next was first reported by CBS News in an article debunking Defendants' false claims, then later confirmed by Baker in a podcast appearance doubling-down on them.

42

128.    ODNI employees began to draft a memorandum concerning Baker's "investigation."  An unfinished draft of that memorandum was passed along to officials in the Trump administration, bouncing among agencies and intelligence officials—even making it to the White House.  Eventually, it was shared with the CIA, where Ms. Kerkhoff worked.

**Defendants' False Claims Subject Ms. Kerkhoff
to a Grueling—and Unwarranted—Federal Investigation**

129.    Ms. Kerkhoff's life irrevocably changed on the morning of November 6, 2025, when her management called and asked that she come into work.  Ms. Kerkhoff suspected the call stemmed from Defendants' November 4 Article, which falsely claimed that she had used excessive force on January 6.

130.    Upon her arrival, Ms. Kerkhoff was asked to wait in an office.  Then, at about 2:00 p.m., two FBI agents arrived.  They told her that they were investigating "online chatter" that she was the pipe bomber.

131.     The agents questioned Ms. Kerkhoff about her location and activities of the night of January 5, 2021.  More than four years had passed, and she did not immediately recall.  They requested Ms. Kerkhoff's consent to search her phone, car, and house.  She consented to the phone and car searches.  Ms. Kerkhoff did not, however, immediately consent to a house search.  She told them it was her boyfriend's, Mr. Dickert's, house, and they would need his consent; he subsequently told them he would need to discuss it with Ms. Kerkhoff first.  The agents told Ms. Kerkhoff to go home, and that they would meet her there.  After this interview with the FBI, Ms. Kerkhoff learned she was being placed on administrative leave.

132.    As Ms. Kerkhoff and Mr. Dickert were driving home, the agents called again, claiming they were stuck in traffic and would be late.  They told Ms. Kerkhoff and Mr. Dickert

that, when they got home, a few people would want to walk through their home. The agents claimed that they were primarily looking for shoes. (The bombing suspect had worn distinctive Nike Air Max Speed Turf sneakers.)

133.    About a half-hour after Ms. Kerkhoff and Mr. Dickert arrived at home, a caravan of FBI vehicles descended on their street and parked outside their house. The FBI brought a bomb-disposal truck and a helicopter, which hovered loudly overhead. Agents exited their vehicles with their guns drawn in full tactical gear. An agent called Mr. Dickert and commanded him to "come out of the house unarmed with your dogs." Mr. Dickert and Ms. Kerkhoff complied and stepped outside. Agents swept through the house, then reentered with bomb-sniffing dogs. They opened cabinets, rifled through drawers, and scattered Ms. Kerkhoff's and Mr. Dickert's belongings—all without obtaining Ms. Kerkhoff or Mr. Dickert's consent. It suddenly occurred to Ms. Kerkhoff that they were not simply looking for a pair of shoes.

134.    The search at Ms. Kerkhoff and Mr. Dickert's home ended around 8:00 p.m. One of the agents introduced himself as a senior FBI official of the FBI's Washington, D.C. field office: a role that does not typically involve executing search warrants. Ms. Kerkhoff knew that his presence indicated that the FBI believed this was an extraordinarily sensitive case. She asked him why he would do all this to investigate "online chatter." The senior official responded that his orders came from "higher up," but that Ms. Kerkhoff could "clear everything up" that night if she would accompany agents to the FBI office for a polygraph interview. Ms. Kerkhoff agreed. Agents assured Ms. Kerkhoff that the drive out to their office would take longer than the interview itself.

135.    That was not true. This interview, unlike the FBI's earlier questioning, was a grueling interrogation. Ms. Kerkhoff was linked to a polygraph machine. For approximately three

44

hours, an interrogator treated Ms. Kerkhoff as if her guilt was presumed.  Again and again, she directly accused Ms. Kerkhoff of planting the bombs, and again and again, Ms. Kerkhoff denied it.  At one point, the interrogator changed out the breathing tubes used in the polygraph because she "did not like how they were reading"—indicating a flaw in the polygraph test or the interrogation method.  She demanded that Ms. Kerkhoff describe in detail what she was doing the night of January 5, 2021, and Ms. Kerkhoff repeatedly explained that she did not remember.  She threatened Ms. Kerkhoff that her security clearance hung in the balance if she did not answer truthfully.  Ms. Kerkhoff responded repeatedly and truthfully: She did not plant pipe bombs in Washington, D.C. on January 5, 2021.

136.    At one point, the interrogator represented to Ms. Kerkhoff that she had "failed" the polygraph test.  Ms. Kerkhoff assumed this was an interrogation technique, because she knew she was telling the truth.  Ms. Kerkhoff also knew that a person cannot "fail" a polygraph test, which merely measures physiological responses, and she was not surprised that she might have shown signs of stress given the exhausting day and intense interrogation she faced.  But the interrogator put Ms. Kerkhoff in a catch-22, insisting Ms. Kerkhoff was, on one hand, showing signs of physiological stress, and on the other, appeared "very controlled."  Ms. Kerkhoff continued the interrogation truthfully, just as she had before.

137.    The American Psychological Association has confirmed what Ms. Kerkhoff understood to be the case: Polygraph tests do not test and cannot determine "deception."[38]  In fact, they have a "weak scientific basis" for testing deception; the polygraph method used by

---

[38] William Iacono & Gershon Ben-Shakhar, *Current Status of Forensic Lie Detection with the Comparison Question Technique: An Update of the 2003 National Academy of Sciences Report on Polygraph Testing*, 43 Law & Hum. Behav. 86 (2019), https://psycnet.apa.org/fulltext/2018-49407-001.html.

Ms. Kerkhoff's interrogator "rest[s] on a weak scientific foundation with indeterminate accuracy." At best, a polygraph may measure physiological responses, but those responses are not reliably indicative of whether a person is telling the truth or lying.

138.    Eventually, Ms. Kerkhoff told the interrogator that she needed to call Mr. Dickert; he had expected her home within an hour.  The interrogator demanded that she answer more questions first.  Finally, after midnight, Ms. Kerkhoff told the interrogator that she was exhausted, and she asked whether she was free to leave.  The interrogator said yes.  Ms. Kerkhoff asked for her phone back, but agents told her they needed to keep it overnight.  She drove home without it. Ms. Kerkhoff arrived home in the early-morning hours of November 7, 2025.

139.    Later that morning, after repeated requests from Ms. Kerkhoff, the FBI finally returned her phone around 11:00 am.  It was flooded with notifications—messages, emails, missed calls, and voicemails—from friends, family, and coworkers who had seen Ms. Kerkhoff's name and photo posted all over X following Defendants' November 5 Article, Podcasts, and posts discussing them.  Ms. Kerkhoff realized this was the same "online chatter" FBI agents had told her they were investigating.

**Defendants Falsely Accuse Ms. Kerkhoff of Being the January 6 Pipe Bomber—
Based Solely on A Bogus "Gait Analysis" and Anonymous Sources**

140.    The next morning, November 8, 2025, Blaze Media published the "bombshell" Defendants had promised their readers: an article authored by Steve Baker and Joseph M. Hanneman headlined, "Former Capitol Police Officer a Forensic Match for Jan. 6 Pipe Bomber,

Sources Say" (the "November 8 Article").[39]  The November 8 Article expressly, falsely accused Ms. Kerkhoff of placing pipe bombs at the RNC's and DNC's offices on January 5, 2021.

141.    Defendants' reporting was false.  Ms. Kerkhoff was not the January 6 pipe bomber. She was a normal, private person—with a family, career, and hobbies—who was at home with her boyfriend and their dog at the exact time a hooded suspect was captured on CCTV placing pipe bombs in Washington, D.C.  Defendants disregarded these facts—and Ms. Kerkhoff's humanity— when they plucked her from obscurity to satisfy the whims of their conspiracy theory.

142.    Immediately under the November 8 Article's headline, Blaze Media splashed close-up photos of Ms. Kerkhoff.  The caption for the headline-photo spread further identified Ms. Kerkhoff as a Capitol Police officer and former Temple University soccer player:



_____

[39] Steve Baker & Joseph M. Hanneman, *Former Capitol Police Officer a Forensic Match for Jan. 6 Pipe Bomber, Sources Say*, Blaze Media (Nov. 8, 2025), https://web.archive.org/web/20251108083210/https://www.theblaze.com/news/former-capitol-police-officer-a-forensic-match-for-jan-6-pipe-bomber-sources-say (archived Nov. 8, 2025).

143.    In the November 8 Article, Defendants disclosed deeply personal and irrelevant information about Ms. Kerkhoff—apparently aiming to signal the depth of their investigation, but effectively only doxing Ms. Kerkhoff.  They published her current job (campus security at the CIA), her age (31), the names of her parents (Brandt and Patricia), her mother's cause of death (pancreatic cancer), and details about her alma mater (Temple University), her hobbies (Rubiks Cube), and her past accomplishments as a collegiate soccer player.

144.    The November 8 Article's opening line revealed the sole evidence for Defendants' false and defamatory accusations against Ms. Kerkhoff: "A computer program that compared the bomb suspect's gait to that of Shauni Kerkhoff produced a 94% match."  Thus, Defendants' entire false theory rose and fell on a "gait analysis."

145.    The November 8 Article explained that Baker and Hanneman used a "software algorithm" that they claimed was able to "rate[] Shauni Rae Kerkhoff, 31, of Alexandria, Va., as a 94% match to the bomb suspect."  It further claimed an anonymous "veteran analyst who ran the analysis for Blaze News said that based on visual observations the program can struggle with, he personally pegged the match at closer to 98%."

146.    Setting aside its abject falsity, Defendants' "gait analysis"—and the conclusions that arose from it—suffered from numerous readily apparent, facial flaws.

147.    *First*, Defendants' accusations rested on the false premise that "gait analysis" is capable of particularly identifying a suspect with "94%-98% accuracy."  This claim suffered from the same problems as the November 5 Article and Podcast.  It is simply not true, and Baker and Hanneman's own research confirmed as much.

48

148.    ***Second***, Defendants failed to explain how they ran the analysis, preventing readers from critically considering how it was performed or the conclusions it reached.

149.    Defendants refused to disclose what "software algorithm" they used, what methods it applied, whether those methods were scientifically accepted, and whether it had been designed or approved to run the type of analysis Defendants asked it to perform.  They did not explain what data set of "gaits" the software used, or how it collected them.  On information and belief, because forensic gait analysis does not allow for the particular identification of an individual, Defendants did not use a scientifically accepted method; either they did not use a software algorithm that was designed to compare individual gaits to reach their "94%" conclusion, or, alternatively, they misrepresented the software algorithm's output to appear to support their false accusations. Defendants also did not explain who ran that software algorithm, how, or what qualifications they possessed to run and evaluate its results.  On information and belief, no qualified gait analyst operated the software or endorsed its purported "94%" conclusion, as current gait analysis science does not allow for such conclusions; either Defendants found an unqualified individual to operate the software, or they simply made it up.

150.    Defendants did not identify any steps they took to avoid confirmation bias or self-selection problems—both of which are known risks in running a gait analysis according to Defendants' own sources.  On information and belief, Defendants took no steps to avoid confirmation bias or self-selection; rather, they used the software algorithm to force a "result" that supported their preconceived false claims.

151.    Defendants gave no indication that they performed a comparable gait analysis on any other subject as a point of comparison or used any control group whatsoever.  On information

and belief, Defendants simply compared Ms. Kerkhoff's gait to the pipe bomber's and purported to find a near-certain "match."

152.    Defendants did not even confirm whether the videos they used showed Ms. Kerkhoff and the pipe bomber suspect walking from similar angles, in similar positions, or holding similar objects—key elements that would significantly affect an analysis according to Defendants' own research.   In fact, Defendants would later confirm that they did ***not*** use appropriately comparable videos of Ms. Kerkhoff and the pipe bomber.

153.    Defendants failed to identify what video clips of the pipe bomber suspect they used to run the analysis, explaining vaguely that they used video from January 5, 2021 that "shows the same scene as the FBI video," but "came from another source and is demonstrably clearer with smoother motion."   On information and belief, the video was provided by the anonymous "video analyst" referenced in the November 8 Article.   That "video analyst" was the anonymous X user named Armitas, who had no disclosed credentials for enhancing video—certainly not for the purposes of running a forensic analysis.

154.    And they only vaguely described the videos of Ms. Kerkhoff they used to run the analysis.  Defendants claimed only to have used footage from "January 6 security video of Officer Kerkhoff" and 2017 footage of her playing soccer as a goalie.  Baker and Hanneman would later confirm the videos they used were not well-suited for running a valid forensic gait analysis against the grainy footage of the hooded pipe bomber.  Once again, Defendants' own sources confirmed as much.  The videos Defendants used showed Ms. Kerkhoff in full duty gear, carrying a fully-loaded heavy gear bag on her back, a large PepperBall launcher in one hand, and a large gas mask bag attached to her opposite leg, unlike the hooded pipe bomber who carried only a backpack in one hand; Ms. Kerkhoff traversed across the Capitol steps and through its interior, while the pipe

bomber walked along Capitol Hill's brick and cobblestone sidewalks; Ms. Kerkhoff was depicted walking during the day, while the pipe bomber walked at night; Ms. Kerkhoff was surrounded by rioters, while the pipe bomber walked alone. Defendants' research articles confirmed that these "environmental [and] visibility" distinctions increased the risk of "errors in recognition."

155. *Third*, Defendants relied solely on confidential sources to bolster the false conclusions the "software algorithm" supposedly generated.

156. According to the Article, a "veteran analyst" "ran the analysis for Blaze News" and was able to provide "visual observations" that allowed him to "personally peg[] the match at closer to 98%." Defendants attempted to bolster the credibility of this anonymous source to their readers—referring to him or her as a "veteran analyst" without providing any information regarding the credentials that would allow him or her to run an analysis or reach such certain conclusions.

157. On information and belief, Defendants did not state their "veteran analyst's" credentials because their "veteran analyst" had no such credentials. As Defendants' own research article sources confirmed, no credible "veteran" gait analyst would have represented that his analysis could identify an individual with certainty, because the science of gait analysis does not currently allow for such conclusions.

158. As with the "software algorithm," Defendants did not describe what methodology the "veteran analyst" used to make his conclusions. They did not even describe what "visual observations" the source conducted, or why they allowed him to "peg the match" with such certainty. Nor did Defendants provide any information regarding potential bias of their confidential sources, or what processes were implemented to avoid bias confirmation or self-selection.

51

159. At other points, the Article represented that "several current intelligence sources" and "sources familiar with gait analysis" "confirmed" the study results. Once again, Defendants attempted to bolster the credibility of these anonymous sources to their readers—referring to them as "intelligence sources" without providing any information regarding the credentials that would allow them to conduct a gait analysis or "confirm" any conclusions.

160. On information and belief, Defendants did not state these other sources' credentials because the sources had no such credentials. As Defendants' own research article sources confirmed, no credible "sources familiar with gait analysis" would have represented that Defendants' analysis could identify an individual with certainty, because the science of gait analysis does not currently allow for such conclusions.

161. As with the "veteran analyst," Defendants did not describe what methodology these other "sources" used to make their conclusions. Nor did Defendants provide any information regarding potential bias of their confidential sources, or what processes were implemented to avoid bias confirmation or self-selection.

162. If Blaze Media did in fact rely on multiple sources to reach such a patently false conclusion, the only reasonable explanation is it self-selected sources who would confirm—not scrutinize—its flawed analysis and findings. But because it did not disclose who its sources were, its readers could not reach or verify this conclusion for themselves.

163. *Fourth*, the results of Defendants' "gait analysis" relied on their assumption that Ms. Kerkhoff walked with a "fateful" "slight limp" following a 2015 soccer injury. Once again, Defendants failed to disclose what processes their analysis included to avoid a bias confirmation or self-selection outcome that would have been influenced by this false belief.

52

164. Ms. Kerkhoff does not walk with a limp. She has run multiple marathons since 2016, finishing four out of the five in fewer than four hours. She accomplished stellar marks in police physical fitness training, even setting a female record for physical fitness. Defendants did not disclose whether or how they took these facts into account in their analysis. On information and belief, Defendants did not even know these facts when they ran the analysis, because Defendants never asked Ms. Kerkhoff to comment on their false accusations against her.

165. The November 8 Article revealed additional flaws in Defendants' "investigation" and reporting.

166. Defendants' primary named source had an obvious bias—but Defendants failed to disclose it. In support of their false accusations against Ms. Kerkhoff, Defendants quoted former FBI agent Seraphin regarding his role in investigating the pipe bomber suspect and his beliefs regarding the FBI's efforts to conceal the suspect's identity.

167. Seraphin has built a platform on distrusting the FBI, positioning himself as a "whistleblower" while portraying the Bureau as a politicized deep state entity that has been weaponized against conservatives. Even before Blaze Media's reporting, Seraphin had repeatedly insisted that the events of January 6, and the investigations and prosecutions that followed it, were emblematic of the FBI's systemic corruption—going so far as to claim that January 6 was a pretext or false-flag-adjacent operation imposed by the FBI and other federal agencies to advance anti-Trump narratives. His statement to Blaze Media confirmed that he supported Defendants' false accusations against Ms. Kerkhoff because they aligned with the same predetermined notion that underlies his own social media and podcast platforms: specifically, that the FBI was "involved in a cover-up and have been since day one."

168.     In addition to Seraphin, the Article cited anonymous sources to vaguely allege that "evidence has emerged recently that pointed toward law enforcement possibly being involved in the planting of the pipe bombs."  The Article likewise relied on "several officials familiar with the government's investigative efforts" to state that "new work [was] urgently needed … to learn if federal agencies or employees knew who was involved in the bomb hoax and participated in a nearly five-year cover-up."  But Defendants did not say who the sources were, what their credentials were (beyond vague references to their "familiarity"), what "evidence has emerged," or how that evidence "[p]ointed toward law enforcement possibly being involved in the planting of the pipe bombs."

169.     The November 8 Article also clarified Defendants' motives in leveling their false claims.  It repeatedly invoked Defendants' preconceived narrative that led them to claim a federal law enforcement officer was the January 6 pipe bomber: "The prospect of a Capitol Police officer being the perpetrator, if confirmed, could recast the entire story of Jan. 6."  It confirmed that narrative was personal to Steve Baker, who was arrested for his role in rioting on January 6: "At the same time the FBI was not solving the pipe-bomb mystery, it was carrying out the largest investigation in its history to hunt down the thousands of Americans who went to the Capitol after Trump's Jan. 6 speech at the Ellipse."

170.     The November 8 Article further completed the narrative thread that Defendants had kicked-off in the November 4 Article.  Defendants repeated their false claims regarding Ms. Kerkhoff's actions in defending the Capitol on January 6, 2021, linking back to their November 4 reporting on Capitol Police use of force.  They doubled down on their false claims regarding the utility of gait analysis and their theory of a government cover-up, hyperlinking to their November 5 Article that promised a "bombshell" report on the identity of the pipe bomber.

54

171. Finally, Defendants reveled in the damage their reporting had already caused Ms. Kerkhoff. They reported, "Kerkhoff's residence in Alexandria, Va. appeared to be under the watch of law enforcement officers on Friday night." Defendants knew this because Blaze Media's own editor-in-chief "was pulled over by local police after stopping to observe the home."

172. Baker would later confirm that "the November 8 story that started it all went through 4-5 layers of editorial review, legal clearance, and executive suite approval" by Blaze Media.[40] Not one person at Blaze Media was willing to impose or require basic journalistic standards that could have prevented Defendants' falsehoods from ever being published.

**Baker and Hanneman Launch a Social Media Tour
to Promote Their False and Defamatory Narrative**

173. Baker and Hanneman took to social media to publicize the November 8 Article and to capitalize on the attention it was receiving. There, they invoked the same media playbook they had crafted earlier that week to promote their Articles and their false claims about Ms. Kerkhoff with fanfare. This created viral momentum, with some posts garnering millions of views.

174. In a post viewed 16.4 million times, and shared more than 21,000 times, Baker claimed his November 8 Article was "the biggest scandal and conspiracy in American history":

---

[40] Steve Baker (@SteveBakerUSA), X (Apr. 9, 2026, at 9:04 AM), https://x.com/SteveBakerUSA/status/2042227055329210567.



175.     Baker cross-promoted his prior reporting, reposting an X post that shared photos of Ms. Kerkhoff defending the Capitol on January 6 and claiming, "That's the alleged Jan 6 pipe bomber firing at the beginning of the @CapitolPolice's response to the Peace Memorial gate breech."  Baker wrote, "Fact Check: True," and provided a hyperlink to his November 4 Article:



176.    Hanneman declared Defendants' reporting "SOLVED" the January 6 pipe bomber case, emphasizing his claims with a "siren" emoji:



177.    Blaze Media similarly posted "BREAKING" with "siren" emojis for emphasis:



178.    Defendants' high-stakes language generated significant virality on X and conservative platforms.  This allowed Defendants to self-perpetuate the spread of their reporting,

selectively interacting with X users who praised their reporting—and dismissing those who disagreed.

### Ms. Kerkhoff Is Exonerated

179.    Ms. Kerkhoff read Defendants' November 8 Article in disbelief.  Like on January 6, she immediately snapped into crisis response mode.

180.    Ms. Kerkhoff had already retained a personal data removal service provider to scan and remove private information from data brokers and "people search" sites in preparation for Trump pardoning the January 6 defendants.  She now called immediate family members and pleaded with them to do the same. She even retained and paid-for the same personal data removal service provider for her entire immediate family.

181.    Ms. Kerkhoff and Mr. Dickert drove to the grocery store and bought a trunk-load of frozen food.  Then, fearful for their safety, they rarely left the house for two weeks.  Every time they did, they were followed.  They did not know by whom: investigators, reporters, or people who believed Defendants' false claims and intended to harm them.

182.    Ms. Kerkhoff received an enormous, unwanted amount of attention from reporters.  Some found her name on Venmo and attempted to send her $1 so they could "connect," enabling them to send her direct messages.  Ms. Kerkhoff was forced to disguise her identity on Venmo and to lock down her profile from public searches.  Others reached out to her through Signal.  She deleted that app entirely.  Ms. Kerkhoff once saw a mysterious man walk up to her front door.  He turned out to be a reporter for the Daily Wire.  On a Friday night, Blaze Media's editor-in-chief Christopher Bedford visited her home in Alexandria, Virginia; Blaze Media later reported that he was "pulled over by local police after stopping to observe" it.

183. The sudden crush of people was terrifying. She and Mr. Dickert kept a loaded gun by the bed while they were sleeping, and another within arm's reach at all times. Ms. Kerkhoff and Mr. Dickert both have concealed carry permits and for those two weeks, they always had their personal firearms loaded and within reach or on their person.

184. Ms. Kerkhoff concluded that she needed legal representation. An acquaintance connected Ms. Kerkhoff with a criminal defense lawyer, Steve Bunnell, whom she promptly retained. The FBI returned to Ms. Kerkhoff's house and requested an additional interview. This time, Bunnell stepped in. He began interacting with the U.S. Attorney's Office directly.

185. Bunnell encouraged Ms. Kerkhoff to search her phone for exonerating information. She found a video that Mr. Dickert recorded the night of January 5, 2021, in which Bella, their greyhound, twitched in her sleep. Ms. Kerkhoff's voice was clearly audible on the video, and metadata established that the video was taken almost exactly when the pipe bombs were planted.

186. On November 14, 2025, Ms. Kerkhoff and Mr. Dickert, joined by Bunnell, had a meeting with an Assistant United States Attorney ("AUSA") and agents from the FBI, including agents from the FBI CART team ("Computer Analysis and Response Team"). They provided the prosecutor and agents the video, along with other forensic and investigative information, and voluntarily answered all questions that the prosecutor and agents asked.

187. After reviewing the forensic evidence, and conducting additional investigation that confirmed Ms. Kerkhoff's alibi, the US Attorney's Office concluded that Ms. Kerkhoff had nothing to do with planting the pipe bombs. The U.S. Attorney's Office advised Ms. Kerkhoff's counsel and the CIA of its conclusion.

188.    On November 19, 2025, almost two weeks after the Blaze published its defamatory article, the CIA brought Ms. Kerkhoff back from administrative leave. Two days later, she returned to work.[41]

### Defendants Update Their Articles but Maintain Their False and Defamatory Accusations— Even as Their Claims Are Debunked

189.    Meanwhile, Defendants' house-of-cards "reporting" crumbled.

190.    Even before Defendants published the November 8 Article, federal officials were already dismissing their false accusations against Ms. Kerkhoff.

191.    On November 7, 2025, U.S. Pardon Attorney and Director of the DOJ's Weaponization Working Group Ed Martin responded to a since-deleted post on X that claimed he had "determined" Ms. Kerkhoff was the "J6 Pipe Bomber." Martin was unequivocal: "***This is false***."



---

[41] During Ms. Kerkhoff's November 6 interrogation, the FBI's own interrogator suggested that Ms. Kerkhoff would not be permitted to return to work if she had, in fact, "failed" the polygraph exam or otherwise caused the interrogator to believe she was being deceptive.

192.    Martin's plain denial of the truth of Defendants' claims did not stop them from publishing the November 8 Article.

193.    It did not take long for responsible journalists to question Defendants' flawed investigation and false claims, too.

194.    On November 12, 2025, reporter Tim McMillan of The Debrief, a respected science news website, critiqued Defendants for relying exclusively on gait analysis in his article, "How Reliable is Forensic Gait Analysis?  Science Weighs in on Controversial Jan 6 Pipe Bomber Claims."[42]

195.    McMillan noted that gait analysis "remains an ***unreliable*** basis for ***identifying*** a suspect ***with certainty*** in the courtroom," and that "even under controlled laboratory conditions, gait evidence should be considered supplementary at best—***not a basis for confidently identifying, much less publicly accusing, a specific individual***."

196.    McMillan critiqued Blaze Media for relying on an analysis "conducted by an unnamed 'veteran analyst,'" which "poses a problem for assessing its credibility."

197.    He further noted that the fact that "gait evidence should be viewed as complementary rather than conclusive — a clue that may support other findings, but not one that can stand alone," "matter[ed]" specifically in the context of Blaze Media's claims about Ms. Kerkhoff: "[W]hen presented in isolation, without clear methodology or peer review, it risks blurring the line between informed analysis and speculation."[43]

---

[42] Tim McMillan, *How Reliable Is Forensic Gait Analysis? Science Weighs In on Controversial Jan. 6 Pipe Bomber Claims*, The Debrief (Nov. 12, 2025), https://thedebrief.org/how-reliable-is-forensic-gait-analysis-science-weighs-in-on-controversial-jan-6-pipe-bomber-claims/.
[43] *Id.*

198.    On November 25, 2025, CBS News definitively debunked Blaze Media's false accusations of Ms. Kerkhoff in an article titled, "How an innocent woman's name was tied to the Jan. 6 pipe bombs."[44]

199.    CBS News disclosed that Ms. Kerkhoff "cleared her name by providing an alibi: video of her playing with her puppies at the time the devices were placed."[45]

200.    Ms. Kerkhoff was never given the opportunity to provide this video to Defendants before they published their Articles because Defendants never sought her comment before publishing their false and defamatory accusations.

201.    CBS News further confirmed that the FBI "ruled [Ms. Kerkhoff] out as suspect." It reported that Defendants' investigation was so shoddy, it "raised concerns among some senior officials in the Trump administration."

202.    The CBS News report further confirmed what Baker had represented in his November 5 Article—specifically, that he took his false "findings" to a federal agency other than the FBI: the Office of the Director of National Intelligence ("ODNI").  Baker's report triggered an ODNI unit to write a memo identifying Ms. Kerkhoff and describing Baker's false allegations about her.[46]  An "unfinished" copy of that memorandum was then given to "senior staff" at the CIA and triggered an unwarranted federal investigation of Ms. Kerkhoff.

---

[44] Jennifer Jacobs, Pat Milton & Arden Farhi, *How an Innocent Woman's Name Was Tied to the Jan. 6 Pipe Bombs*, CBS News (Nov. 25, 2025, 5:26 PM), https://www.cbsnews.com/news/jan-6-pipe-bombs-innocent-womans-name/.

[45] CBS News' description misstated the specific nature of the video, which confirmed Ms. Kerkhoff was at home with Mr. Dickert caring for their greyhound, Bella, at the exact time CCTV footage captured the hooded suspect in Washington, D.C.  Defendants would later latch onto these semantics to revive their false and defamatory claims.

[46] Baker later confirmed he took his accusations about Ms. Kerkhoff to ODNI during various podcast appearances promoting his false and defamatory claims.

203.    As their narrative fell apart, Defendants quietly appended several "Editors' Notes" to the end of November 8 Article.  But even as they did so, the Article's headline, cover photo featuring Ms. Kerkhoff's face, and defamatory accusations remained unchanged.

204.    The same day it originally published the November 8 Article, Blaze Media was forced to add an Editor's Note after a CIA spokeswoman reached out to correct it.[47]   That spokeswoman clarified that Defendants' original reporting regarding Ms. Kerkhoff's position at the CIA was incorrect.  Defendants edited the November 8 Article only to address that "CIA spokeswoman Liz Lyons stated that the subject worked in campus security."  The November 8 Article was otherwise unchanged.

205.    Days later, on or about November 13, 2025, Defendants were forced to make an additional update "to reflect further reporting."  Defendants' updated "Editor's Note" glossed over the fact that the "further reporting"—a November 12 article by popular conservative news website The Daily Wire[48]—disproved false facts Defendants relied on in the original November 8 Article to accuse Ms. Kerkhoff.  In the November 8 Article, Defendants reported that "the pipe-bomb suspect"—i.e., Ms. Kerkhoff—used her neighbors' SmartTrip card "to travel from D.C. to a stop in Falls Church after planting the pipe bombs."  The Daily Wire spoke to the neighbor referenced in Defendants' reporting.  It confirmed that the SmartTrip card was used not by Ms. Kerkhoff, but instead "by a childhood friend who traveled from the south to attend Trump's rally, and stayed

---

[47] Steve Baker & Joseph M. Hanneman, *UPDATE: Former Capitol Police Officer a Forensic Match for Jan. 6 Pipe Bomber, Sources Say*, Blaze Media (Nov. 8, 2025) https://web.archive.org/web/20251108163703/https://www.theblaze.com/news/former-capitol-police-officer-a-forensic-match-for-jan-6-pipe-bomber-sources-say (archived Nov. 8, 2025).
[48] *There's a New Development to The Blaze's Jan. 6 Pipe Bomb Story*, Daily Wire (Nov. 12, 2025), https://www.dailywire.com/news/theres-a-new-development-to-the-blazes-jan-6-pipe-bomb-story.

with him to save money." The Daily Wire further noted that, without this (false) fact, Blaze Media's theory "would now rest solely on the 'gait analysis.'"

206. The same day, Defendants were forced again to edit the November 8 Article. This time, they quietly added a statement from Ms. Kerkhoff's attorney, Steve Bunnell. Defendants added, "After publication, Steve Bunnell, who the Washington Post identified as an attorney for Kerkhoff, told the Post his client 'categorically denies' that she planted the bombs." Defendants made no further edits to the November 8 Article.

207. Finally, on or about November 25, 2025, Defendants were forced to acknowledge CBS's reporting, which conclusively debunked their claims and even highlighted the concerns their investigation and reporting raised in the Trump administration.

208. Once again, Defendants only quietly updated the Article by appending an "Update" to the end of it in italics.

209. In the Update, Defendants admitted that "CBS News reported that the FBI has ruled the suspect out of any involvement in the 2021 pipe bomb plot." It further admitted that Ms. Kerkhoff "was cleared after establishing an alibi through a video of her playing with her puppies at the time the devices were planted."

210. Blaze Media seemed to take issue with the fact that CBS News' reporting relied on "'three sources who were not identified'"—despite the fact that its own reporting relied almost exclusively on anonymous sources. And, while Blaze Media represented it "repeatedly requested such evidence from the FBI," it did not say anything about its failure to request any comment from Ms. Kerkhoff during its investigation.

211.    Despite CBS News' reporting, and despite this "Update," Blaze Media made no changes to the November 8 Article headline, its cover photo, or the false and defamatory claims it made about Ms. Kerkhoff.

**Defendants Remove the Text (But Not the Headlines) of Their Defamatory Articles—and Replace Them With New Statements Doubling Down on Their Defamatory Accusations Against Ms. Kerkhoff**

212.    On December 4, 2025, the Department of Justice announced the arrest of Brian J. Cole, Jr. for planting explosive devices outside the RNC and DNC on January 5, 2021.[49]

213.    Finally, that same day, Blaze Media removed the text of the November 5 and 8 Articles.  It replaced the November 8 Article's cover photo, which prominently and repeatedly featured Ms. Kerkhoff's face, with screenshots from the January 5 CCTV footage of the hooded pipe bomber.

214.    But even as Blaze Media removed the false and defamatory statements Defendants made about Ms. Kerkhoff, it stood by its flawed reporting and doubled-down on the false conclusions it presented.  Thus, Defendants' December 4, 2025 removal of the November 5 and 8 Articles was a "retraction" in name only, and far from a legally sufficient retraction.

215.    Both the November 5 and November 8 Articles' headlines continued to falsely report, respectively, "UPDATE: 'She's one of us!' Steve Baker stuns Glenn Beck with bombshell revelation about J6 pipe-bomb suspect," and "UPDATE: Former Capitol Police officer a forensic match for Jan. 6 pipe bomber."  Both headlines clearly continued to reference—and continued to be understood to reference—Ms. Kerkhoff.  And, by retaining the original headline and adding

---

[49] Press Release, U.S. Attorney's Office for the District of Columbia, *Man Charged for Planting Explosive Devices Outside the RNC and DNC on January 5, 2021* (Dec. 4, 2025), https://www.justice.gov/usao-dc/pr/man-charged-planting-explosive-devices-outside-rnc-and-dnc-january-5-2021.

only the word, "UPDATE," in all caps, the new headlines gave the false impression that the "updates" *confirmed*—and did not *remove*—Defendants' previous false claims.

216. Defendants continued to insist on the "truth" of their reporting by linking the November 8 Article, including its false headline, on Blaze Media's webpage hyperlinked, "theblaze.com/*truth*," which claims to gather Blaze Media's reporting on "The *Truth* about January 6."

217. Defendants also stood by the credibility of the original Articles' sources, declaring in the Updates' text that those sources had "a demonstrated record of reliability and accuracy." As before, Blaze Media failed to state what credentials those sources possessed to support their "demonstrated record." Readers were expected to take their word for it—and readers did. Also as before, Blaze Media failed to acknowledge its primary named source's, Seraphin's, stated animus against the FBI.

218. In the Updates, not only did Defendants insist their sources were "reliab[le]," but they also doubled-down on those sources' false conclusions, declaring, "[T]he sources continue to stand by the information they provided to Blaze News." By doing so, Defendants reaffirmed their false accusations against Ms. Kerkhoff.

219. Defendants' Updates blankly insisted that the Articles' investigation followed "professional journalistic standards." Not only did this disregard Defendants' numerous and intentional departures from journalistic standards—including Defendants' failure to ask Ms. Kerkhoff for comment and Defendants' concealment of the gait analysis' limitations, which their own research made clear—but it also misled readers as to the reliability of Defendants' investigation.

220.    Defendants' removal of the Articles' text stood in stark contrast to their strategic and wide promotion of the Articles across their social media pages and on podcast circuits.  Unlike that massive, coordinated campaign—including the various teasers that preceded the November 8 Article and the promise that the November 8 Article presented "the biggest scandal and conspiracy in American history"—none of the Defendants promoted, let alone acknowledged, the removal of their false reporting from Blaze Media's website.

221.    Finally, each Defendant refused to delete their social media posts promoting the November 5 and 8 Articles.  Thus, even after Blaze Media removed the false and defamatory text from its website, Baker continued to claim to his followers on X that "This might just be the biggest scandal and conspiracy in American history."[50]  Hanneman continued to state, "SOLVED: Former Capitol Police officer a forensic match for Jan. 6 pipe bomber!"[51]  And Blaze Media continued to encourage its followers to "Read all about" Defendants' false claims.[52]

222.    The December 4, 2025 updates did not apologize to Ms. Kerkhoff.  They did not correct Defendants' false prior reporting.  Instead, they insisted on the credibility of Defendants' investigation and reaffirmed the truth of Defendants' false and baseless reporting.

**Defendants Refuse Ms. Kerkhoff's Request for a Retraction and Apology**

223.    On January 16, 2026, Ms. Kerkhoff, through her counsel, sent letters to Blaze Media, Baker, and Hanneman detailing the falsity of their reporting and the numerous facial problems that led to it—including that their false accusations about Ms. Kerkhoff were supported

---

[50]    Steve    Baker    (@SteveBakerUSA),    X    (Nov.    8,    2025,    at    3:19    AM), https://x.com/SteveBakerUSA/status/1987072479894929529.
[51]    Joe    Hanneman    (@HanneBlaze64),    X    (Nov.    8,    2025,    at    2:49    AM), https://x.com/HanneBlaze64/status/1987064854478201136.
[52]    TheBlaze    (@theblaze),    X    (Nov.    8,    2025,    at    8:03    AM), https://x.com/theblaze/status/1987143883139260490.

solely by a junk "gait analysis" conducted by anonymous "analysts" with zero disclosed credentials, and that those same false accusations followed and were directly in-line with Baker's and Hanneman's years-long pursuit of their predetermined narrative that the January 5, 2021 pipe bombs were a deep-state inside job. Ms. Kerkhoff demanded a complete retraction of Defendants' false statements and an apology for the harm they caused her.

224. Counsel then-representing all three Defendants substantively responded on January 29, 2026. Notably, ***Defendants never argued their reporting was true***. Instead, Defendants quibbled with how Ms. Kerkhoff would prove Defendants *knowingly* disregarded the truth—that Ms. Kerkhoff was ***not*** the January 6 pipe bomber. Defendants also insisted their "retraction" of those same false claims was sufficient. In short, Defendants offered no defense of their false accusations against Ms. Kerkhoff.

225. As of the date of this filing, Defendants have refused to take any further steps to retract their defamatory accusations against Ms. Kerkhoff or correct the record about her.

**Baker and Hanneman Continue Peddling Their False Accusations
That Ms. Kerkhoff Is the January 6 Pipe Bomber**

226. While Defendants' counsel insisted their false statements about Ms. Kerkhoff had been "retracted" from Blaze Media's website (they had not), Baker and Hanneman could not let go of the attention their false statements had garnered, including surging X interactions and podcast appearances.

227. The arrest of Cole Jr. and the evidence that supported it foiled Baker and Hanneman's preconceived narrative that January 6 was an inside job. Determined to perpetuate that narrative, they crusaded on the new theory that Cole was a "patsy"—a person who is set up to bear criminal responsibility for a wrongful act they did not commit. In doing so, Baker and

Hanneman defended Defendants' flawed investigation and false conclusions, and they insulted those who questioned it—never engaging with the factual problems critics identified with Defendants' "gait analysis":



228.    Then, on March 23, 2026, Baker and Hanneman published an article on Blaze Media titled, "Brian Cole Jr.'s physical presence, posture, mannerisms are no match to FBI's hoodie-clad pipe-bomb suspect."[53]  This article not only critiqued the FBI's investigation of Cole Jr; it also elevated Hanneman's and Baker's own "investigation"—the same one that led them to falsely accuse Ms. Kerkhoff—as more accurate and reliable.

---

[53] Joseph M. Hanneman & Steve Baker, *Brian Cole Jr.'s Physical Presence, Posture, Mannerisms Are No Match to FBI's Hoodie-Clad Pipe-Bomb Suspect*, Blaze Media (Mar. 23, 2026), https://www.theblaze.com/news/brian-cole-jr-s-physical-presence-posture-mannerisms-are-no-match-to-fbi-s-hoodie-clad-pipe-bomb-suspect.

229.    Defendants invoked a familiar playbook to ensure maximum virality for their latest reporting.  Once again, Defendants used X to organically promote and comment on their own reporting, selectively engaging with supportive users who they called "patriots."  Baker took to the podcast circuit, appearing on the podcasts of Seraphin and other far-right-wing pundits who were sympathetic to their conspiracy theories and the false statements that aligned with them.  He then interacted with X users who reposted or commented on posts promoting those podcasts to cross-link and promote his own reporting.

230.    Ultimately, Baker used his new "patsy" angle to revive his previous false claims about Ms. Kerkhoff.  For example, in promoting the March 23 article on X, Baker highlighted Defendants' "findings" that, while Cole. Jr.'s "shoe size is a 12 to 12.5," the pipe bomber depicted in CCTV footage on January 5, 2021 "is a [shoe size] 9 to 9.5"—*i.e.*, a woman's shoe size.

231.    During podcast appearances, Baker repeatedly represented that "the truth"—his prior accusations about "the pipe bomber"—had been "thwarted," and that "legal considerations" prevented him from further disclosing "darker" details about his prior theory.

232.    As one example, Baker appeared on a March 25, 2026 episode of Seraphin's podcast titled, "STEVE BAKER It's ALL Connected."  Baker and Seraphin invoked their usual "bombshell" language, cryptically teasing, "It's all connected."  Baker stated he "had his voice throttled" following his receipt of Ms. Kerkhoff's retraction demand.

233.    Then, Baker and Seraphin discussed the retraction demands they each received from Ms. Kerkhoff's counsel.  But, instead of engaging with the falsity of their claims as outlined in those letters, Seraphin and Baker doubled down on them.  Baker then previewed, "I have reached the point where I am … stepping back out."

70

234.    Baker conspicuously stepped away from the podcast while Seraphin displayed, and read line-by-line, the retraction demand Ms. Kerkhoff's counsel had sent to him in January. Seraphin zeroed in on a non-distinction to falsely insist that Ms. Kerkhoff had presented an inconsistent alibi: "dog" versus "puppies."

235.    Seraphin attempted to draw a contrast between the language of Ms. Kerkhoff's retraction demand, which plainly explained that "video evidence conclusively demonstrates [Ms. Kerkhoff] was at home caring for her dog [on January 5]," and CBS News' reporting, which stated Ms. Kerkhoff "provid[ed] an alibi video of her playing with her puppies."

236.    CBS News' description misstated the specific nature of the same video described in Ms. Kerkhoff's retraction demand to Seraphin.  That video—however described—confirmed Ms. Kerkhoff was at home with Mr. Dickert and their greyhound, Bella, at the exact time CCTV footage captured the hooded suspect in Washington, D.C.

237.    Ms. Kerkhoff never spoke to CBS News.  On information and belief, CBS News' phrasing was either the result of a "game of telephone" among CBS's sources and its reporters, or an exercise of journalistic liberty to humanize Ms. Kerkhoff.  Regardless, Ms. Kerkhoff never changed her alibi, as Seraphin insisted.  Ms. Kerkhoff's alibi has been consistent because it is true.

238.    On March 25, 2026, in response to a comment on an X post promoting his appearance on Seraphin's podcast, Baker made his own position about Defendants' November 5 and 8 Articles clear: "[He] never retracted anything" about Ms. Kerkhoff.



239.    Apparently emboldened by a semantic non-distinction between "puppies" and "dog," Baker set out to fully revive his false accusations against Ms. Kerkhoff.

240.    Meanwhile, on April 1, 2026, another domino—set in place by Bakers' initial false tip to ODNI and Defendants' false reporting about Ms. Kerkhoff on November 5 and November 8—fell.  In violation of a protective order, Bryan J. Cole Jr.'s defense counsel filed a motion for issuance and early return of a subpoena of Ms. Kerkhoff ("request for subpoena").  That request for subpoena misleadingly (and out of context) stated Ms. Kerkhoff had "failed a polygraph."  It also published her and Mr. Dickert's home address.  The Department of Justice was forced to file a motion for order to show cause why Cole's counsel should not be held in contempt for violating the protective order and publicly harassing and intimidating Ms. Kerkhoff.

241.    Predictably, Baker and Hanneman seized on the request for subpoena as "evidence" their false claims were right.  But this was Baker's design all along.

242.    On information and belief, had Baker never taken his "tip" to ODNI, ODNI never would have drafted the memorandum; had ODNI never drafted the memorandum, the memorandum never would have landed at the FBI; had the memorandum never landed at the FBI, the FBI never would have investigated Ms. Kerkhoff (this is confirmed by the request for subpoena, which indicates the FBI sought an independent gait analysis, an expert forensic methodology that has never been used at trial in American courts); and if the FBI never

72

investigated Ms. Kerkhoff, Defendants never would have had the (manufactured) "corroboration" they desired to falsely accuse Ms. Kerkhoff of being the pipe bomber; and, if Defendants' never had that "corroboration," they never could have published the November 5 and 8 Articles (as evidenced by Blaze Media's and Baker's own statements surrounding the November 5 and 8 Articles, which insisted they could not publish their articles until authorities "battened down the hatches").

243.   In short, what Baker and Hanneman presented as vindication for their false claims against Ms. Kerkhoff was only another example of the harm their baseless smear campaign predictably caused—and they knew it.

244.   Baker and Hanneman made a spectacle of the request for subpoena on X and in podcast appearances.  In a since-deleted X post, Hanneman even posted a screenshot of the request for subpoena that included Ms. Kerkhoff's home address to his 20,000 followers.

245.   Baker was fired by Blaze Media on or about April 1, 2026.  On information and belief, Hanneman resigned from Blaze Media on or about April 3, 2026.

246.   Blaze Media's CEO Christopher Bedford confirmed the reason the outlet fired Baker: his refusal to comply with journalistic efforts and standards.  In a post to X, Bedford stated, "Blaze News has never shied from J6 coverage in particular.  ***Serious coverage requires serious editorial and legal review.  Steve no longer wished submit to his work to this and so we parted ways.***"[54]

---

[54]   Christopher   Bedford   (@CBedfordDC),   X   (Apr.   3,   2026,   2:41   PM), https://x.com/CBedfordDC/status/204013769144705416.

247.    But Blaze Media still did nothing to actually retract—let alone apologize for—publishing and endorsing the false November 5 and 8 reporting or giving Baker and Hanneman the platform they needed to spread their lies about Ms. Kerkhoff.[55]  Once again, Blaze Media gave its readers the impression that technicalities like "editorial legal review" compelled them to terminate Baker—not his repeated falsehoods, or his ongoing reliance on the flawed "analysis" that led to them (an analysis Blaze Media helped commission and endorsed).

### Baker and Hanneman Capitalize on Their Separation from Blaze Media and Raise Money for Themselves by Continuing to Defame Ms. Kerkhoff

248.    Following Baker's termination by, and Hanneman's resignation from, Blaze Media, on April 4, 2026, Baker repeated and reinforced his false and defamatory narrative against Ms. Kerkhoff in a "pinned" X post (the "April 4 Post").[56]  Hanneman "reposted" Baker's post, underscoring it with another X user's commentary that he and Baker "report[ed] with integrity and a sense of truth."[57]

249.    Like Defendants' prior false reporting, the April 4 Post exclusively relied on Defendants' flawed gait analysis.  Baker insisted Ms. Kerkhoff *did* walk with a "limp," this time revealing one of the selective videos he relied on to manufacture his "gait analysis."  In the video, taken during the attack on the Capitol on January 6, Ms. Kerkhoff was in full duty gear and carried a fully loaded, heavy gear bag on her back, a large PepperBall launcher in one hand, and a large

---

[55] Around midnight on March 27, 2026—apparently in response to Baker's X post proclaiming he "never retracted anything" about Ms. Kerkhoff —Blaze Media posted a single, text-only, and comments-disabled X post stating only, "Blaze News stands by its December 4, 2025 retraction of its November 8, 2025 story regarding the Jan. 6th pipe bombs."  TheBlaze (@theblaze), X (Mar. 27, 2026, at 11:47 PM), https://x.com/theblaze/status/2037738400527053194.

[56]  Steve   Baker   (@SteveBakerUSA),   X   (Apr.   4,   2026,   at   2:09   PM), https://x.com/SteveBakerUSA/status/2040491914584014963.

[57]  James   Lee   Bright   (@JLBrightLaw),   X   (Apr.   4,   2026,   at   5:57   PM), https://x.com/JLBrightLaw/status/2040549374732730527.

74

gas mask bag attached to her opposite leg —all of which affected her gait, and none of which mirrored what the pipe bomber suspect was carrying on January 5.

250.    Once again, Defendants' own sources revealed why such a video could not be used to run a valid or reliable gait analysis: "[S]everal factors concerning the subject[ ]can lead to error recognition," including if "[t]he subject in the video footage was carrying an object, which may have affected their gait."[58]  Once again, Defendants failed to explain what parameters (if any) were imposed to overcome this obvious self-selection and bias confirmation.  On information and belief, none were imposed; Defendants ran their "gait analysis" using a methodology that was driven by bias.  And once again, Baker falsely represented that Defendants' "gait analysis" allowed him to "positively identify" Ms. Kerkhoff, when, in reality, gait analysis only reveals "features that are present in a proportion of the population," and therefore cannot determine "uniqueness."[59]

251.    Baker, drawing from his longstanding playbook, tried to salvage his disproven allegations by pivoting to—and contorting—a new false fact.  He now insisted that Ms. Kerkhoff's impressive marathon history—which, in fact, disproved Defendants' gait analysis hypothesis— was *proof* that she was the pipe bomber.  Baker stated that Ms. Kerkhoff had "distinct physical traits that are characteristic of marathon runners and exhibited by the bomber while on that 44-minute trek around the DNC and RNC on the night of J5."

252.    Defendants knew Ms. Kerkhoff ran marathons on November 8; they mentioned it in the November 8 Article.  But they never framed it as evidence of Ms. Kerkhoff's culpability until after they received her retraction demand, which highlighted why that fact disproved their

---

[58]  *Gait: How Video of a Criminal Can Acquit or Convict*, Crim. Just., https://www.americanbar.org/groups/criminal_justice/resources/magazine/archive/gait-how-video-criminal-can-acquit-or-convict/ (Apr. 19, 2023).
[59]  *Id.*

analysis.  Knowing their "gait analysis" did not stand scrutiny, Baker and Hanneman were now grasping onto, and spinning, whatever "facts" they thought would perpetuate their false preconceived narrative.

253.    Baker and Hanneman also publicized Ms. Kerkhoff's retraction demand—but only to double-down on the same false claims it demanded they retract and apologize for.  Baker and Hanneman also falsely claimed Ms. Kerkhoff's counsel's "real client" was "Langley" or the "CIA," introducing a new (false) angle that Ms. Kerkhoff was a "CIA asset"—once again, directly in line with their preconceived narrative that January 6 was a "deep state" hoax.

254.    Baker and Hanneman ultimately used their false claims about Ms. Kerkhoff to promote their own "platform" where they would discuss their "Jan. 6 investigations."  In short, Baker and Hanneman viewed their falsehoods about Ms. Kerkhoff, and the harm they caused her, as the launching pad for the next stage of their careers.

255.    Because no responsible outlet was willing to host them, Baker and Hanneman indicated their new "platform" would be crowd-sourced.  On April 6, 2026 Baker shared to X a link to a fundraising campaign on the website GiveSendGo, urging his followers to "support" Baker and Hanneman's efforts to "tell stories corporate news editors would never allow [them] to touch."[60]  Hanneman also encouraged followers to "donate" by PayPal.[61]  As of the date of this filing, Baker and Hanneman raised over $20,000.  Their fundraising efforts relied almost exclusively on their promise to continue their smear campaign against Ms. Kerkhoff.

---

[60] Steve Baker (@SteveBakerUSA), X (Apr. 6, 2026, at 9:36 AM), https://x.com/SteveBakerUSA/status/204114815778706 2310.
[61] Joe Hanneman (@HanneReports), X (Apr. 7, 2026, at 9:20 AM), https://x.com/HanneReports/status/2041506276648112352.

76

256.    Hours later, Baker and Hanneman shared with their X followers the link to their new "platform": a WordPress blog called "Veritas Regnat" (Latin for "Truth Reigns") that was apparently dedicated to restating and promoting Baker and Hanneman's false claims about Ms. Kerkhoff.  At the time Baker and Hanneman shared the blog with their followers, each of the blog's three articles falsely accused Ms. Kerkhoff of being the January 6 pipe bomber.

257.    One post, which was dated April 6, 2026 and titled "Previously Unreleased Video Contradicts Contention Onetime Pipe-Bomb Suspect Did Not Have a Limp," insisted Ms. Kerkhoff did have "unusual 'circumduction gait.' (A kind of limp.)"  It also restated Baker and Hanneman's new theory that Ms. Kerkhoff's marathon achievements indicated (and did not disprove) she was the pipe bomber, claiming, "The now-former congressional liaison to the FBI, Marshall Yates, once said—while reviewing video of the J6 pipe bomber in the office of his former employer, Rep. Thomas Massie—'We need to be looking for a marathon runner.' Why? Because of distinct physical traits that are characteristic of marathon runners —and exhibited by the hoodie-clad suspect while on the 44-minute trek around the Democratic National Committee and Republican National Committee on the night of Jan. 5, 2021."

258.    Baker and Hanneman reinforced their false accusations by publishing side-by-side videos of Ms. Kerkhoff and the hooded pipe bomber:

77



259.    Once again, Baker and Hanneman's videos revealed inherent problems with their "gait analysis" methodology.  As in the April 4 Post, Ms. Kerkhoff was shown in full duty gear, carrying a fully loaded, heavy gear bag on her back, a large PepperBall launcher in one hand, and a large gas mask bag attached to her opposite leg; the pipe bomber carried a backpack in one hand at his side.  Ms. Kerkhoff was running in a riot environment; the pipe bomber was strolling on an empty street.  She traversed stairs and doors; he walked unimpeded on a level sidewalk.  The videos were not well-suited for a valid "gait analysis."   Baker and Hanneman's own research confirmed this.

260.    Baker and Hanneman's "Veritas Regnat" project made it clear:  They were determined to continue their smear campaign against Ms. Kerkhoff; no fact would get in their way, because they were willing to spin any fact, any way they needed, to conform to their false narrative.

**Defendants Have Caused Ms. Kerkhoff Severe and Ongoing Harm**

261.    Despite Ms. Kerkhoff's exoneration, Defendants' false allegations have irreparably altered her life in virtually every way: professionally, socially, financially, emotionally, and psychologically.  And because they have refused to fully retract the article and apologize, the damage continues to accrue.

262. For one, Defendants forced Ms. Kerkhoff to endure a traumatic and humiliating gauntlet. Their actions directly caused her to endure administrative leave from her job; a grueling, three-hour-long FBI interrogation; and a violative search of her home.

263. Defendants' claims also soured Ms. Kerkhoff's personal relationships. She was once friendly with her neighbors. Now she avoids them, unable to broach conversations about how she inadvertently brought an FBI helicopter and bomb-sniffing dogs to their street. She and Mr. Dickert used to take Bella on long walks through their neighborhood. Now they stay at home. In the months following the article, Ms. Kerkhoff would only leave home wearing a baseball hat pulled low over her eyes, worried that someone would identify and harass or even harm her.

264. Ms. Kerkhoff used to have a fulfilling social life. Since the articles were published, she has become reclusive, unsure of whom she can trust. Former friends have told her that they may never know the truth, and Ms. Kerkhoff has distanced herself from them. Ms. Kerkhoff was once friendly with CIA colleagues beyond her immediate team. Now, she dreads seeing them in the halls. Defendants' false accusation hovers unspoken over every interaction. She understands her coworkers know about it, but feel too awkward, suspicious, or even afraid to bring it up.

265. Defendants' false allegations unleashed a barrage of vicious social media posts against Ms. Kerkhoff, many of them anonymous, and most (if not all) of which remain online. Some called the allegation a "huge scandal" and proof that January 6 was an "op." Others demanded official action. One stated: "Track her down & throw this terrorist in jail immediately! These people don't get to commit acts of terror & function in society unpunished."



266.    The online harassment continues to this day.  Defendants' actions have made Ms. Kerkhoff a subject of constant discussion and disdain on rightwing podcasts.  Seraphin has implied Ms. Kerkhoff's guilt in conversations with the notorious conspiracy theorist Alex Jones, attracting an enormous and vocally hostile audience.

267.    A meme implying Ms. Kerkhoff is the pipe bomber has gone viral on X and right-wing social media forums:

80



268.    Other posts are more cryptic.  Also in January, Seraphin posted on X a public service announcement that Ms. Kerkhoff had recorded for It's On Us, a nonprofit dedicated to sexual assault awareness and prevention.  It drew 36 comments, many of which recognized the post as an attack on Ms. Kerkhoff.



269.    In January 2026, Ivan Raiklin posted a "CALL TO ACTION" to his X followers to "Research everything you can on . . . Shauni Kerkhoff, the alleged pipe bomber suspect and former US Capital Police officer[.]"[62]    The post attracted more than 45,000 views.    That month, he attended a Congressional hearing holding a sign that displayed Ms. Kerkhoff's name:



270.    Many of the online attacks have been personal.    When Ms. Kerkhoff's mother, Patti Kerkhoff, died in August 2024, Ms. Kerkhoff and her family published an online obituary for her. It included a "guest book" section where friends and family could leave consolatory notes.    But

---

[62]    Ivan    Raiklin    (@ivanraiklin),    X    (Jan.    13,    2026,    at    1:23    PM), https://x.com/ivanraiklin/status/2011142185388032396.

after Ms. Kerkhoff was falsely accused, anonymous internet users flooded it with vile posts. She deletes them, and others take their place. She monitors the obituary regularly to ensure that it is not defiled.

271. After Cole's defense counsel improperly disclosed Ms. Kerkhoff's home address, an anonymous individual, in an email to her counsel, threatened to take her life.



272. Defendants' actions have also clouded Ms. Kerkhoff's professional future. Before Defendants' article, she planned to spend the rest of her career in public service. Her record was full of awards and recognition. It reflected that she ranked second of 19 in her class of Capitol Police trainees, set a female record in a fitness test, and in federal law enforcement training in 2025, graduated with the top academic score in her class and obtained an "Expert Marksmanship score", which the program described in a letter as "an obvious indication that you understand and appreciate the importance of the proper use of a firearm to a law enforcement officer." It also reflected that she was awarded a Congressional Gold Medal for defending the Capitol on January 6.

273. Now that record is permanently marred. It notes that the FBI investigated her as a suspect in a serious crime, and that she was placed on administrative leave by the CIA. Any public sector employers—including her current employer—will weigh these things when considering her for new employment, advancement, or higher security clearance. She is considering seeking new

employment in the private sector because of the professional damage.  But she has spent nearly her entire career in federal law enforcement, and she is unsure where she will land.

274.    Before the article was published, Ms. Kerkhoff and Mr. Dickert had plans to marry. Now, with their lives in disarray, they have put their marriage on hold.  She would not be able to enjoy a wedding while Defendants' false accusation continues to wreak havoc on their lives.

275.    Ms. Kerkhoff has been forced to spend significant sums of money as a result of Defendants' smears.  She was forced to hire professionals to scrub her private information from the internet.  She had to purchase additional security alarms and cameras for her home, ensuring that every angle of her house was covered in the event anyone acted on a death threat she had received.   She purchased a treadmill to work out at home, because she fears being recognized at the gym or—worse—causing a bad actor to follow her there and harm her or others.  But the most substantial economic harms have yet to manifest.  Ms. Kerkhoff and Mr. Dickert plan to move, potentially out of state, so they may escape the social isolation that Defendants' false accusation has forced them to endure.

276.    All of this has had a profound emotional impact on Ms. Kerkhoff.  For the first time in her life, she struggles to fall asleep, and when she does sleep, she has nightmares.  Also, for the first time, she has had to take time off work to address her mental health.

277.    Many of these harms are permanent.  Ms. Kerkhoff cannot remove herself from an FBI list of suspects.  She will always be foreclosed from certain job opportunities.  The friendships she has lost, she will never get back.  And her Google results are permanently polluted with allegations that she was the Capitol Bomber.

278. Perhaps most tragically, Defendants have effectively stolen Ms. Kerkhoff's identity. She was once extraordinarily proud of her careers as a Temple University soccer player and a Capitol Police officer. Since the article, she is reluctant to wear Temple and Capitol Police attire, afraid that it will make her a target. She has instructed her family members, including her proud father, to do the same.

**Defendants Published Their False Accusations with Actual Malice—
That Is, With Actual Knowledge That They Are False or, at Minimum,
with Reckless Disregard for the Truth**

279. Defendants published their false and defamatory accusations against Ms. Kerkhoff with actual malice—that is, with actual knowledge that their accusations were false when they published them, or at an absolute minimum, with reckless disregard for their falsity.

*Defendants Had Actual Knowledge That Their Defamatory Accusations
Were False When They Published Them*

280. Defendants had actual knowledge that their defamatory accusations against Ms. Kerkhoff were false at the time they published them. Specifically, Defendants had actual knowledge that their "forensic gait analysis"—their only purported "evidence" linking Ms. Kerkhoff with the attempted pipe bombings—could not reliably identify Ms. Kerkhoff as a suspect at all, much less with near-absolute certainty.

281. Defendants had this actual knowledge because they reviewed literature that unambiguously explained the limitations of forensic gait analysis for suspect identification. Blaze Media, in its November 5 Article, deceptively and selectively quoted research articles concerning gait analysis in PeerJ Computer Science and the American Bar Association's Criminal Justice Magazine.

85

282.    For example, they stated that the PeerJ Computer Science article indicated that gait analysis "is regarded as one of the most sophisticated approaches to identifying an individual from CCTV footage or video recordings and is especially valuable in the absence of other biometric identifiers."  They concealed that the PeerJ Computer Science article's introduction described gait analysis as "one of the ***most complicated*** and sophisticated approaches," and that the article explained that it carries "***the potential for misidentification***" of suspects.

283.    Likewise, Defendants quoted the American Bar Association article as stating "that gait analysis, which has been used to help secure criminal convictions throughout the Anglosphere for decades, 'can be compelling, corroborating evidence,' especially since 'criminals cannot hide their gait.'"  But the ***very same article*** unambiguously explains that forensic gait analysis "does not confirm the identity of the suspect and does not provide conclusive proof in court"; that its identifying features are "class level" concepts that "demonstrate compatibility—not uniqueness"; and that "science has not proven that gait is unique," making forensic gait unusable as a means "to provide positive identification of an individual unless a very limited population is being considered."

284.    Defendants used gait analysis in all of the ways the article deemed unreliable—to "confirm the identity" of the pipe bombing suspect, to demonstrate the purported "uniqueness" of Ms. Kerkhoff's gait, and to provide "positive identification of an individual" (Ms. Kerkhoff) from a virtually limitless population of potential suspects (anyone who could have planted the bombs).

285.    In sum, Defendants knew that the gait analysis they "arranged" was a gross abuse of a forensic tool, but they arranged it anyway, purely to falsely accuse Ms. Kerkhoff.

*Defendants' False Accusations Were So Inherently Improbable That Only A*
*Reckless Person Would Have Published Them*

286.    Defendants' accusations against Ms. Kerkhoff were so inherently improbable—if not facially preposterous—that only a reckless person would have published them.  Defendants alleged that Ms. Kerkhoff planted pipe bombs on January 5, 2021, to divert law enforcement resources away from the Capitol, so that rioters could overwhelm it on January 6, giving authorities a pretext to consolidate power.

287.    But Defendants knew that Ms. Kerkhoff did not neglect the Capitol—she ***defended*** it at great personal cost.  Hanneman knew this because he included footage of Ms. Kerkhoff defending the Capitol in his own Epoch Times documentary. Baker knew this because he had personally witnessed Capitol Police, Ms. Kerkhoff among them, being overwhelmed by rioters at the Capitol Building's West Front on January 6.  Defendants had even reviewed Ms. Kerkhoff's trial testimony, in which she described the enormous toll that January 6 exacted on her and her fellow officers.[63]

288.    Defendants did not attempt to earnestly reconcile this contradiction.  Instead, they made a further false (and inherently implausible) allegation against Ms. Kerkhoff, claiming that she used "lethal force" to antagonize rioters on January 6 in an effort to make the riot more violent. Defendants thus ignored the true (and rational) explanation for Ms. Kerkhoff's actions on January 6—that she was doing her job—in favor of two facially contradictory claims that, independently

---

[63] Joseph M. Hanneman & Steve Baker, *Capitol Police Repeatedly Used Lethal Force on Protesters Early on Jan. 6, Video Shows*, Blaze Media (Nov. 4, 2025), https://www.theblaze.com/news/capitol-police-repeatedly-used-lethal-force-on-protesters-early-on-jan-6-video-shows.

87

and together, were so inherently improbable that only a reckless person would have published them.

*Defendants Published Their Defamatory Accusations*
*Against Ms. Kerkhoff With Animus And Ill Will Towards Her*

289.    Defendants' reckless disregard for the truth is further demonstrated by the fact that they published their false accusations against Ms. Kerkhoff not merely to advance a journalistic theory, but to punish a specific woman whom they disdained for her role in defending the Capitol on January 6 and for her testimony against January 6 rioters.

290.    First, Defendants had ill will towards Ms. Kerkhoff for her defense of the Capitol on January 6.  Baker, himself a January 6 rioter, breached the restricted security perimeter mere steps from where Ms. Kerkhoff and her unit were deploying less-than-lethal rounds against rioters. He was subsequently prosecuted for his crimes.  Before the riot, he published a blog post declaring his rage against Washington elites ("WE are not going to lay down to any level of tyranny"), the Capitol Police[64] ("irreparably corrupt and far too powerful"), and Ms. Kerkhoff specifically, whom he accused of deploying lethal force against rioters.  His investigation of Ms. Kerkhoff was, in substantial part, an act of personal vengeance.  Hanneman, in his Epoch Times documentary, castigated what he deemed Capitol Police "provocation" while he showed video of Ms. Kerkhoff launching PepperBalls at rioters.

291.    Furthermore, Defendants had ill will towards Ms. Kerkhoff for her testimony against January 6 defendants. Ms. Kerkhoff was the first witness to testify in the first January 6 federal criminal trial—the prosecution of militia member Reffitt—and her testimony helped

---

[64]    Steve    Baker    (@SteveBakerUSA),    X    (Mar.    20,    2024,    at    12:25    PM), https://x.com/SteveBakerUSA/status/1770486845408784834.

convict him.  Defendants were familiar with Ms. Kerkhoff's testimony because they reported on it.

292.    Defendants' animus toward Ms. Kerkhoff is perhaps most clearly evidenced by their decision to falsely accuse her of using "lethal force on protesters" in the November 4 Article, and to use that false accusation as a launching pad for the false pipe bomb allegation.  In truth, Ms. Kerkhoff's conduct on January 6 was above reproach.  She faced an immediate and severe threat—rioters had breached a security perimeter, were assaulting officers, and were refusing to yield to commands.  In response, she deployed minimum necessary force and escalated proportionally.  In fact, she deliberately chose *not* to use lethal force, despite having it available— as Baker knew and criticized, using *even that* to promote his "inside job" theory.[65]

293.    Defendants explicitly stated that their "lethal force" allegation led them to falsely accuse Ms. Kerkhoff of planting the pipe bombs.  In the November 5 Podcast, Baker told Beck that "Joe Hanneman and myself, what we did is we started drilling down into identifying who these officers were," referring to Ms. Kerkhoff's unit.  He then confirmed that this identification led him to "pull[] a thread" that led him to accuse Ms. Kerkhoff of planting the bombs.  Defendants thus admitted—on the eve of publication—that the pipe bomb accusation grew directly from their animus towards Ms. Kerkhoff for her conduct on January 6.

*Defendants Published Their False Accusations Against Ms. Kerkhoff to*
*Further A Preconceived Narrative That The January 6 Riot Was An "Inside*
*Job" And Twisted the Facts to Fit That Preconceived Narrative*

294.    Defendants' reckless disregard for the truth is further demonstrated by the fact that they published their false accusations against Ms. Kerkhoff to further their preconceived narrative

---

[65]    Steve Baker (@SteveBakerUSA), X (Sept. 26, 2025, at 2:45 PM), https://x.com/SteveBakerUSA/status/1971647446163116143.

that the January 6 riot was an "inside job" orchestrated by the "deep state"—a baseless conspiracy theory on which they had staked their entire professional identities.

295.    Long before Defendants falsely accused Ms. Kerkhoff, they spent years publicly advancing a theory that the January 6 riot was orchestrated by federal law enforcement and Washington elites.  For example, in February 2021, Baker wrote that the riot was an attempt by "the occupying elites" of the U.S. Capitol to "capture an unprecedented amount of political territory."  Hanneman produced an Epoch Times documentary that presented the riot as an "inside job" orchestrated by the "deep state," and that blamed Capitol Police for provoking rioters by deploying less-than-lethal force.  Blaze Media hired Baker and Hanneman specifically to advance these theories, and they published scores of articles and countless social media posts doing just that.

296.    Defendants explicitly framed the identification of the pipe bombing suspect as a missing puzzle piece that would conclusively prove them right.  In the November 5 Article, Defendants claimed that "the suspect's imminent identification will implicate and shame at least one federal agency."  In the November 5 Podcast, Baker told Glenn Beck that the "genesis" of his accusation "goes back to . . . examining the various players at Capitol Police," and that identifying those individuals led him to "pull a thread."  In the November 8 Article, Defendants stated that "[t]he prospect of a Capitol Police officer being the perpetrator, if confirmed, could recast the entire story of Jan. 6."  Defendants thus all but admitted that they were not journalists following evidence where it led, but rather, advocates who decided on a conclusion and then manufactured support for it.

297.    The facts Defendants alleged did not, by any honest reading, support their narrative—so Defendants twisted those facts until they *appeared* to support it. For example,

Ms. Kerkhoff defended the Capitol on January 6 at great personal cost, directly contradicting the theory that she planted the bombs to help rioters overwhelm it. But Defendants would not let that contradiction interfere with their predetermined narrative. They simply made up a new false claim: that Ms. Kerkhoff had used "lethal force" on rioters to deliberately provoke a more violent response, thus recasting her defense of the Capitol itself as evidence of the conspiracy. Ms. Kerkhoff's impressive marathon record contradicted Defendants' claim that she walked with a "limp" caused by a college soccer injury. But when confronted with this fact, Defendants changed course and (baselessly) recast her athleticism as proof that she was the bomber because the suspect exhibited "distinct physical traits characteristic of marathon runners." Defendants repeatedly twisted the facts to fit their preconceived narrative rather than correcting their narrative to reflect the truth.

*Defendants Purposefully And Deliberately Avoided Obtaining Information
That They Knew Would Contradict Their Preconceived Narrative*

298.    Defendants' reckless disregard for the truth is further demonstrated by the fact that, before publishing the Article, they deliberately avoided obtaining information and evidence they knew would contradict their preconceived narrative.

299.    Most significantly, Defendants never contacted Ms. Kerkhoff before publishing the Article. Had they done so, she could have provided them with exonerating evidence—specifically, a cell phone video of her commenting on her sleeping greyhound Bella, with metadata placing the recording at the precise time the bombs were planted. Defendants knew that contacting the subject of a highly damaging allegation before publication is a basic requirement of responsible journalism. Their failure to do so was deliberate: they did not contact Ms. Kerkhoff because they did not want to hear evidence that would contradict their story.

300.    Defendants also failed to contact any other source who might have challenged their narrative. They did not consult any independent forensic expert in gait analysis to evaluate the reliability of an "intelligence analyst" watching videos. They disregarded a substantial evidentiary record, including the findings of the House Select Committee on January 6, which—following a yearslong investigation orders of magnitude more comprehensive than anything Defendants undertook—found no evidence that Capitol Police officers were responsible for the riot.

*Defendants Knowingly Relied on Anonymous or Facially Unreliable
Sources They Knew Were Biased Against Ms. Kerkhoff*

301.    Defendants' reckless disregard for the truth is further demonstrated by their knowing reliance on sources they knew to be facially unreliable and/or biased against Ms. Kerkhoff.

302.    Defendants' foundational video source was "Armitas," a pseudonymous internet user whose profile picture is taken from a 1998 Japanese role-playing video game and whose publicly known "credential" was posting January 6 conspiracy theories on X. Defendants knew that their prior reliance on Armitas had led them to publish false information. Nevertheless, they relied on Armitas as a foundational source for their claim that Ms. Kerkhoff was a "94% match" for the bombing suspect. Knowing that Armitas was not credible, they attempted to shore up his credibility by stating that he "contributed" to a January 6 Committee report—a Committee that was highly sympathetic to Defendants' false claims.

303.    Defendants also relied on Kyle Seraphin, a disgraced former FBI special agent who had devoted his entire post-FBI career to denigrating the Bureau. Defendants knew that Seraphin's security clearance had been suspended in 2023 for multiple violations, and that he had made other baseless public accusations against individuals involved in the FBI—including baseless allegations

92

for which he was named as a defendant in a separate defamation action. And Defendants knew that Seraphin regularly appeared as a guest of Alex Jones, a media personality who received a $1.4 billion defamation judgment for defaming the victims of the Sandy Hook shooting. Despite knowing all of this, Defendants presented Seraphin's claims to their audience as credible confirmation of their accusation.

304. Every other source that Defendants relied on for their false accusations against Ms. Kerkhoff was unnamed. Defendants relied exclusively on confidential or anonymous sources to validate their faulty "gait analysis." Defendants failed to disclose what credentials those sources possessed to run or approve a gait analysis. On information and belief, Defendants did not disclose their sources' credentials because their sources did not have any credentials. Defendants' own academic research confirms that no legitimate forensic "gait analyst" would state or subscribe to the types of conclusions Defendants' insisted their analysis yielded.

*Defendants' Publication of The Articles Reflect An*
*Extreme Departure from Responsible Journalistic Standards*

305. Defendants' reckless disregard for the truth is further demonstrated by the fact that their conduct in investigating, preparing, and publishing the Articles reflected an extreme departure from responsible journalistic standards. Blaze Media advertised itself to readers as a responsible journalistic outlet. Its "About" page stated: "Our talented writers and editors sift through the disinformation and propaganda to find and present the truth, especially about topics other outlets refuse to cover." Blaze Media founder Glenn Beck, in the November 5 Podcast, teased Defendants' forthcoming false accusations against Ms. Kerkhoff as "Pulitzer prize winning stuff." Baker and Hanneman presented themselves as "investigative journalists." They were obligated to adhere to journalistic standards commensurate with that self-presentation, and their failure to do so is evidence of actual malice.

93

306.    *First*, Defendants' failure to give Ms. Kerkhoff a meaningful opportunity to respond before publication was itself an egregious departure from basic journalistic standards.[66]  No responsible news organization would publicly accuse an individual of a serious crime—complete with her name, employer, age, parents' names, and personal history—without even attempting to reach the accused for comment.  Upon information and belief, Blaze Media's senior editors approved publication of these accusations without requiring that Baker and Hanneman first seek comment from Ms. Kerkhoff.

307.    *Second*, rather than objectively reporting on news, Defendants manufactured it.  By arranging a (bogus) forensic analysis, then sharing their "findings" with anonymous "intelligence sources" and leaking the accusation on X before publication, Defendants deliberately induced the FBI to open an investigation of Ms. Kerkhoff.  They then cited that investigation—which their own actions had caused—as independent corroboration of their accusation.  This is an extreme departure from journalistic standards.

308.    *Third*, Blaze Media's institutional conduct reflected an extreme departure from journalistic standards.  Baker confirmed the "the November 8 story that started it all went through 4-5 layers of editorial review, legal clearance, and executive suite approval" before it was published by Blaze Media.[67]  Not one person at any level of Blaze Media's organization was willing to require Baker or Hanneman to reach out to Ms. Kerkhoff for comment; to verify—let alone disclose—their "gait analysis" methodology; to accurately summarize research articles purportedly supporting their reporting; to speak with an actual expert who could scrutinize their

---

[66] Soc'y of Pro. Journalists, SPJ Code of Ethics (Sep. 6, 2014), https://www.spj.org/spj-code-of-ethics/ (Journalists should "[d]iligently seek subjects of news coverage to allow them to respond to criticism or allegations of wrongdoing.").
[67] Steve    Baker    (@SteveBakerUSA),    X    (Apr.    9,    2026,    at    9:04    AM), https://x.com/SteveBakerUSA/status/2042227055329210567.

"gait analysis" methodology and findings; to seek out *any* source who may have questioned their approach or their findings (and not only those who blindly agreed with the findings because they conformed to their own preconceived narratives); or to disclose their confidential sources (or at least provide enough information that readers could evaluate their credibility). Instead, Blaze Media endorsed Baker and Hanneman's flawed investigation and gave them a platform to broadcast their false claims. These extreme departures from journalistic and editorial standards resulted in the entirely avoidable publication of defamatory falsehoods.

*Defendants Defamed Ms. Kerkhoff To Profit for Themselves—*
*That Is, They Defamed Her With A Financial Motive*

309. Defendants' reckless disregard for the truth is further demonstrated by their substantial and well-documented financial motivations to publish the most sensational possible accusation—especially one that would excite their followers, who also believed in their preconceived narrative—regardless of whether it was true.

310. Blaze Media's business model depends on generating viral content that attracts subscribers and donations. In the November 5 Podcast, Beck plainly framed the defamatory reporting as a fundraising device. He stated:

> When I first started the Blaze, we've concentrated … [on] covering the news that nobody else would cover. And I hoped one day we would be able to do investigative journalism, like what Steve is doing. And this is Pulitzer prize winning stuff. When you hear it, it's quite amazing. But the Blaze has doubled down on their investigative journalism—support them, support them, support them. Become a member of Blaze TV, Blaze TV dot com slash Glen. I don't know what the deal is or anything else, but go there, use promo code "Glenn," and you're going to get a discount. But this needs to be supported. This kind of thing is why they went after him.

311. Defendants, moreover, each hold premium (verified) accounts on X and, under the platform's "Creator Revenue Sharing" program, receive payments in proportion to the engagement

95

their posts receive. The more widely viewed or shared a post, the more money its author earns. Defendants knew that posts containing serious allegations against an individual Capitol Police officer would go massively viral on the platform, regardless of their truth or falsity, and would thereby substantially increase their Creator Revenue Sharing payments. This gave them a strong financial motive.

312. Baker and Hanneman confirmed their financial motive when they created a fundraising campaign on the "GiveSendGo" website to support the launch of their new "platform," which was dedicated to their "investigation" on January 6. Baker and Hanneman relied almost exclusively on their false claims about Ms. Kerkhoff to advertise their new platform and solicit funding, promising followers an "uncensored" account of their (flawed) investigation and (false) claims.

*Defendants Refused to Retract Their Defamatory Accusations Despite Incontrovertible Evidence of Ms. Kerkhoff's Innocence*

313. Defendants' knowing disregard for the truth is further demonstrated by their sustained refusal to retract their defamatory accusations even after incontrovertible evidence established that those accusations were false. Defendants knew that Ms. Kerkhoff had an alibi, that the FBI had detained a real pipe bombing suspect, and that their false allegations caused Ms. Kerkhoff tremendous harm. But Defendants have never apologized or publicly acknowledged that Ms. Kerkhoff was innocent.

314. Defendants merely "updated" the November 8 Article until allowing its text to remain online was no longer tenable. For example, on November 25, 2025—seventeen days after publication—CBS News reported that the FBI had ruled out Ms. Kerkhoff as a suspect after video evidence placed her at home at the same time the pipe bombs were planted. Even then, Defendants

did not retract the Article. Instead, they published a self-serving "update" acknowledging the CBS News report while declining to acknowledge any error.

315. On December 4, 2025, the FBI announced the arrest and charging of Brian J. Cole Jr. as the actual pipe bomber, who quickly confessed to the crime. Only then did Blaze Media purport to "retract" the Article by removing its text and replacing it with an "Update"—but even then, the "Update" was itself defamatory.

316. Rather than acknowledging any error, Blaze Media asserted that its sources "continue to stand by the information they provided to Blaze News," that "[a]t all times, the reporting adhered to professional journalistic standards," and that the Article had been "published with a good-faith belief in its truth." These statements are false. By publishing them, Defendants reinforced the quality and veracity of their prior false statements and compounded the damage to Ms. Kerkhoff's reputation while actively encouraging the conspiracy theories about her to continue spreading.

317. In a January 16, 2026 letter to Defendants, Ms. Kerkhoff's counsel explained the "enormous harm" that their false accusations have caused her, and demanded that they "retract the Article unequivocally, and . . . publicly apologize to Ms. Kerkhoff with the same prominence and fanfare with which [they] defamed her."

318. Defendants did not retract the article or apologize. Instead, on January 29, 2026, Defendants' counsel stated in a letter that "Ms. Kerkhoff will be unable to satisfy [the actual malice] standard as a matter of law. My clients thus decline your letter's demands."

319. Baker and Hanneman further used the retraction demand to double-down on their falsehoods about Ms. Kerkhoff and launch the next stage of their careers: a self-funded "platform"

97

to discuss their "Jan6 Investigation."   Baker and Hanneman used their false claims about

Ms. Kerkhoff—and Ms. Kerkhoff's demands that they retract them—to tease and promote that

platform, further cashing-in on their false claims.

## CLAIMS

### COUNT ONE
### DEFAMATION
### (False Accusations in the November 5 Article)
### (Against Defendant Blaze Media LLC)

320.    Ms. Kerkhoff repeats, re-alleges, and incorporates by reference the allegations in

Paragraphs 1-319 as if set forth fully herein.

321.    On November 5, 2025, Defendant Blaze Media published an article headlined

"'She's one of us!' Glenn Beck with bombshell revelation about J6 pipe-bomb suspect," by Joseph

MacKinnon (the **"November 5 Article"**).  The November 5 Article summarized Defendant Steve

Baker's appearance on a November 5 episode of the Glenn Beck show and included several of

Baker's quotes.  A true and correct copy of the November 5 Article is attached hereto as Exhibit

A.

322.    In the November 5 Article, Blaze Media published the following false and

defamatory statements concerning Ms. Kerkhoff:

(a)    "Blaze News investigative reporters Steve Baker and Joseph Hanneman have spent years working to ***identify the masked individual who placed pipe bombs near the headquarters of the Republican National Committee and the Democratic National Committee in Washington, D.C., on Jan. 5, 2021***."

(b)    "Baker, whom the Biden FBI arrested over his January 6 reporting, revealed to Blaze Media co-founder Glenn Beck on Wednesday that they have finally locked in on a suspect.  What's more, Baker hinted that ***the suspect's imminent identification will implicate and shame at least one federal agency***."

98

(c) Baker told Beck, "When I pulled this thread, I was so shocked by what I saw, *I immediately took it to a source in one of the most important, highest-level investigative federal agencies in the country*. I immediately took it to our sources there, and I said, 'You have to see this.'" "After they looked at it for about two hours, the response that I got back was, 'Holy F,'" continued Baker. "And then the follow-up response was, '*She's one of us!*'"

(d) When pressed by Beck about his confidence level in the suspect ID, Baker said, "*I will tell you that from gait analysis — that's the analysis of the hoodied bomber … compared to the gait analysis of this individual in private life and at work — that the actual software hit at a 94% accuracy.*" "*Human analysis from the experts in intelligence is much higher*," continued Baker. "They looked at it and went, 'My God, that's it. We got it.' … Forensic gait analysis — the scientific study of patterns in an individual's style of movement in walking or running — is regarded as *one of the most sophisticated approaches to identifying an individual from CCTV footage or video recordings* and as especially valuable in the absence of other biometric identifiers."

(e) "*Baker indicated that he left some "breadcrumbs" in recent reports.* Hanneman and Baker reported last week, for instance, that the 8.5-minute video about the Jan. 6 pipe bombs released by the FBI in October contained footage edited to exclude showing *a U.S. Capitol Police SUV pull up directly across the street from where the suspect stood at 8:15 p.m. on January 5, 2021*."

323. The statements in Paragraph 322 are referred to collectively in this Count as the **"November 5 Article Statements."**

324. The November 5 Article Statements are of and concerning Ms. Kerkhoff.

325. Blaze Media clearly intended the November 5 Article Statements to refer to Ms. Kerkhoff, and the November 5 Article Statements would be (and were) understood by readers as referring to Ms. Kerkhoff. It had already published Ms. Kerkhoff's name to its "sources," high-level officials, and others, leading them to publicly identify her immediately after the November 5 Article was published. It referenced "breadcrumbs" Baker had "left" in his prior reporting, including the November 4 Article. This resulted in multiple social media users identifying Ms. Kerkhoff as the target of Blaze Media's false accusation *before* it published her name. And it

did, in fact, falsely accuse Ms. Kerkhoff by name in a separate article two days later, confirming that the November 5 Article Statements were, in fact, of and concerning her.

326. The November 5 Article Statements are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Ms. Kerkhoff planted two pipe bombs in Washington, D.C. on the evening of January 5, 2021.

327. The November 5 Article Statements are false. Ms. Kerkhoff did not plant any pipe bombs anywhere at any time. On the evening of January 5, 2021, she was not out planting pipe bombs, but at home with Mr. Dickert and her dog, as evidenced by video recording.

328. The November 5 Article Statements are defamatory, and readers understood them to be defamatory, because they tend to hold Ms. Kerkhoff up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tend to impair her standing in the community, tend to lower the esteem in which she is held, and tend to discourage others from associating with her, including by accusing her of planting pipe bombs in Washington, D.C., a crime so serious that the Federal Bureau Investigation offered a $500,000 reward to anyone who identified a suspect. Indeed, the real pipe bombing suspect, Brian Cole Jr., was charged with transporting an explosive device in interstate commerce and attempted malicious destruction by means of an explosive; he faces up to 30 years in prison if convicted. The November 5 Article Statements make substantial danger to reputation apparent.

329. The November 5 Article Statements are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because on their face they accuse Ms. Kerkhoff of a serious crime. In addition, they are defamatory *per se* because they attribute to Ms. Kerkhoff unfitness to perform the duties of her profession and foreseeably would hurt Ms. Kerkhoff in her profession. Ms. Kerkhoff is therefore entitled to presumed damages.

330. Blaze Media knew the substantial danger of injury to Ms. Kerkhoff and her reputation from the November 5 Article Statements, which is readily apparent, and in fact intended to cause injury to Ms. Kerkhoff by publishing the November 5 Article Statements.

331. Blaze Media published the November 5 Article Statements with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that Blaze Media:

(a) Had actual knowledge that its defamatory accusations were false when they published them. Blaze Media knew that Defendants' "forensic gait analysis"—their only purported "evidence" linking Ms. Kerkhoff with the attempted pipe bombings—could not particularly identify Ms. Kerkhoff as a suspect, much less with near-absolute certainty. It knew this because it reviewed literature that unambiguously explained the limitations of forensic gait analysis for suspect identification, and it selectively and misleadingly quoted the same;

(b) Published its defamatory accusations even though they were (and are) so inherently improbable that only a reckless person would have published them. Among other things, Blaze Media knew that Ms. Kerkhoff defended the U.S. Capitol on January 6, 2021, at great personal cost, and thus it was inherently improbable that she had planted pipe bombs to draw Capitol Police resources away from it;

(c) Published its defamatory accusations against Ms. Kerkhoff with animus and ill will toward her resulting from, among other things, her role in defending the Capitol on January 6 and her testimony against January 6 rioters;

(d) Published their false accusations against Ms. Kerkhoff to further a preconceived narrative that the January 6 riot was an "inside job"—indeed, they spent years publicly staking their entire professional identities on that baseless theory—then twisted the facts to fit that preconceived narrative, including by inventing additional false claims against Ms. Kerkhoff;

(e) Purposefully and deliberately avoided obtaining information that it knew would contradict its preconceived narrative, including from an independent and qualified expert in gait analysis and from Ms. Kerkhoff herself;

(f) Relied on facially unreliable sources it knew were biased against Ms. Kerkhoff, including Kyle Seraphin, "Armitas," and other anonymous sources;

101

(g)    Departed in a gross and extreme manner from responsible journalistic standards in publishing the November 5 Podcast, including, among other things, its failure to give Ms. Kerkhoff a meaningful opportunity to respond before publication;

(h)    Defamed Ms. Kerkhoff in pursuit of financial gain, including by generating viral content that attracts subscribers and donations. Indeed, on a podcast episode referenced by and published concurrently with the November 5 Article, Glenn Beck plainly framed Blaze Media's defamatory reporting as a fundraising device; and

(i)    Refused to retract its defamatory accusations despite incontrovertible evidence of their falsity and Ms. Kerkhoff's innocence. Blaze Media knew that Ms. Kerkhoff had an alibi, that the FBI had detained a real pipe bombing suspect, and that its false allegations caused Ms. Kerkhoff tremendous harm. But it has never apologized or publicly acknowledged that Ms. Kerkhoff was innocent.

332.    Blaze Media's publication of the November 5 Article Statements was at minimum negligent, in that it acted negligently in failing to ascertain the facts on which the November 5 Article Statements were based.

333.    Blaze Media had no applicable privilege or legal authorization to publish the November 5 Article Statements, or, if it did, it abused that privilege or authorization. Blaze Media published its November 5 Article Statements in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

334.    Blaze Media's actions were malicious, willful, and wanton, and evidence a conscious disregard for Ms. Kerkhoff's rights. Accordingly, punitive damages are appropriate.

335.    As a direct and proximate result of Blaze Media's November 5 Article Statements, Ms. Kerkhoff has suffered substantial economic damage including, among other things, loss of current and future business opportunities.

336.    As a direct and proximate result of Blaze Media's November 5 Article Statements, Ms. Kerkhoff has suffered severe reputational damage.

337.    As a direct and proximate result of Blaze Media's November 5 Article Statements, Ms. Kerkhoff has suffered embarrassment, humiliation, and emotional distress.

338.    In view of the foregoing, Ms. Kerkhoff is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

**COUNT TWO**
**DEFAMATION**
**(False Accusations in the November 5 Podcast)**
**(Against Defendants Blaze Media LLC and Stephen M. Baker)**

339.    Ms. Kerkhoff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1-319 as if set forth fully herein.

340.    On November 5, 2025, Defendant Blaze Media published a podcast on the Glenn Beck Program titled "Why Mamdani's Victory Was Bad, but Virginia's Was WORSE," hosted by Glenn Beck and featuring Defendant Steve Baker (the **"November 5 Podcast"**). A certified transcript of the November 5 Podcast is attached hereto as Exhibit B.

341.    In the November 5 Podcast, Blaze Media and Baker published the following false and defamatory statements concerning Ms. Kerkhoff:

(a)    **Beck**: "***There's a story that is up on the Blaze today.*** I think it broke last night and it's about January 6 and it led Steve Baker to see some things and go, wait a minute. ***And, uh, he started connecting some dots and this story is going to break tomorrow***. … I want to just bring you the story that is released today because ***it plays a smaller role, but an important role in what you're going to see tomorrow***. And tomorrow is a very, very big news story."

(b)    **Beck**: "***So there is a story from Steve Baker on the Blaze: Capitol Police repeatedly used lethal force on protesters early on January 6, according to video***. … And Steve Baker is probably the leading expert on this video.

… [A]s Steve will come one here in a minute and tell you, *there is an important part of this story that will tie into a story that is coming tomorrow exclusively on the Blaze*."

(c) **Beck**: "There is a breaking news story that hopefully is coming out tomorrow. Um you'll understand, uh, once you hear they story, um, *this is one of the biggest stories—I think it is the biggest scandal of my lifetime*. Uh, maybe in the last a hundred years, it is monstrous. Uh, what Steve Baker has, um, is going to report on and, um, we're going to give some, a little bit of background. I can tell you this. *There is a major development in the January 6 pipe bomber investigation.* Um, Blaze News has the exclusive because it is Steve's reporting that has brought this to the attention. *And unfortunately it leads—it's lead suspect is at the highest levels of government.*"

(d) **Baker**: "*[T]he genesis of this … goes back to … much of my work into examining the various players at Capitol Police.*"

(e) **Baker**: "Look, Glenn, *we … have examined this … particular story that we released yesterday*. We've been looking at this for years. We've done updates, but finally Joe Hanneman and myself, *what we did is we started drilling down into identifying who these officers were*." … **Beck**: "That's why I encourage them to read this story because *this story is connected to the next one*." … **Baker**: "Yeah, for … our next story, the follow up to this one, *I did put some breadcrumbs in this story on purpose.*"

(f) **Baker**: "*[W]hat we discovered was a character that high degree of probability is involved in the biggest scandal, as you mentioned earlier, not just of January 6, but possibly our government system*." **Beck**: "And it's at the highest levels. And you're going to name names."

(g) **Baker**: "I was pulling these threads for years. And I pulled one last Wednesday, two weeks ago today. And when I pulled this thread, I was so shocked by what I saw *I immediately took it to a source in one of the most important, highest-level investigative agencies in the country*. I took it to my sources there and said you have to see this. After they looked at it for two hours, the response I got back was: 'Holy F.' And the follow up response I got was, '*She's one of us*.'"

(h) **Beck**: "What's your confidence level in this story?" **Baker**: "I can give you forensic estimates. *I can tell you from gait analysis, that's the analysis of the hoodied bomber on the evening of November [sic] 5, compared to the gait analysis of this individual in private life and at work, that the actual software hit at 94% accuracy. Then human analysis from the experts in intelligence is much higher.* They've looked at it and went 'that's it, you've got it!' And that put things in motion, as a result of that. … I'll say this in closing, it's a high, high degree of certitude, coming from the top people in

our intelligence community. And they've already started making moves related to that."

342.    The statements in Paragraph 341 are referred to collectively in this Count as the **"November 5 Podcast Statements."**

343.    The November 5 Podcast Statements are of and concerning Ms. Kerkhoff.  Blaze Media and Baker clearly intended the November 5 Podcast Statements to refer to Ms. Kerkhoff, and the November 5 Podcast Statements would be (and were) understood by readers as referring to Ms. Kerkhoff.  They had already published Ms. Kerkhoff's name to its "sources," high-level officials, and others, leading them to publicly identify her immediately after the November 5 Article was published.  This resulted in multiple social media users identifying Ms. Kerkhoff as the target of Blaze Media and Baker's false accusations *before* Blaze Media and Baker published her name.  And they did, in fact, falsely accuse Ms. Kerkhoff by name in a separate article two days later, confirming that the Statements were, in fact, of and concerning her.

344.    The November 5 Podcast Statements are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Ms. Kerkhoff planted two pipe bombs in Washington, D.C. on the evening of January 5, 2021.

345.    The November 5 Podcast Statements are false.  Ms. Kerkhoff did not plant any pipe bombs anywhere at any time.  On the evening of January 5, 2021, she was not out planting pipe bombs, but at home with Mr. Dickert and her dog, as confirmed by video recording.

346.    The November 5 Podcast Statements are defamatory, and readers understood them to be defamatory, because they tend to hold Ms. Kerkhoff up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tend to impair her standing in the community, tend to lower the esteem in which she is held, and tend to discourage

others from associating with her, including by accusing her of planting pipe bombs in Washington, D.C., a crime so serious that the Federal Bureau Investigation offered a $500,000 reward to anyone who identified a suspect. The November 5 Podcast Statements make substantial danger to reputation apparent.

347.    The November 5 Podcast Statements are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because on their face they accuse Ms. Kerkhoff of a serious crime. In addition, they are defamatory per se because they attribute to Ms. Kerkhoff unfitness to perform the duties of her profession and foreseeably would hurt Ms. Kerkhoff in her profession. Ms. Kerkhoff is therefore entitled to presumed damages.

348.    Blaze Media and Baker knew the substantial danger of injury to Ms. Kerkhoff and her reputation from the November 5 Podcast Statements, which is readily apparent, and in fact intended to cause injury to Ms. Kerkhoff by publishing the November 5 Podcast Statements.

349.    Blaze Media and Baker published the November 5 Podcast Statements with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that Blaze Media and Baker:

(a)    Had actual knowledge that their defamatory accusations were false when they published them. Specifically, they knew that their "forensic gait analysis"—their only purported "evidence" linking Ms. Kerkhoff with the attempted pipe bombings—could not particularly identify Ms. Kerkhoff as a suspect, much less with near-absolute certainty. They knew this because they reviewed literature that unambiguously explained the limitations of forensic gait analysis for suspect identification;

(b)    Published their defamatory accusations even though they were (and are) so inherently improbable that only a reckless person would have published them. Among other things, they knew that Ms. Kerkhoff defended the U.S. Capitol on January 6, 2021, at great personal cost, and thus it was inherently improbable that she had planted pipe bombs to draw Capitol Police resources away from it;

106

(c)     Published their defamatory accusations against Ms. Kerkhoff with animus and ill will toward her resulting from, among other things, Ms. Kerkhoff's role in defending the Capitol on January 6 and for her testimony against January 6 rioters;

(d)     Published their false accusations against Ms. Kerkhoff to further a preconceived narrative that the January 6 riot was an "inside job"—indeed, they spent years publicly staking their entire professional identities on that baseless theory—then twisted the facts to fit that preconceived narrative, including by inventing additional false claims against Ms. Kerkhoff;

(e)     Purposefully and deliberately avoided obtaining information that they knew would contradict their preconceived narrative, including from an independent qualified expert in gait analysis and from Ms. Kerkhoff herself;

(f)     Relied on facially unreliable sources they knew were biased against Ms. Kerkhoff, including Kyle Seraphin, "Armitas," and other anonymous sources;

(g)     Departed in a gross and extreme manner from responsible journalistic standards in publishing the November 5 Article, including their failure to give Ms. Kerkhoff a meaningful opportunity to respond before publication;

(h)     Defamed Ms. Kerkhoff in pursuit of financial gain, including by generating viral content that attracts subscribers and donations. Indeed, Glenn Beck plainly framed Blaze Media's defamatory reporting as a fundraising device; and

(i)     Refused to retract their defamatory accusations despite incontrovertible evidence of Ms. Kerkhoff's innocence. Blaze Media and Baker knew that Ms. Kerkhoff had an alibi, that the FBI had detained a real pipe bombing suspect, and that their false allegations caused Ms. Kerkhoff tremendous harm. But they have never apologized or publicly acknowledged that Ms. Kerkhoff was innocent, and Defendant Baker continues to make new false and defamatory claims.

350.    Blaze Media and Baker's publication of the November 5 Podcast Statements was at minimum negligent, in that they acted negligently in failing to ascertain the facts on which the Statements were based.

351.    Defendants had no applicable privilege or legal authorization to publish the November 5 Podcast Statements, or, if they did, they abused that privilege or authorization. Defendants published their November 5 Podcast Statements in bad faith, with actual

malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

352. Blaze Media and Baker's actions were malicious, willful, and wanton, and evidence a conscious disregard for Ms. Kerkhoff's rights. Accordingly, punitive damages are appropriate.

353. As a direct and proximate result of Defendants' November 5 Podcast Statements, Ms. Kerkhoff has suffered substantial economic damage including, among other things, loss of current and future business opportunities.

354. As a direct and proximate result of Defendants' November 5 Podcast Statements, Ms. Kerkhoff has suffered severe reputational damage.

355. As a direct and proximate result of Defendants' November 5 Podcast Statements, Ms. Kerkhoff has suffered embarrassment, humiliation, and emotional distress.

356. In view of the foregoing, Ms. Kerkhoff is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

**COUNT THREE**
**DEFAMATION**
**(False Accusations in the November 8 Article)**
**(Against All Defendants)**

357. Ms. Kerkhoff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1-319 as if set forth fully herein.

358. On November 8, 2025, Defendants published an article on Blaze Media's website headlined "Former Capitol Police officer a forensic match for Jan. 6 pipe bomber, sources say" by Steve Baker and Joseph Hanneman (the **"November 8 Article"**). A true and correct copy of the November 8 Article is attached hereto as Exhibit C.

359.   In the November 8 Article, Blaze Media and Baker published the following false and defamatory statements concerning Ms. Kerkhoff:

(a)   ***Former Capitol Police officer a forensic match for Jan. 6 pipe bomber***, sources say

(b)   The forensic study, arranged by Blaze News, revealed that ***Kerkhoff is up to a 98% match to the gait of the pipe-bomb suspect***. The findings were confirmed by several current intelligence sources who viewed the study results.

(c)   Blaze News approached numerous intelligence officials two weeks ago with questions about findings from its investigation, which suggested that ***Kerkhoff matched the description and behavior of the suspected bomber***, based on her distinctive walk, slight limp, 5'7" frame, and other factors.

(d)   A software algorithm that analyzes walking parameters including flexion (knee bend), hip extension, speed, step length, cadence, and variance rated ***Shauni Rae Kerkhoff, 31, of Alexandria, Va., as a 94% match to the bomb suspect shown on video from Jan. 5, 2021***. The veteran analyst who ran the analysis for Blaze News said that based on visual observations the program can struggle with, he personally pegged the match at closer to 98%.

360.   The statements in Paragraph 359 are referred to collectively in this Count as the "November 8 Article Statements**.**"

361.   The November 8 Article Statements are of and concerning Ms. Kerkhoff.  Indeed, they refer to Ms. Kerkhoff by name.

362.    The November 8 Article Statements are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Ms. Kerkhoff planted two pipe bombs in Washington D.C. on the evening of January 5, 2021.

363.   The November 8 Article Statements are false.  Ms. Kerkhoff did not plant any pipe bombs anywhere at any time.  On the evening of January 5, 2021, she was not out planting pipe bombs, but at home video recording her dog.

364.    The November 8 Article Statements are defamatory, and readers understood them to be defamatory, because they tend to hold Ms. Kerkhoff up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tend to impair her standing in the community, tend to lower the esteem in which she is held, and tend to discourage others from associating with her, including by accusing her of planting pipe bombs in Washington, D.C., a crime so serious that the Federal Bureau Investigation offered a $500,000 reward to anyone who identified a suspect.  The November 8 Article Statements make substantial danger to reputation apparent.

365.    The November 8 Article Statements are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because on their face they accuse Ms. Kerkhoff of a serious crime.  In addition, they are defamatory *per se* because they attribute to Ms. Kerkhoff unfitness to perform the duties of her profession and foreseeably would hurt Ms. Kerkhoff in her profession.  Ms. Kerkhoff is therefore entitled to presumed damages.

366.    Defendants knew the substantial danger of injury to Ms. Kerkhoff and her reputation from the November 8 Article Statements, which is readily apparent, and in fact intended to cause injury to Ms. Kerkhoff by publishing the November 8 Article Statements.

367.    Defendants published the November 8 Article Statements with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that Defendants:

(a)    Had actual knowledge that their defamatory accusations were false when they published them.  Defendants knew that their "forensic gait analysis"— their only purported "evidence" linking Ms. Kerkhoff with the attempted pipe bombings—could not particularly identify Ms. Kerkhoff as a suspect at all, much less with near-absolute certainty.  They knew this because they reviewed literature that unambiguously explained the limitations of forensic gait analysis for suspect identification;

(b)     Published their defamatory accusations even though they were (and are) so inherently improbable that only a reckless person would have published them. Among other things, Defendants knew that Ms. Kerkhoff defended the U.S. Capitol on January 6, 2021, at great personal cost, and thus it was inherently improbable that she had planted pipe bombs to draw Capitol Police resources away from it;

(c)     Published their defamatory accusations against Ms. Kerkhoff with animus and ill will toward her resulting from, among other things, Ms. Kerkhoff's role in defending the Capitol on January 6 and for her testimony against January 6 rioters;

(d)     Published their false accusations against Ms. Kerkhoff to further a preconceived narrative that the January 6 riot was an "inside job"—indeed, they spent years publicly staking their entire professional identities on that baseless theory—then twisted the facts to fit that preconceived narrative, including by inventing additional false claims against Ms. Kerkhoff;

(e)     Purposefully and deliberately avoided obtaining information that they knew would contradict their preconceived narrative, including from an independent qualified expert in gait analysis and from Ms. Kerkhoff herself;

(f)     Relied on facially unreliable sources they knew were biased against Ms. Kerkhoff, including Kyle Seraphin, "Armitas," and other anonymous sources;

(g)     Departed in a gross and extreme manner from responsible journalistic standards in publishing the November 8 Article Statements, , including their failure to give Ms. Kerkhoff a meaningful opportunity to respond before publication;

(h)     Defamed Ms. Kerkhoff in pursuit of financial gain. Indeed, Glenn Beck plainly framed Blaze Media's defamatory reporting as a fundraising device, and Baker and Hanneman relied almost exclusively on their false claims to solicit funding for a new media platform; and

(i)     Refused to retract their defamatory accusations despite incontrovertible evidence of their falsity and Ms. Kerkhoff's innocence. Defendants knew that Ms. Kerkhoff had an alibi, that the FBI had detained a real pipe bombing suspect, and that their false allegations caused Ms. Kerkhoff tremendous harm. But they have never apologized or publicly acknowledged that Ms. Kerkhoff was innocent, and Defendants Baker and Hanneman continue to make new false and defamatory claims.

111

368.    Defendants' publication of the November 8 Article Statements was at minimum negligent, in that they acted negligently in failing to ascertain the facts on which the November 8 Article Statements were based.

369.    Defendants had no applicable privilege or legal authorization to publish the November 8 Article Statements, or, if they did, they abused that privilege or authorization.  Defendants published their November 8 Article Statements in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

370.    Defendants' actions were malicious, willful, and wanton, and evidence a conscious disregard for Ms. Kerkhoff's rights.  Accordingly, punitive damages are appropriate.

371.    As a direct and proximate result of Defendants' November 8 Article Statements, Ms. Kerkhoff has suffered substantial economic damage including, among other things, loss of current and future business opportunities.

372.    As a direct and proximate result of Defendants' November 8 Article Statements, Ms. Kerkhoff has suffered severe reputational damage.

373.    As a direct and proximate result of Defendants' November 8 Article Statements, Ms. Kerkhoff has suffered embarrassment, humiliation, and emotional distress.

374.    In view of the foregoing, Ms. Kerkhoff is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

**COUNT FOUR**
**DEFAMATION BY IMPLICATION**
**(False Accusations in the December 4 Update)**
**(Against Defendant Blaze Media LLC)**

375.    Ms. Kerkhoff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1-319 as if set forth fully herein.

376.    On December 4, 2025, Defendant Blaze Media published an "Update" to the November 8 Article headlined "UPDATE: Former Capitol Police officer a forensic match for Jan. 6 pipe bomber, sources say," by Steve Baker and Joseph Hanneman (the **"December 4 Update"**). A true and correct copy of the December 4 Update is attached hereto as Exhibit D.

377.    In the December 4 Update, Blaze Media published the following statements concerning Ms. Kerkhoff:

(a)    "UPDATE: *Former Capitol Police officer a forensic match for Jan. 6 pipe bomber*, sources say,"

(b)    "Our report posted on Nov. 8, 2025, about the Jan. 6 pipe bombs was based on sourcing from individuals in a position to know this type of sensitive law enforcement information who have *a demonstrated record of reliability and accuracy*. Of note, *the sources continue to stand by the information they provided to Blaze News*. At all times, the reporting *adhered to professional journalistic standards* and was published with *a good-faith belief in its truth*."

378.    The statements in Paragraph 377 are referred to collectively in this Count as the **"December 4 Update Statements."**

379.    Defendants published and juxtaposed the December 4 Update Statements to create the false and defamatory implications that Ms. Kerkhoff planted pipe bombs in Washington, D.C. on January 5, 2021, and that overwhelming evidence exonerating Ms. Kerkhoff of planting the bombs was illegitimate (the "Implications").

380. The December 4 Update Statements and Implications are of and concerning Ms. Kerkhoff. Blaze Media and Baker clearly intended the December 4 Update Statements and Implications to refer to Ms. Kerkhoff, and the December 4 Update Statements and Implications would be (and were) understood by readers as referring to Ms. Kerkhoff. In fact, the December 4 Update was an update to the November 8 Article, published at the same URL, that falsely accused Ms. Kerkhoff by name.

381. The Implications are factual (but false) and are reasonably understood as factual (but are false)—specifically, as an assertion that Ms. Kerkhoff planted two pipe bombs in Washington D.C. on the evening of January 5, 2021.

382. The Implications are false. Ms. Kerkhoff did not plant any pipe bombs anywhere at any time, and the evidence exonerating her is both legitimate and overwhelming. On the evening of January 5, 2021, she was not out planting pipe bombs, but at home video recording her dog.

383. The Implications are defamatory, and readers understood them to be defamatory, because they tend to hold Ms. Kerkhoff up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tend to impair her standing in the community, tend to lower the esteem in which she is held, and tend to discourage others from associating with her, including by accusing her of planting pipe bombs in Washington, D.C., a crime so serious that the Federal Bureau Investigation offered a $500,000 reward to anyone who identified a suspect. The Statements make substantial danger to reputation apparent.

384. The Implications are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because on their face they accuse Ms. Kerkhoff of a serious crime. In addition, they are defamatory *per se* because they attribute to Ms. Kerkhoff unfitness to perform

the duties of her profession and foreseeably would hurt Ms. Kerkhoff in her profession. Ms. Kerkhoff is therefore entitled to presumed damages.

385.    Blaze Media and Baker knew the substantial danger of injury to Ms. Kerkhoff and her reputation from the Statements, which is readily apparent, and in fact intended to cause injury to Ms. Kerkhoff by publishing the December 4 Update Statements.

386.    Blaze Media and Baker published the December 4 Update Statements with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that Blaze Media:

(a)    Had actual knowledge that its defamatory accusations were false when they published them. Specifically, it knew that Ms. Kerkhoff was not the January 5, 2021 pipe bomber;

(b)    Published its defamatory accusations even though they were (and are) so inherently improbable that only a reckless person would have published them. Among other things, it knew that Ms. Kerkhoff defended the U.S. Capitol on January 6, 2021, at great personal cost, and thus it was inherently improbable that she had planted pipe bombs to draw Capitol Police resources away from it;

(c)    Published its defamatory accusations against Ms. Kerkhoff with animus and ill will toward her resulting from, among other things, it despised Ms. Kerkhoff for her role in defending the Capitol on January 6 and for her testimony against January 6 rioters;

(d)    Published their false accusations against Ms. Kerkhoff to further a preconceived narrative that the January 6 riot was an "inside job"—indeed, they spent years publicly staking their entire professional identities on that baseless theory—then twisted the facts to fit that preconceived narrative, including by inventing additional false claims against Ms. Kerkhoff;

(e)    Purposefully and deliberately avoided obtaining information that it knew would contradict its preconceived narrative, including from an independent qualified expert in gait analysis and from Ms. Kerkhoff herself;

(f)    Relied on facially unreliable sources it knew were biased against Ms. Kerkhoff, including Kyle Seraphin, "Armitas," and other anonymous sources;

115

(g)    Departed in a gross and extreme manner from responsible journalistic standards in publishing the December 4 Update Statements, including its failure to give Ms. Kerkhoff a meaningful opportunity to respond before publication;

(h)    Defamed Ms. Kerkhoff in pursuit of financial gain, including by generating viral content that attracts subscribers and donations; and

(i)    Refused to retract its defamatory accusations despite incontrovertible evidence of their falsity and Ms. Kerkhoff's innocence.  It knew that Ms. Kerkhoff had an alibi, that the FBI had detained a real pipe bombing suspect, and that its false allegations caused Ms. Kerkhoff tremendous harm.  But it has never apologized or publicly acknowledged that Ms. Kerkhoff was innocent.

387.    Blaze Media and Baker's publication of the December 4 Update Statements was at minimum negligent, in that they acted negligently in failing to ascertain the facts on which the December 4 Update Statements were based.

388.    Blaze Media had no applicable privilege or legal authorization to publish the December 4 Update Statements, or, if it did, they abused that privilege or authorization.  Blaze Media published its Statements in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

389.    Blaze Media's actions were malicious, willful, and wanton, and evidence a conscious disregard for Ms. Kerkhoff's rights.  Accordingly, punitive damages are appropriate.

390.    As a direct and proximate result of Blaze Media's December 4 Update Statements, Ms. Kerkhoff has suffered substantial economic damage including, among other things, loss of current and future business opportunities.

391.    As a direct and proximate result of Blaze Media's December 4 Update Statements, Ms. Kerkhoff has suffered severe reputational damage.

392.    As a direct and proximate result of Blaze Media's December 4 Update Statements, Ms. Kerkhoff has suffered embarrassment, humiliation, and emotional distress.

393.    In view of the foregoing, Ms. Kerkhoff is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

**COUNT FIVE**
**DEFAMATION**
**(False Accusations in the April 4 Post)**
**(Against Defendants Stephen M. Baker and Joseph M. Hanneman)**

394.    Ms. Kerkhoff repeats, re-alleges, and incorporates by reference the allegations in Paragraphs 1-319 as if set forth fully herein.

395.    On April 4, 2026 at 2:09 PM, Defendant Steve Baker uploaded a post to X (the "April 4 Post").  A true and correct copy of the April 4 Post is attached hereto as Exhibit E. Defendant Joseph Hanneman "reposted" the April 4 Post, effectively sharing it to his followers as if he had written it himself.  A true and correct copy of Hanneman's "repost" of the April 4 Post is attached hereto as Exhibit F.

396.    In the April 4 Post, Baker and Hanneman published the following false and defamatory statements concerning Ms. Kerkhoff:

(a)    "Given that Clare Locke has dedicated resources to monitoring every word we write and every one of our media appearances, they must know we have hours of video of ***Ms. Kerkhoff's unusual 'circumduction gait.' (A kind of limp.)*** Is Clare Locke incompetently representing their client, Ms. Kerkhoff (er ... CIA) -- by that easily disproved assertion -- or were they just ***trying to scare The Blaze into a quick settlement before their client would have to face the harsh reality of trial discovery***?"

(b)    ***"As for Ms. Kerkhoff being a marathon runner***, we already knew that. Despite their best efforts to scrub her former internet history, we'd already captured many photos of her participation in marathon events from deep web scrapes. The most interesting little nugget about that is: The until-recently Congressional Liaison to The FBI, Marshall Yates, once told me -- while reviewing video of the J6 pipe bomber in the office of his former

employer, @RepThomasMassie – '*We need to be looking for a marathon runner.' Why? Because of distinct physical traits that are characteristic of marathon runners and exhibited by the bomber while on that 44-minute trek around the DNC and RNC on the night of J5.* (More on that, later.)"

397. The statements in Paragraph 396 are referred to collectively in this Count as the "April 4 Post Statements."

398. The Statements are of and concerning Ms. Kerkhoff. Indeed, they refer to Ms. Kerkhoff by name.

399. The April 4 Post Statements are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Ms. Kerkhoff planted two pipe bombs in Washington, D.C. on the evening of January 5, 2021.

400. The April 4 Post Statements are false. Ms. Kerkhoff did not plant any pipe bombs anywhere at any time. On the evening of January 5, 2021, she was not out planting pipe bombs, but at home with her boyfriend and their dog, as confirmed by video recording.

401. The April 4 Post Statements are defamatory, and readers understood them to be defamatory, because they tend to hold Ms. Kerkhoff up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tend to impair her standing in the community, tend to lower the esteem in which she is held, and tend to discourage others from associating with her, including by accusing her of planting pipe bombs in Washington, D.C., a crime so serious that the Federal Bureau Investigation offered a $500,000 reward to anyone who identified a suspect. The Statements make substantial danger to reputation apparent.

402. The April 4 Post Statements are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because on their face they accuse Ms. Kerkhoff of a serious crime.

In addition, they are defamatory *per se* because they attribute to Ms. Kerkhoff unfitness to perform the duties of her profession and foreseeably would hurt Ms. Kerkhoff in her profession. Ms. Kerkhoff is therefore entitled to presumed damages.

403.    Baker and Hanneman knew the substantial danger of injury to Ms. Kerkhoff and her reputation from the April 4 Post Statements, which is readily apparent, and in fact intended to cause injury to Ms. Kerkhoff by publishing the April 4 Post Statements.

404.    Baker and Hanneman published the April 4 Statements with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that Baker and Hanneman:

(a)    Had actual knowledge that their defamatory accusations were false when they published them.  Specifically, they knew that Ms. Kerkhoff was not the January 5, 2021 pipe bomber.  They also knew that their "forensic gait analysis"—their only purported "evidence" linking Ms. Kerkhoff with the attempted pipe bombings—could not reliably identify Ms. Kerkhoff as a suspect at all, much less with near-absolute certainty.  They knew this because they reviewed literature that unambiguously explained the limitations of forensic gait analysis for suspect identification;

(b)    Published their defamatory accusations even though they were (and are) so inherently improbable that only a reckless person would have published them.  Among other things, they knew that Ms. Kerkhoff defended the U.S. Capitol on January 6, 2021, at great personal cost, and thus it was inherently improbable that she had planted pipe bombs to draw Capitol Police resources away from it;

(c)    Published their defamatory accusations against Ms. Kerkhoff with animus and ill will toward her resulting from, among other things, Ms. Kerkhoff's role in defending the Capitol on January 6 and for her testimony against January 6 rioters;

(d)    Published their false accusations against Ms. Kerkhoff to further a preconceived narrative that the January 6 riot was an "inside job"—indeed, they spent years publicly staking their entire professional identities on that baseless theory—then twisted the facts to fit that preconceived narrative, including by inventing additional false claims against Ms. Kerkhoff

(e)     Purposefully and deliberately avoided obtaining information that they knew would contradict their preconceived narrative, including from an independent qualified expert in gait analysis and from Ms. Kerkhoff herself;

(f)     Relied on facially unreliable sources they knew were biased against Ms. Kerkhoff, , including Kyle Seraphin, "Armitas," and other anonymous sources;

(g)     Departed in a gross and extreme manner from responsible journalistic standards in publishing the April 4 Post, including their failure to give Ms. Kerkhoff a meaningful opportunity to respond before publication;

(h)     Defamed Ms. Kerkhoff in pursuit of financial gain.  Indeed, they relied almost exclusively on their false claims to solicit funding for a new media platform; and

(i)     Refused to retract their defamatory accusations despite incontrovertible evidence of their falsity and Ms. Kerkhoff's innocence.  Instead, they relied on Ms. Kerkhoff's retraction demand to make and promote new false and defamatory claims.

405.    Baker and Hanneman's publication of the April 4 Post Statements was at minimum negligent, in that they acted negligently in failing to ascertain the facts on which the April 4 Statements were based.

406.    Baker and Hanneman had no applicable privilege or legal authorization to publish the April 4 Post Statements, or, if they did, they abused that privilege or authorization.  Baker and Hanneman published their April 4 Post Statements in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

407.    Baker and Hanneman's actions were malicious, willful, and wanton, and evidence a conscious disregard for Ms. Kerkhoff's rights.  Accordingly, punitive damages are appropriate.

408.    As a direct and proximate result of Baker and Hanneman's April 4 Post Statements, Ms. Kerkhoff has suffered substantial economic damage including, among other things, loss of current and future business opportunities.

409.    As a direct and proximate result of Baker and Hanneman's April 4 Post Statements, Ms. Kerkhoff has suffered severe reputational damage.

410.    As a direct and proximate result of Baker and Hanneman's April 4 Post Statements, Ms. Kerkhoff has suffered embarrassment, humiliation, and emotional distress.

411.    In view of the foregoing, Ms. Kerkhoff is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

**COUNT SIX**
**DEFAMATION**
**(False Accusations in the April 6 Blog)**
**(Against Defendants Stephen M. Baker, Joseph M. Hanneman, and Veritas Regnat LLC)**

412.    Ms. Kerkhoff repeats, re-alleges, and incorporates by reference paragraphs 1-319 as if set forth fully herein.

413.    On April 6, 2026, Defendants Stephen Baker and Joseph Hanneman posted to their blog, "Veritas Regnat," an article titled, "Previously Unreleased Video Contradicts Contention Onetime Pipe-Bomb Suspect Did Not Have a Limp" (the **"April 6 Blog"**).  A true and correct copy of the April 6 Blog is attached hereto as Exhibit G.

414.    In the April 6 Blog, Baker and Hanneman published the following false and defamatory statements concerning Ms. Kerkhoff:

(a)    "Veritas Regnat has hours of video showing Kerkhoff's unusual "circumduction gait." (A kind of limp.) This includes hours of video harvested from Capitol Police CCTV of her as a Capitol Police officer on January 6, 2021, and from her short professional soccer career. … *No limp? Video evidence says otherwise*."

(b)    A video that Baker and Hanneman selectively edited to display Ms. Kerkhoff side-by-side with CCTV footage of the January 5 pipe bomber captioned, "A Right Leg Crossover During a Right Turn is Very Unique."

121

(c)      **"The now-former congressional liaison to the FBI, Marshall Yates, once said—while reviewing video of the J6 pipe bomber in the office of his former employer, Rep. Thomas Massie—'*We need to be looking for a marathon runner.*' *Why? Because of distinct physical traits that are characteristic of marathon runners —and exhibited by the hoodie-clad suspect*** while on the 44-minute trek around the Democratic National Committee and Republican National Committee on the night of Jan. 5, 2021."

415.    The statements in Paragraph 414 are referred to collectively in this Count as the "April 6 Blog Statements."

416.    The April 6 Blog Statements are of and concerning Ms. Kerkhoff. Indeed, they refer to Ms. Kerkhoff by name.

417.    The April 6 Blog Statements are factual (but false) and are reasonably understood as factual (but are false)—specifically, as assertions that Ms. Kerkhoff planted two pipe bombs in Washington D.C. on the evening of January 5, 2021.

418.    The April 6 Blog Statements are false. Ms. Kerkhoff did not plant any pipe bombs anywhere at any time. On the evening of January 5, 2021, she was not out planting pipe bombs, but at home with her boyfriend and their dog, as confirmed by video recording.

419.    The April 6 Blog Statements are defamatory, and readers understood them to be defamatory, because they tend to hold Ms. Kerkhoff up to scorn, hatred, ridicule, or contempt in the minds of a considerable and respectable segment in the community, tend to impair her standing in the community, tend to lower the esteem in which she is held, and tend to discourage others from associating with her, including by accusing her of planting pipe bombs in Washington, D.C., a crime so serious that the Federal Bureau Investigation offered a $500,000 reward to anyone who identified a suspect. The April 6 Blog Statements make substantial danger to reputation apparent.

420. The April 6 Blog Statements are also defamatory *per se*, and readers also understood them to be defamatory *per se*, because on their face they accuse Ms. Kerkhoff of a serious crime. In addition, they are defamatory *per se* because they attribute to Ms. Kerkhoff unfitness to perform the duties of her profession and foreseeably would hurt Ms. Kerkhoff in her profession. Ms. Kerkhoff is therefore entitled to presumed damages.

421. Baker and Hanneman knew the substantial danger of injury to Ms. Kerkhoff and her reputation from the April 6 Blog Statements, which is readily apparent, and in fact intended to cause injury to Ms. Kerkhoff by publishing the April 6 Blog Statements.

422. Baker and Hanneman published the April 6 Blog Statements with actual malice, including with actual, subjective awareness of their falsity or, at an absolute minimum, with reckless disregard for the truth, as evidenced by the facts that Baker and Hanneman:

(a) Had actual knowledge that their defamatory accusations were false when they published them. Specifically, they knew that Ms. Kerkhoff was not the January 5, 2021 pipe bomber. They also knew that their "forensic gait analysis"—their only purported "evidence" linking Ms. Kerkhoff with the attempted pipe bombings—could not reliably identify Ms. Kerkhoff as a suspect at all, much less with near-absolute certainty. They knew this because they reviewed literature that unambiguously explained the limitations of forensic gait analysis for suspect identification;

(b) Published their defamatory accusations even though they were (and are) so inherently improbable that only a reckless person would have published them. Among other things, they knew that Ms. Kerkhoff defended the U.S. Capitol on January 6, 2021, at great personal cost, and thus it was inherently improbable that she had planted pipe bombs to draw Capitol Police resources away from it;

(c) Published their defamatory accusations against Ms. Kerkhoff with animus and ill will toward her resulting from, among other things, Ms. Kerkhoff's role in defending the Capitol on January 6 and for her testimony against January 6 rioters;

(d) Published their false accusations against Ms. Kerkhoff to further a preconceived narrative that the January 6 riot was an "inside job"—indeed, they spent years publicly staking their entire professional identities on that

baseless theory—then twisted the facts to fit that preconceived narrative, including by inventing additional false claims against Ms. Kerkhoff;

(e)     Purposefully and deliberately avoided obtaining information that they knew would contradict their preconceived narrative, including from an independent qualified expert in gait analysis and from Ms. Kerkhoff herself;

(f)     Relied on facially unreliable sources they knew were biased against Ms. Kerkhoff, including Kyle Seraphin, "Armitas," and other anonymous sources;

(g)     Departed in a gross and extreme manner from responsible journalistic standards in publishing the April 6 Blog, including their failure to give Ms. Kerkhoff a meaningful opportunity to respond before publication;

(h)     Defamed Ms. Kerkhoff in pursuit of financial gain. Indeed, they relied almost exclusively on their false claims to solicit funding for a new media platform; and

(i)     Refused to retract their defamatory accusations despite incontrovertible evidence of their falsity and Ms. Kerkhoff's innocence. Instead, they relied on Ms. Kerkhoff's retraction demand to make and promote new false and defamatory claims.

423.    Baker and Hanneman's publication of the April 6 Blog Statements was at minimum negligent, in that they acted negligently in failing to ascertain the facts on which the April 4 Statements were based.

424.    Baker and Hanneman had no applicable privilege or legal authorization to publish the April 6 Blog Statements, or, if they did, they abused that privilege or authorization. Baker and Hanneman published their April 6 Blog Statements in bad faith, with actual malice, and with common law express malice such that any otherwise potentially applicable privilege is vitiated and cannot apply.

425.    Baker and Hanneman's actions were malicious, willful, and wanton, and evidence a conscious disregard for Ms. Kerkhoff's rights. Accordingly, punitive damages are appropriate.

124

426.    As a direct and proximate result of Baker and Hanneman's April 6 Blog Statements, Ms. Kerkhoff has suffered substantial economic damage including, among other things, loss of current and future business opportunities.

427.    As a direct and proximate result of Baker and Hanneman's April 6 Blog Statements, Ms. Kerkhoff has suffered severe reputational damage.

428.    As a direct and proximate result of Baker and Hanneman's April 6 Blog Statements, Ms. Kerkhoff has suffered embarrassment, humiliation, and emotional distress.

429.    In view of the foregoing, Ms. Kerkhoff is entitled to actual, presumed, special, exemplary, and punitive damages in amounts to be specifically determined at trial.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Shauni Kerkhoff respectfully requests that the Court enter judgment in her favor and against Defendants Blaze Media LLC, Stephen M. Baker, Joseph M. Hanneman, and Veritas Regnat LLC as follows:

(1)    Award Ms. Kerkhoff compensatory and actual damages in amounts to be proven at trial;

(2)    Award Ms. Kerkhoff presumed and special damages in amounts to be proven at trial;

(3)    Award Ms. Kerkhoff punitive and/or exemplary damages in an amount to be proven at trial;

(4)    Award Ms. Kerkhoff damages disgorgement of profits Defendants made from their false statements about Ms. Kerkhoff in an amount to be proven at trial;

(5)    Award Ms. Kerkhoff her reasonable expenses, including but not limited to reasonable attorneys' fees, incurred to mitigate the harm caused by Defendants'

defamation and tortious conduct, including but not limited to money spent in demanding that Defendants retract their false and defamatory statements and implications and money spent in seeking to counteract the impact of Defendants' false and defamatory statements and implications;

(6)    Award Ms. Kerkhoff her reasonable costs and attorneys' fees spent in bringing this action to vindicate her reputation and good name;

(7)    Award Ms. Kerkhoff all costs, disbursements, fees, and pre- and post-judgment interest as authorized by law; and

(8)    Award Ms. Kerkhoff such other and additional relief and remedies as the Court may deem just and proper.

## **JURY DEMAND**

Plaintiff Shauni Kerkhoff demands a jury on all claims and issues triable by way of jury.

(SIGNATURE PAGE FOLLOWS)

Dated:  April 21, 2026                    Respectfully Submitted,

                                          */s/ Thomas A. Clare, P.C.*
                                          Thomas A. Clare, P.C. (VSB No. 39299)
                                          Camilla J. Hundley (VSB No. 100257)
                                          Jonathan R. Kaiman (VSB No. 99412)
                                          CLARE LOCKE LLP
                                          10 Prince Street
                                          Alexandria, VA 22314
                                          Tel: (202) 628-7400
                                          Email: tom@clarelocke.com
                                          Email: camilla@clarelocke.com
                                          Email: jon.kaiman@clarelocke.com

                                          *Attorneys for Plaintiff Shauni Kerkhoff*