**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

---

**SHAUNI KERKHOFF**,

*Plaintiff,*

v.

**BLAZE MEDIA LLC**, a Delaware limited liability company; **STEPHEN M. BAKER**, an individual; **JOSEPH M. HANNEMAN**, an individual; and **VERITAS REGNAT LLC**, a Wisconsin limited liability company.

*Defendants.*

Civil Action No. 1:26-cv-01078-RDA-WEF

---

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT
OF DEFENDANT BLAZE MEDIA LLC'S MOTION TO DISMISS**

Matthew Piscitelli (VSB No. 92464)
FOLEY HOAG LLP
1717 K Street NW
Washington, DC 20006
(202) 223-1200
MPiscitelli@foleyhoag.com

Michael J. Grygiel (*pro hac vice*)
Kelly L. McNamee (*pro hac vice*)
Amanda S. Coleman (*pro hac vice*)
FOLEY HOAG LLP
1301 Avenue of the Americas
New York, NY 10019
(212) 812-0400
MGrygiel@FoleyHoag.com
KMcNamee@FoleyHoag.com
AColeman@FoleyHoag.com

Patrick F. Philbin (*pro hac vice forthcoming*)
Kyle T. West (*pro hac vice forthcoming*)
TORRIDON LAW PLLC
801 Seventeenth Street NW
Suite 1100
Washington, DC 20006
(202) 249-6900
pphilbin@torridonlaw.com
kwest@torridonlaw.com

*Counsel for Defendant Blaze Media LLC*

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ....................................................................................................... iii

PRELIMINARY STATEMENT ................................................................................................... 1

STATEMENT OF FACTS ........................................................................................................... 3

    A. Blaze Media's Years-Long, Comprehensive Investigation Leading Up to the
       November 2025 Publications. .......................................................................................... 3

    B. Blaze Media's November 2025 Publications. ................................................................. 4

       1. The November 4 Article. ............................................................................................ 4

       2. The November 5 Podcast and November 5 Article. ................................................... 5

       3. The November 8 Article. ............................................................................................ 5

    C. The FBI Investigated Multiple Individuals As Potential Pipe-Bombing Suspects,
       Including Plaintiff. ........................................................................................................... 6

       1. The FBI Targets Plaintiff as a Suspect. .................................................................... 7

    D. Blaze Media Continuously Updated Its Reporting as Additional Information Was
       Made Public. .................................................................................................................... 8

    E. The December 4 Retraction. ............................................................................................ 9

    F. Plaintiff's Claims Against Blaze Media. ....................................................................... 10

ARGUMENT ............................................................................................................................. 10

I.     LEGAL STANDARD ..................................................................................................... 10

II.    THE COMPLAINT FAILS TO ALLEGE FACTS PLAUSIBLY DEMONSTRATING
      ACTUAL MALICE NECESSARY TO STATE A DEFAMATION CLAIM AGAINST
      BLAZE MEDIA ............................................................................................................. 11

    A. The Constitutional Actual Malice Standard Applies Because Plaintiff, as a Capitol
       Police Officer, Is a Public Official. ............................................................................... 11

    B. The Complaint's Allegations of Actual Malice Are Insufficient as a Matter of Law. 12

       1. Assertions of "Inherent Improbability" Do Not Show Actual Malice. .................. 17

       2. Claims of a "Preconceived Narrative" Do Not Show Actual Malice. ................... 18

       3. Assertions that Blaze Media Had an Economic or Political Motive Are Irrelevant.
          19

       4. Allegations that Blaze Media Avoided Sources that Might Have Challenged the
         Story Are Contradicted by the Complaint and Fail to Show Actual Malice. ....... 20

i

5.  Alleged Violations of Journalistic Standards Do Not Show Actual Malice.......... 21

6.  Alleged Use of "Unreliable" Sources Cannot Show Actual Malice..................... 22

7.  Alleged Misstatements About the Role of Gait Analysis Cannot Show Actual Malice. ............................................................................................................... 24

8.  An Alleged Failure to Retract Cannot Show Actual Malice................................. 26

C.  Count Four Fails to State a Claim For Defamation Based on Any Unstated Implication Allegedly Conveyed by The December 4 Retraction............................... 27

1.  The Complaint Fails to Satisfy the Strict Requirements Necessary to Sustain a Defamation by Implication Claim Under Virginia Law. ..................................... 27

a.  The December 4 Retraction Does Not Reasonably Convey the Implications Alleged. ................................................................................................................ 28

b.  Plaintiff Cannot Establish That Blaze Media Adopted or Endorsed the Alleged Implications. ......................................................................................................... 31

III.  IN THE ALTERNATIVE, BLAZE MEDIA IS IMMUNIZED FROM LIABILITY FOR DEFAMATION UNDER VIRGINIA'S ANTI-SLAPP STATUTE................................ 33

CONCLUSION.............................................................................................................................. 34

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Adelson v. Harris*,
   973 F.Supp.2d 467 (S.D.N.Y. 2013).................................................................................25

*Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC*,
   821 F. App'x 234 (4th Cir. 2020) .....................................................................................28

*Arpaio v. Zucker*,
   414 F.Supp.3d 84 (D.D.C. 2019) ......................................................................................19

*Arthur v. Offit*,
   No. 09-cv-1398, 2010 U.S. Dist. LEXIS 21946 (E.D. Va. March 10, 2010) .........................25

*Ashcroft v. Iqbal*,
   556 U.S. 662 (2009)...........................................................................................................10

*Bell Atl. Corp. v. Twombly*,
   550 U.S. 554 (2007)...........................................................................................................10

*Biro v. Condé Nast*,
   883 F.Supp.2d 441 (S.D.N.Y. 2012), *aff'd*, 807 F.3d 541 (2d Cir. 2015) ...............................32

*Biro v. Condé Nast*,
   963 F.Supp.2d 255 (S.D.N.Y. 2013).................................................................................27

*Bose Corp. v. Consumers Union of U.S., Inc.*,
   466 U.S. 485 (1984)...........................................................................................................13

*CACI Premier Tech., Inc. v. Rhodes*,
   536 F.3d 280 (4th Cir. 2008) .............................................................................................13

*Carr v. Forbes, Inc.*,
   259 F.3d 273 (4th Cir. 2001) ........................................................................................11, 13

*Carwile v. Richmond Newspapers, Inc.*,
   196 Va. 1 (1954) ..........................................................................................................28, 30

*Chapin v. Knight-Ridder*,
   993 F.2d 1087 (4th Cir. 1993) ................................................................................ 28, 31, 32

*Church of Scientology Int'l v. Behar*,
   238 F.3d 168 (2d Cir. 2001)..............................................................................................23

iii

*Church of Scientology Int'l v. Daniels*,
  992 F.2d 1329 (4th Cir. 1993) ...............................................................................22

*Coughlin v. Westinghouse Broad. & Cable, Inc.*,
  603 F.Supp. 377 (E.D. Pa. 1985), *aff'd*, 780 F.2d 340 (3d Cir. 1985).....................................18

*Coursey v. Greater Niles Township Pub. Corp.*,
  239 N.E.2d 837 (Ill. 1968) ......................................................................................12

*Covington Specialty Ins. Co. v. Omega Rest. & Bar, LLC*,
  666 F.Supp.3d 528 (E.D. Va. 2023) .......................................................................32

*Dev. Pros. Inc.-Making Cents Int'l LLC v. Bank of Am., N.A.*,
  805 F. Supp. 3d 680 (E.D. Va. 2025) .....................................................................15

*Dottino v. United States*,
  444 U.S. 832 (1979)................................................................................................32

*Epps v. Fox News Network, LLC*,
  No. 23-cv-761-JLH, 2025 U.S. Dist. LEXIS 151605 (D. Del. Apr. 1, 2025) ...................18, 22

*Fairfax v. CBS Broad., Inc.*,
  534 F.Supp.3d 581 (E.D. Va. 2020) ............................................................... *passim*

*Fairfax v. CBS Corp.*,
  2 F.4th 286 (4th Cir. 2021) ...............................................................................26, 33

*Gray v. Udevitz*,
  656 F.2d 588 (10th Cir. 1981) .................................................................................12

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
  491 U.S. 657 (1989)....................................................................................13, 20, 21

*Hyland v. Raytheon Tech Servs. Co.*,
  277 Va. 40 (2009) ...................................................................................................30

*Jankovic v. Int'l Crisis Grp.*,
  822 F.3d 576 (D.C. Cir. 2016)....................................................................20, 22, 23

*Jenkins v. Snyder*,
  No. 00-2150-A, 2001 U.S. Dist. LEXIS 26921 (E.D. Va. Feb. 6, 2001) ...................31, 32

*Kendall v. Daily News Publ. Co.*,
  716 F.3d 82 (3d Cir. 2013).......................................................................................32

*Klayman v. City Pages*,
  650 F. App'x 744 (11th Cir. 2016) ..............................................................................20, 22

iv

*Lluberes v. Uncommon Prods.*,
  740 F. Supp. 2d 207 (D. Mass. 2010) ...................................................................17

*Logan v. District of Columbia*,
  447 F.Supp. 1328 (D.D.C. 1978) .........................................................................27

*Lohrenz v. Donnelly*,
  223 F.Supp.2d 25 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003)..............18

*Malone v. WPCo., LLC*,
  No. 3:22-cv-00046, 2023 U.S. Dist. LEXIS 176018 (W.D. Va. Sept. 29, 2023)....................28

*McCullough v. Gannett Co.*,
  No. 1:22-cv-1099 (RDA/LRV), 2023 U.S. Dist. LEXIS 72291 (E.D. Va. Apr.
  25, 2023) .............................................................................................. *passim*

*McFarlane v. Sheridan Sq. Press, Inc.*,
  91 F.3d 1501 (D.C. Cir. 1996).......................................................................18, 19

*Michel v. NYP Holdings, Inc.*,
  816 F.3d 686 (11th Cir. 2016) .....................................................................11, 25

*Nelson Auto Ctr. Inc. v. Multimedia Holdings Corp.*,
  951 F.3d 952 (8th Cir. 2020) ...............................................................................27

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
  591 F.3d 250 (4th Cir. 2009) ...............................................................................21

*New York Times Co. v. Sullivan*,
  376 U.S. 254 (1964)................................................................11, 12, 13, 17, 31

*Newton v. Nat'l Broad. Co.*,
  930 F.2d 662 (9th Cir. 1990) ...............................................................................31

*OAO Alfa Bank v. Ctr. for Public Integrity*,
  387 F.Supp.2d 20 (D.D.C. 2005)..........................................................................22

*Parsi v. Daioleslam*,
  890 F.Supp.2d 77 (D.D.C. 2012)..........................................................................19

*Pendleton v. Newsome*,
  290 Va. 162 (2015) .......................................................................................28, 29

*Phifer v. City of Rocky Mount*,
  No. 5:08-CV-292-FL, 2010 U.S. LEXIS 102545 (E.D.N.C. Sep. 28, 2010) ..........12

*Prince v. The Intercept*,
  No. 21-CV-10075 (LAP), 2023 U.S. Dist. LEXIS 119974 (S.D.N.Y. 2023).........23

*Reuber v. Food Chem. News, Inc.*,
 925 F.2d 703 (4th Cir. 1991) ................................................................................13, 17

*Rosenblatt v. Baer*,
 383 U.S. 75 (1966).............................................................................................11, 12

*Ryan v. Brooks*,
 634 F.2d 726 (4th Cir. 1980) ....................................................................................13

*Sherwood v. Cnty. of Botetourt*,
 No. 7:25-cv-8821, 2026 U.S. Dist. LEXIS 112907 (W.D. Va. May 21, 2026)...........29, 30, 31

*Southard v. Forbes*,
 588 F.2d 140 (5th Cir.) ..............................................................................................32

*Talley v. Time, Inc.*,
 923 F.3d 878 (10th Cir. 2019) ..................................................................................22

*Tavoulareas v. Piro*,
 817 F.2d 762 (D.C. Cir. 1987) ..................................................................................17

*Tilton v. Capital Cities/ABC, Inc.*,
 905 F.Supp.1514 (N.D. Okl. 1995)............................................................................26

*Underwager v. Salter*,
 22 F.3d 730 (7th Cir. 1994) ......................................................................................25

*Webb v. Virginian-Pilot Media Co.*,
 287 Va. 84 (2014) .................................................................................14, 15, 28, 30

*Westmoreland v. CBS Inc.*,
 596 F.Supp. 1170 (S.D.N.Y.1984) ...........................................................................18

*White v. Fraternal Order of Police*,
 909 F.2d 512 (D.C. Cir. 1990)...................................................................................31

**Statutes**

Va. Code § 8.01-223.2 ........................................................................................................3

Va. Code § 8.01-223.2(A) (2020)......................................................................................33

Va. Code § 8.01-223.2(B).................................................................................................34

Va. Code § 8.01-223.2(C).................................................................................................34

**Rules**

Fed. R. Civ. P. 12(b)(6)....................................................................................................10

**Constitutional Authorities**

U.S. Const. amend. I ...................................................................................................... *passim*

**Other Authorities**

1 Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED
     PROBLEMS  (5th ed. 2017) ...............................................................................................11, 22

**PRELIMINARY STATEMENT**

This case tests a core feature of our democracy:  the ability to participate in debate on a public issue without fear of penalty under state tort law.  It arises from Blaze Media's reporting on the government investigation into the planting of two pipe bombs outside the Democratic and Republican National Committee headquarters in Washington, D.C., on January 5, 2021 — the eve of the January 6 attack on the United States Capitol.  (Compl. ¶¶ 34-35)  That night, a hooded suspect placed pipe bombs outside both the Democratic National Committee and Republican National Committee headquarters.  (*Id.* ¶ 34)  Notwithstanding, *inter alia*, a nearly five-year-long investigation by the Federal Bureau of Investigation ("FBI"), public rewards to identify the suspect that reached $500,000, and the FBI's identification of multiple persons of interest, the case remained unresolved as of Blaze Media's publication of a series of articles in November 2025 (the "November 2025 Publications").[1]  (*Id.* and Ex. C)

Although the Complaint challenges no fewer than seventeen statements in the November 2025 Publications, it distills all those statements into a single allegedly defamatory assertion: that Plaintiff "planted two pipe bombs in Washington, D.C. on the evening of January 5, 2021" (Compl. ¶¶ 326, 344, 362, 381) — a statement nowhere reported by Blaze Media.  What Blaze Media *did* report was that, based on a computerized gait analysis, Plaintiff's gait was "a 94% match" to the

---

[1] The "November 2025 Publications" refers to the three publications challenged in Counts One, Two, and Three of the Complaint:  (1) the November 5, 2025, article by Joseph MacKinnon titled "'She's one of us!' Steve Baker stuns Glenn Beck with bombshell revelation about J6 pipe-bomb suspect," (Compl. Ex. A; "November 5 Article"); (2) the November 5, 2025, podcast episode of *The Glenn Beck Program* titled "Why Mamdani's Victory Was Bad, but Virginia's Was WORSE," with invited guest Steve Baker (Compl. Ex. B; "November 5 Podcast"); and (3) Blaze Media's November 8, 2025, article by Steve Baker and Joseph M. Hanneman titled "Former Capitol Police officer a forensic match for Jan. 6 pipe bomber, sources say," (Compl. Ex. C; "November 8 Article").  In Count Four of the Complaint, Plaintiff also challenges a December 4, 2025, update by Blaze Media retracting the November 8 Article, (Compl. Ex. D; "December 4 Retraction").

bomb suspect's gait.  (Compl. ¶ 144)  While the Complaint disputes the forensic reliability of the gait analysis, it fails to allege any facts showing that anyone at Blaze Media harbored actual doubts about the match result.

Moreover, the Complaint suffers from an even broader pleading failure.  Try as she might, Plaintiff, a former Capitol Police Officer, cannot skirt the requirement that she plead "actual malice" with specificity by the simple expedient of lumping together allegations that do not themselves plausibly suggest any knowledge of probable falsity.  Plaintiff's actual malice allegations are essentially a copy-paste job that recycles the same allegations throughout the Complaint.  The Complaint lists nine distinct allegations supposedly showing actual malice (Compl. ¶¶ 279-313), then repeats (with only immaterial variations) the same nine points for all six defamation counts against four defendants — where each count in turn challenges multiple statements in a distinct publication. (Compl. ¶¶ 331, 349, 367, 386, 404, 422)  From this blunderbuss pleading, it is entirely "unclear what arguments about actual malice Plaintiff ascribes to each statement [s]he claims is actionable."  *McCullough v. Gannett Co.*, No. 1:22-cv-1099 (RDA/LRV), 2023 U.S. Dist. LEXIS 72291, *35 (E.D. Va. Apr. 25, 2023) (Alston, J.).  This flaw is fatal.

Compounding this infirmity, the bare facts in the Complaint show the opposite of actual malice.  Shorn of spin and vitriolic rhetoric, they show a news organization that earnestly believed in its reporting and strove to get the story right, taking steps that included: (i) vetting its gait analysis by sharing it with multiple sources in the government *before* publishing; (ii) waiting to learn that government officials, by acting on the gait analysis, effectively validated it; (iii) repeatedly updating the story as new information came to light; and (iv) ultimately retracting the story entirely when a different suspect was arrested and charged for the pipe-bombs incident.  And

2

as explained below, Plaintiff's claim that Blaze Media did not issue a retraction distorts reality and cannot give rise to a defamation by implication claim.

The Complaint should be dismissed with prejudice because Plaintiff has not and cannot adequately plead "actual malice," and because Virginia's anti-SLAPP statute (Va. Code § 8.01-223.2) immunizes Blaze Media from defamation liability.

## STATEMENT OF FACTS[2]

### A. Blaze Media's Years-Long, Comprehensive Investigation Leading Up to the November 2025 Publications.

Blaze Media is a national news platform and multimedia brand. (Compl. ¶ 16) Stephen Baker and Joseph Hanneman were investigative reporters at Blaze Media who worked as a team covering January 6, including the government's then-unsolved pipe-bomb investigation. (*Id.* ¶ 79)

Baker and Hanneman spent four years delving into the government's pipe-bomb investigation, with a particular focus on the FBI's failure to identify a suspect notwithstanding the undeniable public interest and importance in doing so. (Compl. Ex. B) Among other things, Baker and Hanneman interviewed multiple sources, reviewed extensive video footage, and sought information from governmental agencies. (Compl. ¶¶ 79, 84-85, 99, 152-59; Exs. A, B, C) What emerged from these extensive efforts was the possibility that the government itself — and, specifically, federal law enforcement — may have played a role in planting the bombs (*id.*). To test this theory, Baker and Hanneman arranged for a forensic "gait analysis" — a software-based comparison of walking patterns — through which an analyst measured video footage of Plaintiff against footage of the pipe-bombing suspect. (*Id.* ¶¶ 144, 152) That comparison yielded a 94% "match" between the gaits of Plaintiff and the pipe-bombing suspect. (*Id.* ¶¶ 144-45) Rather than

---

[2] This section is derived from the allegations of the Complaint (Dkt. No. 1), which Blaze Media accepts as true solely for purposes of this motion.

3

accept the results of the gait analysis on their face, Baker and Hanneman sought corroboration by sharing the results of the gait analysis with "several [then-]current intelligence sources" and "sources familiar with gait analysis," all of whom "confirmed" the study's results. (*Id*. ¶¶ 2, 159; Ex. C)

As yet another step in the investigation, Baker took these findings to the Office of the Director of National Intelligence ("ODNI"), the agency that oversees and coordinates the entire United States intelligence community, weeks before reporting anything. (Compl. ¶¶ 124-26) Far from brushing off Baker's findings as a "baseless conspiracy theory" (*Id*. ¶ 1), ODNI personnel immediately began drafting a memorandum concerning Baker's investigation. (*Id*. ¶ 128). An unfinished draft of the memorandum circulated among executive branch agencies and intelligence officials, even reaching the White House, and was ultimately shared with senior staff at the Central Intelligence Agency, where Plaintiff is currently employed. (*Id*. ¶¶ 128, 202)

**B. Blaze Media's November 2025 Publications.**

**1. The November 4 Article.**

On November 4, 2025, Blaze Media published an article by Baker and Hanneman titled "Capitol Police repeatedly used lethal force on protesters early on Jan. 6, video shows" (the "November 4 Article"). (Compl. ¶ 88) The November 4 Article reported that Capitol Police officers had "repeatedly used lethal force" on the crowd at the Capitol on January 6, 2021, and identified testimony by Plaintiff, a former Capitol Police officer, that she had "fired pepper balls" at a rioter "as he scaled the Northwest Steps." (*Id*. ¶¶ 88-91) Although the Complaint spills much ink complaining about the November 4 Article (*see, e.g.*, *id*. ¶¶ 87-97), Plaintiff does not base any of her four claims of defamation against Blaze Media on that Article.

### 2. The November 5 Podcast and November 5 Article.

On November 5, 2025, Baker appeared as a guest on a podcast episode of *The Glenn Beck Program* (the "November 5 Podcast"). (Compl. Ex. B; Compl. ¶ 340) The same day, Blaze Media staff writer Joseph MacKinnon reported on Baker's podcast appearance. MacKinnon's article, (the "November 5 Article"), reported that Baker and Hanneman had "locked in on a suspect" whose "imminent identification will implicate and shame at least one federal agency." (Compl. Ex. A; *Id*. ¶¶ 321, 99-100) The Article also previewed that a "gait analysis" formed the basis of Baker and Hanneman's findings, and linked to two research articles on gait analysis — one published by PeerJ Computer Science and one published by the American Bar Association. (Compl. Ex. A; *Id*. ¶ 102) While both reports referenced certain understood limitations of forensic gait analysis, they also described it as a sophisticated method of identifying individuals from video footage that has been used for decades to help secure criminal convictions and is regularly viewed as compelling, corroborative evidence. (*Id*. ¶¶ 104-09, Ex. A) Further, the November 5 Article reported that Baker's and Hanneman's investigation had prompted "national security-related briefings." (*Id*. ¶ 113, Ex. A)

### 3. The November 8 Article.

On November 8, 2025, Blaze Media published an article by Baker and Hanneman titled "Former Capitol Police officer a forensic match for Jan. 6 pipe bomber, sources say" (the "November 8 Article"). (Compl. Ex. C; Compl. ¶ 358) The November 8 Article identified Plaintiff by name and reported that "[a] computer program that compared the bomb suspect's gait to that of Shauni Kerkhoff produced a 94% match." (Compl. Ex. C) The Article reported that "[t]he veteran analyst who ran the analysis for Blaze News" reported that, based on visual observations, he "personally pegged the match at closer to 98%." (*Id*.)

5

The article explained that the gait analysis compared video footage of Plaintiff — both January 6 Capitol security video and 2017 footage of her playing professional soccer — against a "clearer" version of the video of the hooded pipe-bomb suspect, which Blaze Media obtained from a source. (Compl. Ex. C) Plaintiff's "5'7" frame," "distinctive walk," and "slight limp" were among the factors indicating a match to the suspected bomber. (*Id.*) As reported in the November 8 Article, the results of the gait analysis "were confirmed by several current intelligence sources who viewed the study results." (*Id.* )

The November 8 Article does not state that Plaintiff was the pipe bomber, nor does it claim that the gait analysis match definitively identified Plaintiff. (Compl. Ex. C.) It does provide detailed reporting of Baker and Hanneman's investigation and the results of the gait analysis, ultimately leaving it to readers to decide whether such results might offer a "possible solution" to a mystery  that was the FBI's then-failure to identify the pipe-bomb suspect after nearly five years of investigation — a possible solution that, "if confirmed," "could recast the entire story of Jan. 6." (*Id.*) Prior to publication, Blaze Media attempted to contact representatives of the FBI, the Department of Justice, and the Capitol Police for comment, none of whom replied by the time of publication. (*Id.*) The Article also quoted former Capitol Police Chief Steven Sund, who said he had no knowledge of any Capitol Police involvement in planting the bombs. (*Id.*)

Prior to publication, the November 8 Article went through multiple rounds of editorial review, including legal review and even review by Blaze Media executives. (Compl. ¶ 172)

**C. <u>The FBI Investigated Multiple Individuals As Potential Pipe-Bombing Suspects, Including Plaintiff.</u>**

The November 8 Article explained that the FBI had previously identified Plaintiff's next-door neighbor as a "person of interest" in the pipe-bomb investigation. (Compl. Ex. C) According to former FBI Special Agent Kyle Seraphin, whom the Article quoted, an FBI

6

surveillance team spent two days watching Plaintiff's next door-neighbor before the team was pulled off the case. (*Id.*)  As Baker and Hanneman reported, the FBI tied Plaintiff's neighbor to a Metrorail SmartTrip card allegedly used by the bomber. (*Id.*)

### 1.    The FBI Targets Plaintiff as a Suspect.

On the morning of November 6, 2025, Plaintiff's superiors at the CIA called her in to work, where two FBI agents informed her that they were investigating "online chatter" identifying her as the pipe bomber. (Compl. ¶ 130)  That investigation was no check-the-box exercise.  The FBI took it seriously.  The two federal agents immediately embarked on an in-person interview of Plaintiff, questioning her about her whereabouts and activities on January 5, 2021. (*Id.* ¶ 131)  The fact that she was being questioned about the evening before what was undoubtedly one of the most harrowing experiences of her professional life — the January 6 "attack on the United States Capitol," during which she served on the front lines as a Capitol Police Officer (*see id.* ¶¶ 2, 37-52) — made no impact, as Plaintiff "could not immediately recall" her whereabouts that evening. (*Id.* ¶ 131)

That same day, after FBI agents searched Plaintiff's phone and car, "a caravan of FBI vehicles descended on [Plaintiff's and her then-boyfriend's] street and parked outside their house." (Compl. ¶ 133)  The federal agents then "exited their vehicles with their guns drawn in full tactical gear" before "command[ing]" Plaintiff's then-boyfriend to "come out of the house unarmed with your dogs." (*Id.*)  "FBI agents with bomb dogs [then] ransacked [Plaintiff's] Alexandria, Virginia home": "[t]hey opened cabinets, rifled through drawers, and scattered Ms. Kerkhoff's and Mr. Dickert's belongings[.]" (*Id.* ¶¶ 5, 133)

The search of Plaintiff's home did not end until 8:00 pm that evening. (Compl. ¶ 134)  The FBI's investigation, however, continued.  That night, FBI agents subjected Plaintiff to a "grueling" polygraph examination, which Plaintiff was informed she had "failed." (*Id.* ¶¶ 135–36)

Blaze Media's editor in chief, Christopher Bedford, traveled to Plaintiff's residence the next day to observe for himself reports of law enforcement presence and was "pulled over by local police" before being allowed to leave.  (Compl. Ex. C; *Id.* ¶ 171)

**D.  <u>Blaze Media Continuously Updated Its Reporting as Additional Information Was Made Public.</u>**

Blaze Media stayed abreast of the FBI's continuing investigation and carefully made multiple updates to its reporting to account for new information as it emerged.  (Compl. ¶¶ 203-09) For example:

- On November 8, Blaze Media published an "Editor's Note" after a CIA spokeswoman contacted it, correcting Plaintiff's employment position to reflect that she "worked in campus security."  (*Id.* ¶ 204)

- On November 13, 2025, Blaze Media published another update "to reflect further reporting."  (*Id.* ¶ 205)  The update reported that the "FBI tied a DC Metrorail Smar[t]Trip card allegedly used by the pipe-bomb suspect to [Plaintiff's neighbor] but determined that while [the neighbor] purchased the card, he did not use it."  (Compl. Ex. C; *id.* ¶ 205) Citing a November 12 article by the Daily Wire, the update explained that the card had reportedly been used by the neighbor's visiting friend, not by Plaintiff.  (*Id.* ¶¶ 205–06) The update also reported that an attorney for Plaintiff told The Washington Post that his client "categorically denies" that she planted the bombs.  (*Id.* ¶ 206; Ex. D)

- On November 25, 2025, Blaze Media published an update acknowledging the reporting of CBS News that "the FBI has ruled the suspect out of any involvement in the 2021 pipe bomb plot" and that Plaintiff "was cleared after establishing an alibi through a video of her playing with her puppies at the time the devices were planted."  (*Id.* ¶¶ 207-09)

8

E. **The December 4 Retraction.**

On December 4, 2025, the Department of Justice announced the arrest of Brian J. Cole, Jr. for planting explosive devices on January 5, 2021.  (Compl. ¶ 212)  Cole reportedly confessed shortly thereafter.  (*Id.* ¶ 315)  That same day, Blaze Media retracted the November 8 Article (*Id.* ¶ 213) by removing its text and replacing the cover image of Plaintiff with screenshots of the hooded suspect from the January 5 surveillance footage.  (*Id.*)  In place of the text, Blaze Media published an editor's note (the "December 4 Retraction") explaining its decision to retract.  The December 4 Retraction stated in full:

> Blaze News considers fairness and accuracy to be the defining goals of any news organization.  Our report posted on Nov. 8, 2025, about the Jan. 6 pipe bombs was based on sourcing from individuals in a position to know this type of sensitive law enforcement information who have a demonstrated record of reliability and accuracy.  Of note, the sources continue to stand by the information they provided to Blaze News.  At all times, the reporting adhered to professional journalistic standards and was published with a good-faith belief in its truth.  Even so, in light of Thursday's developments and the FBI's arrest of another individual, Virginia resident Brian Cole Jr., in connection with the Capitol pipe-bomb incident, we consider the values of fairness and accuracy to require retraction of this article.

On January 16, 2026, Plaintiff's counsel sent letters to Blaze Media, Baker, and Hanneman demanding that they retract the November 8 Article and apologize.  (Compl. ¶ 223)  Defendants responded by letter on January 29, 2026, declining Plaintiff's demands and stating that Blaze Media's existing retraction was sufficient.  (*Id.* ¶¶ 224, 318)

Although Baker has expressed his disagreement with Blaze Media's decision to retract the November 8 Article (Compl. ¶ 238), Blaze Media confirmed that "Blaze News stands by its December 4, 2025 retraction of its November 8, 2025 story regarding the Jan. 6th pipe bombs." (*Id.* ¶ 247 n.55)  Blaze Media terminated Baker on or about April 1, 2026, and Hanneman resigned on or about April 3, 2026.  (*Id.* ¶¶ 17–18, 245)  After leaving Blaze Media, Baker and Hanneman published additional statements concerning Plaintiff that are not at issue in this Motion.

9

**F.  Plaintiff's Claims Against Blaze Media.**

Plaintiff filed her Complaint on April 21, 2026, asserting four Counts against Blaze Media. (Compl. ¶¶ 320-93)  Counts I-III sound in defamation premised on seventeen enumerated statements included in the November 2025 Publications.  (*Id.* ¶¶ 320-74)  Plaintiff styled her fourth Count as one for "Defamation by Implication" premised on purported implications she claims are derived from the December 4 Retraction.  (*Id.* ¶¶ 375-93)

ARGUMENT

**I.    LEGAL STANDARD**

To survive a motion to dismiss under Rule 12(b)(6), a complaint must contain factual allegations that are "enough to raise a right to relief above the speculative level."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 554, 555 (2007).  In other words, the "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Twombly*, 550 U.S. at 570).

To determine whether a complaint states a plausible claim to relief, courts should "begin by identifying pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth."  *Id.* at 679.  Moreover, the court must not credit "unwarranted inferences, unreasonable conclusions, or arguments" drawn by the plaintiff from pleaded facts.  *McCullough v. Gannett Co.*, 2023 U.S. Dist. LEXIS 72291, at *10 (E.D. Va. 2023) (internal quotations and citation omitted).  Plausibility requires facts showing "more than a sheer possibility that a defendant acted unlawfully," and it is not enough for a complaint to plead facts that are "merely consistent" with liability.  *Iqbal*, 556 U.S. at 678.

There are strong First Amendment and public policy rationales underpinning the application of the plausibility standard to defamation complaints filed by public officials.  As the Fourth Circuit has explained, "[w]ere the press subject to suit every time it erred, it would decline

10

to speak out without resorting to the sort of cumbersome due diligence common in security offerings. For this reason, the Constitution provides the press with a shield whereby it may be wrong when commenting on acts of a public figure, as long as it is not intentionally or recklessly so." *Carr v. Forbes, Inc.*, 259 F.3d 273, 283 (4th Cir. 2001); *see also Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 702 (11th Cir. 2016) (explaining "the plausibility pleading standard makes particular sense when examining public figure defamation suits . . . [to] ensur[e] that free speech is not unduly burdened by the necessity of defending against expensive yet groundless litigation").

## II.    THE COMPLAINT FAILS TO ALLEGE FACTS PLAUSIBLY DEMONSTRATING ACTUAL MALICE NECESSARY TO STATE A DEFAMATION CLAIM AGAINST BLAZE MEDIA

### A.    The Constitutional Actual Malice Standard Applies Because Plaintiff, as a Capitol Police Officer, Is a Public Official.

The First Amendment, through *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964) and its progeny, requires public officials bringing defamation suits to plausibly plead and then prove actual malice by clear and convincing evidence. *See id.* at 279-80. A government employee is considered a "public official" when the position "has such apparent importance that the public has an independent interest in the qualifications and performance of the person who holds it, beyond the general public interest in the qualifications and performance of all government employees." *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966). This determination is made as a matter of law, so long as the facts and circumstances of a public employee's employment are not in dispute. *Id.* at 88.

The "public official category is by no means limited to upper echelons of government." 1 Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 5:2.1, at 8 (5th ed. 2017) (citations omitted). Rather, the designation "applies at the very least to those among the hierarchy of government employees who have, or appear to the public to have, substantial responsibility for or control over the conduct of governmental affairs." *Rosenblatt*, 383 U.S. at

85.  Here, as the Complaint all but concedes, Plaintiff, as a Capitol Police officer, qualifies as a public official for First Amendment purposes.  In courts across the country—beginning with the U.S. Supreme Court in *Sullivan* — "[p]olice officials have uniformly been treated as public officials within the meaning of [*Sullivan*]," including "[s]treet level policemen, as well as high ranking officers."  *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) (collecting cases).

As government employees entrusted with, *inter alia*, a monopoly on the lawful use of lethal force, "the strong public interest in ensuring open discussion and criticism of [police officers'] qualifications and job performance warrant the conclusion that [police officers constitute] public officials."  *Gray*, 656 F.2d at 591.  Police officer duties — even for those patrolmen among the lowest ranks — "are peculiarly governmental in character and highly charged with the public interest."  *Coursey v. Greater Niles Township Pub. Corp.*, 239 N.E.2d 837, 841 (Ill. 1968).[3]  There can hardly be a more apt application of this principle than here, where Plaintiff did not simply walk a beat — she was a Capitol Police Officer tasked by our federal government with the significant responsibility of protecting the safety and security of the nation's lawmakers and training others to do the same.  (Compl. ¶¶ 30-32)

Accordingly, the Complaint can survive only if Plaintiff alleges facts plausibly showing that Blaze Media published the challenged statements with "actual malice" — the most speech-protective standard in constitutional law.  *Sullivan*, 376 U.S. at 279-80.

    **B.  <u>The Complaint's Allegations of Actual Malice Are Insufficient as a Matter of Law</u>.**

---

[3] *See also, e.g.*, *Phifer v. City of Rocky Mount*, No. 5:08-CV-292-FL, 2010 U.S. Dist. LEXIS 102545, at *25 (E.D.N.C. Sep. 28, 2010) (holding that officer in patrol division counts as "public official").

More than six decades ago, the United States Supreme Court recognized that "erroneous statement is inevitable in free debate and . . . it must be protected if the freedoms of expression are to have the 'breathing space' that they 'need . . . to survive.'" *Id.* at 271-72. To carve out the "breathing space" needed such that "protected speech is not discouraged," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 686 (1989), and to promote "uninhibited, robust, and wide-open" debate on public issues, the *Sullivan* Court established the "actual malice" standard. *Sullivan*, 376 U.S. at 279-80.

As the Fourth Circuit has observed, "establishing actual malice is no easy task." *CACI Premier Tech., Inc. v. Rhodes*, 536 F.3d 280, 293 (4th Cir. 2008) (quoting *Carr v. Forbes, Inc.*, 259 F.3d 273, 282); *see also Ryan v. Brooks*, 634 F.2d 726, 733 (4th Cir. 1980) ("[T]he *New York Times* standard is a difficult one for libel plaintiffs to meet, and [] its application may sometimes produce harsh results."). The standard is met only with facts plausibly suggesting, at the time of publication, the defendant "realized that his statement was false or that he subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984). The test is entirely a subjective one, and proof of negligence alone is insufficient. *Sullivan*, 376 U.S. at 279-80; *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991) (*en banc*) ("Actual malice is a subjective standard."). Applying these principles, this Court has routinely dismissed defamation complaints for failure "to allege facts sufficient to make plausible that [defendant] acted with actual malice." *Fairfax v. CBS Broad., Inc.* , 534 F. Supp.3d 581, 598 (E.D. Va. 2020); *see also McCullough*, 2023 U.S. Dist. LEXIS 72291, at *35-41 (same).

The Complaint identifies seventeen statements that Plaintiff alleges are false and defamatory (the "Challenged Statements"). (*See* Compl. ¶¶ 322(a)-(e), 341(a)-(h), 358(a)-(d),

13

377(a)-(b))  The Complaint then alleges the same nine points supposedly establishing actual malice as to *all* seventeen statements, without any attempt to differentiate among them.  Plaintiff's claims against Blaze Media must be dismissed because Plaintiff fails to allege facts plausibly suggesting that anyone at Blaze Media made the Challenged Statements with actual malice.  That is insufficient to plead actual malice as a matter of law.  A plaintiff may not allege actual malice in the abstract.  Instead, as this Court has explained, a defamation plaintiff must establish actual malice as to *each* statement alleged to be false and defamatory; at the pleading stage, the question is "whether each fact that Plaintiff claims is indicative of actual malice adequately pleads actual malice for each statement that the Court has held are actionable[]."  *McCullough*, 2023 U.S. Dist. LEXIS 72291, at *35-36.

Even putting that defect to the side, the Complaint distills the seventeen Challenged Statements down to a single assertion that Plaintiff identifies as false and defamatory — namely, that Plaintiff "planted two pipe bombs in Washington, D.C. on the evening of January 5, 2021" (Compl. ¶¶ 326, 344, 362, 381)  The threshold problem with that theory is that none of the Challenged Statements says that.  Instead, in plain and unambiguous language, the Challenged Statements report that Blaze Media arranged for a forensic gait analysis study that produced a finding that Plaintiff's gait was a "forensic match" to the gait of the pipe-bomb suspect.  (Compl. ¶¶ 322(a)-(e), 341(a)-(h), 358(a)-(d), 377(a)-(b))  The November 2025 Publications presented that conclusion as only a "possible solution to the pipe-bomb mystery" (Compl. Ex. C) — one that would make Plaintiff a "suspect" whose involvement would be a scandal "if confirmed." (*Id.*; *see also* Compl. Ex. A, at 132 (stating only that reporters had "locked in on a suspect"); Compl Ex. B Tr. 39:21 (suggesting that person identified by gait analysis would be a "lead suspect")).  The Court need not accept Plaintiff's mischaracterization of the Publications' actual statements.  *Webb*

14

*v. Virginian-Pilot Media Companies, LLC*, 287 Va. 84, 90-91 (Va. 2014) (whether a statement is "reasonably capable of the defamatory meaning [the plaintiff] ascribes to it is a question of law" and "resolving it is an essential, gatekeeping function of the court").

Even assuming *arguendo* that such "accusation" is both properly pleaded and reasonably conveyed by the Challenged Statements, the Complaint nevertheless fails plausibly to allege that Blaze Media published any such accusation with knowledge of, or reckless disregard for, its falsity. To the contrary, while Plaintiff strains to cast things in a negative light, the facts alleged in the Complaint show journalists who proceeded cautiously and secured significant corroboration supporting their investigation before they published a word. As detailed *supra*, Baker and Hanneman spent four years delving into the government's pipe-bomb investigation, poring over hundreds of hours of video, interviewing multiple sources, and, eventually, securing a computer gait analysis comparing Plaintiff to the hooded figure in the January 5 video. (Compl. ¶¶ 3, 145) Rather than rush to print the results showing Plaintiff's gait was a 94% forensic match to the pipe bombing suspect, Baker and Hanneman brought their analysis to ODNI, where "several current intelligence sources who viewed the study results" "confirmed" the findings. (November 8 Article; *see also* Compl. ¶ 159)[4] As Baker explained in the November 5 Podcast, he then waited *two weeks* after providing the information to ODNI and had been informed that the government "have already started making moves" based on the information. (Compl. Ex. B 43:11-12; 45:23-24) Then, on the very same day Baker announced that he was postponing publication of what

---

[4] Although the Complaint, on information and belief, invokes baseless speculation to attack the *credentials* of these intelligence sources, *see* Compl. ¶ 160, it does not dispute that the reporters confirmed their analysis with "several" additional sources. *See, e.g.*, *Dev. Pros. Inc.-Making Cents Int'l LLC v. Bank of Am., N.A.*, 805 F. Supp. 3d 680, 691 (E.D. Va. 2025) (rejecting allegation made on information and belief when asserted factual basis for belief did not render allegation plausible).

became the November 8 Article, *see* Compl. ¶ 117, so that the government "can have some more time to look at the J6 pipe bomber evidence" and could "do what they need to do,"[5] the FBI questioned Plaintiff, searched her house, and subjected her to a polygraph examination.  (Compl. ¶¶ 129–39)  This was all after Blaze Media had already learned through a former FBI agent that Plaintiff's next-door neighbor purchased a metro card that law enforcement believed the bomber had used to get in and out of Washington, D.C. on January 5.  (Compl. Ex. C)  It was only with the combination of all that information that Blaze Media moved forward and published the gait analysis results in the November 8 Article.  And, even after that, Blaze Media carefully updated its reporting to account for additional information as it was made public and eventually retracted the November 8 Article immediately after the FBI announced the arrest of another suspect.  (*See* Compl. ¶¶ 203-213)

Although Plaintiff tries to spin the facts in the Complaint to fit her manufactured actual malice narrative, the facts, even as pleaded, are what they are:  two seasoned investigative journalists, animated by a sincere sense of curiosity and armed with the results of a forensic analysis, postponed publishing the results of their "bombshell revelation" (Compl. ¶ 6) for weeks until they were confident it was thoroughly vetted and corroborated.  The fact that the "accusations" Plaintiff insists flow from such reporting may have turned out to be incorrect is of no moment — at least when it comes to actual malice.  As the Supreme Court has recognized, not only are "erroneous statement[s] . . . inevitable in free debate," they "must be protected if the

---

[5]    Steve    Baker    (@SteveBakerUSA),    X    (Nov.    6,    2025,    at    4:58    PM), https://x.com/SteveBakerUSA/status/1986553903555748088.  Baker's November 6 post on X is cited and partially quoted in the Complaint, Compl. ¶¶ 116–18 & n.35, and thus is incorporated by reference, *Simmons*, 2021 WL 2930072, at *3.

freedoms of expression are to have the 'breathing space' they need to survive." *Sullivan*, 376 U.S. at 271–72; *see also Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 717 (4th Cir. 1991).

### 1. Assertions of "Inherent Improbability" Do Not Show Actual Malice.

The Complaint's allegations of "inherent improbability" encapsulate the flaws in Plaintiff's actual malice pleading strategy. (*See* Compl. ¶¶ 286-88)  The Complaint repeatedly alleges that it was "inherently improbable" that "[Plaintiff] planted pipe bombs on January 5, 2021, to divert law enforcement resources away from the Capitol" [on January 6] and that only a "reckless person" would have published such an accusation (*Id.* ¶ 286)  None of the Challenged Statements, however, assert that Plaintiff planted the pipe bombs — let alone that she did so with the goal of drawing resources away from the Capitol. (*See* Compl. ¶¶ 322, 341, 359, 377)  And, tellingly, the Complaint fails to identify which, if any, of the seventeen Challenged Statements imply such an accusation.  Rather, Plaintiff's inherent improbability allegations are premised on her own contrived actual malice narrative.  As inviting as such a portrayal may seem given the legacy of the January 6 attack on the Capitol and the stark partisan divide it engendered, it is hornbook law that actual malice must be pleaded in connection with a specific statement alleged to be actionable. *See Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) (*en banc*) ("[D]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice *in conjunction* with a false defamatory statement." (emphasis in original)); *Lluberes v. Uncommon Prods.*, 740 F. Supp. 2d 207, 223 (D. Mass. 2010) (same, citing *Tavoulareas*).

Even if such allegations were tied to the specific Challenged Statements, "there is no 'inherent improbability' exception that replaces the requirement that Plaintiff plead facts showing actual malice." *McCullough v. Gannett, Co.*, No. 1:22-cv-1099-RDA-LRV, 2023 U.S. Dist. LEXIS 72291, at *36 (E.D. Va. Apr. 25, 2023).  That is particularly the case where, as here, the government's response confirms the inherent *probability* of the assertions actually published —

*i.e.*, that Plaintiff was a forensic match to the pipe bombing suspect.  The fact that ODNI and the FBI treated the results of Baker's and Hanneman's gait analysis seriously — seriously enough to interview Plaintiff, dispatch a caravan of agents to search her home with bomb-sniffing dogs, , and subject her to a "grueling" lie detector test (Compl. ¶¶ 129-138) — forecloses any suggestion that the facts actually conveyed by the Challenged Statements were somehow by their nature improbable.  *See, e.g., McFarlane v. Sheridan Sq. Press, Inc.*, 91 F.3d 1501, 1513 (D.C. Cir. 1996) (claim that National Security Advisor Robert McFarlane was an Israeli spy not so inherently improbable as to show actual malice, especially where Congress was probing the issue); *Epps v. Fox News Network, LLC*, No. 23-cv-761-JLH, 2025 U.S. Dist. LEXIS 151605, at *13 (D. Del. Apr. 1, 2025) (declining to find theory that January 6 rioter was FBI informant "inherently improbable" where "high-ranking government officials had questions about plaintiff's role in the January 6th events").

### 2.  Claims of a "Preconceived Narrative" Do Not Show Actual Malice.

Second, assertions that Blaze Media set out to support a "preconceived narrative" also fall short of alleging actual malice.  (*E.g.*, Compl. ¶ 294-297)  Plaintiff's assertions fail, because "evidence that an investigation was 'designed to confirm a hostile premise rather than to find the truth' does not establish malice."  *Coughlin v. Westinghouse Broad. & Cable, Inc.*, 603 F. Supp. 377, 386 (E.D. Pa. 1985), *aff'd*, 780 F.2d 340 (3d Cir. 1985).  Similarly, a "pre-existing agenda, even one which may be noxious to some minds, is not indicative of actual malice."  *Lohrenz v. Donnelly*, 223 F. Supp.2d 25, 48 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003); *Westmoreland v. CBS Inc.*, 596 F. Supp. 1170, 1174 (S.D.N.Y. 1984) ("[A] determined effort to confirm a previously formed suspicion . . . does not establish malice. . . .").  In any case, the facts alleged in the Complaint — including that Blaze Media made efforts such as speaking to multiple gait analysis experts, subjecting its analysis to review by ODNI, and updating the story as more

18

evidence came to light — belie any claim of actual malice. *See, e.g.*, *McFarlane*, 91 F.3d at 1509 (taking investigative steps "is evidence that the publisher neither believed the allegations to be false nor wilfully [sic] blinded himself to the truth"). Notably, Blaze Media repeatedly updated the November 8 Article with new information, even when it undermined the theory that Plaintiff was a match for the suspect. When the CIA clarified Plaintiff's job duties, Blaze Media updated the story. (Compl. ¶ 204) When Plaintiff issued a denial, Blaze Media added it to the story. (*Id.* ¶ 206) When another news outlet reported that Plaintiff had been eliminated as a suspect, Blaze Media again posted an update. (*Id.* ¶ 209) And when the FBI arrested a different suspect, Blaze Media retracted the story entirely. Ex. D to Compl. The repeated updates — chipping away at the story every time a new piece of information became available — wholly refute Plaintiff's bald assertions that Blaze Media was determined to pursue a pre-conceived narrative without regard for the truth. *Lohrenz*, 350 F.3d at 1286 ("[R]eporting perspectives at odds with the publisher's own 'tends to rebut a claim of malice'").

### 3. Assertions that Blaze Media Had an Economic or Political Motive Are Irrelevant.

Third, claims that Blaze Media had economic or political motives for the November 2025 Publications are irrelevant. "Actual malice deals with a defamation defendant's knowledge or recklessness about the falsity of its statements, not the motivations undergirding publication." *McCullough*, 2023 U.S. Dist. LEXIS 72291, at *40; *Arpaio v. Zucker*, 414 F. Supp.3d 84, 92 (D.D.C. 2019) ("[T]he motivations behind defendants' communications . . . do not impact whether defendants acted with actual malice as a matter of law."). As a result, "caselaw resoundingly rejects the proposition that a motive to disparage someone is evidence of actual malice." *Parsi v. Daioleslam*, 890 F. Supp.2d 77, 90 (D.D.C. 2012). Thus, the allegations of spite and ill-will, even if taken as true, have no relevance to the actual malice inquiry. *McCullough*, 2023 U.S. Dist.

19

LEXIS 72291, at *40.  Allegations of a "desire to increase . . . profits" are also insufficient in the absence of facts suggesting that Blaze Media personnel *knew* what they were saying was false. *McCafferty*, 955 F.3d at 360; *Harte-Hanks*, 491 U.S. at 665 ("[M]otive in publishing . . . cannot provide a sufficient basis for finding actual malice.").

### 4. Allegations that Blaze Media Avoided Sources that Might Have Challenged the Story Are Contradicted by the Complaint and Fail to Show Actual Malice.

Plaintiff also falls short in claiming that Blaze Media purposefully avoided the truth by failing to seek comment from Plaintiff or from "any other source who might have challenged their narrative."  (Compl. ¶ 300)  It is well settled that failing to contact the subject of an article "does not indicate actual malice."  *McCullough*, 2023 U.S. Dist. LEXIS 72291, at *41 n.15; *Klayman v. City Pages*, 650 F. App'x 744, 750 (11th Cir. 2016); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 594-95 (D.C. Cir. 2016).  This is specially so here, where the suggestion that the reporters should have contacted Plaintiff directly is nonsensical.  Law enforcement had spent four years searching for  a dangerous suspect responsible for planting bombs that could have killed people.  When the reporters found information they thought would break the case, it would have been irresponsible — not to mention potentially dangerous — to tip off the suspect before alerting the government.

Next, the suggestion that Blaze Media failed to contact any "source who might have challenged [its] narrative," Compl. ¶ 300, is obviously contradicted by the facts in the Complaint. Blaze Media contacted multiple sources who could have, but did not, contradict their analysis. The November 8 Article reports that "two other sources familiar with gait analysis" concurred with the initial analysis.  (Compl. Ex. C)  More important, Blaze Media brought the information to ODNI two weeks before the November 5 Podcast.  (Compl. ¶ 126)  ODNI could have rejected the analysis.  It could have told the reporters they were all wrong.  Instead, the "findings were confirmed by several current intelligence sources who viewed the study results."  (Comp. Ex. C;

*see also* Compl. ¶ 359)  ODNI also brought in the FBI, who could have independently rejected the information as unreliable.  Instead, the Complaint indicates that the FBI took the information seriously and even conducted its own gait analysis.  (Compl. ¶ 242)  The FBI then interviewed Plaintiff and searched her house.

Nor can Plaintiff twist the reporters' responsible actions in bringing their information to the government into some elaborate plot to dupe the government into starting an investigation so as to "manufacture" corroboration for a story the reporters knew to be false.  (Compl. ¶ ¶ 126, 307)  On a motion to dismiss, the Court draws *reasonable* inferences in Plaintiff's favor — not fantastical ones.  *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009) (court not required to consider "unwarranted inferences [or] unreasonable conclusions").  If the gait analysis actually were unreliable information, it is simply not plausible to infer that the reporters brought it to the government figuring that they could trick the government into relying on it.  Bringing the information to the government necessarily subjected it to independent scrutiny by agencies with vast investigative resources.  When journalists bring information to the government and wait two weeks before publishing anything — until the government has indicated that the information is sufficiently reliable to take action — the only reasonable inference is that the journalists acted responsibly and waited for the government to vet the information and confirm its significance before publishing.

### 5.  Alleged Violations of Journalistic Standards Do Not Show Actual Malice.

Plaintiff's claim that Blaze Media violated journalistic standards completely misses the mark.  It is black letter law that even an "extreme departure from professional standards" is not enough to show actual malice.  *Harte-Hanks*, 491 U.S. at 688.  Defendants are not "held to their professional standards on questions of malice."  *McCullough*, 2023 U.S. Dist. LEXIS 72291. Instead, as this Court has explained, "'journalistic standards' are irrelevant to the inquiry of actual

malice; knowledge is what matters." *Id.* at *41 & n.25; *see also Church of Scientology Int'l v. Daniels*, 992 F.2d 1329, 1334 (4th Cir. 1993) ("[A]ctual malice cannot be established merely by showing a departure from accepted journalistic or professional practices."). As a result, Plaintiff's allegation that Blaze Media failed to contact her for comment cannot show actual malice. *See, e.g.*, *McCullough*, 2023 U.S. Dist. LEXIS 72291, at *41 n.25; *Klayman*, 650 F. App'x at 750; *OAO Alfa Bank v. Ctr. for Public Integrity*, 387 F. Supp.2d 20, 55 (D.D.C. 2005).

Also unavailing is Plaintiff's claim that Blaze Media violated journalistic standards by supposedly "manufacturing" the government's interest in Plaintiff as a suspect and then relying on that interest to confirm their reporting. (Compl. ¶ 308) As explained above, *see supra* p. 21, Plaintiff cannot distort the reporters' responsible conduct in bringing information to the government into a plot to manufacture phony corroboration for a story they knew to be false.

Plaintiff is further off base suggesting that Blaze Media somehow violated journalistic standards, and demonstrated malice, by subjecting the November 8 Article to multiple rounds of internal review and approval, including legal review. (*Id.* ¶ 308) Subjecting the reporting to multiple levels of review does not plausibly show that any Blaze Media employee acted with knowledge that the story was false or likely to be false. To the contrary, it suggests the opposite. *Jankovic*, 822 F.3d at 597 (evidence the "report underwent multiple internal reviews by knowledgeable staff" undercuts actual malice).

### 6. Alleged Use of "Unreliable" Sources Cannot Show Actual Malice.

Plaintiff fares no better arguing that Blaze Media used "unreliable" sources. Compl. ¶ 301. "Courts have consistently held that reliance on tainted or troubled sources does not alone establish actual malice." *Talley v. Time, Inc.*, 923 F.3d 878, 903 (10th Cir. 2019); *Epps*, 2026 U.S. Dist. LEXIS 151605, at *14; *see also* 1 Robert D. Sack, SACK ON DEFAMATION: LIBEL, SLANDER, AND RELATED PROBLEMS § 5:5.2(C) at 5-121-122 (5th ed. 2017). Moreover, the Complaint fails to

22

allege facts showing that any of Blaze Media's sources for any information underlying the statements about Plaintiff were unreliable.

To start, Plaintiff's complaint about "undisclosed" sources, Compl. ¶ 12, is unavailing. Use of confidential sources, without more, cannot raise an inference of actual malice. *Prince v. The Intercept*, No. 21-CV-10075 (LAP), 2023 U.S. Dist. LEXIS 119974, *37 (S.D.N.Y. 2023) (finding no actual malice despite plaintiff's allegation that defendant relied exclusively on anonymous sources and failed to provide any information about those sources); *Jankovic*, 822 F.3d at 597  (finding no actual malice where plaintiff did not point to evidence of "obvious reasons to doubt" confidential sources).  Such sources are essential for investigative journalism.

Next, Plaintiff complains that the November 8 Article quotes a "pseudonymous video analyst" who goes by "Armitas" and that this analyst had previously made a mistake analyzing a video.  (Compl. ¶ 302; *id.* ¶¶ 85-86)  But the attacks on Armitas are irrelevant, because nothing in the November 8 Article relied on Armitas for any information bearing on statements about Plaintiff.  The article cited Armitas primarily for his assertion that publicly available video of the bombing suspect had been released in a reduced framerate.  Whether that was true or not had no bearing ultimately on the gait analysis, the conclusions the Blaze Media reporters drew from it, and their statements about Plaintiff.  Even if Armitas had been wrong about the frame rate, that would not give rise to any inference that the reporters knew their statements about Plaintiff were false.  In any event, the Blaze Media reporters *confirmed* that Armitas was correct by obtaining a higher-framerate version of the video from another source.  (Comp. Ex. C)  Whatever alleged past errors Armitas may have made in a different context were wholly irrelevant once that information was confirmed.  *See Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001) (relying

23

even on an unreliable source does not show malice where information used in the story was corroborated).

Similarly, Blaze Media's reliance on former FBI agent Kyle Seraphin also does not show malice. (Compl. ¶ 303) Here again, the Complaint does not allege that Seraphin's contributions as a source were inaccurate. As relevant here, the November 8 Article relied on Seraphin for a single fact — which Plaintiff does not contest — that the FBI had surveilled Plaintiff's next-door neighbor because of information indicating that the pipe bomb suspect had used the neighbor's metro card to travel into and out of D.C. on January 5-6. (Compl. Ex. C) Using a source for that concededly accurate information cannot show actual malice.

### 7. Alleged Misstatements About the Role of Gait Analysis Cannot Show Actual Malice.

Plaintiff also missteps in arguing that the Blaze Media reporters had "actual knowledge" from two research articles cited in the November 5 Article that gait analysis could not "reliably identify" Plaintiff, and that they falsely represented the conclusions that could be drawn from it. (Compl. ¶ 280; *see also id.* ¶ 103) To start, Plaintiff attacks a straw man by mischaracterizing what the November 5 and November 8 Articles say. The Articles do not claim that gait analysis can definitively identify a person, or do so with "94%" or "98%" certainty. Instead, they explained that Plaintiff's *gait* was a 94-98% match to the gait of the suspect in the video. (*See, e.g.*, Comp. Ex. C ("A computer program that compared the bomb suspect's *gait to that of Shauni Kerkhoff* produced a 94% match.")) That more limited statement — a percentage "match," not a definitive identification — is consistent with the very literature Plaintiff cites. (Compl. ¶ 104)

Although the Complaint disputes at length the reliability of gait analysis as a law enforcement investigative tool (*see* Compl. ¶¶ 102-110), it acknowledges that Blaze Media's November 5 Article "linked to two research articles regarding gait analysis: one published by PeerJ

24

Computer Science, and one published by the American Bar Association." (*Id*. ¶ 104; footnotes omitted) These hyperlinks "instantaneously permit[] the reader to verify an electronic article's claims." *Adelson v. Harris*, 973 F. Supp.2d 467, 484 (S.D.N.Y. 2013) ("The hyperlink is the twenty-first century equivalent of the footnote for purposes of attribution in defamation law"). These same research articles are the sources Plaintiff relies on to question "the reliability of gait analysis as a method of suspect identification." (Compl. ¶ 104) Contrary to the Complaint's allegations, the publication of these research studies through hyperlinks demonstrates that (1) Blaze Media researched the November 5 Article, and (2) the allegations of actual malice are implausible because — according to Plaintiff — Blaze Media made available to readers hyperlinks undercutting its own reporting. This is the opposite of actual malice. *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016) ("reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut, not establish, the presence of actual malice"). In any event, Plaintiff's disagreement with the forensic utility of gait analysis "must be settled by the methods of science rather than by the methods of litigation." *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994); *see also Arthur v. Offit*, No. 09-cv-1398, 2010 U.S. Dist. LEXIS 21946, *18 (E.D. Va. March 10, 2010) ("These, however, are academic questions that are not the sort of thing that courts or juries resolve in the context of a defamation action").

Plaintiff is equally off base in claiming that Blaze Media ignored warnings that it is "crucial" that gait analysis be only one component of an investigation and that it serves as "corroborating evidence." (Compl. ¶ 109) The November 5 Article expressly quoted the ABA article saying that gait analysis "can be compelling, corroborating evidence," (Compl. Ex. A), and Blaze Media's reporting did not rely on gait analysis alone. As the November 8 Article explained, the reporters relied on additional evidence such as Plaintiff's 5'7" height matching the suspect and

25

the fact that she lived next door to an individual who the FBI believed had purchased the metro card the pipe bomber used to travel into and out of D.C. on January 5 and 6.  (Compl Ex. C  2-4)

Plaintiff's supposed smoking gun showing that the reporters "intentionally misrepresented," Compl. ¶ 104, the reliability of gait analysis serves only to show the weakness of Plaintiff's arguments.  Plaintiff complains that the November 5 Article claimed that the PeerJ Computer Science article described gait analysis as "one of the most sophisticated approaches to identifying an individual from CCTV footage" when in fact the article describes gait analysis as "one of the *most complicated* and sophisticated approaches" for making such an identification. (Compl. ¶ 105)  Trying to portray that as evidence of a deliberate falsehood is nonsense.  Failing to repeat the word "complicated" when paraphrasing a description cannot plausibly suggest that Blaze Media reporters were knowingly peddling falsehoods.  *See Tilton v. Capital Cities/ABC, Inc.*, 905 F. Supp.1514, 1535 (N.D. Okl. 1995) ("An edited or altered quotation is not sufficient to establish actual malice unless the alteration results in a material change in the meaning conveyed in the statement.") (internal citation omitted).  That is especially the case where the reporters presented the gait analysis to a government agency, multiple sources within the agency "confirmed" that analysis, (Compl. Ex. C), and the government further endorsed that analysis by decisively acting on it.  Plaintiff's quibbles about the precise words the reporters used to paraphrase an article cannot plausibly raise an inference that they subjectively believed that they were presenting false conclusions.

### 8.  An Alleged Failure to Retract Cannot Show Actual Malice.

Finally, Plaintiff cannot show malice by claiming an alleged failure to retract.  (Compl. ¶ 313)  A failure to retract necessarily occurs *after* a story has been published and thus "is not probative of [a publisher's] state of mind at the time of publication."  *Fairfax v. CBS Corp.*, 2 F.4th 286, 295 (4th Cir. 2021).  Even the complete absence of a retraction "is not in itself enough to

nudge an allegation of actual malice from conceivable to plausible." *Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281-82 (S.D.N.Y. 2013).

Here, moreover, Blaze Media *did* retract the story.  On December 4, Blaze Media took down the November 5 and November 8 Articles and in their place left a notice stating that, given the arrest of a different suspect, "we consider the values of fairness and accuracy to require retraction of this article."  (Compl. ¶¶ 213-214, Ex. D)  Blaze Media's willingness to promptly correct the story "tends to negate any inference of actual malice." *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978); *see also Biro*, 963 F. Supp. 2d at 283 ("allegation of actual malice lacks plausibility" given prompt retraction); *Nelson Auto v. Multimedia Holdings Corp.*, 951 F.3d 952, 959 (8th Cir. 2020) ("[R]eadiness to print a retraction weighs against 'malice.'") (internal citation omitted).

## C. Count Four Fails to State a Claim For Defamation Based on Any Unstated Implication Allegedly Conveyed by The December 4 Retraction.

### 1. The Complaint Fails to Satisfy the Strict Requirements Necessary to Sustain a Defamation by Implication Claim Under Virginia Law.

Count IV asserts a claim for "defamation by implication" based on the December 4 Retraction of the November 8 Article.  (Compl. ¶¶ 375-393 and Ex. D)  That claim fails because Plaintiff does not satisfy the heightened burden that is constitutionally required for pleading a defamation by implication claim, which accepts the truth of the statements from which the purportedly false implication is said to arise. *Webb v. Virginian-Pilot Media Co.*, 287 Va. 84, 89 (2014) (describing implication claim as where "a plaintiff alleges that he has been defamed not by statements of fact that are literally true, but by an implication arising from them").  The Fourth Circuit has cautioned that "a libel-by-implication claim requires an especially rigorous showing where the expressed facts are literally true." *Chapin v. Knight-Ridder*, 993 F.2d 1087, 1092-1093

27

(4th Cir. 1993) (footnote omitted).[6]  Plaintiff must therefore establish not only that the purported

defamatory meaning can be "reasonably" inferred from the Retraction, but also that the Retraction

"affirmatively suggest[s] that the author intend[ed] or endorse[d] the inference."  *Id.* at 1093;

*Fairfax v. CBS Broad., Inc.*, 534 F. Supp.3d 581, 591-2 (E.D. Va. 2020) (same), *aff'd on other*

*grounds*, 2 F.4th 286 (4th Cir. 2021).

Count IV fails both prongs of this test.  Plaintiff alleges that the December 4 Retraction

implied she "planted pipe bombs in Washington, D.C. on January 5, 2021, and that overwhelming

evidence exonerating [Plaintiff] of planting the bombs was illegitimate."  (Compl. ¶ 379)  As set

forth below, these supposed implications are neither reasonable nor endorsed on the face of the

Retraction.

### a.    The December 4 Retraction Does Not Reasonably Convey the Implications Alleged.

In examining the reasonableness of an alleged defamatory implication, a reviewing court

performs "an essential gatekeeping function" by "[e]nsuring that defamation suits proceed only

upon statements which actually may defame a plaintiff, rather than those which merely may

inflame a jury to an award of damages[.]"  *Webb,* 287 Va. at 90; *Pendleton v. Newsome*, 290 Va.

162, 172 (2015).  Thus, "the meaning of the alleged defamatory language can not, by innuendo,

be extended beyond its ordinary and common acceptation."  *Webb*, 287 Va. at 89-90 (quoting

*Carwile v. Richmond Newspapers, Inc.*, 196 Va. 1, 8 (1954)).  Moreover, the statements claimed

---

[6] *See also Malone v. WPCo., LLC*,  No. 3:22-cv-00046, 2023 U.S. Dist. LEXIS 176018, at
* 18 n.11 (W.D. Va. Sept. 29, 2023) (holding that *Chapin* requires a defamation-by-implication
plaintiff to meet a "heightened pleading standard" in cases "[w]here — as here — public figures,
issues of public concern, *and* the press are involved[.]" (emphasis in original) (citing
*Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC*, 821 F. App'x 234, 231 (4th Cir. 2020)).

to give rise to the defamatory implication must be "considered within the context of the [publication] in their entirety." *Fairfax*, 534 F. Supp.3d at 593.

In derogation of the above principles, the Complaint erroneously asserts that the December 4 Retraction "accuse[d] [Plaintiff] of a serious crime." (Compl. ¶ 384) It does no such thing. To the contrary, the Retraction removed all photographs of Plaintiff from the November 8 Article on Blaze Media's website and deleted the Article's entire text. (*See* Ex. D to Compl.) The Retraction replaced that text with an explanation of the reasons for the Article's complete withdrawal, which included the following statements:

- Blaze News considers fairness and accuracy to be the defining goals of any news organization.

- [I]n light of Thursday's developments and the FBI's arrest of another individual, Virginia resident Brian Cole Jr., in connection with the Capitol pipe-bomb incident, *we consider the values of fairness and accuracy to require retraction of this article*.

- After publication, Steve Bunnell, whom the Washington Post identified as an attorney for the Capitol Police officer, told the Post his client "categorically denies" that she planted the pipe bombs.

- The featured image in this article was changed on December 4, 2025.

(Ex. D to Compl.; emphasis supplied)

In order to prop up Plaintiff's defamatory implication claim, the Complaint ignores the above statements. (*See* Compl. ¶ 377) This glaring omission is fatal to Count IV. By taking down the November 8 Article in its entirety, deleting Plaintiff's images, and reporting her counsel's categorical denial, the Retraction — published on the same day the FBI arrested and charged Brian Cole Jr., who confessed to planting the pipe bombs (Compl. ¶ 8) — indicated that the previous reporting was being withdrawn in light of new information out of concerns for "fairness and accuracy." Considered in light of "the circumstances surrounding [its] making and publication" (*Pendleton*, 290 Va. at 172), the Retraction fails to "reasonably cause the statement to convey a

29

defamatory meaning to its recipients." *Sherwood v. Cnty. of Botetourt*, No. 7:25cv-8821, 2026 U.S. Dist. LEXIS 112907, at \*80 (W.D. Va. May 21, 2026). Indeed, by reporting Attorney Bunnell's denial of his client's involvement, it conveys precisely the opposite of the meaning alleged by Plaintiff. *Id*. at \*\*55-56, 81 (rejecting defamatory implication that plaintiff had been cast in the light of a "suspected sexual offender" based on press release stating that the charges against him were "not sexual in nature" which "impli[ed] the opposite" of the alleged meaning ); *Webb*, 287 Va. at 90 (rejecting defamation claim where article "disclaimed" the alleged implication "by quoting the spokesperson's denial") (footnote omitted). As this Court has emphasized, "where a Plaintiff alleges that [s]he has been defamed by implication, the alleged implication must be reasonably drawn *from the words actually used*." *Fairfax*, 534 F. Supp. 3d at 591-92 (emphasis supplied). By omitting certain statements, the Complaint distorts the meaning of the Retraction, which cannot be transmogrified to convey an unarticulated meaning contrived by Plaintiff. *Accord, Hyland v. Raytheon Tech Servs. Co.*, 277 Va. 40, 48 (2009) (held, reversible error where trial court "excluded the necessary consideration of each statement as a whole" in evaluating defamatory implication claim). As Plaintiff would have it, the Retraction somehow impliedly reasserts the previous reporting that it expressly retracts. Both the First Amendment and Virginia defamation law prohibit such a perversion of what the Retraction actually published.

Lastly, Plaintiff cannot salvage her defamation by implication claim by pointing to the headline of the Retraction. The headline still must be read in context and in light of the background knowledge a reader who understood it to refer to Plaintiff would bring to it. *Schaecher v. Bouffault*, 290 Va. 83, 93 (2015) (quoting *Carwile*, 196 Va. at 7) (alleged defamatory words are to be understood "as other people would understand them"). A reader who understood the "Capitol Police officer" mentioned in the headline and in the body of the Retraction, "published at the same

30

URL" (Compl. ¶ 380) as the November 8 Article, would already be familiar with the previous article. The Complaint admits as much. (*Id.* ¶ 215) Any such reader would therefore understand the headline to be referring back to that article rather than to be announcing a new story raising questions about Plaintiff's association with the pipe-bombs, thereby reinforcing that the November 8 Article was being retracted. Simply put, the defamation alleged in the Complaint "is not a reasonable inference to make." *Sherwood*, U.S. Dist. LEXIS 112907, at *56.

### b. Plaintiff Cannot Establish That Blaze Media Adopted or Endorsed the Alleged Implications.

In addition, the Complaint fails to identify anything on the face of the Retraction showing that Blaze Media intended or endorsed any defamatory implication. *Chapin*, 993 F.2d at 1093, 1096; *Fairfax*, 534 F. Supp.3d at 591, 594; *see also White v. Fraternal Order of Police*, 909 F.2d 512, 520 (D.C. Cir. 1990) (publication must supply "additional, affirmative evidence suggesting that the defendant intends or endorses the defamatory inference"). When confronted with defamatory implication claims, courts have warned against exposing defendants to liability "not only for what was not said but also for what was not intended to be said" because such a result would "eviscerate[] the First Amendment protections established by *New York Times Co. [v. Sullivan].*" *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 681 (9th Cir. 1990). "Without a clear signal" from the face of the Retraction that Blaze Media "endorsed the inference," Plaintiff's defamation by implication claim must be dismissed. *Jenkins v. Snyder*, No. 00-2150-A, 2001 U.S. Dist. LEXIS 26921, at *17 (E.D. Va. Feb. 6, 2001).

No such signal is apparent here, where nothing in the Complaint supports that the implications of criminality alleged by Plaintiff were known, let alone intended, by Blaze Media in publishing the Retraction. Nor could there be any such claim — the Retraction itself, considered

31

in its full context,[7] refutes any such notion. *Chapin*, 993 F.2d at 1098 ("we would err if we did not consider the article as a whole"). The Retraction: (1) informed readers that journalistic "values of fairness and accuracy" animated the decision to retract the November 8 Article, (2) quoted Plaintiff's lawyer's categorical denial of his client's involvement in the pipe-bomb incidents, and (3) removed the complete Article and all images of Plaintiff from Blaze Media's website. Providing the above information to readers belies any intention to communicate the impression that Plaintiff was responsible for planting the pipe bombs. *Southard v. Forbes*, 588 F.2d 140, 144 (5th Cir. 1979) (rejecting implied defamation claim when "the innuendo [plaintiffs] claim to impart to the Forbes article [is] a meaning which the article itself denies"); *cert denied*, *Dottino v. United States*, 444 U.S. 832 (1979); *Jenkins*, 2001 U.S. Dist. LEXIS 26921, at *14 (intentionality requirement ensures that an implied defamatory meaning cannot be "manufactured from words not reasonably capable of sustaining such a meaning") (internal quotations and citation omitted). The nail in the coffin as to this point is the Complaint's own recognition that Baker's public disavowal of the decision to publish the Retraction prompted Blaze Media to respond in a social media post stating "Blaze News stands by its December 4, 2025, retraction of its November 8, 2025 story regarding the Jan. 6th pipe bombs." (Compl. ¶¶ 238, 247 n.55)

In the final analysis, nothing published in the Retraction "suggests that the defendants themselves knew of, much less intended, the defamatory meaning." *Kendall v. Daily News Publ. Co.*, 716 F.3d 82, 93 (3d Cir. 2013); *see also Fairfax*, 534 F. Supp.3d at 594; *see also Covington Specialty Ins. Co. v. Omega Rest. & Bar, LLC*, 666 F. Supp.3d 528, 547 (E.D. Va. 2023) (rejecting

---

[7] *Biro v. Condé Nast*, 883 F. Supp.2d 441, 466 (S.D.N.Y. 2012) (determining whether author of magazine article "intended or endorsed" implication "will often require an examination of the statements in the context of the article as a whole"), *aff'd*, 807 F.3d 541 (2d Cir. 2015).

defamatory implication claim for failure to satisfy intentionality requirement).  For this reason alone, Count IV of the Complaint should be dismissed.

### III.    IN THE ALTERNATIVE, BLAZE MEDIA IS IMMUNIZED FROM LIABILITY FOR DEFAMATION UNDER VIRGINIA'S ANTI-SLAPP STATUTE

Virginia's anti-SLAPP statute provides immunity to those exercising their right to speak on matters of public concern in circumstances like those presented here:

> A person shall be immune from tort liability if the tort claim is based solely on statements (i) regarding matters of public concern that would be protected under the First Amendment to the United States Constitution made by that person that are communicated to a third party[.]

Va. Code § 8.01-223.2(A) (2025).  The statute reflects the General Assembly's strong support for free speech on matters of public concern.  *Fairfax*, 2 F.4th at 296.  It also reflects the sound public policy that courts should swiftly dismiss baseless lawsuits attacking freedom of expression — such as this one.  *McCullough*, 2023 U.S. Dist. LEXIS 72291, at *44 ("the very purpose of the immunity is to allow defamation defendants faced with meritless civil suits to *avoid . . .* discovery and trial") (emphasis in original)).

It is beyond question that the November 2025 Publications relate to a "matter[] of public concern" and were communicated to third parties.  Blaze Media is therefore immune from liability at the outset unless Plaintiff has alleged facts that, if proven, would establish the publication of statements that Blaze Media "knew or should have known were false or were made with reckless disregard for whether they were false," Va. Code § 8.01-223.2(B) — that is, unless Plaintiff has adequately pleaded "actual malice."  *McCullough*, 2023 U.S. Dist. LEXIS 72291, at *45 (the "immunity applies when a complaint fails to *plead* actual malice") (emphasis in original).  As explained, *see supra* Point IIB., Plaintiff has failed to allege actual malice.  *Id*. at *35.  Therefore,

33

Blaze Media is also immune from her defamation claims pursuant to Section 223.2, and the Court should dismiss the Complaint for this independent reason.[8]

## CONCLUSION

The claims against Blaze Media should be dismissed with prejudice.

Dated: July 9, 2026
      Washington, DC

Respectfully submitted,

By: /s/*Matthew Piscitelli*
    Matthew Piscitelli (VSB No. 92464)
    FOLEY HOAG LLP
    1717 K Street NW
    Washington, DC 20006
    (202) 223-1200
    MPiscitelli@foleyhoag.com

    Michael J. Grygiel (*pro hac vice*)
    Kelly L. McNamee (*pro hac vice*)
    Amanda S. Coleman (*pro hac vice*)
    FOLEY HOAG LLP
    1301 Avenue of the Americas
    New York, NY 10019
    (212) 812-0400
    MGrygiel@FoleyHoag.com
    KMcNamee@FoleyHoag.com
    AColeman@FoleyHoag.com

    Patrick F. Philbin (*pro hac vice forthcoming*)
    Kyle T. West (*pro hac vice forthcoming*)
    TORRIDON LAW PLLC
    801 Seventeenth Street NW
    Suite 1100
    Washington, DC 20006
    (202) 249-6900
    pphilbin@torridonlaw.com
    kwest@torridonlaw.com

    *Counsel for Defendant Blaze Media LLC*

---

[8] Blaze Media has filed a separate motion for an award of its attorney's fees under the statute. Va. Code § 8.01-223.2(C).

34

## CERTIFICATE OF SERVICE

I hereby certify that, on July 9, 2026, I electronically filed the foregoing with the

Clerk of the Court using the CM/ECF system, which will serve a copy on all counsel of record.


/s/ Matthew Piscitelli
Matthew Piscitelli (VSB No. 92464)

35