**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION**

| | |
|---|---|
| SHAUNI KERKHOFF, | ) |
| | ) |
|     Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) |
| | )   Case No. 1:26-cv-01078-RDA-WEF |
| BLAZE MEDIA LLC, a Delaware limited | ) |
| liability company, STEPHEN M. BAKER, an | ) |
| individual, JOSEPH M. HANNEMAN, an | ) |
| individual; and VERITAS REGNAT LLC, a | ) |
| Wisconsin limited liability company. | ) |
| | ) |
|     Defendants. | ) |
| | ) |

**MEMORANDUM OF LAW IN SUPPORT OF DEFENDANTS STEPHEN M. BAKER,
JOSEPH M. HANNEMAN, AND VERITAS REGNAT LLC'S MOTION TO DISMISS**

J. Alex Little (*pro hac vice*)
Zachary C. Lawson (*pro hac vice*)
John R. Glover (*pro hac vice*)
LITSON PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
(615) 985-8205
alex@litson.co
zack@litson.co
jr@litson.co

Andrew T. George (VA Bar No. 88389)
BOURELLY, GEORGE + BRODEY PLLC
1050 30th Street NW
Washington, D.C. 20007
(202) 341-8805
andrew.george@bgblawyers.com

*Attorneys for Defendants Stephen M. Baker,
Joseph M. Hanneman, and Veritas Regnat LLC*

**INTRODUCTION**

Steve Baker and Joe Hanneman spent four years investigating a question the Federal Bureau of Investigation could not answer in five: who planted two pipe bombs outside the headquarters of the nation's two major political parties on the night of January 5, 2021? (Dkt. 70 ¶¶ 34–35 & Ex. B.) The FBI deployed its full investigative arsenal, offered a reward that reached $500,000, and identified multiple persons of interest, but the case remained ongoing when Blaze Media published the reporting at issue in November 2025. (*Id*. ¶¶ 35–36 & Ex. C.) Baker and Hanneman's reporting on that crime—what a forensic gait analysis showed, what intelligence sources said about it, and what the government did when presented with it—is speech at the core of the First Amendment. Plaintiff's effort to impose ruinous personal liability on two individual reporters for that reporting, and to reach the shoestring publishing venture they founded after leaving Blaze Media, fails as a matter of law several times over.

The Complaint asserts four counts against these Defendants: Count Two against Baker and Blaze Media (a November 5, 2025 podcast); Count Three against Baker, Hanneman, and Veritas Regnat LLC (a November 8, 2025 article); Count Five against Baker and Hanneman (an April 4, 2026 post on X); and Count Six against Baker, Hanneman, and Veritas Regnat (an April 6, 2026 blog post).[1]

Although the Complaint challenges more than a dozen distinct statements across those four publications, it distills every one of them into a single allegedly defamatory assertion: that Plaintiff

---

[1]    Unless otherwise noted, for the sake of consistency, this memorandum adopts the terms defined in Blaze Media's Memorandum of Points and Authorities (Dkt. 62), including the "November 5 Podcast" (Dkt. 1 Ex. B), the "November 8 Article" (*id*. Ex. C), and the "December 4 Retraction" (*id*. Ex. D). Baker and Hanneman are referred to together as the "Individual Defendants," and with Veritas Regnat LLC as "Defendants." This memorandum omits internal quotation marks, alterations, and citations from quoted material unless otherwise indicated.

"planted two pipe bombs in Washington, D.C. on the evening of January 5, 2021." (*Id*. ¶¶ 359, 377, 414, 432.) No challenged statement says that. The Complaint's copy-paste "actual malice" allegations are legally insufficient.

*First*, Plaintiff is a public official. She was a United States Capitol Police officer trained in crowd-control munitions, and every challenged statement concerns her conduct in that office— including whether she planted bombs the night before January 6 and what Capitol Police surveillance video from January 6 shows about her. She therefore must plead facts plausibly showing that each Defendant published each challenged statement with actual malice—knowledge of falsity or a "high degree of awareness of . . . probable falsity." *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 714 (4th Cir. 1991). The Complaint pleads the opposite. It describes reporters who investigated for years, commissioned a forensic analysis rather than eyeballing footage, carried the results to the Office of the Director of National Intelligence ("ODNI") weeks before publishing a word, and went to print only after "several current intelligence sources" confirmed the findings and the FBI itself acted on them. (Dkt. 70 ¶¶ 2, 124–39, 159.) Reporters who subjectively disbelieve a story don't hand it to the nation's intelligence apparatus for scrutiny and then wait.

*Second*, the two post-Blaze-employment counts—Counts Five and Six—challenge statements that are true, unchallenged, or protected opinion. Baker and Hanneman wrote that Plaintiff exhibits a "circumduction gait" (or walking "with one stiff leg"[2]) visible on video they possess and published; that she ran marathons; and that a former FBI congressional liaison once remarked, while reviewing the bomber footage, "We need to be looking for a marathon runner."

---

[2]    *Abnormal gait: Gait disorder types, causes & treatments*, https://my.clevelandclinic.org/health/diseases/21092-gait-disorders (last visited Jul 27, 2026).

(Dkt. 70 ¶ 259). The Complaint does not—because it cannot—allege that the videos do not exist, that Plaintiff never ran a marathon, or that the quoted remark was never made. Instead, it celebrates her "impressive marathon history" in the same breath it sues over the observation. (*Id.* ¶ 253.) Truth is never defamation, and characterizations of disclosed video footage that readers can watch for themselves are not actionable assertions of fact.

*Third*, the Complaint suffers from structural defects no amendment can cure. Count Three sues Veritas Regnat over an article published on November 8, 2025—roughly five months *before* Veritas Regnat even existed. (*Id*. ¶¶ 19, 258, 373.) An entity cannot "publish" a statement before it is formed, nor can act with "reckless disregard" in making a publication that predates its existence. Count Five sues Hanneman for pressing "repost" on another person's X (formerly Twitter) post. But "reposting" is conduct that Congress expressly immunized in Section 230 of the Communications Decency Act, 47 U.S.C. § 230(c)(1). And the Court lacks personal jurisdiction over Veritas Regnat, a Wisconsin company whose only alleged conduct is operating a WordPress blog that no allegation connects to a Virginia audience.

*Fourth*, Virginia's anti-SLAPP statute, Va. Code § 8.01-223.2, independently immunizes all three Defendants. Every challenged statement addresses a matter of intense public concern, and the statutory exception for knowing or reckless falsehoods turns on the same actual malice showing that Plaintiff has failed to plead.

The claims against Baker, Hanneman, and Veritas Regnat should be dismissed with prejudice.

**STATEMENT OF FACTS[3]**

A.   **Baker and Hanneman's Four-Year Investigation and the November 2025 Publications.**

Baker and Hanneman were investigative reporters at Blaze Media who worked as a team covering January 6, including the government's highly publicized pipe-bomb investigation. (Dkt. 70 ¶ 79.) Over four years, they interviewed sources, reviewed extensive video footage, and sought information from government agencies. (*Id*. ¶¶ 79, 84–85, 99, 152–59 & Exs. A–C.) To test where their investigation led them, they arranged a forensic "gait analysis"—a software-based comparison of walking patterns—measuring video of Plaintiff against video of the hooded pipe-bomb suspect.[4] (*Id*. ¶¶ 144, 152.) The software rated the two gaits a 94% match. (*Id*. ¶¶ 144–45.) The reporters did not stop there. They shared the results with "several current intelligence sources" and "two other sources familiar with gait analysis," all of whom confirmed the findings. (*Id*. ¶¶ 2, 159 & Ex. C.) Baker then took the findings to ODNI weeks before anything was published. (*Id*. ¶¶ 124–26.) ODNI personnel began drafting a memorandum about the investigation that circulated through executive-branch agencies and reached the White House and senior CIA staff. (*Id*. ¶¶ 128, 202.)

---

[3]   This section is drawn from the allegations of the Complaint and the exhibits attached to it, which Defendants accept as true solely for purposes of this Motion.

[4]   Gait analysis is a well-recognized hallmark of criminal investigations and prosecutions. *E.g.*, *United States v. Daniels*, 91 F.4th 1083, 1099 (11th Cir.), *cert. denied* (2024) (affirming the admissibility of government "testimony about the robber's unique arm swing"); *United States v. Hallman*, No. CR 20-10017-LTS, 2021 WL 4554520, at *16 (D. Mass. Oct. 5, 2021) (government witnesses testified that the robber "walk[ed] with a limp or in an otherwise idiosyncratic manner"); *Grant v. City of New York*, No. 15-cv-3635, 2019 WL 1099945, at *6 (E.D.N.Y. Mar. 8, 2019) (finding fact that individual "walks with a limp or gait which the suspect did not have" was a material factor in a probable cause analysis).

The government did not treat the reporters' findings as a prank tip. On November 6, 2025, two FBI agents interviewed Plaintiff about her whereabouts on January 5, 2021—which she could "not immediately recall." (*Id*. ¶¶ 129–31.) That same day, FBI agents searched her phone and car, and a caravan of agents in tactical gear searched her Alexandria home with bomb-detection dogs. (*Id*. ¶¶ 5, 133.) That night, the FBI administered a polygraph examination and informed Plaintiff she had failed it.[5] (*Id*. ¶¶ 134–36.) The Complaint also alleges that the FBI conducted its own gait analysis. (*Id*. ¶ 244.)

Blaze Media updated the November 8 Article repeatedly as new information emerged—correcting Plaintiff's job description at the CIA's request, adding her counsel's categorical denial, and reporting CBS News's account that the FBI was no longer investigating her. (*Id*. ¶¶ 204–09.) On December 4, 2025, the same day the Department of Justice announced the arrest of Brian J. Cole, Jr., Blaze Media took down the November 8 Article. (*Id*. ¶¶ 213–14 & Ex. D.)

**B.    The Demand Letter and Defendants' Departures from Blaze Media.**

On January 16, 2026, Plaintiff's counsel, Clare Locke LLP, sent Blaze Media, Baker, and Hanneman letters demanding a retraction and apology. (*Id*. ¶¶ 322.) As relevant here, the letter asserted—as a matter of *fact*—that "Ms. Kerkhoff's 2015 soccer injury did not give her a 'slight limp' from which any reasonable 'analyst' could link her to the bombing suspect," that she "has fully recovered from her injury," and that "[i]n the interim, she has run multiple marathons." (*Id*. Ex. E.) Defendants' then-counsel declined the demands by letter on January 29, 2026. (*Id*. ¶¶ 323.)

---

[5]    Plaintiff's attempt to water down her polygraph failure because no one really "fails" polygraphs is flat wrong. *E.g.*, *United States v. Daniels*, No. 25-10349, 2026 WL 296595, at *1 (11th Cir. Feb. 4, 2026) (affirming the Court's reliance on the fact that "Daniels took and failed a polygraph examination"); *United States v. Wakefield*, 112 F. App'x 257, 259 (4th Cir. 2004) ("It is undisputed that Wakefield failed such a polygraph examination.").

Blaze Media terminated Baker on or about April 1, 2026, and Hanneman resigned on or about April 3, 2026. (*Id*. ¶¶ 17–18, 245.)

**C.      The April 4 Post and Hanneman's Repost.**

On April 4, 2026, Baker published a post on X responding to the demand letter. (*Id*. ¶ 250 & Ex. E (the "April 4 Post").) The April 4 Post quoted the letter's "no limp" passage verbatim and responded directly to it: "they must know we have hours of video of Ms. Kerkhoff's unusual 'circumduction gait.' (A kind of limp.) Hours of video we've harvested from Capitol CCTV of her as a Capitol Police officer on January 5 and 6, 2021, and from her short professional soccer career." (Dkt. 70 Ex. E.) It posed two questions about the law firm's strategy—whether Clare Locke was "incompetently representing" its client "by that easily disproved assertion," or "just trying to scare The Blaze into a quick settlement." (*Id.*) And it addressed the letter's marathon point: "As for Ms. Kerkhoff being a marathon runner, we already knew that," recounting that former FBI congressional liaison Marshall Yates "once told me . . . 'We need to be looking for a marathon runner'" because of "distinct physical traits that are characteristic of marathon runners and exhibited by the bomber" in the January 5 surveillance footage. (*Id.*) The post closed: "Clare Locke says, 'No limp.' Video evidence says otherwise." (*Id.*)

The same exhibit shows Baker's replies to strangers in the ensuing thread. When one commenter scoffed that Plaintiff "doesn't look physically fit to have run several marathons," Baker corrected her: "That's warm weather gear and body armor. She's very fit and athletic." (*Id*. Ex. E.) When another asked how "someone that obese" could hold a law-enforcement job, Baker answered: "She's not obese. That's cold weather gear and body armor. She's quite trim and fit." (*Id.*)

Hanneman's alleged role in Count Five is a single click. He "'reposted' the April 4 Post" (*Id*. ¶ 410)—more precisely, as Plaintiff's own exhibit shows, he pressed "repost" on a *third* X user's post, which quoted Baker's post and added that user's comment that Baker and Hanneman "report with integrity and a sense for the truth." (*Id*. Ex. F.) The Complaint does not allege that Hanneman authored, edited, or added a single word. (*Id*. ¶¶ 410–411 & Ex. F.)

**D.      Veritas Regnat and the April 6 Blog Post.**

Veritas Regnat LLC is a Wisconsin limited liability company, headquartered in Sun Prairie, Wisconsin, that Baker and Hanneman formed after their departures from Blaze Media to operate a WordPress blog and to receive funds from an online fundraising campaign. (*Id*. ¶¶ 19, 258.) Baker and Hanneman shared the blog with their followers on April 6, 2026. (*Id*. ¶ 257.)

That day, the blog published the post at issue in Count Six: "Previously Unreleased Video Contradicts Contention Onetime Pipe-Bomb Suspect Did Not Have a Limp." (*Id*. ¶ 428 & Ex. G (the "April 6 Blog").) Like the April 4 Post, the April 6 Blog identifies itself in its opening lines as a response to litigation correspondence: "Attorneys representing former U.S. Capitol Police officer Shauni Kerkhoff have contended that reporting we did at Blaze Media in November 2025 about their client was inaccurate, claiming she does not have a discernible right leg drag or limp," and it describes and quotes the "January letter threatening a defamation lawsuit." (*Id*. Ex. G.) The post states that "Veritas Regnat has hours of video showing Kerkhoff's unusual 'circumduction gait,'" displays side-by-side video of Plaintiff and the hooded suspect, repeats the FBI congressional liaison's "marathon runner" quotation, and concludes: "No limp? Video evidence says otherwise." (*Id*. ¶ 429 & Ex. G.) The Complaint's objection to the side-by-side footage is that Plaintiff appears in it "in full duty gear" carrying equipment that "affected her gait"—an argument about what the videos prove, not a denial that they exist or that they depict her. (*Id*. ¶¶ 251, 261.)

8

**E.      Plaintiff's Claims Against These Defendants.**

Plaintiff filed her Complaint on April 21, 2026. Counts Two, Three, Five, and Six assert defamation claims against Baker, Hanneman, and Veritas Regnat as described above. Each count alleges that the challenged statements are "assertions that Ms. Kerkhoff planted two pipe bombs in Washington, D.C. on the evening of January 5, 2021," (*Id.* ¶¶ 359, 377, 414, 432), and each recites the same nine actual-malice theories, in materially identical language, against every Defendant. (*Id.* ¶¶ 364, 382, 419, 437; *see also id.* ¶¶ 284–319.)

## LEGAL STANDARD

When personal jurisdiction is challenged under Rule 12(b)(2), the plaintiff bears the burden of establishing jurisdiction over each defendant, *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009), and the court need not "credit conclusory allegations or draw farfetched inferences." *Masselli & Lane, PC v. Miller & Schuh, PA*, No. 99-2440, 2000 WL 691100, at *1 (4th Cir. 2000). To survive dismissal under Rule 12(b)(6), a complaint must plead facts stating a claim that is "plausible on its face," *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)), and the Court must disregard legal conclusions, "unwarranted inferences, unreasonable conclusions, [and] arguments." *Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 255 (4th Cir. 2009). The plausibility standard carries particular force in public-official defamation suits, where the Constitution shields the press so that it "may be wrong when commenting on acts of a public figure, as long as it is not intentionally or recklessly so." *Carr v. Forbes, Inc.*, 259 F.3d 273, 283 (4th Cir. 2001); (*see* Dkt. 62, Part I).

## ARGUMENT

**I.    The Court Lacks Personal Jurisdiction Over Veritas Regnat.**

Veritas Regnat is a Wisconsin limited liability company headquartered in Sun Prairie, Wisconsin. (Dkt. 70 ¶ 19.) Its only alleged conduct is operating a WordPress blog and receiving crowd-sourced donations. (*Id* ¶ 332.) Neither act occurred in Virginia, and the Complaint alleges no facts showing that either was directed at Virginia.

Posting content on "a generally accessible" website does not subject the poster to jurisdiction wherever the content can be read. To establish specific jurisdiction over an out-of-state publisher based on internet activity, the plaintiff must show that the defendant "(1) directs electronic activity into the State, (2) with the manifested intent of engaging in business or other interactions within the State, and (3) that activity creates, in a person within the State, a potential cause of action cognizable in the State's courts." *ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002). Applied to online publications, the question is whether the publisher "manifest[ed] an intent to target and focus on Virginia readers." *Young v. New Haven Advoc.*, 315 F.3d 256, 263 (4th Cir. 2002). Writing *about* a person who happens to live in Virginia is not targeting a Virginia *audience*. In *Young*, the Fourth Circuit found no jurisdiction over Connecticut newspapers whose internet articles allegedly defamed a Virginia prison warden, because nothing showed the newspapers aimed their content at Virginia readers rather than at their own audience. *Id.* at 263–64.

The Complaint fails that test as to Veritas Regnat. The April 6 Blog addresses several national controversies: an attempted bombing in Washington, D.C., a federal investigation, and a looming defamation suit that drew coverage from national outlets. (Dkt. 70 ¶¶ 8, 34–35, 207–09.) Nothing about the blog's "general thrust and content" is aimed at Virginians. *Young*, 315 F.3d at

10

263. The Complaint's jurisdictional allegations do not fill the gap, because they describe someone else's conduct: Blaze Media's Virginia business registration, Blaze Media's coverage of Virginia political issues, and travel to Virginia that the Complaint itself dates to the Blaze-era investigation in November 2025—months before Veritas Regnat existed.[6] (Dkt. 70 ¶ 21(b), (d).) What remains for Veritas Regnat is a bare assertion, "[u]pon information and belief," that "a significant portion" of unspecified "readers and followers" are Virginia residents. (*Id*. ¶ 21(e).) That is precisely the kind of conclusory allegation the Court does not credit on a Rule 12(b)(2) motion. *See In re Boon Glob., Ltd.*, 923 F.3d 643, 654 (9th Cir. 2019) ("Conclusory allegations . . . are insufficient to confer personal jurisdiction. Something more is needed."); *see also In re Lilley*, No. 10-81078C-13D, 2011 WL 1428089, at *3 (Bankr. M.D.N.C. Apr. 13, 2011) (describing how "upon information and belief" is often used inappropriately to couch conclusory allegations). The claims against Veritas Regnat—Counts Three and Six—should be dismissed for lack of personal jurisdiction. They also fail on the merits, as shown below.

II.    **Plaintiff Must Plead Facts Plausibly Showing That Each Defendant Published Each Challenged Statement with Actual Malice.**

A.    *Plaintiff Is a Public Official, and Every Challenged Statement Concerns Her Official Conduct.*

Plaintiff was a United States Capitol Police officer entrusted with protecting the national legislature and training other officers in the use of crowd-control munitions. That means she was a public official under *New York Times Co. v. Sullivan*, 376 U.S. 254 (1964), and its progeny. *See Rosenblatt v. Baer*, 383 U.S. 75, 85–86 (1966); *Horne v. WTVR, LLC*, 893 F.3d 201, 208 (4th Cir.

---

[6]    Veritas Regnat was registered as a Wisconsin limited liability company on March 31, 2026. *See* https://apps.dfi.wi.gov/apps/corpsearch/Details.aspx?entityID=V036952&hash=662409828 &searchFunctionID=95d7270b-dcaf-4748-82d9-1be7af595555&type=Simple&q=veritas+regnat. Courts may consider matters outside the pleadings when analyzing challenges to personal jurisdiction. *Grayson v. Anderson*, 816 F.3d 262, 268 (4th Cir. 2016).

2018). "Every court that has faced the issue has decided that an officer of law enforcement, from ordinary patrolman to Chief of Police, is a 'public official' within the meaning of federal constitutional law." *Seymour v. A.S. Abell Co.*, 557 F. Supp. 951, 957 (D. Md. 1983); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir. 1981) ("The cop on the beat is the member of the department who is most visible to the public" and is, therefore, a "public official" who must show actual malice).

That Plaintiff left the force in mid-2021 changes nothing for the April 2026 statements. A police officer is not "strip[ped] of his status as a public official" upon leaving the department where, as here, the challenged statements concern conduct *during* her tenure. *Gray,* 656 F.2d at 590 n.3; *see Rosenblatt*, 383 U.S. at 87 n.14; *Garrison v. Louisiana*, 379 U.S. 64, 77 (1964) ("[A]nything which might touch on an official's fitness for office is relevant[.]"). An accusation of crime, moreover, "can never be irrelevant" to an official's fitness. *Horne*, 893 F.3d at 210 (citing *Monitor Patriot Co. v. Roy*, 401 U.S. 265, 277 (1971) and *Ocala Star-Banner Co. v. Damron*, 401 U.S. 295, 300 (1971)). Every statement challenged here concerns Plaintiff's time in uniform: whether an officer trained in less-lethal munitions planted bombs blocks from her post on the eve of January 6, and what Capitol Police surveillance video of her from January 5 and 6, 2021 shows. (Dkt. 70 ¶¶ 359, 377, 414, 432.) The actual-malice standard governs all four counts.

### B. Actual Malice Is Subjective, Individual, and Statement-Specific.

Actual malice asks whether the *speaker*, at the time of publication, "realized that his statement was false or . . . subjectively entertained serious doubt as to the truth of his statement." *Bose Corp. v. Consumers Union of U.S., Inc.*, 466 U.S. 485, 511 n.30 (1984); *St. Amant v. Thompson*, 390 U.S. 727, 731 (1968). Because the test is subjective, it must be pleaded person by person. That is, a complaint must allege facts showing the specific "state of mind" of a person

responsible for the challenged statement, and one defendant's knowledge cannot be "imputed" to another. *Patel v. Cable News Network, Inc.*, 83 Va. App. 387, 412 (2025); *see Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 485–86 (E.D. Va. 2018). And it must be pleaded statement by statement. "[D]efamation plaintiffs cannot show actual malice in the abstract; they must demonstrate actual malice in conjunction with a false defamatory statement." *Tavoulareas v. Piro*, 817 F.2d 762, 794 (D.C. Cir. 1987) (en banc) (emphasis omitted); *McCullough v. Gannett, Co.*, No. 122CV1099RDALRV, 2023 WL 3075940, at *6 (E.D. Va. Apr. 25, 2023) (A complaint must "identify which specific statements plaintiff considers defamatory or libelous.").

The Complaint does the opposite. It recites nine boilerplate malice theories once (Dkt. 70 ¶¶ 284–319), then re-pleads the same nine—with only immaterial variations—against every combination of four Defendants across six counts and more than a dozen statements, (*Id.* ¶¶ 346, 364, 382, 419, 437). From that shotgun pleading, it is "unclear what arguments about actual malice Plaintiff ascribes to each statement," let alone to each Defendant. *McCullough,* 2023 WL 3075940, at *13. That defect alone requires dismissal.

**III.    Counts Two and Three Fail to State a Defamation Claim Against Baker and Hanneman.**

> *A.    The November Statements Are Not Reasonably Capable of the Defamatory Meaning Plaintiff Ascribes to Them.*

Whether a statement "is reasonably capable of the defamatory meaning [the plaintiff] ascribes to it is a question of law," and resolving it "is an essential threshold, gatekeeping function of the court." *Webb v. Virginian-Pilot Media Cos.*, 287 Va. 84, 90-91 (2014); *see Schaecher v. Bouffault*, 290 Va. 83 (2015); *Va. Citizens Def. League v. Couric*, 910 F.3d 780, 783–84 (4th Cir. 2018). The meaning of the words "cannot, by innuendo, be extended beyond [their] ordinary and common acceptation." *Webb*, 287 Va. at 89.

13

Counts Two and Three rest on a single ascribed meaning: that Plaintiff "planted two pipe bombs." (Dkt. 70 ¶¶ 359, 377.) But no challenged statement says that. The November 8 Article reported—under a headline ending in "sources say"—that a computer program produced a 94% gait match, that the analyst and other sources put it higher, and that the finding presented a "possible solution" that "if confirmed, could recast the entire story of Jan. 6." (*Id*. Ex. C.) Reporting a forensic result and the government's response to it is not a verdict about guilt.

Count Two fares worse still. Five of its eight challenged statements are not Baker's words at all—they are Glenn Beck's. (*Id*. ¶ 356(a)–(c), (e) (Beck speaking).) Baker did not publish statements he did not make, and the Complaint offers no theory for holding a podcast guest liable for his host's framing. Baker's own statements described his investigation: that the "software hit at a 94% accuracy," that intelligence sources reacted as they did, and that the government had "already started making moves." (*Id*. ¶ 356(g)–(h).) The Complaint does not allege the software produced a different number, that the sources said something else, or that the government sat still— indeed, it pleads that the FBI interviewed Plaintiff, searched her home, and polygraphed her the next day. (*Id*. ¶¶ 129–39.) And none of the podcast statements so much as names Plaintiff. They preview a story "coming out tomorrow" about an unnamed "lead suspect." (*Id*. ¶ 356(c).) Telling an audience that reporters have "locked in on a suspect" is a description of a reporting process— one the ensuing FBI investigation of Plaintiff proved was rooted in legitimate fact.

B.    *Complaint Pleads No Facts Plausibly Showing that Baker or Hanneman Subjectively Doubted the November Reporting—It Pleads the Opposite.*

The Complaint recites nine actual-malice theories against Baker and Hanneman for the November reporting—the same nine it recites, in materially identical words, against every Defendant for every publication. (*Id*. ¶¶ 364(a)–(i), 382(a)–(i); *see id.* ¶¶ 284–319.) Two principles control all nine. Motive, animus, and even an "extreme departure from professional standards" do

not establish actual malice, *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 664-65 (1989), and "'journalistic standards' are irrelevant to the inquiry of actual malice; knowledge is what matters," *McCullough*, 2023 WL 3075940, at *15. "[C]onclusory assertions of actual malice do not satisfy the federal pleading requirements for a defamation claim." *Spirito v. Peninsula Airport Comm'n*, 350 F. Supp. 3d 471, 481 (E.D. Va. 2018) (citing *Mayfield v. Nat'l Ass'n for Stock Car Auto Racing, Inc.*, 674 F.3d 369, 378 (4th Cir. 2012)). Measured against what Baker and Hanneman are alleged to have known, each theory fails—most of them more than once.

**1. "Actual knowledge" from the gait-analysis literature (Dkt. 70 ¶¶ 364(a), 382(a); *see id.* ¶¶ 285–90)**. The Complaint's lead theory is that Baker and Hanneman "knew" their accusation was false because two research articles they reviewed explain that gait analysis cannot conclusively identify a suspect. The theory fails at every step. To start, it answers a statement no one made. The November publications did not report a charge or conviction. It reported that a computer program returned a 94% match, that the analyst who ran it "pegged the match at closer to 98%," and that the finding presented a "possible solution" that "if confirmed, could recast the entire story of Jan. 6." (Dkt. 70 ¶¶ 144–45, 156 & Ex. C.) Knowing that a forensic technique has limits does not mean Defendants harbored serious doubt that the software returned the number it returned. Awareness that gait analysis cannot convict is fully consistent with belief in a reported match—and belief, not certainty, is what the Constitution requires. *St. Amant*, 390 U.S. at 731.

Next, Baker and Hanneman hyperlinked the *very studies* Plaintiff says refute their reporting. (Dkt. 70 ¶ 104.) A reporter bent on deceiving his readers does not footnote his own refutation. The hyperlink is "the twenty-first century equivalent of the footnote," *Adelson v. Harris*, 973 F. Supp. 2d 467, 484 (S.D.N.Y. 2013), *aff'd*, 876 F.3d 413 (2d Cir. 2017), and "reporting perspectives contrary to the publisher's own should be interpreted as helping to rebut,

not establish, the presence of actual malice." *Michel v. NYP Holdings, Inc.*, 816 F.3d 686, 703 (11th Cir. 2016). Plaintiff's smoking gun—that the November 5 Article called gait analysis "one of the most sophisticated approaches" to video identification when the source called it "one of the most *complicated* and sophisticated approaches" (Dkt. 70 ¶ 282)—is a paraphrase, not a lie. Even a deliberate alteration of quoted words cannot show actual malice "unless the alteration results in a material change in the meaning conveyed by the statement." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 517 (1991). Dropping the word "complicated" changes nothing here. And the ABA article was deployed for precisely the proposition it states—that gait analysis "can be compelling, corroborating evidence"—which is how the reporting used it: as corroboration alongside Plaintiff's 5'7" frame, her next-door neighbor's metro card, and the confirming sources. (Dkt. 70. Ex. A.) Where a cited source admits more than one rational reading, a publisher "may adopt one of [a] number of possible rational interpretations" without creating even a jury issue of malice. *Cannon v. Peck*, 36 F.4th 547, 570 n.14 (4th Cir. 2022). What remains is a quarrel about how much forensic weight gait analysis can bear—a dispute that "must be settled by the methods of science rather than by the methods of litigation." *Malone v. WP Co., LLC*, No. 3:22-CV-00046, 2023 WL 6447311, at *5 (W.D. Va. Sept. 29, 2023); *Arthur v. Offit*, No. CIV.A. 01:09-CV-1398, 2010 WL 883745, at *6 (E.D. Va. Mar. 10, 2010) ("Courts have a justifiable reticence about venturing into the thicket of scientific debate, especially in the defamation context.").

**2. Inherent improbability (Dkt. 70 ¶¶ 364(b), 382(b); *see id*. ¶¶ 291–93)**. The accusation the Complaint labels improbable—that Plaintiff planted bombs "to divert law enforcement resources away from the Capitol" so authorities would have "a pretext to consolidate power" (Dkt. 70 ¶ 291)—appears in no challenged statement. Actual malice cannot be shown "in the abstract"; it must be shown "in conjunction with a false defamatory statement." *Tavoulareas*, 817 F.2d at

16

794. And "there is no 'inherent improbability' exception that replaces the requirement that Plaintiff plead facts showing actual malice." *McCullough*, 2023 WL 3075940, at *13. The doctrine is reserved for tales "so inherently improbable that only a reckless man would have put them in circulation." *St. Amant*, 390 U.S. at 732.

The Complaint's own allegations settle the point. ODNI staffed a memorandum on Baker and Hanneman's findings that circulated to the White House and the CIA. (Dkt. 70 ¶¶ 128, 202.) The FBI interviewed Plaintiff, searched her home with bomb-detection dogs, administered a polygraph she was told she failed, and commissioned its own gait analysis. (*Id.* ¶¶ 129–39, 242.) A proposition the nation's premier investigative agency deemed worth a caravan of heavily armed agents, a bomb squad, a helicopter, and a three-hour polygraph was not facially preposterous. *See McFarlane v. Sheridan Sq. Press, Inc.*, 91 F.3d 1501, 1509 (D.C. Cir. 1996) (there is no "objective standard of care" for corroborating reporting); *EPPS v. Fox News Network, LLC*, No. CV 23-761-JLH, 2025 WL 2205982, at *5 (D. Del. Apr. 1, 2025) (actual malice not shown where "high-ranking government officials had questions about plaintiff's role in the January 6th events at the Capitol"); *Blankenship v. NBCUniversal, LLC*, 60 F.4th 744, 764 (4th Cir. 2023) (declining to credit proffered "circumstantial evidence" of actual malice).

**3. Animus and ill will (Dkt. 70 ¶¶ 364(c), 382(c); *see id.* ¶¶ 294–98)**. Here the Complaint spends its individualized energy: Baker was prosecuted for crossing the restricted perimeter on January 6, wrote angry posts about "Washington elites" and the Capitol Police, and criticized Plaintiff's use of force; Hanneman's documentary "castigated" Capitol Police tactics. (*Id.* ¶¶ 295–97.) Even accepting all of this as true, as the Court must, "proof of a media defendant's ill will toward a public figure plaintiff is, without more, insufficient to establish knowledge of falsity or reckless disregard for the truth." *Jackson v. Hartig*, 274 Va. 219, 231 (2007); *see also Harte-Hanks*

17

*Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 666 (1989). Actual malice "should not be confused with the concept of malice as an evil intent or a motive arising from spite or ill will." *Masson*, 501 U.S. at 510. "Debate on public issues will not be uninhibited if the speaker must run the risk that it will be proved in court that he spoke out of hatred." *Garrison*, 379 U.S. at 73. Plaintiff's premise that a reporter's hostility toward his subject implies knowing falsehood would end adversarial journalism. As the Fourth Circuit has long recognized, "it is hardly unusual for publications to print matter that will please their subscribers; many publications set out to portray a particular viewpoint or even to advance a partisan cause. Defamation judgments do not exist to police their objectivity[.]" *Reuber v. Food Chem. News, Inc.*, 925 F.2d 703, 716 (4th Cir. 1991) (en banc).

**4. Preconceived narrative (Dkt. 70 ¶¶ 364(d), 382(d); *see id*. ¶¶ 299–302)**. "Naked assertion[s]" that a reporter "conceived a storyline in advance and sought to find evidence to confirm that story, and relied on unreliable or biased sources in researching" do not plausibly allege actual malice. *Harvey v. Cable News Network, Inc.*, 48 F.4th 257, 274 (4th Cir. 2022). A "pre-existing agenda, even one which may be noxious to some minds, is not indicative of actual malice." *Lohrenz v. Donnelly*, 223 F. Supp. 2d 25, 48 (D.D.C. 2002), *aff'd*, 350 F.3d 1272 (D.C. Cir. 2003) (internal quotation omitted). The theory has traction only where a defendant "consciously set out to make the evidence conform to the preconceived story," *Eramo v. Rolling Stone, LLC*, 209 F. Supp. 3d 862, 872 (W.D. Va. 2016)—and the alleged conduct is the opposite. Baker and Hanneman commissioned a computer test run by a third party rather than eyeballing footage. (Dkt. 70 ¶¶ 144–45.) They handed the results to ODNI, which was free to reject them. (*Id.* ¶¶ 124–26.) And on the Complaint's own telling, the November 8 Article was updated every time additional information surfaced: the CIA's correction of Plaintiff's job description, the Daily Wire's metro-card reporting, her counsel's categorical denial, and CBS's report that the FBI had

18

ruled her out. (*Id.* ¶¶ 204–09.) Reporters committed to a predetermined conclusion do not repeatedly append updates that might cut against it. Nor do they include hyperlink citations about the reliability of gait analysis as a whole. (*Id.* ¶¶ 104.) "[R]eporting perspectives at odds with the publisher's own tends to rebut a claim of malice, not to establish one." *Lohrenz*, 350 F.3d at 1286; *Klayman v. City Pages*, 650 F. App'x 744, 751 (11th Cir. 2016) ("Evidence that an article contains information that readers can use to verify its content tends to undermine claims of actual malice.").

**5. Purposeful avoidance (Dkt. 70 ¶¶ 364(e), 382(e); *see id*. ¶¶ 303–05)**. Here, the Complaint borrows the language from Supreme Court cases like *Harte-Hanks*'s phrase but never supplies the factual allegations to support it. "Purposeful avoidance of the truth" describes a deliberate choice not to examine dispositive evidence already at hand—in *Harte-Hanks*, a newspaper that declined to listen to tapes in its possession or interview the one witness both sides agreed could resolve the charges. 491 U.S. at 692 (Still, "failure to investigate will not alone support a finding of actual malice."). Baker and Hanneman did the reverse. They placed their central finding before the government's own investigators weeks before publication and waited while agencies with subpoena power, forensic laboratories, and the original evidence tested it. (Dkt. 70 ¶¶ 124–26.) That is the pursuit of verification, not the avoidance of it.

The failure-to-contact-Plaintiff allegation adds nothing. "[I]f caselaw is clear on any point it is that an author is under no duty to . . . provide the subject an opportunity to reply." *Parsi v. Daioleslam*, 890 F. Supp. 2d 77, 90 (D.D.C. 2012) (citation omitted); *Jankovic v. Int'l Crisis Grp.*, 822 F.3d 576, 594–95 (D.C. Cir. 2016) ("Even where doubt-inducing evidence could be discovered, a publisher may still opt not to seek out such evidence and may rely on an informed source. . ."); *see Patel*, 910 S.E.2d at 418 n.9 (failure to interview the plaintiff "would, at most, constitute negligence" and not be "sufficient to infer actual malice"). It also would have been

19

reckless here. Reporters who believe they may have identified a fugitive bomber responsibly call the government, not the suspect. And the government called her. Before any publication named Plaintiff, the FBI had interviewed her, searched her home, and polygraphed her. (Dkt. 70 ¶¶ 129–39.) Nor does Plaintiff's Bella video allegation (*id.* ¶ 304) fill the gap—the Complaint answers itself. When FBI agents asked Plaintiff on November 6 where she was on the night of January 5, she "did not immediately recall." (*Id.* ¶ 131.) She located the video only after retaining counsel, who "encouraged [her] to search her phone for exonerating information," and she delivered it to prosecutors on November 14—six days after the Article ran. (*Id.* ¶¶ 186–87.) The exculpatory evidence Plaintiff insists one phone call would have produced was evidence she did not yet know she had.

The "skeptical sources" variant fares no better. The reporters consulted "[t]wo other sources familiar with gait analysis" and "several current intelligence sources," all of whom confirmed the findings (*Id*. ¶ 159 & Ex. C), and the FBI ran its own gait analysis (*id.* ¶ 244). The House Select Committee's general conclusion that Capitol Police did not orchestrate the January 6 riot (*id.* ¶ 305) says nothing about whether this gait software returned this match as to this officer. A publisher's failure to credit generalized material it had no reason to think addressed its specific finding is not "a high degree of awareness of . . . probable falsity." *Garrison*, 379 U.S. at 74; *see Jackson*, 274 Va. at 229–30 (presence of contradictory information in a defendant's own files insufficient to establish actual malice); *Patel*, 83 Va. App. at 413–14 (allegation that publisher ignored contradictory information failed was insufficient).

**6. Unreliable sources (Dkt. 70 ¶¶ 364(f), 382(f); *see id*. ¶¶ 306–09)**. "Courts have consistently held that reliance on tainted or troubled sources does not alone establish actual malice." *Talley v. Time, Inc.*, 923 F.3d 878, 903 (10th Cir. 2019); *accord Harvey*, 48 F.4th at 274.

The question is whether the speaker recklessly disregarded "obvious reasons to doubt the veracity of the informant or the accuracy of his reports," *St. Amant*, 390 U.S. at 732—and, before that, whether the information the source supplied is even alleged to be false. Here, the supposedly untrustworthy source—Armitas—supplied one fact: that the publicly released bomber footage had a reduced framerate. Baker and Hanneman confirmed it by obtaining higher-framerate video from a different source. (Dkt. 70 Ex. C.) Reliance on even a questionable source is not malice where the information is independently corroborated. *Church of Scientology Int'l v. Behar*, 238 F.3d 168, 175 (2d Cir. 2001). Former FBI agent Kyle Seraphin likewise supplied one fact—that the FBI had surveilled Plaintiff's next-door neighbor over the metro card—and the Complaint never alleges that fact is false. A statement not alleged to be false cannot evidence malice as to statements that are. The anonymous intelligence sources raise no inference either: confidential sourcing, without more, is not actual malice. *Prince v. Intercept*, No. 21-CV-10075 (LAP), 2023 WL 4492413, at *12 (S.D.N.Y. July 12, 2023); *Jankovic v. Int'l Crisis Grp.,* 72 F. Supp. 3d 284, 314 (D.D.C. 2014), aff'd, 822 F.3d 576 (D.C. Cir. 2016) ("[R]eliance on confidential sources to rebut any insinuation of malice is proper."). The Complaint's attack on their credentials is a bare "information and belief" guess (Dkt. 70 ¶¶ 160, 309) that the Court need not credit. *Nemet Chevrolet*, 591 F.3d at 255. This is not *Wells v. Liddy*, 186 F.3d 505, 542–43 (4th Cir. 1999), where the speaker leaned on a single source who had "difficulty differentiating between reality and nonreality." Baker and Hanneman had a software output, a recognized forensic tool, a veteran analyst, two sources familiar with gait analysis, several intelligence sources—and, before they published a word naming Plaintiff, the visible, escalating conduct of the FBI itself.

Plaintiff also points to Baker's own interview statement that he "went to the three most respected firms that do gait analysis for intelligence communities around the world," and that

"none of them would take this, none of them would touch it with a thousand-foot pole." (Dkt. 70 ¶ 157; *see* ¶ 309.) Plaintiff reads that admission as proof that Defendants knew their analysis was worthless and published anyway. But that proves no such thing. A defendant who *broadcasts* that the field's leading firms declined to endorse his work is not a defendant "highly aware that [his story] is probably false" and concealing it—he is a defendant disclosing to his audience the very limitation Plaintiff says he hid. As the Second Circuit has recognized, "there is a critical difference between not knowing whether something is true and being highly aware that it is probably false," and "only the latter establishes reckless disregard." *Satanic Temple, Inc. v. Newsweek Digital LLC*, 177 F.4th 202, 215 (2d Cir. 2026).

If the refusal shows anything, it shows only that certain firms were unwilling to attach their names to a politically-charged matter—not that they doubted what the videos did or did not depict. A gait analyzer's reluctance to be drawn into the highest-profile domestic-terrorism investigation in recent memory says nothing about the truth of the underlying comparison, and it is the truth of the comparison, not the willingness of others to associate with it, that the actual malice inquiry measures. That distinction is dispositive here, because Plaintiff does *not* allege that any of these firms *looked* at the videos and reached a *contrary* conclusion or that they ran the comparison and told Baker it did *not* match. Plaintiff says they declined to perform any analysis *at all*. A source who says nothing gives a reporter nothing to disbelieve. Actual malice turns on what Baker knew, and the refusal of a firm to opine could not have told him his reporting was false, because it told him nothing about the videos one way or the other. Contrast the case Plaintiff needs but does not have—one in which a respected firm ran the analysis, found no match, and told Baker as much— where the reporter would at least confront information "that might confirm the probable falsity" of his charge. *Harte-Hanks*, 491 U.S. at 692. But that is not this case.

Plaintiff's "respected firms" allegation cuts against her in a second respect. To make it, Plaintiff concedes that gait analysis *is* a recognized forensic discipline, and that it is regularly used by "intelligence communities around the world." (Dkt. 70 ¶ 309.) A reporter who relies on an established, law-enforcement-utilized forensic method does not act with reckless disregard for the truth by doing so, and the Constitution does not condition that reliance on his first securing the field's most eminent practitioner. *Sullivan* and its progeny "protect journalists and publishers from liability based on errors of fact that arise from reliance on a credible source." *Newton v. Nat'l Broad. Co.*, 930 F.2d 662, 682 (9th Cir. 1990). The actual-malice standard exists precisely to supply "breathing space" for reporting on matters of public concern, *Harte-Hanks*, 491 U.S. at 686, and "failure to investigate before publishing, even when a reasonably prudent person would have done so, is not sufficient to establish reckless disregard," *id.* at 688. Plaintiff's imagined rule—that a journalist can rely a recognized forensic method *only* after retaining the world's most "respected firm" to perform it—would impose the very duty the Supreme Court has refused to recognize—and would chill science- and forensic-based reporting by making the freedom to report turn on the cooperation of a handful of elite firms who may decline for any reason or none. Imposing a "duty to corroborate . . . when the source of potentially libelous material is a person of questionable credibility" would be a "dramatic change in the nature of the actual malice standard" and "turn the inquiry away from the publisher's state of mind and to inquire instead whether the publisher satisfied an objective standard of care." *McFarlane v. Sheridan Square Press, Inc.*, 91 F.3d 1501, 1509 (D.C. Cir. 1996).

**7. Journalistic standards (Dkt. 70 ¶¶ 364(g), 382(g); *see id.* ¶¶ 310–13)**. Even an "extreme departure from professional standards" does not establish actual malice. *Harte-Hanks*, 491 U.S. at 665. The Complaint's centerpiece—that Baker and Hanneman "manufactured" the

government's interest in Plaintiff and then cited that interest as corroboration (Dkt. 70 ¶ 312)—is exactly the kind of "unwarranted inference[]" the Court disregards on a motion to dismiss. *Nemet Chevrolet*, 591 F.3d at 255. Reporters who know their analysis is bogus do not deliver it to the intelligence community, because the certain consequence of doing so is *independent scrutiny* by agencies with every investigative tool the reporters lack. The plausible inference from handing your story to the government and waiting is confidence, not fraud. And the allegation that the story cleared "4-5 layers of editorial review, legal clearance, and executive suite approval" (Dkt. 70 ¶ 313) describes Blaze Media's conduct, not these Defendants'—and cuts the other way regardless. *Jankovic v. Int'l Crisis Grp.,* 822 F.3d 576, 597 (D.C. Cir. 2016*)* ("multiple internal reviews by knowledgeable staff" undercut actual malice).

**8. Financial motive (Dkt. 70 ¶¶ 364(h), 382(h); *see id*. ¶¶ 314–17)**. "[A] newspaper's motive in publishing a story . . . cannot provide a sufficient basis for finding actual malice," *Harte-Hanks*, 491 U.S. at 665, and a profit motive fares no better. *Reuber*, 925 F.2d at 715–16; *Fairfax v. CBS Corp.*, 2 F.4th 286, 294–95 (4th Cir. 2021); *McCafferty v. Newsweek Media Grp., Ltd.*, 955 F.3d 352, 360 (3d Cir. 2020) ("[A] desire to increase its profits and sluggish sales does not make out actual malice.") (internal quotation omitted). Glenn Beck's on-air fundraising pitch, Dkt. 70 ¶ 314, is Beck's statement and Blaze Media's business model; neither can be imputed to Baker or Hanneman, *Patel*, 83 Va. App. at 412. What remains as to these two men is that they hold monetized X accounts (Dkt. 70 ¶ 316) and, months later, crowdfunded a new publishing venture, (*id.* ¶ 317.) If a creator-revenue account was enough to plead actual malice, every working journalist on the platform would forfeit the protection of *Sullivan*. And, in any event, the fundraising campaign postdates the November publications by months; it says nothing about anyone's state of mind "at the time of the publication." *Sullivan*, 376 U.S. at 286.

**9. Refusal to retract (Dkt. 70 ¶¶ 364(i), 382(i); *see id*. ¶¶ 318–19)**. Post-publication conduct "is not probative of [a publisher's] state of mind at the time of publication." *Fairfax*, 2 F.4th at 295; *see Blankenship*, 60 F.4th at 763 ("[T]he lack of a retraction has little to no relevance in the actual malice inquiry."). *Sullivan* itself rejected failure to retract as evidence of malice. 376 U.S. at 286–88. The premise is false in any event: on the Complaint's own telling, the Article was updated *four times* as contrary facts emerged and was retracted the same day the FBI announced Cole's arrest. (Dkt. 70 ¶¶ 204–14.) A publisher's willingness to correct "tends to negate any inference of actual malice." *Logan v. District of Columbia*, 447 F. Supp. 1328, 1332 (D.D.C. 1978); *see Biro v. Conde Nast*, 963 F. Supp. 2d 255, 281–82 (S.D.N.Y. 2013); *Nelson Auto Ctr., Inc. v. Multimedia Holdings Corp.*, 951 F.3d 952, 959 (8th Cir. 2020). What the Complaint calls "doubling down" (Dkt. 70) is simply continued belief—and continued belief is the opposite of the "high degree of awareness of . . . probable falsity" the Constitution demands. *Garrison*, 379 U.S. at 74. Indeed, the Complaint's own portrait of Baker and Hanneman is of two men who "staked their entire professional identities" on their January 6 reporting. (Dkt. 70 ¶ 299.) That is an allegation of conviction. Conviction—even misplaced conviction—defeats a claim that requires proof of knowing falsehood. *St. Amant*, 390 U.S. at 731.

Nine insufficient theories do not aggregate into one sufficient theory when none of the nine speaks to what Baker or Hanneman knew or doubted. None of the theories—taken individually or in some combination—demonstrate "concrete evidence" capable of "produc[ing] an abiding conviction that actual malice is highly probable." *Blankenship v. Trump*, No. 23-1454, 2024 WL 1254171, at *2 (4th Cir. Mar. 25, 2024) (internal quotation omitted). The Fourth Circuit affirmed dismissal in *Fairfax* on precisely such a combined analysis—sourcing, investigation, motive, and

25

non-retraction allegations that together still fell "considerably short" of plausibly alleging serious subjective doubt. 2 F.4th at 293–96. The same is true here.

What is left, as to Baker and Hanneman individually, affirmatively negates malice. Starting with Baker, the Complaint alleges that he took the gait-analysis results to ODNI weeks before publication (Dkt. 70 ¶¶ 124–26); that he publicly postponed the story so the government could "do what they need to do" (*Id.* ¶¶ 116–18); and that the FBI responded by interrogating Plaintiff, searching her home with bomb-detection dogs, and administering a polygraph she failed (*Id.* ¶¶ 129–39). A reporter who believes his story is false does not deliver it to the Office of the Director of National Intelligence for scrutiny and then wait two weeks while the nation's premier investigative agencies test it.[7] He publishes before anyone can check. Baker did the reverse. Nowhere—in 127 pages—does the Complaint allege that any source, official, or expert told Baker or Hanneman before publication that the gait match was *wrong*. Not one. That silence resolves the question.

As for Hanneman, the Complaint barely mentions him except in the collective. It never "[brings] home" the actual malice standard to Hanneman specifically. *Sullivan*, 376 U.S. at 287. Strip away the group-pleaded "Defendants" allegations, the individualized allegations reduce to two: (1) he produced an Epoch Times documentary critical of Capitol Police tactics (Dkt. 70 ¶¶ 292, 295, 300), and he posted "SOLVED" on X after the November 8 Article ran (*Id.* ¶¶ 6, 222). The documentary shows a viewpoint, and a viewpoint, even a disfavored one, is not indicative of actual malice. *Lohrenz*, 223 F. Supp. 2d at 48. The "SOLVED" post shows belief in the reporting— the *opposite* of the serious subjective doubt the Constitution requires. *St. Amant*, 390 U.S. at 731

---

[7]    Indeed, it is a federal crime to "knowingly or willfully" provide "materially false" "writing[s] or document[s]" to the government. § 18 U.S.C. 1001.

26

("[R]eckless conduct is not measured by whether a reasonably prudent man would have published, or would have investigated before publishing."). The Complaint also pleads that Hanneman knew Plaintiff defended the Capitol on January 6 because his documentary included footage of her doing so. (Dkt. 70 ¶ 292.) Knowing that Plaintiff fired pepper balls at rioters on January 6 says nothing about what she did the night of January 5—and "there is no 'inherent improbability' exception that replaces the requirement that Plaintiff plead facts showing actual malice." *McCullough*, 2023 WL 3075940, at *13.

The Fourth Circuit's decision in *Hatfill v. New York Times Co.*, 532 F.3d 312 (4th Cir. 2008), confirms the result. There, a Times columnist published a series of columns pointing by name to Dr. Steven Hatfill as the likely anthrax attacker—accusations far more direct than anything published here—yet the court entered judgment for the newspaper because the columnist relied on sources and on the government's own investigative focus on Hatfill, and nothing showed he harbored serious doubts. (*Id.* at 325–26.) The same government validation exists here, except stronger: the Complaint alleges that ODNI circulated a memorandum on the reporters' findings to the White House and the CIA, and that the FBI searched Plaintiff's home and ran its own gait analysis. (*Id.* ¶¶ 128, 133–34, 203, 244.) *See also Blankenship*, 60 F.4th at 761–65 (no actual malice even where broadcasters' statement that plaintiff was a "convicted felon" was false). Counts Two and Three should be dismissed.

## IV.    Count Three Fails Against Veritas Regnat Because It Did Not Exist at the Time of the November 8 Article.

Count Three charges Veritas Regnat with defaming Plaintiff in the November 8 Article. (Dkt. 70 ¶¶ 372–389.) Veritas Regnat was formed in April 2026. (*Id.* ¶¶ 19, 257–58.) The November 8 Article was published on November 8, 2025. (*Id.* ¶ 373.) That is the end of the analysis.

27

The Complaint does not allege that Veritas Regnat wrote, edited, published, or republished the November 8 Article—it could not have, because the company would not exist for another five months. Nor does the Complaint plead any basis for successor liability: no assumption of Blaze Media's liabilities, no merger, no continuation of Blaze Media's corporate identity. *See Fuisz v. Lynch*, 147 F. App'x 319, 321–22 (4th Cir. 2005) (applying Virginia's successor-liability exceptions). And because actual malice is measured by the publisher's state of mind "at the time of the publication," *Sullivan*, 376 U.S. at 286, an entity formed months after publication cannot, as a matter of law, have published the statement with any state of mind at all. Count Three should be dismissed against Veritas Regnat with prejudice.

## V.     Counts Five and Six Fail to State a Claim.

Counts Five and Six are built on the April 4 Post and the April 6 Blog—two publications that answer Plaintiff's counsel's demand letter on a single, discrete factual point: whether video shows that Plaintiff walks with a limp. Both publications quote the letter's assertion that Plaintiff's "2015 soccer injury did not give her a 'slight limp,'" and both respond: "Video evidence says otherwise." (Dkt. 70 Exs. E, G.) Plaintiff's theory is that this exchange over her gait "asserts" she "planted two pipe bombs." (*Id.* ¶¶ 396, 414.) It asserts no such thing, and the counts fail at every step.

### A.     *The April Statements Are True, Unchallenged, or Protected Opinion—and None Is Reasonably Capable of the Meaning Plaintiff Ascribes.*

A defamation claim requires a false statement of fact. "[S]peech which does not contain a provably false factual connotation" is not actionable. *Steele v. Goodman*, 382 F. Supp. 3d 403, 419 (E.D. Va. 2019); *see Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 19–20 (1990). Truth defeats the claim, and the plaintiff must plead the falsity of what the defendant *actually said*—not of a

meaning she supplies. *Webb*, 287 Va. at 90–91. Measured against those principles, the challenged statements collapse on inspection.

*The gait statements.* Baker and Hanneman wrote that they "have hours of video of Ms. Kerkhoff's unusual 'circumduction gait,'" harvested from Capitol Police CCTV and her soccer career. (Dkt. 70 ¶¶ 411(a), 429(a).) The Complaint never alleges the videos do not exist or do not depict Plaintiff. It reproduces frames from them. (*Id*. ¶ 259.) Instead, its quarrel is interpretive—that Plaintiff's duty gear "affected her gait" in the footage and that the comparison to the bomber is methodologically unsound. (*Id*. ¶¶ 250–52, 259–61.) But whether disclosed video footage reveals a "circumduction gait" is an evaluative characterization of evidence the publications put in front of the reader. "Because the reader understands that such supported opinions represent the writer's interpretation of the facts presented, and because the reader is free to draw his or her own conclusions based upon those facts, this type of statement is not actionable in defamation." *Biospherics, Inc. v. Forbes, Inc.*, 151 F.3d 180, 185 (4th Cir. 1998); Sharing a video and "inviting viewers to decide for themselves" to draw their own conclusions from it is "not capable, in context, of having a defamatory meaning." *Galanakis v. City of Newton, Iowa*, No. 4:23-CV-00044-SHL-SBJ, 2023 WL 3479167, at *11 (S.D. Iowa May 8, 2023). Here, Baker and Hanneman did not ask anyone to take their word for the limp—they published the video and the side-by-side comparison and invited the audience to look. (Dkt. 70 ¶ 260 & Exs. E, G.); *Phantom Touring, Inc. v. Affiliated Publications*, 953 F.2d 724, 730–31 (1st Cir.1992) (when statement provides factual bases for its conclusion, it is a "personal conclusion" rather than a statement of fact subject to a defamation claim). And to the extent the statement rests on an underlying fact, the Complaint concedes it: Plaintiff's tibia *was* broken in half in 2015 and repaired with a steel rod. (Dkt. 70 ¶ 27.)

*The marathon statements.* The April publications state that Plaintiff is a marathon runner and that former FBI congressional liaison Marshall Yates, while reviewing the bomber footage, once said, "We need to be looking for a marathon runner." (*Id*. ¶¶ 411(b), 429(c).) The Complaint pleads that Plaintiff ran the New Jersey Marathon in 3:49, placing "in the top 10 to 20% of female marathoners worldwide" (*id*. ¶ 27), touts her "impressive marathon history" (*id*. ¶ 253), and acknowledges that Baker and Hanneman "knew Ms. Kerkhoff ran marathons on November 8; they mentioned it in the November 8 Article" (*id*. ¶ 254). Plaintiff cannot sue over a fact her own Complaint celebrates. As for the Yates remark, the Complaint quotes it repeatedly and never once alleges it was invented—never alleges Yates did not say it. (*Id*. ¶¶ 253, 259, 411(b), 429(c).) That silence is dispositive: a statement not alleged to be false cannot support the claim. The accompanying observation—that the hooded suspect "exhibited" physical traits "characteristic of marathon runners" on his 44-minute walk—describes the *bomber* on publicly released surveillance footage; it is another evaluative gloss on disclosed video, not a provably false assertion about Plaintiff. *Chapin v. Knight-Ridder, Inc*., 993 F.2d 1087, 1092–93 (4th Cir. 1993) (Defamation plaintiffs who rely on "implication" "must make an especially rigorous showing where the expressed facts are literally true.").

*The Clare Locke passage.* Count Five also challenges the April 4 Post's two rhetorical questions about Plaintiff's law firm: whether Clare Locke was "incompetently representing" its client "by that easily disproved assertion," or instead "just trying to scare The Blaze into a quick settlement." (Dkt. 70 ¶ 411(a).) Those barbs are aimed at the lawyers' litigation strategy, not at Plaintiff, and they are quintessential rhetorical commentary—"relative in nature," dependent "on [the] speaker's viewpoint," and incapable of being proved true or false. *Morrissey v. WTVR, LLC*, 432 F. Supp. 3d 617, 624 (E.D. Va. 2020) (using terms like "fool" and "famously and stupidly" to

30

describe a lawyer were not defamation); *see Schaecher*, 290 Va. at 93 (words must be understood in context, "as other people would understand them"). A jab at opposing counsel's demand letter does not accuse the client of terrorism.

*The headline.* Count Six challenges the April 6 Blog's description of Plaintiff as a "Onetime Pipe-Bomb Suspect." (Dkt. 70 ¶¶ 428–429.) That is literally true, and Plaintiff pleads the proof. The FBI interviewed her about her whereabouts on January 5, searched her home with bomb-detection dogs, examined her phone and car, and polygraphed her. (*Id.* ¶¶ 130–39.) "Onetime" tells every reader the suspicion is past. A true description of a concluded federal investigation cannot be recast as a fresh accusation of the underlying crime. *Hatfill*, 532 F.3d at 325 (no defamation where the plaintiff about whom defendant reported "fit the profile that the FBI had developed and that he had been identified specifically by the FBI as a suspect who should be investigated carefully").

### B.  Counts Five and Six Fail the Rigorous Requirements for Defamation-by-Implication.

Because none of the April Statements actually say what Plaintiff claims they "assert," Counts Five and Six can survive, if at all, only as claims that literally true statements *imply* her guilt. The Constitution sets a high bar for that theory. Where the stated facts are true, the plaintiff must make "an especially rigorous showing": the language must "not only be reasonably read to impart the false innuendo, but it must also affirmatively suggest that the author intends or endorses the inference." *Chapin*, 993 F.2d at 1093. That heightened standard governs when, as here, the defendants are journalists, the plaintiff is a public official, and the subject is a matter of public concern. *Agbapuruonwu v. NBC Subsidiary (WRC-TV), LLC*, 821 F. App'x 234, 237–38 (4th Cir. 2020).

The claimed implication is not a reasonable reading. Context controls, *Schaecher*, 290 Va. at 93, and the context here is unmistakable: both publications announce themselves, in their

31

opening lines, as responses to a "letter threatening a defamation lawsuit" and join issue on the one factual assertion that letter made—"No limp." (Dkt. 70 Exs. E, G.) Both describe Plaintiff as a "former" or "onetime" suspect. (*Id.*) A reader following this exchange understands he is watching journalists defend the accuracy of a discrete piece of their prior reporting against a legal demand—not announcing that a woman the FBI had ceased investigating, months after another man was arrested and charged, is guilty of the bombing. Defending one's description of a onetime suspect's gait is not an accusation that the onetime suspect is the bomber.

Nor does anything on the face of either publication "affirmatively suggest" that Baker or Hanneman intended or endorsed the inference of guilt. *Chapin*, 993 F.2d at 1093. The publications assert a limp, a marathon history, and a quotation—full stop. Plaintiff's own exhibit shows what Baker was actually endorsing in that thread: when commenters mocked Plaintiff's appearance and fitness, Baker corrected them—"She's very fit and athletic"; "She's not obese. . . . She's quite trim and fit." (*Id*. Ex. E.) A reporter bent on branding Plaintiff a terrorist does not interrupt his own comment thread to defend her. The record Plaintiff herself attached refutes the endorsement she must plead.

C.      *The Complaint Pleads No Facts Plausibly Showing Actual Malice as to the April Statements.*

Counts Five and Six also fail for want of actual malice. The Complaint's theory of "actual knowledge" is that Baker and Hanneman "knew that Ms. Kerkhoff was not the January 5, 2021 pipe bomber." (Dkt. 70 ¶¶ 419(a), 437(a).) But the April Statements do not say she was. As to what the statements *do* say—the gait, the marathons, the Yates quotation—the Complaint pleads no falsity at all, and therefore no knowledge of falsity and no reckless disregard of it. There is nothing to have doubted.

32

The manner of publication confirms the point. Baker and Hanneman published their evidence—the video itself, side by side with the suspect footage—and invited readers to compare. (*Id*. ¶ 260 & Ex. G.) A speaker who shows his work and stakes his claim on footage anyone can watch is the opposite of one entertaining "serious doubts" about it. *St. Amant*, 390 U.S. at 731. Plaintiff's rejoinder—that her duty gear affected her gait in the footage and that the comparison was methodologically flawed (Dkt. 70 ¶¶ 259–50, 261)—is an argument about what the videos prove. "[A]llowing readers to decide for themselves what to conclude from the Report, making any allegation of actual malice less plausible." *Turner v. Wells*, 879 F.3d 1254, 1274 (11th Cir. 2018); *Underwager v. Salter*, 22 F.3d 730, 736 (7th Cir. 1994); *Biospherics*, 151 F.3d at 186 (Expressing a "subjective view, an interpretation, a theory, conjecture or surmise, rather than . . . claim[ing] to be in possession of objectively verifiable . . . facts" is nonactionable as a matter of law.). Disputes over the videos are not evidence that anyone subjectively disbelieved what the footage shows.

> D.    *Section 230 of the Communications Decency Act Independently Bars Count Five Against Hanneman.*

Hanneman's entire alleged conduct in Count Five is that he "'reposted' the April 4 Post." (Dkt. 70 ¶ 410.) Plaintiff's own exhibit shows what that means: Hanneman pressed "repost" on a post written by a third X user, which itself quoted Baker's post. (*Id*. Ex. F.) He added nothing— not a word, not a caption, not an edit. (*Id*.)

Congress has spoken to precisely this conduct: "No provider *or user* of an interactive computer service shall be treated as the publisher or speaker of any information provided by another information content provider." 47 U.S.C. § 230(c)(1) (emphasis added). The Fourth Circuit gave the provision its broad reading in *Zeran v. America Online, Inc.*, 129 F.3d 327, 330 (4th Cir. 1997), and immunity is lost only where the defendant is "responsible, in whole or in part, for the

creation or development" of the offending content—that is, where he "materially contributed" to what makes it allegedly unlawful. *Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 128 (4th Cir. 2022); *see* 47 U.S.C. § 230(f)(3). A user who merely passes along content created entirely by others is immune, and the immunity is properly enforced on a motion to dismiss. *Nemet Chevrolet*, 591 F.3d at 254–55; *Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 451–52 (E.D. Va. 2012) (user who forwarded others' postings immune); *accord Monsarrat v. Newman*, 28 F.4th 314, 320–21 (1st Cir. 2022) (verbatim repost of another's content immune); *Banaian v. Bascom*, 175 N.H. 151, 156–58 (2022) (users who retweeted allegedly defamatory tweet immune under § 230); *Life Mastery Network LLC v. Haygarth*, No. CV 25-00297 JAO-RT, 2026 WL 1622887, at *15 (D. Haw. May 22, 2026) (Users "indisputably enjoys immunity under the CDA for reposting content.").

Hanneman is a "user" of X; Baker and the intermediate poster were the "information content provider[s]"; and the Complaint alleges no contribution by Hanneman to the content—material or otherwise. Count Five therefore cannot be maintained against him as a matter of federal statutory law, whatever its other defects.

## VI. Virginia's Anti-SLAPP Statute Independently Immunizes Baker, Hanneman, And Veritas Regnat.

Virginia law immunizes from tort liability any person whose alleged tort "is based solely on statements . . . regarding matters of public concern that would be protected under the First Amendment . . . that are communicated to a third party." Va. Code § 8.01-223.2(A). The statute reaches all tort claims, *Malone v. WP Co., LLC*, No. 3:22-CV-00046, 2023 WL 6447311, at *8 (W.D. Va. Sept. 29, 2023), applies in this Court*, Fairfax*, 2 F.4th at 296, and exists so that defendants facing meritless speech-based suits can "avoid . . . discovery and trial." *McCullough*, 2023 WL 3075940, at *16.

34

Every challenged statement addresses matters of public concern: an nationally covered investigation of the attempted bombing at the headquarters of both major political parties on the eve of January 6, a five-year federal investigation carrying a $500,000 reward, and the public controversy—covered by CBS News, the Washington Post, and others—over the reporting and litigation that followed. (Dkt. 70 ¶¶ 34–35, 199–203, 206–09, 326–34.) statutory immunity yields only for statements the declarant "knew or should have known were false or . . . made with reckless disregard" for falsity, Va. Code § 8.01-223.2(B)—the showing Plaintiff has failed to plead. *Supra* Parts III, V. The statute therefore supplies an independent ground for dismissal of all four counts.[8]

## CONCLUSION

For these reasons, the claims against Baker, Hanneman, and Veritas Regnat should be dismissed with prejudice.

Dated: August 6, 2026

Respectfully submitted,

/s/ *Andrew T. George*
Andrew T. George (VA Bar No. 88389)
BOURELLY, GEORGE + BRODEY PLLC
1050 30th Street NW
Washington, D.C. 20007
Tel.: (202) 341-8805
andrew.george@bgblawyers.com

/s/ *J. Alex Little*
J. Alex Little (*pro hac vice*)
Zachary C. Lawson (*pro hac vice*)
John R. Glover (*pro hac vice*)
LITSON PLLC
54 Music Square East, Suite 300
Nashville, TN 37203
Tel.: (615) 985-8205
alex@litson.co
zack@litson.co

---

[8]    Defendants will seek their reasonable attorney fees and costs under Va. Code § 8.01-223.2(C) by separate motion.

jr@litson.co

*Attorneys for Defendants Stephen M. Baker, Joseph M. Hanneman, and Veritas Regnat LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on August 6, 2026, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF system, which will send a notification of such filing to all counsel of record.

/s/ *Andrew T. George*
Andrew T. George

36