**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| SHAUNI KERKHOFF,<br><br>*Plaintiff*,<br><br>v.<br><br>BLAZE MEDIA LLC;<br>STEPHEN M. BAKER; JOSEPH M. HANNEMAN; and VERITAS REGNAT LLC.<br><br>*Defendants*. | ) | Civil Action No. 1:26-cv-01078 |

**PLAINTIFF'S OPPOSITION TO DEFENDANT BLAZE MEDIA LLC'S MOTION TO DISMISS**

Thomas A. Clare, P.C. (VSB No. 39299)
Camilla J. Hundley (VSB No. 100257)
Jonathan R. Kaiman (VSB No. 99412)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Tel: (202) 628-7400
Email: tom@clarelocke.com
Email: camilla@clarelocke.com
Email: jon.kaiman@clarelocke.com

*Attorneys for Plaintiff Shauni Kerkhoff*

## TABLE OF CONTENTS


TABLE OF AUTHORITIES ..... ii

INTRODUCTION ..... 1

FACTUAL BACKGROUND ..... 2

A. Blaze Media Hires Baker and Hanneman to Pursue Their Preconceived Narrative That January 6 Was an "Inside Job" ..... 2

B. Blaze Media Targets Ms. Kerkhoff Because She Was a Capitol Police Officer Who Testified Against January 6 Rioters ..... 4

C. Blaze Media Claims It Has Identified the Pipe Bomber Based Solely on a "Gait Analysis" 5

D. Blaze Media Manufactures Corroboration for Its False Claims ..... 6

E. Blaze Media Falsely Names Ms. Kerkhoff as the Pipe Bomber ..... 7

F. Blaze Media Doubles Down on Its False Claims Against Ms. Kerkhoff Rather Than Retract Them ..... 9

G. Ms. Kerkhoff Files This Lawsuit to Vindicate Her Reputation ..... 11

LEGAL STANDARD ..... 12

ARGUMENT ..... 12

I. Defendants' Publications Falsely Accused Ms. Kerkhoff of Planting Pipe Bombs. ..... 13

A. Blaze Media's Articles and Statements Are Reasonably Capable of Conveying that Ms. Kerkhoff Planted Pipe Bombs in Washington, D.C. ..... 13

B. Blaze Media Cannot Overcome the Conclusion That Its Articles and Podcasts Are Reasonably Capable of Being Understood to Accuse Ms. Kerkhoff of Planting Pipe Bombs. ..... 17

II. Blaze Media's December 4 Update Continued to Imply the Same Defamatory Meaning Its Articles and Podcast Originally Published. ..... 19

III. Blaze Media Does Not Satisfy Its Burden of Establishing that Ms. Kerkhoff Is a Public Official. ..... 22

IV. The Complaint Overwhelmingly Pleads Sufficient Facts to Plausibly Allege Blaze Media Acted With Actual Malice. ..... 23

A. Ms. Kerkhoff Pleads Facts Constituting Direct Evidence of Actual Malice. ..... 26

B. Ms. Kerkhoff Pleads Facts Constituting Circumstantial Evidence of Actual Malice. ..... 28

V. Virginia's Anti-SLAPP Statute Does Not "Immunize" Blaze Media From Liability. ..... 34

CONCLUSION ..... 35

## TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015) .......... 37

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) .......... 26

*Arctic Co., Ltd. v. Loudoun Times Mirror*,
624 F.2d 518 (4th Cir. 1980) .......... 24

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) .......... 12

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015) .......... 25

*Bose Corp. v. Consumers Union of the United States, Inc.*,
466 U.S. 485 (1984) .......... 20

*Brogan v. Passaic Daily News*,
123 A.2d 473 (N.J. 1956), *overruled on other grounds by Maressa v. New Jersey Monthly*, 445 A.2d 376 (N.J. 1982) .......... 37

*Carbone v. Cable News Network, Inc.*,
910 F.3d 1345 (11th Cir. 2018) .......... 37

*Carwile v. Richmond Newspapers,*
82 S.E.2d 588 (Va. 1954) .......... 15

*Chapin v. Knight-Ridder, Inc.*,
993 F.2d 1087 (4th Cir. 1993) .......... 20

*Cox v. Red Hat, Inc.*,
No. 1:23-cv-766, 2025 WL 889888 (E.D. Va. Mar. 21, 2025) (Alston, J.) .......... 12

*Eramo v. Rolling Stone,*
209 F. Supp. 3d 862 (W.D. Va. 2016) .......... passim

*Fairfax v. CBS Corp.*,
2 F.4th 286 (4th Cir. 2021) .......... 37

*Fitzgerald v. Penthouse Int'l, Ltd.*,
639 F.2d 1076 (4th Cir. 1981) .......... 14

*Foretich v. Cap. Cities/ABC, Inc.*,
37 F.3d 1541 (4th Cir. 1994) .......... 23

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... 25

*Gilmore v. Jones*,
370 F. Supp. 3d 630 (W.D. Va. 2019) .......... passim

*Goulmamine v. CVS Pharmacy, Inc.*,
138 F. Supp. 3d 652 (E.D. Va. 2015) .......... 13, 18, 21

*Gray v. Udevitz*, 656 F.2d 588 (10th Cir. 1981) .......... 23, 24, 25

*Grover Gaming Inc. v. Rice*,
No. 5:23-cv-036, 2023 WL 8936752 (W.D. Va. Dec. 27, 2023) .......... 23

*Harris v. City of Seattle*,
152 F. App'x 565 (9th Cir. 2005) .......... 32

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) .......... 27, 33, 34

*Hatfill v. N.Y. Times Co.*,
416 F.3d 320 (4th Cir. 2005) .......... passim

*Hayne v. The Innocence Project*,
2011 WL 198128 (S.D. Miss. Jan. 20, 2011) .......... 30

*Herbert v. Lando*,
441 U.S. 153 (1979) .......... 26, 36

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) .......... 25

*Klocke v. Watson*,
936 F.3d 240 (5th Cir. 2019) .......... 37

*La Liberte v. Reid*,
966 F.3d 79 (2d Cir. 2020) .......... 37

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*,
885 F.3d 659 (10th Cir. 2018) .......... 37

*Masson v. New Yorker Mag., Inc.*,
501 U.S. 496 (1991) .......... 26

*McCullough v. Gannett Co.*,
No. 1:22-cv-1099, 2023 WL 3075940 (E.D. Va. Apr. 25, 2023) (Alston, J.) .......... 28, 30

*Meredith v. Nestle Purina Petcare Co.*,
516 F. Supp. 3d 542 (E.D. Va. 2021) .......... 12

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990)........................................................................................................ 19

*Nunes v. NBCUniversal Media, LLC*,
643 F. Supp. 3d 403 (S.D.N.Y. 2022) ................................................................... 31

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019) ................................................................................... 31

*Palmer v. Mahin*,
120 F. 737 (8th Cir. 1903) ..................................................................................... 22

*Pendleton v. Newsome*,
772 S.E.2d 759 (Va. 2015) ................................................................................ passim

*Richmond Newspapers, Inc. v. Lipscomb*,
362 S.E.2d 32 (1987) .............................................................................................. 25

*Rosenblatt v. Baer*,
383 U.S. 75 (1966).................................................................................................. 24

*Shady Grove Orthopedic Assocs., P.A. v. Allstate Ins. Co.*,
559 U.S. 393 (2010)................................................................................................ 38

*Simpson v. Lamberth*,
No. 1:26-cv-00095 (AJT/LRV), 2026 WL 1644081 (E.D. Va. Mar. 31, 2026)....................... 38

*Spirito v. Peninsula Airport Comm'n*,
250 F. Supp. 3d 471 (E.D. Va. 2018) ..................................................................... 26

*St. Amant v. Thompson*,
390 U.S. 727 (1968)........................................................................................ 26, 30, 35

*Stern v. Cosby*,
645 F. Supp. 2d 258 (S.D.N.Y. 2009) ................................................................... 27

*Tah v. Glob Witness Publ'g, Inc.*,
413 F. Supp. 3d 1, 11–12 (D.D.C. 2019), *aff'd*, 991 F.3d 231(D.C. Cir. 2021)....................... 17

*United States v. Chartis Ins. Agency, Inc.*,
834 F. Supp. 2d 459 (E.D. Va. 2011) ..................................................................... 12

*US Dominion, Inc. v. Powell*,
554 F. Supp. 3d 42 (D.D.C. 2021)........................................................................... 31

*Vivera Pharms., Inc. v. Gannett Co.*,
CL-2020-14458, 2021 WL 6550461 (Va. Cir. Ct. Mar. 26, 2021).......................................... 38

*Webb v. Virginian-Pilot Media Cos., LLC*,
287 Va. 84 (2014) ..... 21

*Wells v. Liddy*,
186 F.3d 505 (4th Cir. 1999) ..... 18

*Zerangue v. TSP Newspapers, Inc.*,
814 F.2d 1066 (5th Cir. 1987) ..... 36

**Statutes**

Va. Code § 8.01-223.2(B) ..... 35

**Other Authorities**

1 Rodney A. Smolla, *Law of Defamation*, § 4:2.50 ..... 16

## INTRODUCTION

For nearly five years, the identity of the person who planted two pipe bombs outside the DNC and RNC headquarters on the eve of January 6, 2021 was one of the FBI's most vexing unsolved mysteries—a case so significant that the reward for information grew to $500,000. Shauni Kerkhoff had nothing to do with that mystery. She was an ordinary, private citizen who, as a Capitol Police officer, helped defend the Capitol on January 6. Blaze Media plucked her out of obscurity anyway, splashed her photograph across the internet, and told the world—with "94-98%" certainty—that she was the pipe bomber. It was not true. Blaze Media did not discover a suspect. It manufactured one to fit a story its reporters had already decided to tell.

Facing suit for that accusation, Blaze Media tries to shrink what it did into something it claims the First Amendment was designed to protect: an "erroneous statement" made in "debate on a public issue," entitled to "breathing space." (Mot. 1, 13.) But nothing about Blaze Media's reporting resembles that kind of journalism. This was not a case of reporters who "proceeded cautiously" and "secured significant corroboration" before going to print, as Blaze Media insists. (Mot. 16.) It was a case of reporters who had spent years insisting January 6 was a "deep state" "inside job," who needed a suspect to prove it, and who found one in Ms. Kerkhoff simply because she was a Capitol Police officer. Baker and Hanneman were not, as Blaze Media claims, "animated by a sincere sense of curiosity." (Mot. 17.) They were animated by a theory they had already decided to report.

Nor did Blaze Media "secure significant corroboration." (Mot. 16.) It leveled its accusation based solely on a computerized "gait analysis," which the very academic literature Blaze Media cited in its reporting confirmed could not "provide a positive identification" of anyone. When Blaze Media reporter Steve Baker took that analysis to the three "most respected" gait-analysis firms "in the world"—real experts who could actually vet it—"none of them would

touch it with a thousand-foot pole." Rather than accept that answer, Blaze Media went to unnamed sources and manufactured the corroboration it lacked. Baker took his findings not to the FBI, which had jurisdiction over the pipe-bomb investigation, but to a now-defunct intelligence task force that he believed would rubber-stamp, rather than scrutinize, his theory. It worked exactly as planned—and that manufactured "validation" is the only thing Blaze Media now calls corroboration.

At every turn, Blaze Media had the chance to stop before publishing a false felony accusation against a private citizen, and it failed at every one. It never called Ms. Kerkhoff for comment. It ignored the U.S. Pardon Attorney's flat public denial that anyone had "determined" she was the bomber. It concealed from its readers that credentialed experts had refused to endorse its findings. And when the truth finally caught up with it—when the government arrested the actual suspect on December 4, 2025—Blaze Media did not retract its accusations. It quietly deleted the offending text, appended the word "UPDATE" to headlines and photographs it otherwise left untouched, and publicly reaffirmed that its sources had "a demonstrated record of reliability and accuracy." Blaze Media has never once admitted that it got the story wrong, because getting the story right was never the point.

Now, Ms. Kerkhoff is entitled to a trial on the merits to vindicate the harm Blaze Media's false reporting caused. Blaze Media's Motion should be denied.

## FACTUAL BACKGROUND

### A. Blaze Media Hires Baker and Hanneman to Pursue Their Preconceived Narrative That January 6 Was an "Inside Job"

Long before Blaze Media mentioned Shauni Kerkhoff's name, its reporters, Stephen Baker and Joseph Hanneman, had already decided that the events of January 6, 2021 were an "inside job" orchestrated by the federal government. (First Am. Compl. ("FAC") ¶¶ 67–71.) Baker, a January

6 rioter who breached the Capitol's doors, emerged from the riot "singularly focused" and "obsessed" with a narrative that the "deep state" was to blame. (*Id.* ¶¶ 53–58, 67.) Blaze Media was attracted to that theory, and it hired him as a contributor in 2023. (*Id.* ¶ 71.) Then, in 2024, Blaze Media hired Joseph Hanneman as an "investigative reporter" to continue pursuing that same inside-job theory. (*Id.* ¶ 73.) Before joining Blaze Media, Hanneman produced a documentary, *The Real Story of Jan. 6*, which concluded that the riot was an "inside job" that the "deep state" orchestrated, and that Capitol Police officers bore responsibility for it by brutalizing rioters with less-than-lethal rounds. (*Id.* ¶ 74.) Baker and Hanneman became reporting partners at Blaze Media, publishing more than 105 articles—and thousands of social media posts—built entirely on the premise that January 6 was an inside job. (*Id.* ¶ 79.)

Eventually, Defendants set their sights on the unsolved January 5, 2021 attempted pipe bombing as the vehicle to prove their theories right. (*Id.* ¶ 79.) On the evening of January 5, 2021, between 7:30 and 8:30 p.m., an unknown individual dressed in a gray hooded sweatshirt, a face mask, glasses, black gloves, and distinctive Nike Air Max Speed Turf sneakers planted two pipe bombs in central Washington, D.C. (*Id.* ¶ 34.) Neither bomb exploded, and both were discovered in the early afternoon of January 6, 2021, just as that day's riot at the Capitol was gathering force. (*Id.* ¶ 35.)

The FBI spent the next five years investigating who had planted the bombs. (*Id.*) It initially offered a $50,000 reward for information leading to the suspect's identification, then raised that reward to $100,000, and ultimately to $500,000—yet the case remained unresolved. (*Id.*) Rather than accept that a genuinely difficult case simply remained unsolved, Blaze Media, Baker, and Hanneman repeatedly hypothesized—without evidence—that the FBI's years-long failure to

identify a suspect was itself proof that federal law enforcement was complicit in a cover-up. (*Id.* ¶¶ 80–86.)

### B. Blaze Media Targets Ms. Kerkhoff Because She Was a Capitol Police Officer Who Testified Against January 6 Rioters

In November 2025, Defendants decided to falsely accuse Ms. Kerkhoff—a Capitol Police officer who had defended the Capitol on January 6—of planting the pipe bombs. (*Id.* ¶ 87.)

To lay the foundation for their accusation, on November 4, 2025, Blaze Media published an article by Baker and Hanneman advancing their "inside job" theory yet again, this time falsely claiming that Capitol Police officers had "repeatedly used lethal force" against the January 6 crowd and that this "le[d] to a large escalation of violence toward police"—inverting what actually happened. (*Id.* ¶¶ 88–89.) But the November 4 Article served a second, undisclosed purpose that Baker would later admit: It was a "breadcrumb" for Defendants' still-secret plan to accuse Ms. Kerkhoff of being the pipe bomber. (*Id.* ¶ 90.) The Article's actual target and motive were unmistakable once read in context: Defendants selectively quoted Ms. Kerkhoff's sworn testimony from the first January 6 case to go to trial, in which Ms. Kerkhoff was the first witness, to give the false impression that she had admitted to using improper force against rioters. (*Id.* ¶ 91.) The November 4 Article further falsely implied that Ms. Kerkhoff had trained other officers to use improper force, and Defendants underscored the point with a photograph of Ms. Kerkhoff training National Guard members. (*Id.* ¶ 92.)

Defendants' singular focus on Ms. Kerkhoff—to the exclusion of roughly a dozen other members of the Capitol Police Civil Disturbance Unit and hundreds of other officers who defended the Capitol that day—was, at the time, inexplicable. (*Id.* ¶ 93.) Defendants nonetheless foreshadowed their real intent, citing an anonymous source to insinuate that Ms. Kerkhoff had left the Capitol Police under suspicious circumstances to work for "a three-letter federal intelligence

agency" and had "immediately wiped her social media, phone numbers, and email accounts"—commentary calculated to raise readers' suspicions. (*Id.* ¶ 94.) Baker's promotion of the November 4 Article confirmed that it was the first link in a chain aimed squarely at Ms. Kerkhoff. He told his followers that "[p]art two is going to change everything" and urged them to "bookmark" the story, cryptically teasing "more to follow." (*Id.* ¶¶ 96–97.)

### C. Blaze Media Claims It Has Identified the Pipe Bomber Based Solely on a "Gait Analysis"

Blaze Media published "part two" the next day. On November 5, 2025, Baker appeared on Blaze Media's Glenn Beck Program (the "November 5 Podcast"), and Blaze Media simultaneously published an article headlined, "'She's one of us!' Steve Baker stuns Glenn Beck with bombshell revelation about J6 pipe-bomb suspect" (the "November 5 Article"). (*Id.* ¶ 98, Exs. A, B.) Blaze Media claimed that after "spend[ing] years working to identify" the pipe bomber, it had "finally locked in on a suspect," and—consistent with Defendants' inside-job theory—that the suspect's identification would "implicate and shame at least one federal agency." (*Id.* ¶¶ 99–100.)

Blaze Media claimed that it had identified the suspect with "much higher" than "94% accuracy" based solely on a "gait analysis." (*Id.* ¶¶ 102–103.) Academic research cited in Blaze Media's own November 5 Article confirmed that "gait analysis" cannot provide a "positive identification"—but that's exactly the type of conclusion Blaze Media claimed its "analysis" produced. (*Id.* ¶¶ 103, 109.) The research also made clear that "it's essential to use gait analysis in conjunction with other evidence"—but Blaze Media relied on no other evidence. (*Id.* ¶ 106.) Instead of disclosing the shortcomings and limits of gait analysis to its readers, it intentionally misrepresented that same research's findings to exaggerate the reliability of its "analysis." (*Id.* ¶¶ 104–11.)

Blaze Media hyped its own reporting to maximize its reach: Glenn Beck called it "one of the biggest" stories and "scandals" of his lifetime and "Pulitzer Prize winning stuff," and Baker claimed Blaze Media's conclusions had triggered "national security-related briefings" within the federal government. (*Id.* ¶¶ 112–113.) The strategy worked immediately: within hours, X users began identifying Ms. Kerkhoff by name, and within twenty-four hours of the November 5 Podcast and Article, her name had spread like wildfire across social media. (*Id.* ¶¶ 115, 119–121, 123.)

**D. Blaze Media Manufactures Corroboration for Its False Claims**

Baker did not confine his "findings" to Blaze Media's audience. He also, in his own words, "took it to a source in one of the most important, highest-level investigative federal agencies in the country"—but that agency was not the FBI, which actually had jurisdiction over the pipe-bomb investigation and was offering a cash reward for tips. (*Id.* ¶¶ 124–125.) He instead chose the Office of the Director of National Intelligence's Director's Initiative Group ("ODNI DIG")—a now-defunct task force with no jurisdiction or capability to verify his claims—because he believed exposing "government involvement on January 6" was part of "the agenda for . . . DIG." (*Id.* ¶ 125.)

Baker's tip to ODNI DIG was manufactured corroboration: because gait analysis alone was not enough to publicly name Ms. Kerkhoff, Defendants needed to be able to point to an existing government "investigation" that appeared to validate their finding. (*Id.* ¶ 126.) So, Baker hand-selected an agency he believed would entertain—rather than scrutinize—his theory. (*Id.*) The gambit worked exactly as planned: ODNI DIG personnel began drafting a memorandum about Baker's "investigation," which circulated among executive branch officials and was ultimately shared with the CIA, where Ms. Kerkhoff worked. (*Id.* ¶¶ 127–128.) ODNI DIG's mishandling of Baker's tip was so severe that it contributed to the suspension, and eventual dissolution, of the task force altogether. (*Id.* ¶ 128, n.39.)

Then, on the morning of November 6, 2025—the day after the November 5 Podcast and Article—Ms. Kerkhoff was called to work, where two FBI agents told her they were investigating "online chatter" that she was the pipe bomber. (*Id.* ¶ 130.) That "online chatter" was Defendants' own reporting. (*Id.* ¶¶ 115, 119–120.) Ms. Kerkhoff was subjected to a search of her home by a caravan of armed agents, a bomb-disposal truck, and a helicopter, followed by a three-hour polygraph interrogation. (*Id.* ¶¶ 130–136.) When Ms. Kerkhoff's phone was finally returned to her the next morning, it was "flooded with notifications" from friends, family, and coworkers who had seen her name and photograph "posted all over X"—the same "online chatter" the FBI had told her it was investigating. (*Id.* ¶ 139.)

**E. Blaze Media Falsely Names Ms. Kerkhoff as the Pipe Bomber**

On November 8, 2025, Blaze Media published the "bombshell" it had promised: an article by Baker and Hanneman headlined, "Former Capitol Police Officer a Forensic Match for Jan. 6 Pipe Bomber, Sources Say," expressly and falsely accusing Ms. Kerkhoff of planting the pipe bombs (the "November 8 Article"). (*Id.* ¶¶ 140–141, Ex. C.) Blaze Media splashed close-up photographs of Ms. Kerkhoff beneath the headline and disclosed a trove of irrelevant, deeply personal information about her—her employer, her age, her parents' names, her mother's cause of death, her alma mater, and her hobbies—effectively doxxing a private citizen under the guise of investigative rigor. (*Id.* ¶¶ 142–143.)

The Article's opening line revealed the sum total of Blaze Media's evidence: "A computer program that compared the bomb suspect's gait to that of Shauni Kerkhoff produced a 94% match." (*Id.* ¶ 144.) But that "analysis" was riddled with disqualifying flaws that Blaze Media either ignored or actively concealed. Blaze Media never disclosed what software Defendants used, what methodology it applied, what data set of "gaits" it relied on, who operated it, or what qualifications that person had. (*Id.* ¶¶ 148–149.) Defendants disclosed no steps taken to guard against

confirmation bias or self-selection, ran no comparable analysis on any other individual as a control, and never confirmed that the video angles, distances, or conditions used for Ms. Kerkhoff and the pipe bomber were even comparable. (*Id.* ¶¶ 150–152.)

To facially bolster its accusation, Blaze Media quoted a "veteran analyst," who claimed he personally "pegged the match at closer to 98%" and other "intelligence sources" and "sources familiar with gait analysis" who claimed to confirm the analysis's findings. (*Id.* ¶¶ 145, 159.) Defendants concealed the credentials of those sources because none existed: no credible analyst would represent, with the certainty Defendants claimed, a conclusion that current gait-analysis science does not support. (*Id.* ¶¶ 157, 160.) Indeed, Baker himself later admitted that he "went to the three most respected firms that do gait analysis for intelligence communities around the world," and "none of them would touch it with a thousand-foot pole." (*Id.* ¶ 149.)

The November 8 Article made plain what was really driving Blaze Media's accusation: that "[t]he prospect of a Capitol Police officer being the perpetrator, if confirmed, could recast the entire story of Jan. 6." (*Id.* ¶ 169.)

Blaze Media launched a coordinated social media campaign to spread the November 8 Article and its false accusation as widely as possible. Baker's post calling the story "the biggest scandal and conspiracy in American history" was viewed 16.4 million times and shared more than 21,000 times. (*Id.* ¶ 174.) Hanneman declared the case "SOLVED," punctuated with a siren emoji, and Blaze Media posted "BREAKING" with the same emphasis. (*Id.* ¶¶ 176–177.) Defendants selectively engaged with supportive users while ignoring critics, fueling further virality, and X users—echoing Defendants' own language—began declaring that Blaze Media had "SOLVED" the case and that Ms. Kerkhoff was the pipe bomber. (*Id.* ¶¶ 178–179.)

### F. Blaze Media Doubles Down on Its False Claims Against Ms. Kerkhoff Rather Than Retract Them

Even before Defendants published the November 8 Article, federal officials were already rejecting their theory: on November 7, 2025, U.S. Pardon Attorney Ed Martin responded to a post claiming he had "determined" Ms. Kerkhoff was the pipe bomber with a flat denial—"This is false." (*Id.* ¶ 192.) That denial did not stop Defendants from publishing the November 8 Article the next day. (*Id.* ¶ 193.) Independent scrutiny followed swiftly. On November 12, 2025, The Debrief published an article—grounded in the very limitations Defendants had concealed—explaining that gait analysis "remains an unreliable basis for identifying a suspect with certainty" and criticizing Blaze Media's reliance on an unnamed "veteran analyst" whose credibility could not be assessed. (*Id.* ¶¶ 195–198.) That same week, then-FBI Deputy Director Dan Bongino—who had himself previously called the pipe bombing an "inside job"—publicly called Defendants' reporting "grossly inaccurate," adding that it "serves only to mislead the public." (*Id.* ¶ 8.)

On November 25, 2025, CBS News definitively debunked Blaze Media's accusation in an article titled, "How an Innocent Woman's Name Was Tied to the Jan. 6 Pipe Bombs," reporting that Ms. Kerkhoff had cleared her name with an alibi video and that the FBI had "ruled [her] out as suspect"—and that Defendants' shoddy investigation had "raised concerns among some senior officials in the Trump administration." (*Id.* ¶¶ 199–202.) Ms. Kerkhoff never had the chance to provide that exonerating video to Defendants before publication, because Defendants never asked her for comment. (*Id.* ¶ 201.) CBS News further confirmed that Baker's tip to ODNI DIG—not any legitimate investigative process—was what triggered the very investigation that Defendants then cited as corroboration for their story. (*Id.* ¶ 203.)

As their story collapsed, Defendants responded not with a retraction but with a series of quiet edits—appending brief "Editor's Notes" to the bottom of the November 8 Article while

leaving its headline, its cover photographs of Ms. Kerkhoff, and its core false accusations untouched. (*Id.* ¶ 204.) The first edit, made the same day the November 8 Article was published, corrected only the description of Ms. Kerkhoff's CIA job title after a CIA spokeswoman intervened. (*Id.* ¶ 205.) A second edit, on November 13, was forced by The Daily Wire, which debunked Defendants' claim that Ms. Kerkhoff had used a neighbor's transit card to flee the bombing scene—a claim The Daily Wire noted was necessary because, without it, Blaze Media's theory "would now rest solely on the 'gait analysis.'" (*Id.* ¶ 206.) A third edit quietly added a denial from Ms. Kerkhoff's attorney. (*Id.* ¶ 207.) A fourth edit, appended only after CBS News' definitive debunking, acknowledged that the FBI had "ruled the suspect out," and that Ms. Kerkhoff had been cleared by an alibi video, while Blaze Media simultaneously complained about CBS's use of unnamed sources—apparently blind to its own near-total reliance on anonymous sourcing. (*Id.* ¶¶ 208–211.) Despite all of this, Blaze Media made no change whatsoever to the Article's headline, photograph, or the substance of its false accusations. (*Id.* ¶ 212.)

The reckoning Defendants could not quietly edit away arrived on December 4, 2025, when the Department of Justice announced the arrest of the actual suspect, Brian J. Cole, Jr., who quickly confessed. (*Id.* ¶ 213.) That same day, Blaze Media finally removed the text of the November 5 and November 8 Articles, replacing it with an "Editor's Note," and it swapped the photographs of Ms. Kerkhoff's face for CCTV stills of the real suspect (the "December 4 Update"). (*Id.* ¶ 214.) But even then, Blaze Media stood by its flawed reporting and doubled down on the false conclusions it presented. (*Id.* ¶ 215.) Both Articles' headlines were left standing, altered only by prepending the word "UPDATE." (*Id.* ¶ 216.) Defendants reaffirmed that their sources had "a demonstrated record of reliability and accuracy" and "continue[d] to stand by the information they provided." (*Id.* ¶¶ 218–219.) They likewise insisted their investigation had followed "professional

journalistic standards," ignoring their own admitted failure to seek comment from Ms. Kerkhoff and their concealment of gait analysis's known limitations. (*Id.* ¶ 220.) And while Defendants had promoted the original Articles with a massive, coordinated social media campaign, none of them promoted—or even acknowledged—the removal of their false reporting. (*Id.* ¶ 221.) The December 4 Update included no apology and no correction of the false reporting; it simply reaffirmed it. (*Id.* ¶ 223.) Baker would later admit as much: "[He] didn't retract anything. Technically, neither did the Blaze. They removed the article, but said they were still standing behind the work." (*Id.* ¶ 224.)

### G. Ms. Kerkhoff Files This Lawsuit to Vindicate Her Reputation

On January 16, 2026, Ms. Kerkhoff's counsel sent Blaze Media a detailed retraction demand explaining the falsity of its reporting. (*Id.* ¶ 225.) Defendants' counsel responded on January 29, 2026. (*Id.* ¶ 226.) Notably, Blaze Media's counsel never asserted that its reporting was true. (*Id.*) Instead, it argued only that Ms. Kerkhoff could not prove actual malice and that Defendants' "retraction" was already sufficient. (*Id.* ¶ 226.) As of the filing of the Amended Complaint, Defendants had refused to take any further steps to retract their accusations or correct the record. (*Id.* ¶ 227.)

Ms. Kerkhoff filed her original Complaint on April 21, 2026, asserting four counts of defamation against Blaze Media. (ECF No. 1.) Ms. Kerkhoff filed her First Amended Complaint on July 23, 2026 to add new facts Steve Baker publicly revealed regarding the processes that led Blaze Media to publish the false statements about Ms. Kerkhoff. (ECF No. 70.) Meanwhile, Ms. Kerkhoff's life remains irrevocably altered: she was placed under FBI scrutiny that will follow her for the rest of her career, has lost friendships and professional opportunities, lives in fear for her physical safety, and has postponed her wedding—all because Blaze Media chose to manufacture a story rather than report the truth. (*Id.* ¶¶ 263–83.)

## LEGAL STANDARD

On a motion to dismiss, courts apply the familiar plausibility standard under which a plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The threshold to survive a motion to dismiss is a low one." *United States v. Chartis Ins. Agency, Inc.*, 834 F. Supp. 2d 459, 461 (E.D. Va. 2011) (quotation omitted). A complaint "should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005). "In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff." *Meredith v. Nestle Purina Petcare Co.*, 516 F. Supp. 3d 542, 547 (E.D. Va. 2021).

"[T]he usual standards of notice pleading apply in defamation cases," and "[w]hile the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them." *Hatfill*, 416 F.3d at 329. It is therefore "erroneous for a district court to apply a stricter standard," and a defamation complaint "must be treated 'like any other civil complaint in federal court.'" *Cox v. Red Hat, Inc.*, No. 1:23-cv-766, 2025 WL 889888, at *9 (E.D. Va. Mar. 21, 2025) (Alston, J.) (quoting *Hatfill*, 416 F.3d at 329).

## ARGUMENT

Ms. Kerkhoff brings four counts for defamation against Blaze Media arising from four of its publications: the November 5 Podcast, the November 5 Article, the November 8 Article, and the December 4 Update (together, the "Publications")—each of which falsely accused Ms. Kerkhoff of planting pipe bombs in Washington, D.C. on January 5, 2021. To prevail on this motion, Ms. Kerkhoff need only allege "(1) publication of (2) an actionable statement with (3) the requisite intent." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 666 (W.D. Va. 2019); *accord*

*Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 658 (E.D. Va. 2015). A statement is actionable if it is "false and defamatory." *Goulmamine*, 138 F. Supp. 3d at 659.

Blaze Media does not contest that its statements were published to third parties. It does not contest that its statements were about Ms. Kerkhoff. And it does not contest that its statements were false. Instead, Blaze Media argues only that its statements are subject to a different (contrived) defamatory meaning; that its December 4 Update did not continue to defame Ms. Kerkhoff; that Ms. Kerkhoff must show Blaze Media acted with actual malice because she is a "public official"; and that the First Amended Complaint fails to plead actual malice. All are unavailing.

## I. Defendants' Publications Falsely Accused Ms. Kerkhoff of Planting Pipe Bombs.

Without expressly making the argument, Blaze Media attempts to introduce a threshold question: whether its statements conveyed that Ms. Kerkhoff was the pipe bomber. (Mot. 14–15.) Blaze Media does not—and cannot—dispute that falsely accusing a person of placing pipe bombs in the Nation's Capital is defamatory *per se*. Instead, Blaze Media attempts to impose an unreasonable interpretation of its Articles and Podcast to avoid this plainly defamatory meaning. But Blaze Media's Publications conveyed to readers that its "gait analysis" could identify, and did in fact identify, Ms. Kerkhoff as the pipe bomber. Indeed, that is the exact interpretation Blaze Media used to promote its Publications to its readers. And that is the exact meaning Blaze Media's readers repeatedly interpreted. Now that Ms. Kerkhoff has filed suit to clear her name, the Court cannot allow Blaze Media to distance itself from its defamatory claims.

### A. Blaze Media's Articles and Statements Are Reasonably Capable of Conveying that Ms. Kerkhoff Planted Pipe Bombs in Washington, D.C.

"Under Virginia law, a plaintiff seeking to recover for defamation *per se* must allege a publication of false information concerning the plaintiff that tends to defame the plaintiff's

reputation." *Hatfill*, 416 F.3d at 330. An accusation that a plaintiff planted pipe bombs in Washington, D.C. is defamatory *per se*. *See id.* (accusations impugning plaintiff in anthrax mailings were defamatory *per se*); *see also Gilmore*, 370 F. Supp. 3d at 673 (accusation that plaintiff "had foreknowledge of a violent attack and filmed it for clandestine political purposes" was defamatory *per se*).

Blaze Media does not dispute this. Instead, it attempts to force an alternative interpretation: that it merely reported the results of a forensic gait analysis. (Mot. 15–16.) But at this juncture, the Court need only decide whether the statements are "reasonably capable of the [defamatory] meaning [the plaintiff] ascribe[s] to them." *Hatfill*, 416 F.3d at 331. It is up to the jury to decide what meaning was actually conveyed. *Fitzgerald v. Penthouse Int'l, Ltd.*, 639 F.2d 1076 (4th Cir. 1981); *see also Pendleton v. Newsome*, 772 S.E.2d 759, 765 (Va. 2015) (reversing demurrer and remanding for a jury to decide whether the defendant's statements actually conveyed the alleged defamatory implication, once the court found them "reasonably capable" of doing so). And, when evaluating a statement's meaning, "every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Carwile v. Richmond Newspapers,* 82 S.E.2d 588, 592 (Va. 1954). The Publications did not merely report the results of a "forensic gait analysis," as Blaze Media insists. (Mot. 15–16.) They are more than capable of being understood as reporting that Blaze Media was capable of identifying, and did in fact identify, Ms. Kerkhoff as the pipe bomber.

This is evident from the outset of the November 8 Article. Its headline states, "Former Capitol Police officer a forensic match for Jan. 6 pipe bomber." (FAC Ex. C.) Immediately beneath that headline, the Article prominently presents four close-up photos of Ms. Kerkhoff, each framing a CCTV screen capture of the January 6 pipe bomber, before claiming Ms. Kerkhoff's gait was a "***94-98% match*** to the ***unique*** stride of the long-sought Jan. 6 pipe-bomb suspect[.]"

(*Id.*) The Article then confirmed that it was not merely reporting the results of a "forensic gait analysis study" (Mot. 15) but rather (falsely) reporting that the analysis offered a "***solution***" to the pipe bomber case. (FAC Ex. C.) And it purported to bolster its findings by citing to multiple confidential "sources familiar with gait analysis," "several current intelligence sources," and a "veteran analyst," who "confirmed" that Ms. Kerkhoff "matched the gait of the gray-hoodie-wearing suspect." (*Id.*) And it reinforced its false accusations by offering a (baseless) explanation for why Ms. Kerkhoff might have an "unusual" gait, herself: a 2015 "season-ending [soccer injury]" that, according to Blaze Media, "***would become a fateful thing a decade later***, when investigators studied her movements on Jan. 5 and 6, 2021." Finally, Blaze Media touted the "far-reaching reverberations" its accusations would have, including "***recast[ing] the entire story of Jan. 6***." (*Id.*)

The November 5 Article and Podcast conveyed the same false accusations. Once again, a reader need look no further than the headline of the November 5 Article to understand its false message: "'She's one of us!' Steve Baker stuns Glenn Beck with bombshell revelation about J6 pipe-bomb suspect." (FAC Ex. A.) The first paragraph of the November 5 Article confirms that Blaze Media's reporting would "***identify*** the masked individual who placed pipe bombs near the headquarters of the Republican National Committee and the Democratic National Committee in Washington, D.C. on Jan. 5, 2021." (*Id.*) The next paragraph doubled down, reporting Blaze Media had "finally ***locked in on a suspect***," whose "imminent ***identification*** will implicate and shame at least one federal agency." (*Id.*) It referred to Ms. Kerkhoff as not just "a" suspect, but the "lead" suspect. (*Id.*) The Article then quoted Baker's statement on the November 5 Podcast: "My God, that's it. ***We got it.***" (*Id.* Ex. A, Ex. B at 45:13-15.) And on the November 5 Podcast, Glenn Beck and Baker touted the supposed significance and reliability of their reporting as a

"buttoned up" and "major development in the January 6 pipe bomber investigation." (*Id.* Ex. B at 39:18–23, 42:15–21.)

That Blaze Media intended to convey the false accusation that Ms. Kerkhoff was the pipe bomber is further confirmed by how it promoted the Articles and Podcasts. Unsurprisingly, and fatally for Blaze Media's alternative defamatory meaning argument, at the time of publication—and before changing tack after Ms. Kerkhoff filed this lawsuit—Blaze Media repeatedly promoted the Publications as definitively resolving who placed the D.C. pipe bombs. Glenn Beck boasted its reporting was "Pulitzer Prize-winning stuff." (FAC ¶ 112.) For his part, Hanneman, who was then employed by Blaze Media, promoted the November 8 Article as having "SOLVED" the pipe bomber case, (FAC ¶ 176), while Baker claimed the Publications unveiled the "biggest scandal and conspiracy in American history." (FAC ¶ 174.) Thus, Blaze Media's treatment of its own statements undercuts its made-for-litigation alternative defamatory meaning.

The defamatory meaning of Blaze Media's publications is further confirmed by how readers of the Articles and listeners of the Podcast actually understood them: namely, that readers and listeners understood Blaze Media to accuse Ms. Kerkhoff of placing the pipe bombs. "[E]vidence of how actual recipients of the communication understood the alleged defamation is highly probative," "powerful evidence of whether average or hypothetical readers could understand a statement as conveying a defamatory meaning." 1 Rodney A. Smolla, *Law of Defamation*, § 4:2.50; *Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 11–12 (D.D.C. 2019) (explaining that "[t]he 'views of [readers of an article]' are 'insightful' and are 'supportive of what a hypothetical reasonable [person] might have understood [it] to mean'"), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021). Blaze Media's readers understood Blaze Media's reporting as having "found the PIPE BOMBER." (FAC ¶¶ 179, 340.) Simply put, Blaze Media's statements were not merely capable

of conveying that Ms. Kerkhoff placed the pipe bombs in Washington, D.C. They unquestionably conveyed that meaning.[1]

**B. Blaze Media Cannot Overcome the Conclusion That Its Articles and Podcasts Are Reasonably Capable of Being Understood to Accuse Ms. Kerkhoff of Planting Pipe Bombs.**

None of Blaze Media's attempts to distance itself from the defamatory meaning of its Publications have merit.

*First,* Blaze Media insists that, because it never used the words "planted two pipe bombs in Washington, D.C.," its statements cannot be interpreted as conveying that accusation. (Mot. 15.) That is not the law. "In determining whether or not the language does impute a criminal offense, the words must be construed in the plain and popular sense[;] ***an express allegation of criminal activity is not necessary***." *Goulmamine*, 138 F. Supp. 3d at 659 (emphasis added); *accord Hatfill*, 416 F.3d at 331 (It is not necessary that words "make the charge in express terms"—it is enough that they "naturally and presumably … be understood by those who [read] them as charging a crime."). Thus, Blaze Media's argument improperly demands an express accusation Virginia law does not require.

*Wells v. Liddy* is instructive. 186 F.3d 505, 523 (4th Cir. 1999). There, the Fourth Circuit held that claims that a secretary kept photos of women in her desk were "capable of defamatory meaning, namely, that Wells was a participant in a scheme to procure prostitutes." *Id.* It reached this conclusion even though the defendant had not explicitly accused the plaintiff of complicity in the alleged call-girl operation. *Id.* It was enough that the defendant implied as much by asserting

[1] As explained herein, the December 4 Update maintained and reinforced the defamatory meaning of Blaze Media's statements in the Articles and Podcast.

that the manila envelope was kept in her desk. *Id.* Blaze Media's claims go even further. They insist, with "94-98% certainty," that they identified Ms. Kerkhoff as the pipe bomber.

*Second*, Blaze Media asserts that its publications, at most, report "that a forensic gait analysis study undertaken by Blaze Media produced a finding that Plaintiff's gait was a forensic match" to the gait of the pipe-bomb suspect. (ECF No. 82 at 15.) But that would force this Court to improperly ignore all of the "inference[s], implication[s], [and] insinuation[s]" that plainly arise from its statements. *Hatfill*, 416 F.3d at 331 (courts "should consider not only the words themselves but also the inferences fairly attributable to them"). In *Hatfill*, the Fourth Circuit noted that articles tying a plaintiff to anthrax mailings—but not expressly accusing him of doing so—"did not describe any other actual or potential target of investigation, they recounted detailed information pertaining to [the plaintiff] alone." 416 F.3d at 332–33. The articles also stated a factual basis for why the plaintiff would have access to anthrax and a motive to mail it. *Id.* "Based on these assertions, a reasonable reader … likely would conclude that [the plaintiff] was responsible for the anthrax mailings." *Id.* Likewise here, Blaze Media's Publications focused exclusively on Ms. Kerkhoff, and they purported to offer a factual basis for their accusations: the gait analysis's "results." Like in *Hatfill*, the reasonable "inference, implication, or innuendo" derived from those statements—and indeed, the exact understanding Blaze Media readers took away from them—was that Ms. Kerkhoff ***was*** the pipe bomber.

*Third*, Blaze Media attempts to minimize its accusations by describing them as presenting only "a possible solution to the pipe-bomb theory." (Mot. 15.) But a defendant cannot escape liability through hedges, disclaimers, or a careful choice of words designed to avoid literal falsity while still conveying the defamatory meaning. *Hatfill*, 416 F.3d at 333–34. "Just as a defendant cannot escape liability for making a false assertion of fact by prefacing that assertion with the

words 'in my opinion,' neither can it escape liability simply by pairing a charge of wrongdoing with a statement that the subject must, of course, be presumed innocent." *Id.* (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990)). Referring to Ms. Kerkhoff as a "suspect" or "possible solution" does nothing to change—let alone soften—Blaze Media's accusations.

Read together, in their proper context, and considering the inferences fairly attributable to them, Blaze Media's Publications plainly accuse Ms. Kerkhoff of planting the pipe bombs. And it is against that defamatory meaning that the remaining elements of Ms. Kerkhoff's claim—including actual malice—must be interpreted.

## II. Blaze Media's December 4 Update Continued to Imply the Same Defamatory Meaning Its Articles and Podcast Originally Published.

Blaze Media likewise attempts to distance itself from the defamatory implication conveyed by its December 4 Update. But "Virginia law recognizes a claim for defamation by inference, implication or insinuation." *Pendleton*, 772 S.E.2d at 763. And "defamatory innuendo is no more protected by the First Amendment than is defamatory speech expressed by any other means." *Id.* at 764 (citing *Bose Corp. v. Consumers Union of the United States, Inc.*, 466 U.S. 485, 504 (1984)).

In arguing that this Court should dismiss Count IV of the FAC, Defendants misstate the Fourth Circuit's holding in *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993). The Fourth Circuit has since clarified: it did not hold in *Chapin* that ***all*** defamation-by-implication claims must allege the defendant affirmatively intended or endorsed that implication or innuendo. *Hatfill*, 416 F.3d at 334 n.7. Rather, a libel-by-implication plaintiff must make the "especially rigorous showing" that Blaze Media demands ***only*** in cases "where the expressed facts are literally true." *Id.* ("[I]t is immaterial whether [defendant] actually intended to defame [plaintiff].") In *Hatfill,* in contrast to *Chapin*, the plaintiff "allege[d] ***both*** that the [defamatory] inference … is

false ***and*** that the factual assertions from which that inference arises are false." *Id.* Accordingly, the Fourth Circuit concluded that "*Chapin* is inapposite." *Id.*[2]

The same holds here. Ms. Kerkhoff alleges not only that the December 4 Update's implications are false and defamatory, but also that the "facts" on which Blaze Media based those implications are false. (FAC ¶ 321 ("These statements are false.").) Specifically, the sources Blaze Media originally cited were not reliable; Blaze Media's report did not adhere to professional journalistic standards; and the Articles could not have been "published with a good-faith belief in its truth" because Blaze Media knew its gait analysis could not present the results it claimed.[3] (*Id.*) Accordingly, *Chapin* is inapposite, and Defendants need not have intended or endorsed the defamatory implications—that Blaze Media correctly identified Ms. Kerkhoff as the pipe bomber—to be actionable.[4]

---

[2] Blaze Media's reliance on *Webb v. Virginian-Pilot Media Cos., LLC*, 287 Va. 84, 89–91 (2014), which also involved a claim for defamation by implication based on literally true facts, is misplaced for the same reasons. *Webb* is also distinguishable from this case for the same reason the Virginia Supreme Court highlighted in *Pendleton*: "That case, also a claim for defamation by innuendo, was based on statements by a defendant that raised no implication that the plaintiff had acted wrongfully, and showed that it was just as likely that other persons were responsible for the allegedly improper conduct of which the plaintiff complained. In the present case, by contrast, the plaintiff was the sole and unmistakable target of any innuendo she may be able to prove to have resulted from the defendants' statements." 772 S.E.2d at 764.

[3] At the motion-to-dismiss stage, "a court must accept as false any statements which the Complaint alleges to be false." *Goulmamine*, 138 F. Supp. 3d at 659; *accord Hatfill*, 416 F.3d at 334 n.7 ("[T]he district court was required to accept [plaintiffs's] assertion that the facts upon which [the defendant] based his defamatory charge were false.").

[4] Even if the Court could determine the truth or falsity of the statements underlying the December 4 Update, the Virginia Supreme Court has made clear this Court cannot determine Blaze Media's intent based on the words of the publication, itself, at the motion to dismiss stage. *Pendleton*, 772 S.E.2d at 764-65 ("Nor have we held that the defendant's words must, by themselves, suggest that the author intends or endorses the allegedly defamatory inference. … Motive, intent, scheme, plan, or design are issues of fact that may be proved by circumstantial as well as direct evidence.").

And, read as a whole, the December 4 Update makes clear that is the exact message Blaze Media conveyed. First, Blaze Media made no effort to change the headlines of its reports—which remained linked as originally reported on "theblaze.com/***truth***." (FAC ¶¶ 216–17.) Thus, even as Blaze Media was forced to remove its false accusations, it continued to report, "UPDATE: 'She's one of us!' Steve Baker stuns Glenn Beck with bombshell revelation about J6 pipe-bomb suspect," and "UPDATE: Former Capitol Police officer a forensic match for Jan. 6 pipe bomber." (*Id.* ¶ 216.) Second, by maintaining the "demonstrated record of reliability and accuracy" of the Articles' sources, and noting that those purportedly "reliable" sources "continue to stand by the information they provided to Blaze News," Blaze Media communicated to readers that those sources' false conclusions were valid—notwithstanding the removal of the Articles' text. (*Id.* ¶ 219.) And, rather than admitting any error in making its false claims, Blaze Media assured its readers it could trust its initial reporting, because it "adhered to professional journalistic standards." (*Id.* ¶ 321.) Blaze Media's inclusion of Ms. Kerkhoff's denial did not change the December 4 Update's defamatory meaning. *See Hatfill*, 416 F.3d at 333 n.10 (a defamation defendant "cannot escape liability simply by pairing a charge of wrongdoing with a statement that the subject must, of course, be presumed innocent"); *see also Palmer v. Mahin*, 120 F. 737, 746 (8th Cir. 1903) (mere publication of the injured party's denials of the original story does not constitute a retraction).[5] This is confirmed by the fact that, even after Blaze Media published the December 4 Update, readers continued to cite the Articles to falsely accuse Ms. Kerkhoff of being the pipe bomber. (FAC ¶ 224.)

---

[5] Nor should the Court credit Blaze Media's literal eleventh-hour response to Baker's public disavowal of Blaze Media's proclaimed "retraction." (Mot. 34.) In contrast with the fanfare with which Blaze Media published and promoted the Articles and Podcasts, Blaze Media published the referenced post—which was a text-only, single sentence post, with comments disabled, ensuring it received minimum engagement—to X at 11:47 PM. (FAC ¶ 249 n.59).

Considering the December 4 Update in context, and taking all inferences in Ms. Kerkhoff's favor, as this Court must, "it cannot be said at the demurrer stage that [the Update] w[as] not capable of conveying the defamatory innuendo" that Blaze Media's initial false accusations were correct. *Pendleton*, 772 S.E.2d at 764–65.

## III. Blaze Media Does Not Satisfy Its Burden of Establishing that Ms. Kerkhoff Is a Public Official.

Although Blaze Media fails to acknowledge it, Blaze Media bears the burden to demonstrate that Ms. Kerkhoff is a public official. *Grover Gaming Inc. v. Rice*, No. 5:23-cv-036, 2023 WL 8936752, at *7 (W.D. Va. Dec. 27, 2023) (quoting *Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994) (courts "proceed upon the initial presumption that the defamation plaintiff is a private individual")).[6] To meet this burden, Blaze Media must show Ms. Kerkhoff "ha[s], or appear[s] to the public to have, substantial responsibility for or control over the conduct of governmental affairs[.]" *Arctic Co., Ltd. v. Loudoun Times Mirror*, 624 F.2d 518, 521 (4th Cir. 1980). It must also show that Ms. Kerkhoff "invite[d] public scrutiny and discussion of the person holding it, entirely apart from the scrutiny and discussion occasioned by the particular charges in controversy." *Rosenblatt v. Baer*, 383 U.S. 75, 86, n.13 (1966). Finally, Blaze Media must show that Ms. Kerkhoff was "a public official for the purposes of the article" and "the defamatory statements … relate[d] to [her] official conduct." *Gray*, 656 F.2d at 590–91 (cited at Mot. 13).

Blaze Media does not attempt to argue Ms. Kerkhoff exercised such "substantial responsibility," that she "invited public scrutiny" in her role, or that its Publications "relate[d] to h[er] official conduct." *Id.* Instead, it seems to impose a categorical rule: that any police officer,

[6] Given Blaze Media's burden, it is significant that Blaze Media's primary case was decided on a full evidentiary record—not at the motion to dismiss stage. (Mot. 13 (citing *Gray v. Udevitz*, 656 F.2d 588 (10th Cir. 1981) (summary judgment).)

regardless of their rank or responsibilities, qualifies as a public official. (Mot. 12.) That is not the law. Indeed, in stating the standard for a "public official," the Supreme Court expressly guarded against the possibility that "this test might apply to a night watchman accused of stealing state secrets." *Rosenblatt*, 383 U.S. at 86, n.13.

The facts, as alleged in the Amended Complaint, confirm that Ms. Kerkhoff did not exercise the requisite responsibility or invite the requisite scrutiny. In 2021, Ms. Kerkhoff was a "rank and file" Capitol Police Officer. (FAC ¶¶ 31–33.) Ms. Kerkhoff did not supervise or manage other officers or employees; rather, Ms. Kerkhoff was supervised by her commanding officer, including during the protests on January 6. (*Id.* ¶ 43.)[7] As such, Ms. Kerkhoff did not direct or appear to direct the operations of the Capitol Police. She merely followed the orders of her superiors. (*Id.*) Finally, even if these duties elevated Ms. Kerkhoff to public official status (they do not), Blaze Media does not—and cannot—explain how its false claims that she was the pipe bomber "relate[d] to [her] official conduct" as a Capitol Police officer. *Gray*, 656 F.2d at 590–91. For each of these reasons, Blaze Media fails to show Ms. Kerkhoff is a "public official."

## IV. The Complaint Overwhelmingly Pleads Sufficient Facts to Plausibly Allege Blaze Media Acted With Actual Malice.

Because Ms. Kerkhoff is a private figure, she need not plead actual malice to defeat Blaze Media's motion to dismiss.[8] Even so, the Amended Complaint overwhelmingly pleads facts to show Blaze Media published the Publications with actual malice.

---

[7] Ms. Kerkhoff's training of other officers does not transform her position into one of "substantial responsibility." *See Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 36-7 (1987) (holding public school teacher was not a public official because the public had no independent interest in school teacher's qualifications and performance).

[8] The Amended Complaint pleads actual malice not because Plaintiff is a public official, as Blaze Media contests, but because Ms. Kerkhoff intends to seek punitive damages, and must prove actual malice to recover them. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974).

The actual malice inquiry is not an insurmountable hurdle, especially at the pleading stage. *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). Indeed, the Supreme Court has more than once admonished that because "proof of 'actual malice' calls a defendant's state of mind into question," this element "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979). Rather, it raises questions of fact that must be evaluated through discovery and resolved by the factfinder. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254–56 (1986). Therefore, at this stage, Ms. Kerkhoff "need only plead sufficient facts that, if proven, create a plausible inference of actual malice." *Gilmore*, 370 F. Supp. 3d at 671 (quoting *Spirito v. Peninsula Airport Comm'n*, 250 F. Supp. 3d 471, 481 (E.D. Va. 2018)).

Contrary to Blaze Media's argument, whether the author knew or "in fact entertained serious doubts as to the truth of his publication" is not the sole standard for showing actual malice. (Mot. 14.) A plaintiff can also establish actual malice by showing that the defendant "acted with a high degree of awareness of … probable falsity." *Masson v. New Yorker Mag., Inc.*, 501 U.S. 496, 510 (1991). And the Court cannot credit Blaze Media's suggestion that it made its false claims "with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968). Rather, the "finder of fact"—not the Court—"must determine whether the publication was indeed made in good faith," and "[p]rofessions of good faith will be unlikely to prove persuasive" where, as here, "a story is fabricated by the defendant … [or] where there are obvious reasons to doubt the veracity of the information or the accuracy of his reports." *Id.*

Because defamation defendants almost never admit to knowingly lying, *Herbert v. Lando*, 441 U.S. 153, 170 (1979), "a plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence," *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). And, in evaluating the sufficiency of a plaintiff's actual malice allegations, the Court must

examine the totality of the allegations "taken together"—not any one allegation standing alone, as Blaze Media attempts to do. *Gilmore*, 370 F. Supp. 3d at 673; *accord Eramo v. Rolling Stone,* 209 F. Supp. 3d 862, 872 (W.D. Va. 2016); *see also Stern v. Cosby*, 645 F. Supp. 2d 258, 278 (S.D.N.Y. 2009) ("[E]ach individual piece of evidence cannot fairly be judged individually …. Plaintiffs are entitled to an aggregate consideration of all their evidence to determine if their burden has been met.") (quotation omitted).

Ms. Kerkhoff pleads with particularity both direct and circumstantial evidence that Blaze Media acted with actual malice when it falsely accused her of placing pipe bombs in Washington, D.C. And while Blaze Media takes issue with ***how*** the First Amended Complaint pleads actual malice, its argument fails both practically and legally. (Mot. 14–15.) Practically, because the Articles, Podcast, and Update all relied on the same faulty gait analysis to assert the same false and defamatory narrative—that Blaze Media could, and did, identify Ms. Kerkhoff as the pipe bomber—it is no surprise that many of the same indicia of actual malice apply across each Publication. Regardless, the Amended Complaint ***does*** differentiate between how Blaze Media's knowing disregard of the truth resulted in the specific false statements it made in each Publication. (FAC ¶¶ 346, 364, 382, 401.) And, legally, *McCullough* does not stand for the proposition Blaze Media asserts. (Mot. 15 (citing *McCullough v. Gannett Co.*, No. 1:22-cv-1099, 2023 WL 3075940 (E.D. Va. Apr. 25, 2023) (Alston, J.)).) In *McCullough*, this Court did not require "a defamation plaintiff [to] establish actual malice as to *each* statement alleged to be false and defamatory," or rule such a failure to be "fatal," as Blaze Media insists (Mot. 2, 15); in that case, this Court simply noted that "it is somewhat unclear what arguments about actual malice Plaintiff ascribes to each statement he claims is actionable" before it readily "addresse[d] whether each fact that Plaintiff claims is indicative of actual malice adequately pleads actual malice for each statement[.]"

*McCullough,* 2023 WL 3075940, at *13–15. Ultimately, McCullough resulted in dismissal of a defamation complaint not because of its pleading structure, as Blaze suggests, but because the plaintiff failed to allege "specific" facts underlying them. *Id.* at *14. The same cannot be said here. Because the Amended Complaint not only identifies numerous indicia of actual malice, but also pleads with specificity the facts that underlie them, under the same reasoning this Court applied in *McCullough*, Ms. Kerkhoff's claims cannot be dismissed. *Id.*; *see also Gilmore*, 370 F. Supp. 3d at 674–75 (denying motion to dismiss defamation claim after finding "concrete" allegations of actual malice are sufficient to "create a plausible inference of actual malice").

### A. Ms. Kerkhoff Pleads Facts Constituting Direct Evidence of Actual Malice.

Ms. Kerkhoff pleads that Blaze Media "had actual knowledge that [its] defamatory accusations were false when [it] published them." (FAC ¶¶ 346(a) (Count I), 364(a) (Count II), 382(a) (Count III), 401(a) (Count IV).) And she pleads facts showing Blaze Media's knowledge.

Blaze Media knew its claims that it could identify Ms. Kerkhoff as the pipe bomber with "much higher" than "94% accuracy" in the November 5 Podcast and Article, (*id.* ¶¶ 337, 356), that Ms. Kerkhoff "is up to a 98% match to the gait of the pipe bomb suspect," (*id.* ¶ 374) in the November 8 Article, and that those initial claims were "reliabl[e]" or "accurat[e]" in the December 4 Update, (*id.* ¶ 392),[9] were false, because Blaze Media possessed and reviewed academic literature that made clear forensic gait analysis cannot possibly reach such conclusions (*id.* ¶¶ 104–06, 108–10, 285–86). Specifically, Blaze Media knew that, because gait analysis poses "the potential for misidentification," it is "***essential*** to use gait analysis in conjunction with other evidence," it is "***crucial*** that gait analysis is only one component of the

[9] By December 4, Blaze Media further knew that the FBI had cleared Ms. Kerkhoff as a suspect. (FAC ¶ 401(a)).

whole investigation," and that gait analysis has only been used as "***corroborating*** evidence." (*Id.* ¶¶ 106, 109.) That did not stop Blaze Media from relying solely on a "gait analysis" to falsely accuse Ms. Kerkhoff of being the pipe bomber.[10] (*Id.* Exs. A–C.) Blaze Media also knew that gait analysis "***does not confirm the identity of [a] suspect***"; it "***is not a positive identification***"; and "***precise individualization of a person's gait has yet to be scientifically proved***." (*Id.* ¶¶ 108–09.) Yet, "precise individualization," "confirm[ation of] the identity of the suspect," and a "positive identification" with near-absolute—94-98%—certainty is exactly the conclusion Blaze Media represented its "analysis" yielded. (*Id.* ¶¶ 110, 289, Exs. A–C.)

There is no doubt Blaze Media possessed and reviewed these articles, because it cited them in its own reporting. (*Id.* ¶ 111.) Contrary to Blaze Media's arguments, Blaze's presentation of these academic articles only bolsters the indicia of its actual malice; it does not salvage them. (Mot. 26–28.) First, as explained below, it is no credit to Blaze Media that it "researched the November 5 Article" when it disregarded and purposefully omitted from its reporting every contradictory fact that research presented. *See, e.g., Eramo*, 209 F. Supp. 3d at 872, 874 (evidence that a defendant "consciously disregarded contradictory evidence" and ignored information that revealed its reporting was "inaccurate" supports a finding of actual malice). Second, Blaze Media did not merely "paraphrase" the academic articles. (Mot. 27.) It inaccurately described the articles' conclusions to facially bolster the credibility of Defendants' flawed analysis and false findings. (FAC ¶¶ 105, 108, 286–87.) That is further evidence of its actual malice. *See Hayne v. The Innocence Project*, No. 3:09-cv-218-KS-LRA, 2011 WL 198128, at *5 (S.D. Miss. Jan. 20,

---

[10] Blaze Media's insistence that it also relied on the fact that "Ms. Kerkhoff lived next-door to an individual" overlooks that Blaze Media was ultimately forced to remove its false reporting on this point after another publication investigated and disproved it. (FAC ¶¶ 206–07.)

2011) (allegation that defendants "edit[ed] their publications in such a way as to maximize the false light that was cast on [plaintiff]" supports actual malice).

**B. Ms. Kerkhoff Pleads Facts Constituting Circumstantial Evidence of Actual Malice.**

In addition to direct evidence of actual malice, Ms. Kerkhoff pleads substantial facts constituting circumstantial evidence of Blaze Media's actual malice.

**Inherently Improbable Accusations.** Actual malice can be established, independently, when a statement is "so inherently improbable that only a reckless man would have put [it] in circulation." *St. Amant*, 390 U.S. at 732. And the FAC explains exactly why Blaze Media's accusations were so implausible that "only a reckless man would believe it." *Cf. McCullough*, 2023 WL 3075940, at *13 (while a "mere assertion of inherent improbability was not enough to establish actual malice," a complaint that includes other allegations explaining why the claim is "obviously improbable" is sufficient) (quoting *US Dominion, Inc.*, 554 F. Supp. 3d at 63) (cited at Mot. 21). Blaze Media's false allegations arose from a preconceived narrative that the pipe bombs were placed to divert law enforcement resources away from the Capitol. (FAC ¶ 291.) But Blaze Media also knew that Ms. Kerkhoff was, herself, one such "law enforcement resource[]" who defended the Capitol at great personal cost. (*Id.* ¶ 292.) Blaze Media also suggested that the FBI had been unable to solve the pipe bomber mystery for years because it was "actively engaged in the coverup," and that Blaze Media's lone, software-generated "gait analysis" was the "major development" that solved the case with "a high, high degree of certitude." (*Id.* Ex. B.) Thus, Blaze Media's claims are similar to those in *US Dominion, Inc.*, where the court found that statements that "the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it." *US Dominion, Inc. v. Powell*, 554 F. Supp. 3d 42, 63 (D.D.C. 2021).

Nor does Baker's self-reported tip to ODNI DIG "foreclos[e]" the inherent improbability of its false claims. (Mot. 18–19.) The Amended Complaint explains exactly why Baker took his report to ODNI: because he knew it would act on his false claims without scrutinizing them. (FAC ¶¶ 124–26, 244.) That ODNI did, in fact, respond to his tip—the exact manufactured "corroboration" Baker intended—says nothing about the story's inherent improbability at the time Blaze Media published it.[11] And this argument ignores the government's ultimate response to that tip: (1) the U.S. Pardon Attorney and Director of the DOJ's Weaponization Working Group Ed Martin immediately, unequivocally, and publicly denied that he had "determined" the identity of the "J6 Pipe Bomber" to be Ms. Kerkhoff, (*id.* ¶ 192); (2) the FBI cleared Ms. Kerkhoff as a suspect, (*id.* ¶¶ 188, 202); and (3) ODNI DIG was forced to disband as a result of its mishandling of that same tip, (*id.* ¶ 128, n.39). *See Hatfill*, 416 F.3d at 334 n.5 (rejecting defendant's characterization of articles as "accurate report[s] of an ongoing investigation" where the defendant's own reporting "actually ***generated*** suspicion by asserting facts that tend to implicate him in the anthrax murders") (emphasis in original).

**<u>Conformed False Facts to Fit Preconceived Narrative.</u>** Contrary to Blaze Media's characterizations, "evidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the evidence conform to the preconceived story" is "***quite powerful evidence***" of actual malice. *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005). In fact, courts in this Circuit have repeatedly acknowledged the significance of a

[11] This Court cannot accept Blaze Media's counternarrative regarding Steve Baker's tip to the ODNI DIG over the well-pled allegations in the Amended Complaint, because doing so would impermissibly "weigh competing, plausible theories of actual malice on a motion to dismiss." *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 420 (S.D.N.Y. 2022); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804, 811 (2d Cir. 2019) ("[I]t is not the [trial] court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory.")

defendant's preconceived narrative as evidence of actual malice. *See Eramo*, 209 F. Supp. 3d at 872 (evidence that author previously published multiple similar articles indicated a preconceived storyline and actual malice) (citing *Harris*, 152 F. App'x at 568); *see also Gilmore*, 370 F. Supp. 3d at 675 (same).

That Blaze Media preconceived a storyline that the pipe bomber acted as part of a "deep state" "inside job," and conformed its "gait analysis" and false accusations against Ms. Kerkhoff to conform to that narrative, is indicated by numerous facts: (1) Baker and Hanneman spent years publicly advancing a theory that the January 6 riot was orchestrated by federal law enforcement, and they were hired by Blaze Media specifically to advance those theories before publishing scores of articles under Blaze Media's banner doing just that, (FAC ¶ 300); (2) Blaze Media tagged and gathered its reporting on the pipe bomber on a webpage where it purported to reveal "The ***Truth*** about January 6" among other articles dedicated to reporting January 6 as a "deep state" cover-up, (*id.* ¶ 217); (3) Blaze Media expressed animus against Ms. Kerkhoff and other Capitol Police officers in the days immediately prior to publishing the Publications, (*id.* ¶¶ 88–89); (4) Blaze Media ran a gait analysis of only Ms. Kerkhoff, and no one else, against CCTV footage of the pipe bomber using an undisclosed and unqualified "software algorithm" that did not guard against potential bias, (*id.* ¶¶ 149, 151, 161); (5) Blaze Media sought out unreliable sources to confirm the software analysis's findings after "respected" firms refused to "touch [its analysis] with a thousand-foot pole," (*id.* ¶¶ 149, 157, 160); (6) Blaze Media ignored and omitted academic research regarding gait analysis that undercut the reliability of its analysis, (*id.* ¶¶ 106–109, 286–87); (7) Blaze Media took its faulty analysis to ODNI DIG to manufacture corroboration, knowing its gait analysis could not stand alone, (*id.* ¶ 126), then boasted that its "bombshell reporting" "SOLVED" the pipe bomb case, suggesting a desire to create news rather than simply report true

facts, (*id.* ¶¶ 176, 216); and (8) Blaze Media advertised its false findings as having the potential to "recast the entire story of Jan. 6"—confirming its blind allegiance to its preconceived narrative, all along, (*id.* ¶ 301).

**Bias, Ill Will, and Improper Motive.** "Evidence concerning motive," bias, "animosity," and ill will can "support a finding of actual malice." *Connaughton*, 491 U.S. at 689; *see also Eramo*, 209 F. Supp. 3d at 872 ("[W]hile actual malice cannot be inferred from ill will or intent to injure alone, '***it cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry***'") (quoting *Connaughton*, 491 U.S. at 688) (emphasis added). Blaze Media's ill will towards Ms. Kerkhoff is illustrated, for instance, by both Baker's and Hanneman's long-stated animus against the Capitol Police, (FAC ¶ 295), and their admission that they targeted Ms. Kerkhoff ***because*** she was a member of the Capitol Police, (*id.* ¶¶ 297–98).

**Departure from Journalistic Standards.** Combined with the numerous additional indicia of actual malice, Blaze Media's departure from journalistic standards ***is*** "supportive evidence" of its actual malice. *Eramo*, 209 F. Supp. 3d at 871; *see also Gilmore*, 370 F. Supp. 3d at 671 ("A defendant's 'failure to investigate' or observe journalistic standards, although not determinative, is relevant to the actual malice inquiry."). And, while a failure to contact a defamation plaintiff before publication, standing alone, might not satisfy the actual malice standard, the Supreme Court has observed that a failure to interview a key source about defamatory statements is a departure from journalistic standards sufficient to establish actual malice. *Connaughton*, 491 U.S. at 692–93; *accord Gilmore*, 370 F. Supp. 3d at 673 (allegation that defendant failed to "reach out" to him before publication was "concrete" evidence of departure from journalistic standards and actual malice). Had Blaze Media contacted Ms. Kerkhoff, it could have learned that she ***did not*** have a "slight limp" and she ***did*** have an alibi—but Blaze Media was not interested in learning that

contradictory information. (FAC ¶ 311.) And that is not Blaze Media's only departure from journalistic standards; when "respected" firms dismissed its gait analysis, Blaze Media simply sought other inherently unreliable sources who would "confirm" it. (*Id.* ¶¶ 149, 157, 160.) And, instead of objectively reporting on an investigation, it manufactured one so it would seem its "gait analysis" was corroborated—then used that same investigation to bolster the credibility of its false claims. (*Id.* ¶ 213.)

**Reliance on Inherently Unreliable and Undisclosed Sources.** "[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice." *Biro*, 807 F.3d at 546. And Blaze Media knew anyone willing to vouch for its gait analysis must have been unreliable. First, Blaze Media knew that academic experts in gait analysis disclaimed the type of results Blaze Media claimed its analysis produced. (FAC ¶ 309.) Second, it knew "respected" firms were not willing to "touch" the gait analysis "with a thousand-foot pole." (*Id.*) Thus, the FAC does not "invoke[] baseless speculation to attack the credentials of [Blaze Media's] sources" (Mot. 16 n.5); Blaze Media's own reporting and Baker's own statements confirm that Blaze Media had "obvious reasons to doubt the veracity" of its sources. *St. Amant*, 390 U.S. at 732. And its failure to investigate further before publishing those sources' conclusions is further evidence of its actual malice. *Eramo*, 209 F. Supp. 3d at 872–73 (failure to further investigate claims of sources suspected to be non-credible supports a finding that defendant acted with actual malice).[12]

[12] Blaze Media does not dispute that Armitas or Seraphin are unreliable sources. Instead, it attempts to recast the contributions each made to the Articles and Podcasts. Blaze Media insists "[N]othing in the November 8 Article relied on Armitas for any information bearing on statements about Plaintiff." (Mot. 25.) Notably, Blaze Media asserts this without any citation to the Amended Complaint or its Publications; and it cannot provide any citation, because this claim is contrary to the Amended Complaint's allegations. (FAC ¶¶ 153, 307.) So, the Court cannot credit it. *Hatfill*, 416 F. 3d at 329 ("We must accept as true all well-pleaded allegations."). It also attempts to

**<u>Deliberate Omission of Evidence Contradicting Defamatory Accusations.</u>** Blaze Media's omission of evidence contradicting (1) the validity of its analysis and (2) the impossibility of the conclusions it claimed that analysis reached is also evidence of its actual malice. *Eramo*, 209 F. Supp. 3d at 873–74 ("A verdict for the plaintiff has been upheld when a reporter's own notes showed that she was aware of facts contradicting her story.") (quoting *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987)). As explained above, Blaze Media intentionally omitted from its Articles and Podcast academic research that would have warned its readers gait analysis cannot "positive[ly] identif[y]" a suspect—much less with 94-98% certainty. (FAC ¶ 109.) And, while Blaze Media touted the supposed expertise of its confidential "intelligence" sources and "veteran" gait analysts, (*id.* ¶¶ 155–162), Blaze Media never disclosed to its readers the number of "respected" firms that refused to engage with its gait analysis, (*id.* ¶ 309)—even as it continued to "stand by" the reliability of those anonymous sources after it was forced to remove the conclusions they made, (*id.* ¶ 219).

**<u>Refusal to Retract.</u>** "Refusal to retract an exposed error tends to support a finding of actual malice." *Zerangue*, 814 F.2d at 1071; *see also Herbert*, 441 U.S. at 164 n.12 (post-publication actions can constitute circumstantial evidence of actual malice); *accord Eramo*, 209 F. Supp. 3d at 874 ("Circumstantial evidence showing reckless disregard may derive from the defendant's words or acts before, at, or after the time of the communication."). Blaze Media steadfastly refused to retract its defamatory accusations, even as it was repeatedly forced to issue quiet updates after new information confirmed its claims were false. (FAC ¶¶ 318–325.) Worse,

---

minimize Seraphin's contribution. In doing so, it ignores that Blaze Media was forced to correct the exact narrative Seraphin provided after the Daily Wire independently investigated it. (FAC ¶ 206.) And, in any event, the Court cannot take at Blaze Media's word the extent Seraphin contributed to the Articles; Ms. Kerkhoff is entitled to discovery to confirm that.

even when it was forced to remove the text falsely accusing Ms. Kerkhoff of being the pipe bomber, it doubled down on the veracity of those accusations, insisting its reporting "adhered to professional journalistic standards," and that its sources "continue to stand by the information they provided to Blaze News," (*id.* ¶ 321)—a far cry from a "full and unequivocal [re]traction which does not contain lurking insinuations or hesitant withdrawals." *Brogan v. Passaic Daily News*, 123 A.2d 473, 477 (N.J. 1956), *overruled on other grounds by Maressa v. New Jersey Monthly*, 445 A.2d 376 (N.J. 1982).

Taken together, each of these indicia, and the specific facts underlying them, more than plead Blaze Media's actual malice.

**V. Virginia's Anti-SLAPP Statute Does Not "Immunize" Blaze Media From Liability.**

Virginia's anti-SLAPP statute, Va. Code § 8.01-223.2, offers no basis to dismiss Ms. Kerkhoff's claims. As a preliminary matter, Blaze Media assumes, without analysis, that Virginia's anti-SLAPP statute applies in federal court. (Mot. 34–35.) It does not. Numerous circuits have held that state anti-SLAPP laws similar to Virginia's conflict with the Federal Rules of Civil Procedure and cannot apply in federal court.[13] As explained in Ms. Kerkhoff's Omnibus Opposition to Defendants' Anti-SLAPP Motions for Attorneys' Fees, Virginia's anti-SLAPP statute cannot apply here, either, because it directly conflicts with Rule 11. *See Shady Grove*

[13] *See La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020); *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019); *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018); *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659 (10th Cir. 2018); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015). The Fourth Circuit has yet to squarely address the issue. In *Fairfax v. CBS Corp.*, the Fourth Circuit held that "Section 8.01-223.2(B) permits, but does not require, a court to award attorney's fees to a prevailing defendant and does not create a presumption in favor of a fee award." 2 F.4th 286, 297 (4th Cir. 2021). Neither party raised the issue of whether the anti-SLAPP's fee-shifting provision conflicts with Rule 11 and applies in federal court, so the court assumed that it applied without analyzing the issue.

*Orthopedic Assocs., P.A. v. Allstate Ins. Co.*, 559 U.S. 393, 421 (2010).[14] That conflict is determinative.

Even if the anti-SLAPP statute did apply in this Court—which it does not—the immunity provided under it would not apply to Blaze Media. Virginia's anti-SLAPP statute is express: "The immunity provided by this section ***shall not apply*** to any statements that the declarant knew or should have known were false or were made with reckless disregard for whether they were false." Va. Code § 8.01-223.2(B). Because Blaze Media made its statements with knowledge of falsity or reckless disregard for the truth (*see* section IV, *supra*), Virginia's anti-SLAPP statute does not apply. *See Simpson v. Lamberth*, No. 1:26-cv-00095 (AJT/LRV), 2026 WL 1644081, at *5 (E.D. Va. Mar. 31, 2026) ("In other words, if a statement is made with 'actual malice,' immunity cannot apply.") (quotation omitted); *see also Gilmore*, 370 F. Supp. 3d at 682 (denying "motion for immunity" under Virginia's anti-SLAPP statute where complaint sufficiently alleged actual malice); *accord Vivera Pharms., Inc. v. Gannett Co.*, CL-2020-14458, 2021 WL 6550461, at *4 (Va. Cir. Ct. Mar. 26, 2021) ("Even if the statements are privileged, [plaintiff's] claims should not be dismissed [under the immunity statute] because the complaint properly alleges malice as described above.").

## CONCLUSION

For the foregoing reasons, Shauni Kerkhoff respectfully requests that the Court deny Blaze Media's Motion to Dismiss the Amended Complaint.

---

[14] Ms. Kerkhoff incorporates by reference the arguments made in her Omnibus Opposition to Defendants' Anti-SLAPP Motions for Attorneys' Fees.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Thomas A. Clare, P.C.*

Thomas A. Clare, P.C. (VSB No. 39299)
Camilla J. Hundley (VSB No. 100257)
Jonathan R. Kaiman (VSB No. 99412)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Tel: (202) 628-7400
Email: tom@clarelocke.com
Email: camilla@clarelocke.com
Email: jon.kaiman@clarelocke.com

*Attorneys for Plaintiff Shauni Kerkhoff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Opposition to Defendant Blaze Media LLC's Motion to Dismiss was served on all counsel of record by e-filing it using the Court's CM/ECF system on September 21, 2026.

/s/ *Thomas A. Clare, P.C.*
Thomas A. Clare, P.C.