**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF VIRGINIA**
**ALEXANDRIA DIVISION**

| | | |
|---|---|---|
| SHAUNI KERKHOFF,<br><br>*Plaintiff*,<br><br>v.<br><br>BLAZE MEDIA LLC;<br>STEPHEN M. BAKER; JOSEPH M. HANNEMAN; and VERITAS REGNAT LLC.<br><br>*Defendants*. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:26-cv-01078 |

**PLAINTIFF'S OPPOSITION TO DEFENDANTS STEPHEN M. BAKER, JOSEPH M. HANNEMAN, AND VERITAS REGNAT LLC'S MOTION TO DISMISS**

Thomas A. Clare, P.C. (VSB No. 39299)
Camilla J. Hundley (VSB No. 100257)
Jonathan R. Kaiman (VSB No. 99412)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Tel: (202) 628-7400
Email: tom@clarelocke.com
Email: camilla@clarelocke.com
Email: jon.kaiman@clarelocke.com

*Attorneys for Plaintiff Shauni Kerkhoff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

FACTUAL BACKGROUND ........ 3

A. Baker and Hanneman Build Their Reporting Careers on the Preconceived Theory That January 6 Was an "Inside Job." ........ 3

B. Baker and Hanneman Target Ms. Kerkhoff Because She Defended the Capitol and Testified Against January 6 Rioters. ........ 4

C. Baker Claims That He and Hanneman Have "Discovered" the Pipe Bomber's Identity Based Solely on a Gait Analysis ........ 5

D. Baker and Hanneman Manufacture Their Own "Corroboration" by Taking Their Tip to an Agency With No Power to Investigate It. ........ 6

E. Baker and Hanneman Falsely Name Ms. Kerkhoff as the Pipe Bomber ........ 7

F. Even as Their Story Collapses, Baker and Hanneman Refuse to Retract It ........ 8

G. After Ms. Kerkhoff Demands a Retraction, Baker and Hanneman Launch Veritas Regnat to Perpetuate Their False Claims—and to Profit From Them ........ 9

LEGAL STANDARD ........ 10

ARGUMENT ........ 11

I. This Court Has Personal Jurisdiction Over Veritas Regnat. ........ 11

II. Ms. Kerkhoff States Claims for Defamation. ........ 14

A. Ms. Kerkhoff More Than Sufficiently Pleads Defamatory Meaning. ........ 14

1. The November Article and Podcast Accused Ms. Kerkhoff of Planting Pipe Bombs. ........ 16

2. The April Post and Blog Continued Defendants' Defamatory Campaign and Doubled-Down on Defendants' Same False Narrative. ........ 18

3. Defendants Cannot Overcome the Conclusion That Their Publications Are Reasonably Capable of Being Understood to Accuse Ms. Kerkhoff of Planting Pipe Bombs. ........ 19

B. Defendants Do Not Satisfy Their Burden of Establishing that Ms. Kerkhoff Is A Public Official. ........ 21

C. Ms. Kerkhoff Overwhelmingly Pleads Sufficient Facts to Plausibly Allege Baker, Hanneman, and Veritas Regnat Acted With Actual Malice. ........ 23

1. Ms. Kerkhoff Pleads Facts Constituting Direct Evidence of Actual Malice ........ 25

2. Ms. Kerkhoff Pleads Facts Constituting Circumstantial Evidence of Actual Malice 27

D. Section 230 Does Not Apply to Hanneman's April 4 Post. .......................................... 33
E. Virginia's Anti-SLAPP Statute Does Not Apply. .......................................... 35
CONCLUSION .......................................... 35

# TABLE OF AUTHORITIES

**Cases**

*Abbas v. Foreign Policy Grp., LLC*,
783 F.3d 1328 (D.C. Cir. 2015) ........ 42

*ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*,
293 F.3d 707 (4th Cir. 2002) ........ 20

*Anderson v. Liberty Lobby, Inc.*,
477 U.S. 242 (1986) ........ 30

*Arctic Co. v. Loudoun Times Mirror*,
624 F.2d 518 (4th Cir. 1980) ........ 29

*Ashcroft v. Iqbal*,
556 U.S. 662 (2009) ........ 18

*Banaian v. Bascom*,
281 A.3d 975 (N.H. 2022) ........ 42

*Biro v. Conde Nast*,
807 F.3d 541 (2d Cir. 2015) ........ 30, 38

*Butters v. Nat'l Acad. of Scis.*,
176 F. 4th 43 (D.C. Cir. 2016) ........ 23

*Calder v. Jones*,
465 U.S. 783 (1984) ........ 20

*Carbone v. Cable News Network, Inc.*,
910 F.3d 1345 (11th Cir. 2018) ........ 42

*Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*,
334 F.3d 390 (4th Cir. 2003) ........ 18

*Carwile v. Richmond Newspapers,*
82 S.E.2d 588 (Va. 1954) ........ 23

*Consulting Eng'rs Corp. v. Geometric Ltd.*,
561 F.3d 273 (4th Cir. 2009) ........ 17

*Cox v. Red Hat, Inc.*,
No. 1:23-cv-766, 2025 WL 889888 (E.D. Va. Mar. 21, 2025) (Alston, J.) ........ 18

*Directory Assistants, Inc. v. Supermedia, LLC*,
884 F. Supp. 2d 446 (E.D. Va. 2012) ........ 41

*Dongguk Univ. v. Yale Univ.*,
734 F.3d 113 (2d Cir. 2013) .......... 31

*Donnell v. Daily News, L.P.*,
No. 401845/2013, 2022 WL 4243699 (N.Y. Sup. Ct. 2022) .......... 38

*Eramo v. Rolling Stone*,
209 F. Supp. 3d 862 (W.D. Va. 2016) .......... passim

*Fairfax v. CBS Corp.*,
2 F.4th 286 (4th Cir. 2021) .......... 32, 42

*Foretich v. Cap. Cities/ABC, Inc.*,
37 F.3d 1541 (4th Cir. 1994) .......... 28

*Gertz v. Robert Welch, Inc.*,
418 U.S. 323 (1974) .......... 30

*Gilmore v. Jones*,
370 F. Supp. 3d 630 (W.D. Va. 2019) .......... passim

*Goulmamine v. CVS Pharmacy, Inc.*,
138 F. Supp. 3d 652, (E.D. Va. 2015) .......... 21, 28

*Gray v. Udevitz*,
656 F.2d 588 (10th Cir.1981) .......... 29

*Grover Gaming, Inc. v. Rice*,
No. 5:23-cv-036, 2023 WL 8936752 (W.D. Va. 2023) .......... 26, 28

*Harris v. City of Seattle*,
152 F. App'x 565 (9th Cir. 2005) .......... 37

*Harte-Hanks Commc'ns, Inc. v. Connaughton*,
491 U.S. 657 (1989) .......... 31, 36

*Hatfill v. N.Y. Times Co.*,
416 F.3d 320 (4th Cir. 2005) .......... passim

*Hayne v. The Innocence Project*,
2011 WL 198128 (S.D. Miss. Jan. 20, 2011) .......... 33

*Henderson v. Source for Pub. Data, L.P.*,
53 F.4th 110 (4th Cir. 2022) .......... 41

*Herbert v. Lando*,
441 U.S. 153 (1979) .......... 40

*Horne v. WTVR, LLC*,
893 F.3d 201 (4th Cir. 2018) ........ 29

*Hutchinson v. Proxmire*,
443 U.S. 111 (1979) ........ 30

*Klocke v. Watson*,
936 F.3d 240 (5th Cir. 2019) ........ 42

*La Liberte v. Reid*,
966 F.3d 79 (2d Cir. 2020) ........ 42

*Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*,
885 F.3d 659 (10th Cir. 2018) ........ 42

*McCullough v. Gannett Co.*,
No. 1:22-cv-1099, 2023 WL 3075940 (E.D. Va. Apr. 25, 2023) (Alston, J.) ........ 32, 34

*Meredith v. Nestle Purina Petcare Co.*,
516 F. Supp. 3d 542 (E.D. Va. 2021) ........ 18

*Milkovich v. Lorain Journal Co.*,
497 U.S. 1 (1990) ........ 28

*Monitor Patriot Co. v. Roy*,
401 U.S. 265 (1971) ........ 29

*Monsarrat v. Newman*,
28 F.4th 314 (1st Cir. 2022) ........ 40, 42

*Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*,
591 F.3d 250 (4th Cir. 2009) ........ 41

*Nunes v. NBCUniversal Media, LLC*,
643 F. Supp. 3d 403 (S.D.N.Y. 2022) ........ 35, 39

*Ocala Star-Banner Co. v. Damron*,
401 U.S. 295 (1971) ........ 29

*Palin v. N.Y. Times Co.*,
940 F.3d 804 (2d Cir. 2019) ........ 35

*Patel v. Cable News Network, Inc.*,
910 S.E.2d 532 (Va. App. 2025) ........ 31

*Pendleton v. Newsome*,
772 S.E.2d 759 (Va. 2015) ........ 23, 26

*Richmond Newspapers, Inc. v. Lipscomb*,
362 S.E.2d 32 (Va. 1987) ........ 29

*Rosenblatt v. Baer*,
383 U.S. 75 (1966)........ 28, 29, 30

*Seymour v. A.S. Abell Co.*,
557 F. Supp. 951 (D. Md. 1983)........ 29

*Simpson v. Lamberth*,
No. 1:26-cv-00095, 2026 WL 1644081 (E.D. Va. Mar. 31, 2026) ........ 42

*St. Amant v. Thompson*,
390 U.S. 727 (1968)........ 30, 31, 34, 38

*Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*,
330 F.3d 1110 (9th Cir. 2003) ........ 36

*Tah v. Glob. Witness Publ'g, Inc.*,
413 F. Supp. 3d 1 (D.D.C. 2019), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021)........ 25

*Tavoulareas v. Piro*,
817 F.2d 762 (D.C. Cir. 1987)........ 30, 31, 32

*The Gazette, Inc. v. Harris*,
325 S.E.2d 713 (Va. 1985) ........ 24

*United States v. Chartis Ins. Agency, Inc.*,
834 F. Supp. 2d 459 (E.D. Va. 2011) ........ 18

*US Dominion, Inc. v. Powell*,
554 F. Supp. 3d 42 (D.D.C. 2021)........ 35

*WJLA-TV v. Levin*,
564 S.E.2d 383 (Va. 2002) ........ 24

*Young v. New Haven Advocate*,
315 F.3d 256 (4th Cir. 2002) ........ 20

*Zeran v. Am. Online, Inc.*,
129 F.3d 327 (4th Cir. 1997) ........ 41

*Zerangue v. TSP Newspapers, Inc.*,
814 F.2d 1066 (5th Cir. 1987) ........ 40

**Statutes**

47 U.S.C. § 230........ 41

Va. Code § 8.01-223.2 ........ 42

**Other Authorities**

1 Rodney A. Smolla, *Law of Defamation*, § 4:2.50 ........ 23

## INTRODUCTION

Steve Baker and Joseph Hanneman built their reporting careers on a single, unshakeable premise: that January 6, 2021 was a "deep state" "inside job." And they decided that the identity of a hooded, masked pipe bomber suspect was the linchpin to prove their narrative right. In November 2025, they announced they "SOLVED" the case. On nothing more than a gait analysis, Baker and Hanneman told the world they had determined Shauni Kerkhoff, a former Capitol Police officer, was the January 5 pipe bomber with "94-98%" certainty—even though they knew gait analysis, especially as they claimed to have conducted it, could not reach such a conclusion. A month later, the government arrested the actual bomber, but Baker and Hanneman never retracted their false accusation. Instead, they launched a new entity, Veritas Regnat, to continue to defame Ms. Kerkhoff, unchecked. Now, Defendants ask this Court to end Ms. Kerkhoff's defamation case before their faulty analysis or its false conclusions can be tested.

*First*, Defendants insist that their reporting is not capable of conveying its core claim: that Ms. Kerkhoff placed two pipe bombs in Washington, D.C. on January 5, 2021. But Defendants told their audience they had "SOLVED" the "biggest scandal and conspiracy in American history," and that their gait analysis produced a "94-98%" match between Ms. Kerkhoff and the pipe bomber "with high, high certitude." Readers understood exactly what that meant. Across social media, they repeated that Defendants had "found the PIPE BOMBER," and it was Ms. Kerkhoff. Defendants cannot avoid liability through a made-for-litigation reading that their own promotion of the story never allowed.

*Second*, Defendants declare Ms. Kerkhoff a "public official" based on her job title alone. But it is Defendants' burden to show that Ms. Kerkhoff "had, or appeared to the public to have, substantial responsibility for or control over the conduct of governmental affairs," not merely that she wore a uniform.

*Third*, Defendants' actual-malice argument does not grapple with the Amended Complaint it purports to summarize. Ms. Kerkhoff pleads that Baker and Hanneman possessed and misrepresented research contradicting their "positive identification"; that the world's most respected gait-analysis firms refused, in Baker's own words, to "touch" his analysis "with a thousand-foot pole"; that Baker took his tip not to the FBI—which actually had jurisdiction over the case—but to a now-defunct intelligence unit he believed would rubber-stamp rather than scrutinize his theory; and that Defendants revived and intensified their accusation in April 2026, months after the real bomber's arrest, to launch a fundraising campaign for their new venture. Defendants respond only by reciting the unremarkable rule that no single fact alone proves malice—ignoring that Ms. Kerkhoff pleads facts that, together, create a plausible inference of it.

*Fourth*, Defendants' remaining defenses fare no better. Veritas Regnat cannot escape personal jurisdiction by calling itself a commentator on "national controversies" when its April 6 Blog exists to defend—and adopts—Baker and Hanneman's identification of a Virginia resident as the pipe bomber. And Section 230 does not immunize Hanneman for "reposting" a statement that is, on its face, his own. That leaves Virginia's anti-SLAPP statute—and Defendants' own words defeat it. Defendants tell this Court the statute exists so defendants facing meritless speech suits can "avoid . . . discovery and trial." But Baker was not looking to avoid discovery—he was daring Ms. Kerkhoff to "Bring it." The day she filed her Complaint, Baker mocked her publicly, insisting his own false claims—not her reputation—would be vindicated: "Lawsuit? You have no idea what we have. What you have unleashed. Discovery is a b*tch. Bring it." Ms. Kerkhoff respectfully submits that Defendants should be held to their word.

## FACTUAL BACKGROUND

### A. Baker and Hanneman Build Their Reporting Careers on the Preconceived Theory That January 6 Was an "Inside Job."

Long before they mentioned Shauni Kerkhoff's name, Baker and Hanneman had already decided that January 6, 2021 was an "inside job" orchestrated by the federal government. (First Am. Compl. ("FAC") ¶¶ 67–71.) Baker was prosecuted for his participation in the January 6 riot at the United States Capitol. (*Id.* ¶¶ 55, 57, 70, 72.) He built a narrative that January 6 was not a genuine insurrection but an "inside job" orchestrated by the "deep state"—a narrative that absolved him of blame for his own conduct that day. (*Id.* ¶¶ 67-68.) This "inside job" narrative attracted the attention of Blaze Media, which hired Baker as a contributor in 2023. (*Id.* ¶ 71.)

The following year, Blaze Media hired Hanneman as an "investigative reporter." (*Id.* ¶ 73.) Hanneman arrived with the same theory in hand: his documentary, *The Real Story of Jan. 6*, argued that January 6 was an "inside job" for which Capitol Police officers bore responsibility by using excessive force against rioters. (*Id.* ¶ 74.) Baker contributed video to Hanneman's documentary, and he interviewed Hanneman about it on his own podcast. (*Id.* ¶ 77.) At Blaze Media, they became reporting partners, publishing more than 105 articles built entirely on the premise that January 6 was an "inside job." (*Id.* ¶ 79.)

Eventually, Baker and Hanneman's reporting zeroed in on the identity of a hooded suspect who planted two pipe bombs near the DNC and RNC headquarters on January 5, 2021. (*Id.* ¶ 79.) Baker and Hanneman believed that the bomber's identity would prove their "deep state" theories right. (*Id.*) They did not spend the ensuing years investigating that question with an open mind; they tried to confirm what they had already decided was true. (*Id.* ¶¶ 80-86.)

### B. Baker and Hanneman Target Ms. Kerkhoff Because She Defended the Capitol and Testified Against January 6 Rioters.

Plaintiff Shauni Kerkhoff is a former United States Capitol Police officer, who was awarded the Congressional Gold Medal. (*Id.* ¶¶ 15, 59.) On January 6, she was posted at the Capitol's West Front when the building was overrun. (*Id.* ¶¶ 42-47.) In the months after the riot, Ms. Kerkhoff became the first witness to testify in the first January 6 criminal trial. (*Id.* ¶¶ 61-63.) She testified again the following year against a second convicted rioter. (*Id.* ¶ 64.) In November 2025, consistent with the "inside job" narrative they had spent years building, Baker and Hanneman decided to falsely accuse Ms. Kerkhoff of being the pipe bomber. (*Id.* ¶ 87.)

Baker and Hanneman's first move against Ms. Kerkhoff was to attack her role in defending the Capitol. On November 4, 2025, Baker and Hanneman published an article headlined, "Capitol Police repeatedly used lethal force on protesters early on Jan. 6, video shows" (the "November 4 Article"). (*Id.* ¶¶ 88-89.) The November 4 Article focused exclusively on Ms. Kerkhoff—to the exclusion of hundreds of other officers who defended the Capitol. (*Id.* ¶¶ 91-93.) It identified her by name and photograph, and it misleadingly quoted her trial testimony to suggest she had admitted to using improper force. (*Id.*)

At the time, it was unclear why Baker and Hanneman singled out Ms. Kerkhoff. (*Id.* ¶ 93.) But Baker would reveal the November 4 Article was a "breadcrumb" for what was coming. (*Id.* ¶¶ 90.) The Article cited an anonymous source to insinuate that Ms. Kerkhoff had left the Capitol Police under suspicious circumstances to work for "a three-letter federal intelligence agency" and "immediately wiped her social media, phone numbers, and email accounts"—commentary calculated to raise readers' suspicions. (*Id.* ¶ 94.) On X, Baker promoted the November 4 Article by highlighting its suggestion that Ms. Kerkhoff had something to hide, teasing to his followers that "part two is going to change everything." (*Id.* ¶ 96.)

### C. Baker Claims That He and Hanneman Have "Discovered" the Pipe Bomber's Identity Based Solely on a Gait Analysis

The next day, Baker appeared on Blaze Media's Glenn Beck Program (the "November 5 Podcast") to preview "part two." (*Id.* ¶ 98.) Baker and Beck discussed that after spending "half a decade" to identify the pipe bomber, Baker had finally "got it," he had "discovered" the pipe bomber, and—consistent with Defendants' inside-job theory—that the suspect's identification would implicate "the highest levels of government." (*Id.* ¶¶ Ex. B.)

Beck explained that the "genesis" of the story traced back to Baker "examining the various players at Capitol Police," and Baker confirmed that he and Hanneman had "started drilling down into identifying who these officers were." (*Id.* ¶ 356(d)-(e).) When Beck asked Baker's "confidence level," Baker answered that "the actual software hit at 94% accuracy"; that "human analysis from the experts in intelligence is much higher"; and that he had "a high, high degree of certitude." (*Id.* ¶ 356(h).) Blaze Media published a companion article the same day, headlined, "'She's one of us!' Steve Baker stuns Glenn Beck with bombshell revelation about J6 pipe-bomb suspect" (the "November 5 Article"). (*Id.* ¶¶ 98-100.)

But Baker knew that his "gait analysis" was incapable of identifying a suspect with the near certainty he claimed. (*Id.* ¶ 103.) The November 5 Article revealed Defendants possessed and reviewed two academic research articles on gait analysis. (*Id.* ¶ 104.) That research confirmed that "gait analysis" cannot provide a "positive identification." (*Id.* ¶ 103, 109.) The research also made clear that "it's essential to use gait analysis in conjunction with other evidence." (*Id.* ¶ 106.) Yet a "positive identification" based solely on gait analysis is exactly what Baker told listeners his and Hanneman's analysis had produced. (*Id.* ¶ 110.)

Baker promised to release the "suspect's name … after the relevant agencies have battened down the hatches." (*Id.* ¶ 113.) This promise ensured Baker's audience would stay

tuned for his grand reveal; it would also prove to be a key, manufactured, component of Baker and Hanneman's attempt to facially bolster their claims. (*Id.*) But even before Baker named her, X users began identifying Ms. Kerkhoff by name, and within twenty-four hours of the November 5 Podcast, her name had spread like wildfire across social media. (*Id.* ¶¶ 115, 119–121, 123.)

### D. Baker and Hanneman Manufacture Their Own "Corroboration" by Taking Their Tip to an Agency With No Power to Investigate It.

Baker knew that the gait analysis he and Hanneman "arranged" was not enough to name their suspect. (*Id.* ¶¶ 126, 290.) So, Baker took his "tip" to the Office of the Director of National Intelligence's Director's Initiative Group ("ODNI DIG")—a now-defunct unit which had no jurisdiction over, or investigative means to corroborate, an accusation like Baker's. (*Id.* ¶ 125.) Baker chose ODNI DIG because he believed exposing "government involvement on January 6" was already "a major part of [its] agenda"—in other words, because he knew that office would simply validate his theory rather than test it. (*Id.* ¶ 125.) Thus, by sharing his tip with ODNI DIG, Baker manufactured precisely the corroboration his gait analysis needed: an existing "investigation" he could then cite as if it independently confirmed his own findings. (*Id.* ¶ 126.) ODNI DIG responded exactly as Baker had expected it would. It began drafting a memorandum about his "investigation," and a draft of that memorandum circulated among executive branch officials, eventually reaching the CIA, where Ms. Kerkhoff worked. (*Id.* ¶ 128.)

The consequences for Ms. Kerkhoff were immediate and severe. The morning of November 6, 2025, two FBI agents arrived at her workplace and told her they were investigating "online chatter" that she was the pipe bomber. (*Id.* ¶¶ 129-30.) That day, agents searched her phone and car, and a caravan of FBI vehicles—including a bomb-disposal truck and a helicopter—descended on her home. (*Id.* ¶¶ 131-33.) Ms. Kerkhoff was subjected to an hours-long polygraph during which an interrogator repeatedly accused her of planting the bombs, told

her she had "failed" the polygraph, and warned that her security clearance was at stake if she did not "answer truthfully"—a tactic Ms. Kerkhoff recognized as an investigation technique. (*Id.* ¶¶ 134-37.) Ms. Kerkhoff told the truth throughout: she had not planted any bombs. (*Id.* ¶ 135.)

After Ms. Kerkhoff voluntarily provided investigators exculpatory video evidence, the U.S. Attorney's Office concluded that Ms. Kerkhoff had nothing to do with the bombings; the CIA brought her back from administrative leave; and she returned to work. (*Id.* ¶¶ 186-89.) The ODNI referral Baker engineered became the mechanism that subjected an innocent woman to a raid of her home and a middle-of-the-night interrogation—an ordeal Defendants then cited in their reporting as if it validated, rather than resulted from, their own baseless tip. (*Id.* ¶¶ 126, 128-39, 244.) Ultimately, ODNI DIG's mishandling of Baker's tip contributed to the suspension of its work and its ultimate dissolution. (*Id.* ¶ 128 n.39.)

**E. Baker and Hanneman Falsely Name Ms. Kerkhoff as the Pipe Bomber**

On November 8, 2025, Baker and Hanneman's article titled, "Former Capitol Police Officer a Forensic Match for Jan. 6 Pipe Bomber, Sources Say" (the "November 8 Article"), which expressly and falsely accused Ms. Kerkhoff of placing pipe bombs at the RNC's and DNC's offices on January 5, 2021. (*Id.* ¶ 140.) Immediately beneath the headline, the Article splashed multiple close-up photographs of Ms. Kerkhoff framing an image of the pipe bomber; the caption identified Ms. Kerkhoff as a former Capitol Police officer. (*Id.* ¶ 142.)

The November 8 Article's entire theory rose and fell on the same "gait analysis" Baker had already previewed: a "computer program" that supposedly "produced a 94% match" between Ms. Kerkhoff and the pipe bomber, "confirmed" by an anonymous "veteran analyst who . . . personally pegged the match at closer to 98%." (*Id.* ¶¶ 144-45.) But Baker and Hanneman disclosed nothing about the software they used, the data set it relied on, who operated it, or what qualifications that person had. (*Id.* ¶ 149.) They likewise never disclosed what steps, if any,

they took to guard against confirmation bias; never ran a comparable analysis on any other subject as a control; and never confirmed that the videos were comparable. (*Id.* ¶¶ 150-52, 154.)

Defendants compounded the inaccuracy of their "gait analysis" with unreliable sourcing. Their primary sources were anonymous and described only in vague, self-serving terms such as a "veteran analyst" and "current intelligence sources." (*Id.* ¶¶ 156, 159.) Defendants disclosed no credentials for these sources because they had none. (*Id.* ¶ 157.) In fact, Baker admitted that reliable sources would not engage with his gait analysis; he "went to the three most respected firms that do gait analysis for intelligence communities around the world," and "none of them would take this, none of them would touch it with a thousand-foot pole." (*Id.* ¶¶ 149, 157.)

Baker and Hanneman then launched a coordinated social media campaign to maximize the reach of their false accusation. (*Id.* ¶ 173.) Baker posted that the story was "the biggest scandal and conspiracy in American history"; Hanneman posted it "SOLVED" the pipe bomber mystery. (*Id.* ¶¶ 174, 176-77.) Users across X amplified Defendants' claims, announcing that Baker and Hanneman had "found the PIPE BOMBER," and it was Ms. Kerkhoff. (*Id.* ¶ 179.)

### F. Even as Their Story Collapses, Baker and Hanneman Refuse to Retract It

Ms. Kerkhoff's exoneration began almost immediately, and Defendants' house-of-cards "reporting" began to crumble just as quickly. (*Id.* ¶ 190.) On November 12, 2025, a journalist critiqued Baker and Hanneman's gait analysis as unreliable for identifying any suspect with certainty. (*Id.* ¶¶ 195-96.) On November 25, 2025, CBS News reported that the FBI had "ruled [Ms. Kerkhoff] out as suspect" after she provided an alibi video, and that Defendants' investigation had "raised concerns among some senior officials in the Trump administration." (*Id.* ¶¶ 199, 202.) Then, on December 4, 2025, the DOJ announced the arrest of the actual suspect, Brian J. Cole, Jr., who quickly confessed. (*Id.* ¶¶ 8, 213.) Only after the FBI's arrest of the actual bomber did Blaze Media remove the text of the November 5 and 8 Articles—even as it

insisted it stood by the integrity of its false claims and the reliability of the sources that provided them. (*Id.* ¶ 321.) For his part, Baker made it clear: He "didn't retract anything." (*Id.* ¶ 224.)

### G. After Ms. Kerkhoff Demands a Retraction, Baker and Hanneman Launch Veritas Regnat to Perpetuate Their False Claims—and to Profit From Them

On January 16, 2026, Ms. Kerkhoff's counsel sent Blaze Media, Baker, and Hanneman a letter detailing the falsity of their reporting and demanding a complete retraction and apology. (*Id.* ¶ 225.) Counsel for all three Defendants responded on January 29, 2026. (*Id.* ¶ 226.) Notably, that response never once argued that Defendants' reporting was true. (*Id.*) Undeterred, Baker and Hanneman kept peddling their false accusations. (*Id.* ¶ 228.) Blaze Media terminated Baker on April 1, 2026, and Hanneman resigned on April 3, 2026, after Baker refused to comply with the outlet's editorial and legal standards. (*Id.* ¶¶ 247-48.)

That did not stop them: instead, on April 4, 2026, Baker post on X, reviving Defendants' same false narrative about Ms. Kerkhoff, which Hanneman then "reposted" to his own followers with commentary praising Defendants' "integrity and . . . sense of truth" (the "April 4 Post"). (*Id.* ¶ 250, Exs. E, F.) The April 4 Post used Ms. Kerkhoff's own retraction demand as a hook; but rather than correct their prior false claims, Defendants doubled-down on them. Defendants quoted the demand's statement that Ms. Kerkhoff had no "slight limp" and insisted, to the contrary, that "we have hours of video of Ms. Kerkhoff's unusual 'circumduction gait.'" (*Id.* ¶¶ 251, 411(a).) They seized on the fact that Ms. Kerkhoff runs marathons—a fact that disproved, not supported, Defendants' "limp" theory—and simply inverted it, claiming her marathon-running was evidence she was the pipe bomber, because a former official had once remarked, "We need to be looking for a marathon runner." (*Id.* ¶¶ 253-54, 411(b).) On April 6, 2026, Baker and Hanneman shared with their followers their new "platform": a WordPress blog called "Veritas Regnat" operated by Veritas Regnat LLC, whose first three posts falsely accused Ms.

Kerkhoff of being the pipe bomber. (*Id.* ¶¶ 19, 258.) One post, titled "Previously Unreleased Video Contradicts Contention Onetime Pipe-Bomb Suspect Did Not Have a Limp," (the "April 6 Post") again asserted that Ms. Kerkhoff had an "unusual 'circumduction gait'" and again recast her marathon history as proof she was the pipe bomber. (*Id.* ¶¶ 259-61, 429(a), (c), Ex. G.) Baker and Hanneman used their revived campaign against Ms. Kerkhoff to raise money, treating the harm they caused her as the launching pad for the next stage of their careers. (*Id.* ¶¶ 256-57.)

The April 4 Post and April 6 Blog were not new reporting or dispassionate commentary—they reignited and reinforced the very same false and defamatory accusation Baker and Hanneman had first published in November: that they had identified Ms. Kerkhoff as the pipe bomber, and that their conclusion had been right all along. (*Id.* ¶¶ 250-51, 259-61.)

Notwithstanding her exoneration, Ms. Kerkhoff continues to suffer immense and irreparable harm from Defendants' campaign. (*Id.* ¶¶ 13, 263-64.) Defendants continue to pursue Ms. Kerkhoff, disregarding her humanity and targeting her role in defending the Capitol on January 6—because that is exactly what makes her useful to a narrative Baker and Hanneman had already decided was true long before they ever looked at the facts. (*Id.* ¶¶ 90, 94, 294-98.)

## LEGAL STANDARD

**12(b)(2).** Where a defendant challenges personal jurisdiction based only on the pleadings, a plaintiff need only make "a *prima facie* showing of a sufficient jurisdictional basis to survive the jurisdictional challenge." *Consulting Eng'rs Corp. v. Geometric Ltd.*, 561 F.3d 273, 276 (4th Cir. 2009). The court "must construe all relevant pleading allegations in the light most favorable to the plaintiff, assume credibility, and draw the most favorable inferences for the existence of jurisdiction." *Gilmore v. Jones*, 370 F. Supp. 3d 630, 650 (W.D. Va. 2019).

**12(b)(6).** On a 12(b)(6) motion to dismiss, a plaintiff need only "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable." *Ashcroft v.*

*Iqbal*, 556 U.S. 662, 678 (2009). "The threshold to survive a motion to dismiss is a low one." *United States v. Chartis Ins. Agency, Inc.*, 834 F. Supp. 2d 459, 461 (E.D. Va. 2011). A complaint "should not be dismissed under Rule 12(b)(6) unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Hatfill v. N.Y. Times Co.*, 416 F.3d 320, 329 (4th Cir. 2005) (quotation omitted). "In considering a motion to dismiss, the Court will accept a plaintiff's well-pleaded allegations as true and view the facts in a light most favorable to the plaintiff." *Meredith v. Nestle Purina Petcare Co.*, 516 F. Supp. 3d 542, 547 (E.D. Va. 2021).

"[T]he usual standards of notice pleading apply in defamation cases," and "[w]hile the Federal Rules of Civil Procedure require more specific pleading in certain cases, defamation cases are not among them," *Hatfill*, 416 F.3d at 329. It is therefore "erroneous for a district court to apply a stricter standard," and a defamation complaint "must be treated 'like any other civil complaint in federal court.'" *Cox v. Red Hat, Inc.*, No. 1:23-cv-766, 2025 WL 889888, at *9 (E.D. Va. Mar. 21, 2025) (Alston, J.) (quoting *Hatfill*, 416 F.3d at 329).

## ARGUMENT

### I. This Court Has Personal Jurisdiction Over Veritas Regnat.

Courts employ a three-part test to determine whether they may exercise specific jurisdiction over an out-of-state defendant, examining, "(1) the extent to which the defendant purposefully availed itself of the privilege of conducting activities in the forum state; (2) whether the plaintiff's claims [arose] out of those activities; and (3) whether the exercise of personal jurisdiction is constitutionally reasonable." *Gilmore*, 370 F. Supp. 3d at 652. "Even a single contact may be sufficient to create jurisdiction when the cause of action arises out of that single contact, provided that the principle of fair play and substantial justice is not thereby offended." *Carefirst of Md., Inc. v. Carefirst Pregnancy Ctrs., Inc.*, 334 F.3d 390, 396 (4th Cir. 2003). The

Fourth Circuit has adapted this test for cases involving online publishers. *Gilmore*, 370 F. Supp. 3d at 652. In those cases, the Court asks "whether (1) each defendant manifested an intent to direct their website content to a Virginia audience, such that the defendant should reasonably anticipate being haled into court in Virginia, and (2) whether each defendant's activity creates, in a person within the State, a potential cause of action under Virginia law." *Id.* (quotations omitted). The Amended Complaint confirms Veritas Regnat more than meets each requirement.

First, Veritas Regnat insists it did not "manifest" an intent to direct [its] website content to a Virginia audience" because its reporting was focused on "national controversies." (Mot. 10.) That is not dispositive. "[W]ebsites with a national focus are still capable of publishing content that, although perhaps of interest to many readers, is of special concern for citizens of a particular state[,]" *Gilmore*, 370 F. Supp. 3d at 654-55 n.25, particularly where, as here, "the clear purpose of the article … is to connect" the event to "a Virginia citizen's role in [it]." *Id.* at 657.

Indeed, the April 6 Blog's entire purpose is to explain Defendants' basis for falsely identifying Ms. Kerkhoff—a Virginia citizen and resident of Alexandria, Virginia, who works in McLean, Virginia—as the January 5 pipe bomber. (FAC, Ex. G.) The April 6 Blog further discusses a demand letter sent on behalf of Ms. Kerkhoff by a Virginia law firm. (*Id.* Ex. G.) And it makes an express reference to "***our*** Nov. 8 investigative article"—adopting Baker and Hanneman's earlier reporting as its own.[1] (*Id.*) The November 8 Article reported on a federal investigation of Ms. Kerkhoff that took place in Virginia; twice identified Alexandria, Virginia

[1] Veritas Regnat attempts to distance itself from Baker and Hanneman's conduct in reporting the November 8 Article as "describ[ing] someone else's conduct." Dkt. 87 at 11. But the long-arm statute reaches "a person, who acts directly *or by an agent*." Va. Code § 8.01-328.1(A) (emphasis added). Baker and Hanneman formed Veritas Regnat, operate it, solicited donations to fund it, and published the April 6 Blog on its site—all to continue the investigation they started in November and to perpetuate the defamatory campaign that resulted from it.

as Ms. Kerkhoff's residence; reported that Blaze Media's "editor in chief Christopher Bedford was pulled over by local police after stopping to observe the home [in Virginia]"; and reported that the FBI "was feet from the Falls Church[, VA] address of the pipe bomb suspect days after Jan. 6." (*Id.* ¶¶ 5, 133, 259–60; Exs. C, G.) Thus, unlike in *Young v. New Haven Advocate*, where the "focus of the articles" was on the "Connecticut prisoner transfer policy and its impact on the transferred prisoners and their families . . . in Connecticut" and only incidentally commented on the conditions of a Virginia prison, the entire "focal point" of Veritas Regnat's reporting is its identification of one Virginia resident, Ms. Kerkhoff, as the pipe bomber (to the exclusion of another Virginia resident, Brian Cole Jr.). 315 F.3d 256, 263 (4th Cir. 2002).[2]

Veritas Regnat's activity also satisfies the second prong, because it "create[d], in a person within the State, a potential cause of action" under Virginia law. *ALS Scan, Inc.*, 293 F.3d at 714. "[T]he brunt of the harm" caused by Veritas Regnat's false and defamatory claims—that Ms. Kerkhoff is the pipe bomber, and gait analysis confirms it—"in terms both of [Ms. Kerkhoff's] emotional distress and the injury to her professional reputation, was suffered," and continues to be suffered, in Virginia, where she lives and works, (FAC ¶¶ 265-67, 275-279). *Calder v. Jones*, 465 U.S. 783, 789 (1984) (holding that California courts had jurisdiction over a Florida citizen who wrote a libelous story from Florida directed at a California citizen, knowing that the injury would be felt in California, where plaintiff resided and worked). Ms. Kerkhoff has foregone "dream job" opportunities at her office in Virginia, (FAC ¶ 277); she has had to purchase additional security systems for her home in Virginia, (*id.* ¶ 279); and her relationships with neighbors and friends in Virginia have been harmed, (*id.* ¶ 265-66). The Amended

[2] Veritas Regnat's role is further distinguishable from the internet service provider defendant in *ALS Scan, Inc. v. Digit. Serv. Consultants, Inc.*, 293 F.3d 707, 714 (4th Cir. 2002) (cited at Mot. 10.) Veritas Regnat was an active publisher; it was not merely "passive." *Id.* at 714; *see also Gilmore*, 370 F. Supp. 3d at 659 (distinguishing defendant on the same grounds).

Complaint alleges far more tying Veritas Regnat to Virginia than the fact that "readers and followers" are Virginia residents. (Mot. 11.) This Court has personal jurisdiction over it, and its Motion should be denied.

## II. Ms. Kerkhoff States Claims for Defamation.

Ms. Kerkhoff brings four counts for defamation against Defendants arising from four publications: the November 5 Podcast (Baker), the November 8 Article (Baker and Hanneman),[3] the April 4 Post (Baker and Hanneman), and the April 6 Blog (Baker, Hanneman, and Veritas Regnat) (together, the "Publications")—each of which falsely accused Ms. Kerkhoff of planting pipe bombs in Washington, D.C. on January 5, 2021. To prevail on this motion, Ms. Kerkhoff need only allege "(1) publication of (2) an actionable statement with (3) the requisite intent." *Gilmore*, 370 F. Supp. 3d at 666. A statement is actionable if it is "false and defamatory." *Goulmamine v. CVS Pharmacy, Inc.*, 138 F. Supp. 3d 652, 658 (E.D. Va. 2015). Defendants do not contest that their statements were published to third parties.[4] They do not contest that their statements were about Ms. Kerkhoff. And they do not contest claims that Ms. Kerkhoff was the pipe bomber were false. Instead, Defendants argue only that their statements are subject to a different (contrived) defamatory meaning; that Ms. Kerkhoff must show Defendants acted with actual malice because she is a "public official"; and that the Amended Complaint fails to plead actual malice. All are unavailing.

### A. Ms. Kerkhoff More Than Sufficiently Pleads Defamatory Meaning.

Defendants do not—and cannot—dispute that falsely accusing a person of placing pipe

---

[3] Count Three's caption inadvertently states that it is asserted "Against All Defendants." Count Three concerns only the November 8 Article published by Blaze Media, Baker, and Hanneman on November 8, 2025. Ms. Kerkhoff does not assert Count Three against Veritas Regnat, and Section IV of Defendants' Motion is accordingly moot.

[4] Hanneman does not dispute that he published the April 4 Post; he argues that Section 230 immunizes him from liability arising from that publication. That argument fails.

bombs in the Nation's Capitol is defamatory *per se*. *See Hatfill*, 416 F.3d at 330 (accusations impugning plaintiff in anthrax mailings were defamatory *per se*); *see also Gilmore*, 370 F. Supp. 3d at 673 (accusation that plaintiff "had foreknowledge of a violent attack and filmed it for clandestine political purposes" were defamatory *per se*). And Defendants' Publications are capable of conveying that exact meaning. Defendants repeatedly claimed their "gait analysis" identified Ms. Kerkhoff as the pipe bomber with a "high degree of probability," (FAC ¶ 356(f), Ex. B)—"up to a 98% match," (*id.* ¶ 374(b), Ex. C). Hanneman boasted that he "SOLVED" the pipe bomber case, and Baker claimed he revealed "the biggest scandal and conspiracy in American history." (*Id.* ¶¶ 174, 176). Even after their false claims were disproven, they continued to focus exclusively on Ms. Kerkhoff as the real pipe bomber and a foil to the actual suspect, whom they deemed a "patsy," (*id.* ¶¶ 229, 232), insisting the "gait analysis" that led to their false accusations was accurate, even after it had been foiled, (*id.* ¶¶ 411,429, Exs. E-G). And that is exactly the meaning their readers understood; users on X invoked Defendants' Publications to accuse Ms. Kerkhoff of being the pipe bomber. (*Id.* ¶ 179). Despite all this, Defendants ask this Court to find they merely "report[ed] a forensic result" and the "video evidence" that underlaid that gait analysis's findings. (*Id*. at 15-16, 27-33.) Now that Ms. Kerkhoff has filed suit to clear her name, the Court cannot allow Defendants to distance themselves from their defamatory claims through a made-for-litigation interpretation.

Defendants' Publications are more than capable of being understood as reporting that Defendants' "gait analysis" could identify, and did in fact identify, Ms. Kerkhoff as the pipe bomber. At the motion to dismiss stage, the Court need only decide whether the statements are "reasonably capable of the [defamatory] meaning [the plaintiff] ascribe[s] to them." *Hatfill*, 416 F.3d at 331. It is up to the jury to decide what meaning was actually conveyed. *See Pendleton v.*

*Newsome*, 772 S.E.2d 759, 765 (Va. 2015) (reversing demurrer and remanding for a jury to decide whether the defendant's statements actually conveyed the alleged defamatory implication after finding them "reasonably capable" of doing so). "It is only when the court can say that the publication is not reasonably capable of any defamatory meaning and cannot be reasonably understood in any defamatory sense that it can rule, as a matter of law, that it was not libelous." *Butters v. Nat'l Acad. of Scis.*, 176 F. 4th 43, 49 (D.C. Cir. 2016). When evaluating meaning, "every fair inference that may be drawn from the pleadings must be resolved in the plaintiff's favor." *Carwile v. Richmond Newspapers,* 82 S.E.2d 588, 592 (Va. 1954).

### 1. The November Article and Podcast Accused Ms. Kerkhoff of Planting Pipe Bombs.

A cursory review of the November 8 Article confirms that it can reasonably be understood as accusing Ms. Kerkhoff of placing the bombs. The Article's headline declares, "Former Capitol Police officer a forensic match for Jan. 6 pipe bomber." (FAC Ex. C.) The Article then prominently presents four close-up photos of Ms. Kerkhoff, each framing a CCTV screen capture of the pipe bomber, before claiming Ms. Kerkhoff's gait was a "***94-98% match*** to the ***unique*** stride of the long-sought Jan. 6 pipe-bomb suspect[.]" (*Id.*) The Article confirms that it is not merely reporting the results of a "forensic gait analysis study," (Mot. 15), but rather (falsely) reporting that the analysis offers a "***solution***" to the pipe bomber case. (FAC Ex. C.) It bolsters its "software" findings by citing to confidential "sources familiar with gait analysis," "several current intelligence sources" and a "veteran analyst," who "***confirmed***" that Ms. Kerkhoff "matched the gait of the gray-hoodie-wearing suspect." It then reinforces its false accusations by offering a (baseless) explanation for why Ms. Kerkhoff might have an "unusual" gait: a 2015 "season-ending [soccer injury]" that, according to Defendants "***would become a fateful thing a decade later***, when investigators studied her movements on Jan. 5 and 6, 2021."

Finally, Defendants touted the "far-reaching reverberations" their accusations would have, including "***recast[ing] the entire story of Jan. 6***." (*Id.*)

That Baker and Hanneman intended to convey the false accusation that Ms. Kerkhoff ***was*** the pipe bomber is further confirmed by how they described the November 8 Article. Hanneman promoted the November 8 Article as having "***SOLVED***" the pipe bomber case, (*id.* ¶ 176), while Baker claimed it unveiled the "***biggest scandal and conspiracy*** in American history." (*Id.* ¶ 174.) Thus, at the time of publication—and before changing tack after Ms. Kerkhoff filed this lawsuit—they promoted the Article as definitively resolving who placed the D.C. pipe bombs.

Same for Baker's November 5 Podcast statements.[5] Baker boasted his "confidence level" in identifying the pipe bomber was "***much higher***" than "the actual software hit at 94% accuracy," based on "human analysis from experts in intelligence." (*Id.* Ex. B). He claimed sources assured him, "***That's it, you've got it!***" (*Id.*). He emphasized his identity of the pipe bomber was made with "***a high, high degree of certitude***." (*Id.*) Once again, that Baker intended to convey that he had discovered the pipe bomber's identity is confirmed by how he promoted his Podcast appearance; on X, he bragged about the impact of his claims: "The government's investigation into the J6 pipe bombs was going nowhere just two weeks ago. Today I can tell you that has all changed." (*Id.* ¶ 117.)

The defamatory meaning of Defendants' statements is further confirmed by how readers and listeners understood them: namely, that Baker and Hanneman "found the PIPE BOMBER,"

---

[5] It is of no moment that Baker did not name Ms. Kerkhoff in the November 5 Article. (Mot. 14.) *The Gazette, Inc. v. Harris*, 325 S.E.2d 713, 737-39 (Va. 1985). He made clear that he placed "breadcrumbs" to identify her, and readers used those "breadcrumbs" to determine exactly who he was referring to, (FAC ¶ 115, 119-21). *Id.* The November 8 Article confirmed the November 5 Podcast referred to her. *WJLA-TV v. Levin*, 564 S.E.2d 383, 390 (Va. 2002) (later publication identifying the plaintiff can establish that an earlier, non-identifying publication was "of or concerning" the plaintiff).

and it was Ms. Kerkhoff. (*Id.* ¶¶ 179, 340.) "[E]vidence of how actual recipients of the communication understood the alleged defamation is … highly probative," "powerful evidence of whether average or hypothetical readers could understand a statement" as conveying a defamatory meaning. 1 Rodney A. Smolla, *Law of Defamation*, § 4:2.50; *Tah v. Glob. Witness Publ'g, Inc.*, 413 F. Supp. 3d 1, 11-12 (D.D.C. 2019) ("The "views of [readers of an article]" are "insightful" and are "supportive of what a hypothetical reasonable [person] might have understood [it] to mean."), *aff'd*, 991 F.3d 231 (D.C. Cir. 2021).

### 2. The April Post and Blog Continued Defendants' Defamatory Campaign and Doubled-Down on Defendants' Same False Narrative.

Defendants continued their false and defamatory campaign through the April 4 Post and the April 6 Blog, which insisted the gait analysis was ***not*** "factually flawed." The April Post and Blog must be read in the context of the November Article and Podcast's accusations. *See Hatfill*, 416 F.3d at 333 (defamatory statements made in multiple columns must be "taken together" to determine defamatory meaning). Indeed, Defendants expressly tied the April Publications to Defendants' November 8 Article. (FAC Exs. E-G.) And Defendants' own Motion admits the April Publications "***defend[ed] the accuracy*** of a discrete piece"—significantly, the sole evidentiary basis—"of their prior reporting." (Mot. 32.)

In the April Publications, Defendants claimed to present proof of Ms. Kerkhoff's "unusual 'circumduction gait'"—which was exactly what Defendants claimed made her a 94-98% match to the pipe bomber in November. (FAC Exs. E-G.) They averred the fact that Ms. Kerkhoff was a "marathon runner" confirmed she was the pipe bomber, because "distinct physical traits that are characteristic of marathon runners [were] exhibited by the bomber." (*Id.*) In short, Defendants did not merely publish descriptions of Ms. Kerkhoff or characteristics of her gait (Mot. 28-31); they continued to insist those exact descriptions and characteristics were what

proved their false claims were right all along. And it is clear Defendants intended their April Publications to affirm the accuracy and truth of their false accusations against Ms. Kerkhoff.[6] In comments to the April 4 Post, when readers disagreed with what Baker insisted the videos portrayed, he dismissed their observations and insisted his analysis was correct.[7] , Ex. E.) When Hanneman reposted Baker's X post, he echoed and endorsed a user's commentary that he and Baker "report[ed] with integrity and a sense of truth." (*Id.* ¶ 250.)

**3. Defendants Cannot Overcome the Conclusion That Their Publications Are Reasonably Capable of Being Understood to Accuse Ms. Kerkhoff of Planting Pipe Bombs.**

*First*, Defendants attempt to distance themselves from their Publications' defamatory meaning by discussing their statements in isolation. (Mot. 13-14, 28-31.) But courts do not decide defamatory meaning in a vacuum. *Grover Gaming, Inc. v. Rice*, No. 5:23-cv-036, 2023 WL 8936752, at *3 (W.D. Va. 2023) ("[T]o appropriately construe a statement in light of what might reasonably have been understood therefrom, it is incumbent upon courts to look ***not just at the allegedly defamatory words themselves, but also at the context and general tenor of the message.***") (emphasis added). Defendants did not merely report gait analysis "results" (Mot. 14); they claimed those "results" "recast the entire story of Jan. 6," (FAC ¶ 301, Ex. C), revealed the "biggest scandal and conspiracy in American history," (*id.* ¶ 174), and "SOLVED" the pipe bomber mystery, (*id.* ¶ 176). And in April, after their "gait analysis" and its purported "results" were foiled by third parties, (*id.* ¶ 195), the arrest of the actual pipe bomber suspect, (*id.* ¶ 213), and a retraction demand from Ms. Kerkhoff that explained why the gait analysis was unreliable

[6] Thus, even if the Court accepts Defendants' arguments that Counts Five and Six should be interpreted as defamation by implication claims, which they should not, the Amended Complaint pleads "circumstances surrounding the making and publication of the statement which would reasonably cause the statement to convey a defamatory meaning to its recipients," and that Defendants "intend[ed] or endors[ed] that inference." *Pendleton*, 772 S.E.2d at 763.

[7] Bakers' responses further undermine Defendants' claim that Defendants "left it up for readers to decide" the conclusions their gait analysis presented. (Mot. 29-30.) (*See also* FAC ¶ 229.)

and Defendants' claims were false, (*id.* ¶¶ 225, 254), Defendants did not merely discuss whether Ms. Kerkhoff "walks with a limp," (Mot. 28-29); they reframed that same gait analysis to insist it was accurate, (FAC ¶ 251). Considering their statements in context, Defendants cannot avoid the defamatory meaning they plainly conveyed.

*Second*, Defendants ask this Court to improperly ignore all of the "inference[s], implication[s], [and] insinuation[s]" that plainly arise from their statements. *Hatfill*, 416 F.3d at 331. In *Hatfill*, the Fourth Circuit noted that articles tying a plaintiff to anthrax mailings—but not expressly accusing him of doing so—"did not describe any other actual or potential target of investigation, and they recounted detailed information pertaining to [the plaintiff] alone." *Id.* at 332-33. Like in *Hatfill,* Defendants focused ***exclusively*** on Ms. Kerkhoff as the ***only*** possible pipe bomber suspect. In *Hatfill*, the court observed the articles stated a factual basis for why the plaintiff would have access to anthrax and a motive to mail it. *Id.* Here, Defendants not only purported to offer a factual basis for their accusations—the gait analysis's "results"—but they also insisted those "results" were accurate even after they were debunked. In *Hatfill,* the court held, "[b]ased on these assertions, a reasonable reader … likely would conclude that [the plaintiff] was responsible for the anthrax mailings." *Id.* And here, the reasonable "inference, implication, or innuendo" derived from those statements—and indeed, the exact understanding Defendants' readers took away from them—was that Ms. Kerkhoff ***was*** the pipe bomber. *Id.*; *see also Gilmore*, 370 F. Supp. 3d at 672–73 (insinuation of foreknowledge of a violent attack was "reasonably capable of conveying the defamatory innuendo").

*Third*, Defendants argue because "no challenged statement says that" Ms. Kerkhoff "planted two pipe bombs," their statements cannot be interpreted as conveying that accusation. (Mot. 14.) That is not the law. "In determining whether or not the language does impute a

criminal offense, the words must be construed in the plain and popular sense[;] ***an express allegation of criminal activity is not necessary***." *Goulmamine*, 138 F. Supp. 3d at 659 (emphasis added); *accord Hatfill*, 416 F.3d at 331 ("It is not necessary" that words "make the charge in express terms" if they "naturally and presumably [can] be understood … as charging a crime."). Thus, Defendants' argument improperly demands an express accusation Virginia law does not require.

*Fourth*, Defendants attempt to minimize their false claims by arguing they did not publish "a verdict about guilt" (Mot. 14) or "intend[] or endorse[] an inference of guilt" (Mot. 32). This does not lessen the impact of their false accusations. "Just as a defendant cannot escape liability for making a false assertion of fact by prefacing that assertion with the words 'in my opinion,' neither can it escape liability simply by pairing a charge of wrongdoing with a statement that the subject must, of course, be presumed innocent." *Hatfill*, 416 F.3d at 333-34 (citing *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990)).

Read together and with all proper inferences, Defendants' statements plainly accused Ms. Kerkhoff of planting the pipe bombs. And it is against that defamatory meaning that the remaining elements of Ms. Kerkhoff's claim—including actual malice—must be interpreted.

### B. Defendants Do Not Satisfy Their Burden of Establishing that Ms. Kerkhoff Is A Public Official.

Defendants bear the burden to demonstrate that Ms. Kerkhoff is a public official. *Grover Gaming Inc.*, 2023 WL 8936752, at *7 (courts "proceed upon the initial presumption that the defamation plaintiff is a private individual") (quoting *Foretich v. Cap. Cities/ABC, Inc.*, 37 F.3d 1541, 1553 (4th Cir. 1994)).[8] To meet this burden, Defendants must show Ms. Kerkhoff "had, or

[8] Given Defendants' burden, it is significant that every case they rely upon was decided on a full evidentiary record—not at the motion to dismiss stage. (Mot. at 11-12 (citing *Rosenblatt v. Baer*, 383 U.S. 75, 86 (1966) (appeal of jury trial); *Ocala Star-Banner Co. v. Damron*, 401 U.S.

appeared to the public to have, substantial responsibility for or control over the conduct of governmental affairs," *Arctic Co. v. Loudoun Times Mirror*, 624 F.2d 518, 521 (4th Cir. 1980); that Ms. Kerkhoff "invite[d] public scrutiny and discussion …, entirely apart from the scrutiny[y] and discussion occasioned by the particular charges in controversy," *Rosenblatt v. Baer*, 383 U.S. 75, 86, n.13 (1966); and that "the defamatory statements … relate[d] to [her] official conduct," *Gray*, 656 F.2d at 590-91. Defendants do not attempt to satisfy this test. Instead, they insist categorically that, because she was a Capitol Police officer, she is a public official. (Mot. 11.) That is not the law. Indeed, in stating the standard for a "public official," the Supreme Court expressly guarded against the possibility that "this test might apply to a night watchman accused of stealing state secrets." *Rosenblatt*, 383 at 86, n.13.

The Amended Complaint confirms that Ms. Kerkhoff did not exercise the requisite responsibility or invite the requisite scrutiny. Ms. Kerkhoff was a rank-and-file Capitol Police Officer. (FAC ¶¶ 31-33.) She did not supervise or manage other officers or employees; rather, she was supervised by her commanding officer, including on January 6.[9] (FAC ¶ 43.) Even if her duties elevated Ms. Kerkhoff to a public official status (they do not), Defendants do not—and cannot explain—how their false claims that she was the pipe bomber "relate[d] to her official conduct" as a Capitol Police officer. *Gray*, 656 F.2d at 590-91. Indeed, Defendants' own reporting confirmed that the Capitol Police Chief "had no awareness of any Capitol Police officer involvement in the pipe-bomb planting." (FAC Ex. C.) Instead, Defendants rely on their

---

295 (1971) (appeal after jury trial); *Monitor Patriot Co. v. Roy*, 401 U.S. 265 (1971) (appeal after jury trial); *Horne v. WTVR, LLC*, 893 F.3d 201, 208 (4th Cir. 2018) (appeal of summary judgment; *Seymour v. A.S. Abell Co.*, 557 F. Supp. 951 (D. Md. 1983) (summary judgment); *Gray v. Udevitz*, 656 F.2d 588, 591 (10th Cir.1981) (appeal of summary judgment)).

[9] Ms. Kerkhoff's training of other officers does not transform her position into one of "substantial responsibility." *See Richmond Newspapers, Inc. v. Lipscomb*, 362 S.E.2d 32, 36-37 (Va. 1987) (holding public school teacher is not a public official because the public had no independent interest in school teachers' qualifications and performance).

own preconceived narrative—"whether an officer trained in less-lethal munitions planted bombs blocks from her post on the eve of January 6"—to try to create such a link (Mot. 12), but they cannot rely on the controversy ***they*** created to do so. *Rosenblatt*, 383 U.S. at 86, n.13.

### C. Ms. Kerkhoff Overwhelmingly Pleads Sufficient Facts to Plausibly Allege Baker, Hanneman, and Veritas Regnat Acted With Actual Malice.

Because Ms. Kerkhoff is a private figure, she need not plead actual malice to defeat Defendants' motion to dismiss.[10] Even so, the Amended Complaint overwhelmingly pleads facts to show Baker, Hanneman, and Veritas Regnat published the Publications with actual malice.

The actual malice inquiry is not an insurmountable hurdle. *Biro v. Conde Nast*, 807 F.3d 541, 545 (2d Cir. 2015). Ms. Kerkhoff "need only plead sufficient facts that, if proven, create a plausible inference of actual malice." *Gilmore*, 370 F. Supp. 3d at 671. The Supreme Court has more than once admonished that this element "does not readily lend itself to summary disposition." *Hutchinson v. Proxmire*, 443 U.S. 111, 120 n.9 (1979). Rather, it raises questions of fact that must be evaluated through discovery and resolved by the factfinder. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254-56 (1986). Thus, the Court cannot credit Defendants' insistence that they made their false claims "with a belief that the statements were true." *St. Amant v. Thompson*, 390 U.S. 727, 732 (1968); *accord Tavoulareas v. Piro*, 817 F.2d 762, 788-89 (D.C. Cir. 1987) ("The rejection of an objective standard of care, however, does not mean that libel defendants can defame with impunity merely by testifying that they published the challenged statements with the belief that they were true.") (cited at Mot. 13). Rather, the "finder of fact"—not the Court—"must determine whether the publication was indeed made in good faith," and "[p]rofessions of good faith will be unlikely to prove persuasive" where, as

---

[10] Ms. Kerkhoff pleads actual malice not because she is a public official, but because she seeks punitive damages and must prove actual malice to recover them. *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 349 (1974).

here, "a story is fabricated by the defendant … [or] where there are obvious reasons to doubt the veracity of the informant or the accuracy of his reports." *St. Amant*, 390 U.S. at 732.

"[A] plaintiff is entitled to prove the defendant's state of mind through circumstantial evidence." *Harte-Hanks Commc'ns, Inc. v. Connaughton*, 491 U.S. 657, 668 (1989). And, in evaluating the sufficiency of a plaintiff's actual malice allegations, the Court must examine the totality of the allegations "taken together"—not any one allegation standing alone, as Defendants attempt to do. *Gilmore*, 370 F. Supp.3d at 673; *see Tavoulareas,* 817 F.2d at 794 n.43 ("[E]ach individual piece of evidence cannot fairly be judged individually …. Plaintiffs are entitled to an aggregate consideration of all their evidence to determine if their burden has been met.").

Ms. Kerkhoff pleads direct and circumstantial evidence that Baker, Hanneman, and Veritas Regnat acted with actual malice when they falsely accused her of placing pipe bombs in Washington, D.C.[11] While Defendants take issue with *how* the Amended Complaint pleads actual malice, their argument fails both practically and legally. (Mot. 14-15.) Practically, because each Publication relied on the same faulty gait analysis to assert the same false narrative, it is no surprise that many of the same indicia of actual malice apply across each Publication. Regardless, the Amended Complaint ***does*** differentiate between how Defendants' actual malice resulted in the specific false statements they made in each Publication. (FAC ¶¶ 364, 382, 419,

---

[11] Citing *Patel v. Cable News Network, Inc.*, 910 S.E.2d 532 (Va. App. 2025), Defendants insist actual malice must be pleaded "person by person." (Mot. 12.) That is not what *Patel* holds. In *Patel*, the plaintiff attempted to assert "actual malice" against a "media corporation" without identifying "the specific 'state of mind' of a person within [the] media corporation at the time of publication." *Id.* at 544. This is black-letter defamation law that does not apply here. *Id.* (quoting *Dongguk Univ. v. Yale Univ.*, 734 F.3d 113, 123-24 (2d Cir. 2013) ("Where, as here, the defendant is ***an institution rather than an individual***, the question is whether the individual responsible for the statement's publication acted with the requisite culpable state of mind."). Here, Ms. Kerkhoff exactly identifies who—Baker and Hanneman—knowingly or recklessly disregarded the truth. The law does not require Ms. Kerkhoff to be omnipotent; Baker and Hanneman reported as "partners," and discovery is needed to confirm their relative roles.

437.) Legally, neither *Tavoulareas* nor *McCullough* stands for the proposition Defendants assert. (Mot. 15 (citing *Tavoulareas*, 817 F.2d at 794 and *McCullough v. Gannett Co.*, No. 1:22-cv-1099, 2023 WL 3075940 (E.D. Va. Apr. 25, 2023) (Alston, J.)). In *Tavoulareas*, the D.C. Circuit reviewed "both evidence generic to the entire article … and evidence relating more specifically to various statements in the article" to evaluate actual malice. 817 F.2d at 790. And in *McCullough*, this Court did not require a defamation plaintiff to plead actual malice "statement by statement," as Defendants insist (Mot. 15); it simply noted that "it is somewhat unclear what arguments about actual malice Plaintiff ascribes to each statement he claims is actionable" before readily evaluating the complaint's actual malice allegations. *McCullough,* 2023 WL 3075940, at *13–15.

#### 1. Ms. Kerkhoff Pleads Facts Constituting Direct Evidence of Actual Malice

This case is not *Fairfax v. CBS Corp.*—Defendants' primary authority—where the plaintiff "d[id] not allege that [the defendant] broadcast the … programs actually knowing [a third party's claims] were false." 2 F.4th 286, 293 (4th Cir. 2021). In November, Baker and Hanneman knew their own false claims—that, based on the gait analysis they "arranged," they could identify Ms. Kerkhoff as the pipe bomber with "much higher" than "94% accuracy," (*id.* ¶¶ 337) as "up to a 98% match" to the pipe bomber, (*id.* ¶ 374)—were false.

Baker and Hanneman possessed and reviewed academic literature that made clear forensic gait analysis cannot possibly reach such conclusions, especially under the conditions the November Publications described. (*Id.* ¶¶ 104-106, 108-110, 285-86).[12] Specifically, they knew

[12] At this point, the Amended Complaint's pleadings do not require this Court to determine the capabilities of "gait analysis" generally—an issue Defendants repeatedly try to inject in their Motion. (*E.g.*, Mot. 16.) The question is whether the "gait analysis," ***as Defendants ran it***, was accurate or reliable (it was not), and whether Defendants knew the "gait analysis," ***as they ran it***," was inaccurate and unreliable (they did).

that, because gait analysis poses "the potential for misidentification," it is "***essential*** to use gait analysis in conjunction with other evidence," it is "***crucial*** that gait analysis is only one component of the whole investigation," and that gait analysis has only been used as "***corroborating*** evidence." (*Id.* ¶¶ 106, 109.) That did not stop them from relying solely on a "gait analysis" to falsely accuse Ms. Kerkhoff of being the pipe bomber.[13] (*Id.* Exs. B, C.) They also knew that gait analysis "***does not confirm the identity of [a] suspect***"; it "***is not a positive identification***"; and "***precise individualization of a person's gait has yet to be scientifically proved***. (*Id.* ¶¶ 108-09.) Yet, "precise individualization," "confirm[ation of] the identity of the suspect," and a "positive identification" with near-absolute 94-98% certainty is exactly the conclusion they represented their "analysis" yielded. (*Id.* ¶¶ 110, 289, Exs. A-C.)

Neither Baker nor Hanneman disputes that they possessed and reviewed these articles. (Mot. 15-16.) Instead, they attempt to minimize the effect of them. But Defendants did not merely "paraphrase" the articles, (Mot. 16.); they inaccurately described the articles' conclusions to facially bolster the credibility of their flawed analysis and false findings, (FAC ¶¶ 105, 108, 286-87.) *See Hayne v. The Innocence Project*, No. No. 3:09–CV–218, 2011 WL 198128, at *5 (S.D. Miss. Jan. 20, 2011) (allegation that defendants "edit[ed] their publications in such a way as to maximize the false light that was cast on [plaintiff]" supports actual malice). And Defendants did not merely "adopt one of [a] number of possible rational interpretations" the academic articles presented, (Mot. 16.); they cherry-picked (and misquoted) the scant helpful quotes those articles included, while deliberately omitting every contradictory fact those same articles presented. *See Eramo v. Rolling Stone*, 209 F. Supp. 3d 862, 874 (W.D. Va. 2016)

[13] Defendants' insistence that they also relied on the fact that "Ms. Kerkhoff lived next-door to an individual" overlooks that they were ultimately forced to remove their false reporting on this point after another publication investigated and disproved it. (FAC ¶¶ 206-07.)

(evidence that a defendant "consciously disregarded contradictory evidence" and ignored information that revealed its reporting was "inaccurate" supports a finding of actual malice).

Defendants' April Publications fare worse. By then, Defendants knew (1) the FBI and U.S. Attorneys' office had concluded Ms. Kerkhoff had nothing to do with the pipe bombs, (FAC ¶¶ 188, 199-200); (2) that the actual suspect had been arrested, (*id.* ¶ 213); (3) that Ms. Kerkhoff did not have the "slight limp" that was the cornerstone of their "analysis," (*id.* ¶ 225, Ex. E, G); and (4) Ms. Kerkhoff had a verified alibi, (*id.* ¶¶ 200, 318). But not even knowledge of those facts stopped Defendants from continuing their false and defamatory claims.

**2. Ms. Kerkhoff Pleads Facts Constituting Circumstantial Evidence of Actual Malice**

In addition to direct evidence of actual malice, Ms. Kerkhoff pleads substantial facts constituting circumstantial evidence of Defendants' actual malice.

**Inherently Improbable Accusations.** Actual malice can be independently established when a statement is "so inherently improbable that only a reckless man would have put [it] in circulation." *St. Amant*, 390 U.S. at 732. The Amended Complaint explains exactly why Defendants' accusations were so "obviously improbable." *McCullough*, 2023 WL 3075940, at *13 (while a "mere assertion of inherent improbability was not enough to establish actual malice," a complaint that includes other allegations explaining why the claim is "obviously improbable" is sufficient) (cited at Mot. 17). Defendants' false allegations arose from a preconceived narrative that the pipe bombs were placed to divert law enforcement resources away from the Capitol.[14] (FAC ¶ 291.) Defendants also knew that Ms. Kerkhoff defended the Capitol on January 6 at great personal cost—and they never reconciled this contradiction. (*Id.* ¶

[14] As explained above, the November Publications need not have expressly stated this. (*See* Mot. 16.) It is clear from Baker and Hanneman's prior reporting, as well as how they described the impact of their false claims about Ms. Kerkhoff, that this theory motivated them. (FAC ¶ 169, 175.)

292.) Defendants also suggested that the FBI failed to solve the pipe bomber mystery because it was "actively engaged in the coverup," and that their lone, software-generated "gait analysis" was the "major development" that "SOLVED" the case. (*Id.* ¶ 169, 176; Exs. B, C, E.) Defendants' false claims were similarly "improbable" to those in *US Dominion, Inc. v. Powell*, where the court found that statements that "the existence of a vast international conspiracy that is ignored by the government but proven by a spreadsheet on an internet blog is so inherently improbable that only a reckless man would believe it." 554 F. Supp. 3d 42, 63 (D.D.C. 2021).

As they did in the November Article, Defendants rely on Baker's manufactured corroboration to justify their reckless reporting. The Court should not allow Defendants to continue this circular reasoning. The Amended Complaint explains exactly why Baker took his report to ODNI: because he knew it would act on his false claims without scrutinizing them. (FAC ¶¶ 124-126, 244.) That ODNI did, in fact, respond to his tip—exactly as he intended—says nothing about the story's inherent improbability at the time Blaze Media published it.[15] And Defendants' argument ignores the government's ultimate response to that tip: (1) U.S. Pardon Attorney Ed Martin immediately, unequivocally, and publicly denied that he had "determined the identity of the pipe bomber" to be Ms. Kerkhoff, (*id.* ¶ 192); (2) the FBI cleared Ms. Kerkhoff as a suspect, (*id.* ¶¶ 188, 202); and (3) ODNI was forced to disband as a result of its mishandling of that same tip, (*id.* ¶ 128 n.39). *See Hatfill*, 416 F.3d at 334 n.5 (rejecting defendant's characterization of articles as "accurate report[s] of an ongoing investigation" where

[15] This Court cannot accept Defendants' counternarrative regarding Steve Baker's tip to the ODNI DIG over the well-pled allegations in the Amended Complaint, because doing so would impermissibly "weigh competing, plausible theories of actual malice on a motion to dismiss." *Nunes v. NBCUniversal Media, LLC*, 643 F. Supp. 3d 403, 419 (S.D.N.Y. 2022); *see also Palin v. N.Y. Times Co.*, 940 F.3d 804, 815 (2d Cir. 2019) ("[I]t is not the [trial] court's province to dismiss a plausible complaint because it is not as plausible as the defendant's theory.") *Hatfill v. New York Times Co.,* does not allow this either; that case was decided at summary judgment, on a full record. 532 F.3d 312, 325-26 (4th Cir. 2008) (cited at Mot. 27).

the defendant's own reporting "actually ***generated*** suspicion by asserting facts that tend to implicate him in the anthrax murders") (emphasis in original).

**Animus, Ill Will, and Financial Motive.** "Evidence concerning motive," bias, "animosity," and ill will can "support a finding of actual malice." *Connaughton*, 491 U.S. at 688-89; *see also Eramo*, 209 F. Supp. 3d at 872 ("[W]hile actual malice cannot be inferred from ill will or intent to injure alone, it cannot be said that evidence of motive or care never bears any relation to the actual malice inquiry"). Baker and Hanneman's ill will towards Ms. Kerkhoff is illustrated by their long-stated animus against the Capitol Police, (FAC ¶ 295) and that they targeted Ms. Kerkhoff because she was a member of the Capitol Police, (FAC ¶¶ 297-98). This is not just a case where a defendant harbored "hostility" toward a defamation plaintiff (Mot. 18); here, that "hostility" was the foundation for Defendants' false claims.

Same for evidence of financial motive. *Connaughton*, 491 U.S. at 667-68 ("the evidence of motive" is "supportive" of a finding of actual malice); *Suzuki Motor Corp. v. Consumers Union of U.S., Inc.*, 330 F.3d 1110, 1135-36 (9th Cir. 2003) ("financial motive … is a relevant factor bearing on the actual malice inquiry"). Blaze Media fired Baker; Hanneman resigned soon after. (FAC ¶ 247.) Unemployed, Defendants turned to the claims that generated the most publicity: their false accusations about Ms. Kerkhoff. (*Id.* ¶ 250.) They made those accusations the center of their new platform, Veritas Regnat, and they promised to continue to make those same false claims to entice their followers to fundraise for Veritas Regnat. (*Id.* ¶¶ 256-58.) In short, Defendants knew their false accusations about Ms. Kerkhoff were attention-grabbing, so they exploited those claims for their own financial benefit—regardless of their falsity.

**Conformed False Facts to Fit Preconceived Narrative.** "[E]vidence that a defendant conceived a story line in advance of an investigation and then consciously set out to make the

evidence conform to the preconceived story" is "quite powerful evidence" of actual malice. *Harris v. City of Seattle*, 152 F. App'x 565, 568 (9th Cir. 2005). Defendants' own Motion admits that evidence a defendant "consciously set out to make the evidence conform to the preconceived story" indicates actual malice, (Mot. 18) (citing *Eramo*, 209 F. Supp. 3d at 872).

That Baker and Hanneman preconceived their storyline that the pipe bomber acted as part of a "deep state" "inside job," and conformed their "gait analysis" and false accusations against Ms. Kerkhoff to fit that narrative, is indicated by numerous facts: (1) Baker and Hanneman spent years advancing a theory that the January 6 riot was orchestrated by federal law enforcement, and they were hired by Blaze Media specifically to advance those theories, (FAC ¶ 300); (2) Baker and Hanneman expressed animus against Ms. Kerkhoff and other Capitol Police officers days prior to the November Publications, (*id.* ¶¶ 88-89); (3) Baker and Hanneman ran a gait analysis of only Ms. Kerkhoff, and no one else, against CCTV footage of the pipe bomber using an undisclosed and unqualified "software algorithm" that did not guard against potential bias, (*id.* ¶¶ 149, 151, 154); (4) Baker and Hanneman sought out sources they knew were not reliable to confirm their software analysis's faulty findings after "respected" firms refused to "touch [its analysis] with a thousand-foot pole," (*id.* ¶ 149, 157, 160); (5) Baker and Hanneman ignored and mischaracterized academic research regarding gait analysis that undercut their analysis, (*id.* ¶ 109); and (6) Baker and Hanneman claimed their false findings had the potential to "recast the entire story of Jan. 6"—confirming their blind allegiance to their preconceived narrative, all along (*id.* ¶ 301). The April Publications underscore Defendants' strategy. Defendants knew in November that Kerkhoff was a marathon runner. (*Id.* Ex. C.) When Ms. Kerkhoff pointed out how that fact disproved their "gait analysis" theory in her retraction demand, Baker and Hanneman simply contorted it to look like proof of their false claims. (*Id.* ¶¶ 253-54.)

**Reliance on Inherently Unreliable and Undisclosed Sources.** "[R]eliance on anonymous or unreliable sources without further investigation may support an inference of actual malice." *Biro*, 807 F.3d at 546. Baker and Hanneman knew anyone willing to vouch for their gait analysis must have been unreliable. Baker and Hanneman knew academic experts disclaimed the type of analysis Baker and Hanneman ran and the type of results they claimed their analysis produced. (FAC ¶ 309.) By Baker's own admission, they knew "respected" firms were not willing to "touch" the gait analysis "with a thousand-foot pole." (*Id.*) The Amended Complaint does not make a "bare guess" at the unreliability of Defendants' sources; Defendants' own reporting and Baker's own statements confirm that Defendants "had obvious reasons to doubt the veracity" of any source willing to "corroborate" their findings. *St. Amant*, 390 U.S. at 732; *see also Eramo*, 209 F. Supp. 3d at 872-73 (failure to further investigate claims of sources suspected to be non-credible supports a finding that defendant acted with actual malice).[16]

The Court cannot accept Defendants' alternate explanations for their sourcing—especially not at the motion to dismiss stage. (Mot. 20-22.) So long as those sources and the "forensic tool" Defendants relied upon remain confidential, Defendants cannot blindly vouch for their reliability. *See Hatfill*, 532 F.3d at 326 (a defendant who refuses to disclose the identity of a confidential source may be precluded "from referring to, relying on, or entering into evidence the existence of the … confidential sources that were not disclosed"); *accord, Donnell v. Daily News, L.P.*, No. 401845/2013, 2022 WL 4243699, at *6 (N.Y. Sup. Ct. 2022) (if "defendants …

[16] Defendants do not dispute that Armitas or Seraphin are unreliable. Instead, they attempt to recast the contributions each made. Defendants insist Armitas "supplied one fact" to the November 8 Article; that is not clear from the Article, and it is contrary to the Complaint's allegations, so the Court cannot credit it. *Hatfill*, 416 F. 3d at 329 ("We must accept as true all well-pleaded allegations."). They also minimize Seraphin's contribution, ignoring that they were forced to correct the exact narrative Seraphin provided after the Daily Wire independently investigated it. (FAC ¶ 206.) In any event, the Court cannot take at Defendants' word the extent Seraphin contributed to the Article; Ms. Kerkhoff is entitled to discovery to confirm that.

protect the identity of their confidential source … then they cannot also use that confidential source as proof"). Nor can the Court credit Defendants' alternative explanation that the "most respected" gait analysis firms refused their gait analysis because they were "unwilling to attach their names to a politically-charged manner," (Mot. 22); the Amended Complaint makes clear that it was the analysis's baseless conclusions that deterred them, (FAC ¶ 149.) *See Hatfill*, 416 F.3d at 329 (all well-pleaded allegations must be "accept[ed] as true" and all inferences must be drawn in plaintiff's favor); *see also Nunes,* 643 F. Supp. 3d at 420 ("A court does not weigh competing, plausible theories of actual malice on a motion to dismiss.").

**<u>Departure from Journalistic Standards.</u>** Defendants' departure from journalistic standards is "supportive evidence" of their actual malice. *Eramo*, 209 F. Supp. 3d at 871; *see also Gilmore*, 370 F. Supp. 3d at 671 (defendant's "'failure to investigate' or observe journalistic standards, although not determinative, is relevant to the actual malice inquiry"). And, while the failure to contact Ms. Kerkhoff before publication, standing alone, might not satisfy the actual malice standard, that Defendants failed to "reach out" to her before publication is "concrete" evidence of their departure from journalistic standards and actual malice. *Gilmore*, 370 F. Supp. 3d at 673. That was not Defendants' only departure from journalistic standards; when the "most respected" firms dismissed Baker and Hanneman's gait analysis, they simply sought other inherently unreliable sources who would "confirm" it. (*Id.* ¶¶ 149, 157, 160.) And, instead of objectively reporting on an investigation, Baker manufactured one so it would seem Defendants' "gait analysis" was corroborated—then used that same investigation to bolster the credibility of their false claims. (*Id.* ¶ 126.) As for the April Publications, Blaze Media confirmed that Baker was terminated ***because*** he was not willing to comply with journalistic standards. (*Id.* ¶ 248.) So, Baker and Hanneman aligned to form Veritas Regnat—where they continued to defame Ms.

Kerkhoff in complete disregard of journalistic standards and ethics. (*Id.* ¶ 258.)

**<u>Deliberate Omission of Evidence Contradicting Defamatory Accusations.</u>** Defendants omitted evidence contradicting the validity of their gait analysis's methodology and the reliability of the conclusions it claimed that analysis reached. *Eramo*, 209 F. Supp. 3d at 873-74 ("A verdict for the plaintiff has been upheld when a reporter's own notes showed that she was aware of facts contradicting her story."). As explained above, Defendants intentionally omitted from their Publications portions of academic research they reviewed that would have warned their readers gait analysis cannot "positive[ly] identif[y]" a suspect—much less with 94-98% certainty. (FAC ¶¶ 109, 149, 156.) And, while Defendants touted (and continue to tout) the supposed expertise of their confidential "intelligence" sources and "veteran" gait analysts, (*id.* ¶¶ 155-162), Baker did not disclose to their readers the number of "respected" firms who refused to engage with their gait analysis until months after Defendants' initial reporting, (*id.* ¶ 309).

**<u>Refusal to Retract.</u>** "Refusal to retract an exposed error tends to support a finding of actual malice." *Zerangue v. TSP Newspapers, Inc.*, 814 F.2d 1066, 1071 (5th Cir. 1987) *see also Herbert v. Lando*, 441 U.S. 153, 164 n.12 (1979) (post-publication actions can constitute circumstantial evidence of actual malice). Defendants steadfastly refused to retract their defamatory accusations. Indeed, Baker has expressly disavowed that he ever "retract[ed] anything." (FAC ¶ 240.) And, instead of acknowledging the facts presented in Ms. Kerkhoff's retraction demand, they used that same demand as a launch pad to ***continue*** to defame her. (*Id.* ¶ 325, Exs. E-G.)

### D. Section 230 Does Not Apply to Hanneman's April 4 Post.

Because Section 230 immunity is an affirmative defense, dismissal is appropriate only where there is "no doubt that the plaintiff's claim is barred." *Monsarrat v. Newman*, 28 F.4th 314, 318 (1st Cir. 2022). Section 230(c)(1) reaches only information "provided by ***another***

information content provider," 47 U.S.C. § 230(c)(1)—in other words, someone other than a person "responsible, in whole or in part, for the creation or development" of the original content. 47 U.S.C. § 230(f)(3); *see also Henderson v. Source for Pub. Data, L.P.*, 53 F.4th 110, 126 n.22 (4th Cir. 2022) (reversing grant of Section 230 protection at the pleading stage).[17]

The problem is with Hanneman's argument is that he did not merely "retweet" ***someone else's*** content; he reposted ***his own*** statements that Baker originally shared. Baker's April 4 Post is written in the first-person plural: "***[W]e*** have hours of video of Ms. Kerkhoff's unusual 'circumduction gait'"; "***we*** *already knew that*." (FAC Ex. E.) It names Hanneman as a recipient of the demand letter it purports to rebut, and it closes by advertising the venture he co-owns: "***Joe*** *and I* launch our new endeavor on Monday." (*Id.* ¶ 411(a)–(b), Ex. E (emphasis added).) Hanneman is therefore the "information content provider," and Defendants cannot establish that the information was merely "provided by another information content provider." *Henderson*, 53 F.4th at 119–20, 126 n.22. Defendants' cited cases are all distinguishable. *Zeran* speaks only of "service providers" who cannot "screen each of their millions of postings," while preserving liability for "the original culpable party." *Zeran v. Am. Online, Inc.*, 129 F.3d 327, 330–31 (4th Cir. 1997). Here, because the original post included Hanneman's own statements and perspective, he ***is*** an "original culpable party." *Directory Assistants* and *Nemet* involved third-party content the defendants had no hand in. *Directory Assistants, Inc. v. Supermedia, LLC*, 884 F. Supp. 2d 446, 452 (E.D. Va. 2012); *see Nemet Chevrolet, Ltd. v. Consumeraffairs.com, Inc.*, 591 F.3d 250, 259 (4th Cir. 2009). *Banaian* immunized defendants who did not create the underlying content; in *Monsarrat*, the defendant "neither offered nor implied any view of his

[17] Count Five is pleaded against Baker as well as Hanneman, (FAC ¶¶ 409–426), and Defendants assert Section 230 only as to Hanneman, (Mot. 33–34). Even on their own theory, the defense could not dispose of the Count.

own about the posts." 28 F.4th at 319; *Banaian v. Bascom*, 281 A.3d 975, 980 (N.H. 2022).

### E. Virginia's Anti-SLAPP Statute Does Not Apply.

Virginia's anti-SLAPP statute, Va. Code § 8.01-223.2, offers no basis to dismiss Ms. Kerkhoff's claims. As a preliminary matter, Virginia's anti-SLAPP does not apply in federal court.[18] (Mot. 34-35.) Numerous circuits have held that state anti-SLAPP laws similar to Virginia's conflict with the Federal Rules of Civil Procedure and cannot apply in federal court.[19]

Even if the anti-SLAPP statute did apply, the immunity provided under it would not apply to Defendants. Virginia's anti-SLAPP statute is express: "The immunity provided by this section shall not apply to any statements that the declarant knew or should have known were false or were made with reckless disregard for whether they were false." Va. Code § 8.01-223.2(B). Because Defendants made their statements with knowledge of falsity or reckless disregard for the truth (see section II.C, *supra*), Virginia's anti-SLAPP statute does not apply. *See Simpson v. Lamberth*, No. 1:26-cv-00095, 2026 WL 1644081, at *5 (E.D. Va. Mar. 31, 2026) ("In other words, if a statement is made with 'actual malice,' immunity cannot apply.").

## CONCLUSION

For the foregoing reasons, Shauni Kerkhoff respectfully requests that the Court deny Steve Baker, Joseph Hanneman, and Veritas Regnat LLC's Motion to Dismiss the Amended Complaint.

---

[18] Ms. Kerkhoff incorporates by reference the arguments made in her Omnibus Opposition to Defendants' Anti-SLAPP Motions for Attorneys' Fees.

[19] *See La Liberte v. Reid*, 966 F.3d 79 (2d Cir. 2020); *Klocke v. Watson*, 936 F.3d 240 (5th Cir. 2019); *Carbone v. Cable News Network, Inc.*, 910 F.3d 1345 (11th Cir. 2018); *Los Lobos Renewable Power, LLC v. AmeriCulture, Inc.*, 885 F.3d 659 (10th Cir. 2018); *Abbas v. Foreign Policy Grp., LLC*, 783 F.3d 1328 (D.C. Cir. 2015). The Fourth Circuit has yet to squarely address the issue. In *Fairfax v. CBS Corp.*, the Fourth Circuit held that "Section 8.01-223.2(B) permits, but does not require, a court to award attorney's fees to a prevailing defendant and does not create a presumption in favor of a fee award." 2 F.4th at 297. Neither party raised the issue of whether the anti-SLAPP's fee-shifting provision conflicts with Rule 11 and applies in federal court, so the court assumed that it applied without analyzing the issue.

Dated: September 21, 2026

Respectfully submitted,

*/s/ Thomas A. Clare, P.C.*

Thomas A. Clare, P.C. (VSB No. 39299)
Camilla J. Hundley (VSB No. 100257)
Jonathan R. Kaiman (VSB No. 99412)
CLARE LOCKE LLP
10 Prince Street
Alexandria, VA 22314
Tel: (202) 628-7400
Email: tom@clarelocke.com
Email: camilla@clarelocke.com
Email: jon.kaiman@clarelocke.com

*Attorneys for Plaintiff Shauni Kerkhoff*

**CERTIFICATE OF SERVICE**

I hereby certify that a true and correct copy of the foregoing Opposition to Defendants Stephen M. Baker, Joseph M. Hanneman's, and Veritas Regnat LLC's Motion to Dismiss was served on all counsel of record by e-filing it using the Court's CM/ECF system on September 21, 2026.

/s/ *Thomas A. Clare, P.C.*
Thomas A. Clare, P.C